U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT 2024 JUL 23 AM 10: 03

CLERK

BY ___JMM___
DEPUTY CLERK

```
*************************************
SCOTT TRAUDT,                      *
Plaintiff                          *
                                   *
v.                                 *    Docket Number: 2;34-cv-782
                                   *    JURY TRIAL DEMANDED
ARI RUBINSTEIN                     *
Defendant                          *    1st Amended Complaint
                                   *
GTS SECURITIES LLC                 *
GTS EQUITY PARTNERS LLC            *
GTS EXECUTION SERVICES LLC         *
Defendant                          *
                                   *
CHARLES W. SCHWAB AND CO. INC.     *
SCHWAB HOLDINGS, INC.              *
Defendant                          *
                                   *
FINANCIAL INDUSTRY                 *
REGULATORY AUTHORITY               *
Defendant                          *
                                   *                       +
GARY GENSLER                       *
US SECURITIES AND EXCHANGE         *
COMMISSION                         *
Respondent                         *
                                   *
*************************************
```

Docket Number: 2;34-cv-782 (handwritten "24")

## COMPLAINT

## INTRODUCTION

This action is brought by Scott Traudt to recover damages for violations of the Securities Exchange Act of 1934 (15 USCS 78), the Computer Fraud and Abuse Act (18 USCS 1030), the Racketeer Influenced Corrupt Organizations Act (18 USCS 1964);, and to seek a Writ of Mandamus against Securities and Exchange Commission Chairman Gary Gensler (28 USCS 1361 and 28 USCS 1651). Traudt also seeks the appointment by this court of a Special Master(s)

pursuant to Federal Rule of Civil Procedure 53 comprised of a team making use of Artificial Intelligence and former US law enforcement personnel to oversee the two days of trading in "Non-Voting Series A Preferred Shares of Meta Materials," *inter alia*.

## PARTIES

1.      Plaintiff Scott Traudt (hereinafter referred to either as "Plaintiff" and/or "Traudt") has at all times mentioned herein been a resident and citizen of the Town of Strafford, Orange County, Vermont, and is a commercial fisherman and truck driver, and will where appropriate invoke Admiralty Jurisdiction for extensions of time should employment necessitate sea duty subsequent to the filing of this complaint.

2.      Defendant Ari Rubinstein (hereinafter "Rubinstein") is Chief Executive Officer of GTS Securities, a market maker in the New York Stock Exchange. Upon information and belief, Rubinstein has multiple homes in multiple jurisdictions within the USA, but the headquarters for GTS Securities is in New York City at 545 Madison Avenue, 15th Floor, NY, NY 10022. Rubinstein's primary residence is in NY, NY.

3.      Defendant GTS Securities (hereinafter "GTS") is a market maker herein sued in its corporate capacity and is located as its primary place of business at 545 Madison Avenue, 15th Floor, NY, NY 10022.

4.      Defendant Charles Schwab Co. Inc. (hereinafter "Schwab"), address 3000 Schwab Way, Westlake, TX 76262,  is Traudt's broker-dealer for the transaction involving the purchase of "Non-Voting Series A Preferred Shares of Meta Materials" (hereinafter "MMTLP"). Schwab merged with TD Ameritrade (hereinafter "TDA") in 2023. Traudt's original purchases of MMTLP were via TDA on 30 November, 2022.

5.      Defendant Financial Industry Regulatory Agency (hereinafter "FINRA") is a Securities and Exchange Commission "self-regulatory organization" charged with regulating the US financial markets. Its headquarters is at 1735 K Street NW, Washington, D.C., 20006. Robert W. Cook is its President.

6.      Respondent Gary Gensler (hereinafter "Gensler") is Chairman of the Securities and Exchange Commission, which is located at 100 F Street, NE Washington , D.C. 20549.

## JURISDICTION

7.      The Court has original jurisdiction over this action in accordance with 15 USCS 78, 18 USCS 1030, 18 USCS 1961, 28 USCS 1361, 28 USCS 1651 and since this is multi-jurisdictional litigation wherein Traudt was damaged in his property and finances in Vermont, this court also has jurisdiction on diversity of citizenship grounds (28 USCS 1332) and because the amount in controversy is way more than $75,000 (28 USCS 1332).  It has supplemental jurisdiction over state law claims (the Vermont Securities Act 9 VSA 5601, 5605, 5607).

## VENUE

8.      Venue is appropriate in this district pursuant to 28 U.S.C. §1391, in that significant damage was inflicted upon Traudt in Vermont, that Defendants Rubinstein, Schwab, and GTS have sufficient local contacts via their securities businesses in Vermont to meet *de minima* standards of participation in the securities ecosystem in Vermont all the while having the resources to defend themselves in US District Court for Burlington, Vermont. Defendant FINRA has local offices in New York city ((200 Liberty Street, 15th Floor, NY, NY 10281) and is thus a 4 hour drive for counsel to reach Burlington, Vermont with proper notice. Respondent Gensler will play a limited role in these proceedings as the Writ of Mandamus to be sought does not involve discovery of the SEC nor Gensler, and will be reduced more than likely to arguments of

law regarding the applicability of the Writ based on the facts established during the litigation herein.

9.    On 14 December 2020 Torchlight Energy Resources Inc. (ticker "TRCH"), a Texas-based oil exploration company, initialized a merger plan with Meta Materials Inc. (ticker "MMAT"), a Canada-based high-technology materials firm.

10.    From 2010 to 2020, TRCH traded a total of 745 million shares.

11.    From 1 January 2021 to 21 June 2021, TRCH traded 3.6 billion shares.

12.    Using a Z-test statistical analysis performed on 14 July 2024 and using the figures above regarding volume over 2010-2020 and for half of 2021 with an average daily variation of 5% for the 10 years of recorded trading, it was statistically impossible for that many shares to have been traded in TRCH without manipulation or some other non-uniform, unpredictable event.

13.    Upon information and belied, naked shorts were added to TRCH by Ari Rubinstein together with and in concert with others for the first 6 months of 2021.

14.    A proxy statement issued by TRCH and dated 5 May 2021 and filed with the SEC on 7 May 2021 stated that "Prior to the Effective Time, Torchlight will declare a dividend, on a one-for-one basis, of shares of Series A Preferred Stock to the holders of Torchlight Shares as of the Series A Preferred Record Date. The Series A Preferred Stock is not expected to be listed on a securities exchange and will be administered by the Combined Company's transfer agent."

15.    In June, 2021, GTS, under orders from Rubinstein, and CanaccordGenuity (hereinafter "Canaccord") a Canadian market maker, jointly filed paperwork without MMAT nor TRCH executives' permission to facilitate registering the "Series A Preferred Stock" to enable it to trade on the Over The Counter (hereinafter "OTC") market for NASDAQ.

16.     GTS and Canaccord used 10 year old dated information in derogation of FINRA rules and submitted falsified Form 211's in order to make what would become MMTLP tradable.[1]

17.     The confirmation of the inception of conspiracy was written in plain English in a letter dated 21 June 2021, the OCC stated that the "Series A Preferred Shares" would not trade, yet noted to options traders that they did not have to close out any short positions through the merger until OTC could get what would become "MMTLP" could trade – exactly the opposite of what the merged companies had wanted and had filed.

18.     The OCC 21 June 2021 memoranda outlined above was only shared with market makers and hedge funds to include GTS and Rubinstein.

19.     GTS had a duty under Rubinstein's supervision to record all short sales to include naked shorts and was in addition given extra time to close out fails-to-deliver under the "market maker exemption" rule.

20.      Referencing the above, FINRA Rule 204(b) provides exceptions for bona fide market making activities in that market makers engaged in bona fide market making are given additional time to close out fails-to-deliver arising from such activities, but are also bound to maintain daily records of their fails-to-deliver and report them "as required to ensure transparency and regulatory oversight."

21.     GTS and Rubinstein know exactly how man shares of MMTLP were sold both long, short, and naked short from 21 June 2021 to 9 December 2022.

22.     The Depository Trust & Clearing Corporation (hereinafter "DTCC") is chartered to maintain exacting records of securities trades and to provide electronic means for recovering and disseminating information related to securities on the US stock markets.

23.     The DTCC  potentially has an auxiliary way of knowing exactly how man shares of MMTLP were sold both long, short, and naked short from 21 June 2021 to 9 December 2022 not only from record keeping but also via payments for clearing and settlement made by GTS to

---

[1] Circumstantial evidence points to Rubinstein having discussions with Schwab executive Michael Dunn in June, 2021, and at this point the plan to trade, short, counterfeit, and oversell what would become "MMTLP" was initialized by and through Schwab.

them for shares moved in any capacity from GTS computerized trading systems; DTCC collects clearing fees, settlement fees, and custody fees. Circumstantial evidence points to GTS not paying these fees to DTCC, therefore at this point potentially owing the United States of America untold millions if not billions (if one includes other abuses of the "market maker exemption" discussed in detail elsewhere herein) under the False Claims Act ("Qui Tam") 31 USCS 3730.

24.     FINRA was allegedly made aware of this falsification by TRCH CEO John Brda (hereinafter "Brda") and MMAT CEO George Palikaras (hereinafter "Palikaras") and took no action to keep MMTLP from trading.

25.     TRCH and MMAT completed their merger on 28 June 2021.

26.     There were approximately still outstanding 100 million shares sold short of TRCH that carried, unclosed, into the merger with MMAT.[2] Other data involving the 3.6 billion in total trade volume points to the possibility that the TRCH merger with MMAT saddled MMTLP with more than 1 billion naked short shares from the moment it started trading.

27.     On 15 July 2021, MMAT filed an S-1 to create a spinoff of MMAT (which would come to be MMTLP) into a private company to be named Next Bridge Hydrocarbons (hereinafter "NBH").

28.     Circumstantial evidence suggests that Ari Rubinstein conspired with Michael Dunn at Schwab to prematurely get MMTLP entered into the books at Schwab on 31 July 2021 (it became a component of Schwab's Index Fund "SWTSX" on that date) and allow for certain

---

[2] "A short sale is a sale of a security that the seller does not own or does not have the right to sell, with the expectation of buying the same security later at a lower price to cover the short sale." (SEC Rule 200(g)(1)).

traders using Schwab to begin naked shorting a stock that did not even exist legally for trading until 6 October 2021.

29.     Referencing the prior FACT, Schwab noted in its statement regarding the index fund that *"holdings may include collateral held by the fund for securities on loan. In addition, certain securities may be designated as collateral for transactions such as open futures contracts or delayed-delivery solutions."*

30.     MMTLP began trading in the OTC market on 6 October, 2021.

31.     In an email dated 12 October 2021 from Schwab's Michael Dunn, states to a Schwab customer with questions over how MMTLP came to trade in so many different ways at variance with normal procedure, Dunn states:

*Hello,*

*In regard to a couple of items we discussed (keeping everything non-account specific to be in line with Schwab email policies):*

*Upon review, this was never restricted by Schwab. I didn't fully realize on our call 10/7 was the first day of trading it was a new issue that had never traded before and wasn't able to sync up with all the OTC info so it could be restricted. The OTC markets site was apparently updated mid day on 10/7 and before the opening on 10/8 as far as allowing normal quoting/trading not only in a non-electronic market going forward.*

*This is an extremely unique situation in which a stock would simultaneously be a new issue (of sorts), but also be still amid a process of getting updated financials so that on day 1 of trading , it wasn't fully eligible for market maker quoting.*

*Kind regards,*

*Michael S. Dunn*
*Resolution Manager*
*Denver Trade Support*
*Specialty Trading Group*

32.     MMTLP immediately became violently shorted as it started to trade and never came off FINRA's OTC "Threshold List" for the entirety of its brief trading history after being tagged on that list on 14 October 2021.[3]

33.     Between 6 September 2022 and 9 November 2022, MMAT filed S-1s and revisions that were eventually to become effective on or about 18 November 2022. [4]

34.     GTS sold naked shorts "legally" using the market maker exception in MMTLP and *there is no evidence available that they ever did a FINRA mandated "locate" of those shares at any time whatsoever* to legally emplace them into the stream of securities commerce involving MMTLP.

35.     GTS routinely closes out its books for each reporting year by having billion dollars in total securities sold but not yet bought.

36.     Schwab is oversold by 500%, has denied on 10 July 2024 being oversold, yet had admitted that it had 1.8 million shares sold short on its books in June, 2023 via a TDA client.

37.     Trade Station was oversold and admitted it publicly, though the exact extent is at least 200% according to online "share registration polling" conducted in the summer of 2023.

---

[3] The Threshold Security List is a list of securities that have a high level of fails-to-deliver (FTD) activity, which is when a broker-dealer sells a security but does not have the security available to deliver to the buyer. The list is used to identify securities that may be subject to increased regulatory scrutiny and to help broker-dealers identify and address potential issues with their trading and clearing activities. (FINRA Rule 4320).

[4] The SEC defines an S-1 as a "registration statement under the Securities Act of 1933" that is used to register the offer and sale of securities, including common stock, preferred stock, debt securities, and other types of securities. The S-1 registration statement typically includes information about the company, its business, its financial condition, its management, and its securities being offered. The statement is designed to provide investors with a comprehensive overview of the company and its securities, and to ensure that the company is in compliance with federal securities laws.

38.     FINRA operates, maintains, and controls its own stock exchange (XADF) on the OTC-UTC exchange and coordinates activities therein with JP Morgan Chase in complete contravention of its rules and mandate from SEC and uses a trading system created and owned by Prof. James Angell from Georgetown University to manage it through Intelligent Cross LLC.

39.     FINRA as a self-regulatory organization (SRO) has no standing under **Loper Enterprises v. Raimondo** (US Supreme Ct. #22-451, 2024) and **West Virgina v. EPA** (#20-1530, 2022) to maintain the U3 halt and is routinely using powers and authority not delegated to it by Congress.

40.     FINRA's U3 halt was illegal under **West Virginia** as the rarity by which the U3 halts happen (only three times since the Securities Act of 1934 was passed) and because it is illegal under the revised "major questions" doctrine by which the US Supreme Court reined in a federal agency making policy decisions for Americans when it had no power to do so; the U3 halt was orchestrated by two Wall Street back benchers and aided and abetted with a cartel sitting in the room with them with vested financial interest in seeing the shorts remaining unclosed because of their exposure to catastrophic losses.

41.     That FINRA has "immunity" from a damage claim as a *private* SRO is impossible to sustain in the wake of **Loper** as the decision was not appealable, was done by a private organization usurping Congressional law making powers, contravenes the clear and unambiguous language of 2010's Dodd-Frank laws, and because as an SRO it was – if the legality of its existence is not called into question – simply impossible for it, and the US government, to not be seen as one.

42.     MMAT's S-1 became effective after FINRA review on 18 November 2022.

9

43.     Traudt purchased 305 shares of MMTLP at $9.62 a share on 30 November 2022 from TDA for a total of $2,934.95.

44.     On 29 November 2022, heavily redacted emails obtained by MMTLP shareholders under 5 USCS 552 - the Freedom of Information Act (hereinafter "FOIA") – showed that FINRA Vice President of Market Operations for Transparency Services Patricia Casimates (hereinafter "Casimates") was emailed by FINRA Fraud Officer Sam Draddy (hereinafter "Draddy") ostensibly about MMTLP and included three SEC officers.

45.     On 2 December 2022 Richard Boyle from FINRA's National Cause and Financial Crimes Detection Program emailed Jay Gibbon at FINRA and courtesy copied another SEC officer who was redacted from the email that stated that *"I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer [Meta Materials/Next Bridge Hydrocarbons] and its proposed spin-off transaction. Would one of you have time on Monday or Tuesday to discuss this matter? FINRA's Market fraud Investigations team recently received several tips that appear to have also been sent to the SEC."*

46.     On 5 December 2022 Draddy emailed three redacted SEC officers, FINRA's Boyle and Jay Gibbon, and stated in the email that it *"-looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well).  I know you have spoken to Patti Casimates and our General Counsel's office – but was wondering if it made sense for my Fraud team to have a conversation directly with you and your folks working on the matter so we are not duplicating efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak."*

47.     FINRA's Fraud Team did not halt nor advise a halt in any and all further regulatory approvals by FINRA subsequent to Draddy's email, above.

48.     On 6 December 2022 FINRA issued an intentionally erroneous  "Daily List" corporate action notice regarding MMTLP that was at odds with prior approved MMTLP guidance by stating that MMTLP shares would be "cancelled" on 13 December 2022 – a date never entertained nor mentioned by NBH or MMAT management - despite other wording stating in the same notice that shares would transition from MMTLP into NBH on 14 December 2022 and did so stressing to NBH that NBH was "not to edit or interpret it."

49.     In the same notice as above, FINRA changed the language of the pay date and simply stated that MMTLP shareholders with settled positions as of 12 December 2022 would now receive one share of NBH per share of MMTLP.

50.     Schwab marked MMTLP short share ability at "limited" on 6 December 2022 during the trading day "lit" (normal daytime OTC market) and set a borrow fee of 23% and at the same time the parent to MMTLP (MMAT) had an enormous borrow rate of 115% indicating that Schwab was having great difficulty finding clients' shares to lend.

51.     On 9 December 2022, after the U3 halt, Schwab's MMTLP's borrow rate increased to 27.5% even *with* a trading halt and its availability was marked "not available."

52.     On 6 December 2022, MMTLP started trading at $7.15 a share, ran as high as $9.50 a share, and eventually closed at $8.18 with a total volume of 5,000,000 shares traded.

53.     On 7 December 2022 (the day after the FINRA released its intentionally confusing and damaging corporate action to the Daily List) , MMTLP started trading at $9.90 a share, never ran higher, and closed at its daily low of $7.00 on 4,220,000 shares traded for volume.

54.     On 8 December 2022 (the last day of trading for MMTLP as on 9 December 2022 the U3 halt occurred), MMTLP started trading at $6.15 a share (which was the high point for the

11

day), and eventually closed at $2.90 a share with a total volume of 13,710,000 shares traded and in total defiance of financial physics as the volume was indicative of short position holders not closing out their positions, and also that algorithmic trading facilitated by GTS and Rubinstein was systematically destroying MMTLP's share price with a "short attack" wherein GTS and Rubinstein, with a nod of approval or at least quiet acquiescence from the major players in the brokerages, flooded the trading with counterfeit shares and used the weaponized-against –retail-investors high-frequency trading systems at GTS to utterly eviscerate the possibility of a "short squeeze" in MMTLP.

55.     From the closing bell on 6 December 2022 to the closing bell on 8 December 2022, MMTLP lost 53% of its value.

56.     Various exchanges trading in MMTLP began to report "505" codes across the board on 6 December 2022 which is trading code for "I am out of shares" signaling that MMTLP was wildly oversold and shorted to apocalyptic levels.

57.     More uncertainty and confusion was deliberately added to MMTLP investors when on 8 December 2022 FINRA issued another "Daily List" notice stating (now) that MMTLP would be "deleted" on 13 December 2022.

58.     On 8 December 2022 MMTLP was trading illegally in the pre-market on OTC in significant volume in what appeared to be an obvious attempt to scare investors.

59.     In the same notice as #21, above, FINRA changed the language of the pay date and simply stated that MMTLP shareholders with settled positions as of 12 December 2022 would now receive one share of NBH per share of MMTLP.

60.     Per FINRA's own rule 6940, any issues with regards to *settlement or fraud* should have been discovered during the review of not one but two confusing Corporate Actions notices dated on 6 and 8 December 2022 respectively. FINRA broke its own rule.

61.     It was FINRA's pattern and practice of conduct in securities prior to the MMTLP U3 halt of 9 December 2022 to state, in stocks going from publicly traded to private, that short position holders had to "buy to close out short positions only" or reasonable facsimile thereof.

62.     After the markets closed on 8 December 2022 (4pm EST) FINRA attempted perhaps the greatest, most brazen attempt at CYA that has ever been seen since the first investor gave medium rare rabbit legs in a dried goat stomach to some Stone Age hominid in return for future stone tool production: *they placed a "caveat emptor" notice on MMTLP stock the night before they halted trading in it leaving 65,000 shareholders holding long positions no ability to sell, nor make use of the farcical "caveat emptor" warning.*

63.     FINRA, citing some "extraordinary event" and acting under the auspices of FINRA Rule 6440(a)(3) and by decision of the Vice President of Transparency Services Chris Stone, initiated a U3 halt in trading of MMTLP on 9 December 2022.

64.     The trade halt in MMTLP was without notice to retail investors but with plenty of notice to corporate, hedge, market makers, and "whale" investors as the members of the UPC were aware of the halt and *acted accordingly in their own institutions.*

65.     Information from Casimates and Stone was provided to UPC board members on or about 2 December 2022.

66.     Casimates chaired the "halt" committee (the UPC, more or less) and without challenging industry representatives if they had a counter-party interest in the information she provided about MMTLP (how much were their respective institutions exposed either from

oversold pure counterfeit positions or from deep exposure to synthetic shorts or conventional shorts?), brought them all into the fold with Stone having the final say as "Transparency" vice-president for FINRA in moving to halt trading.

67.     Upon information and belief, FINRA purposely mislead the public and Congress about the reasons for the U3 halt issued by Stone (approved by Cook) by stating it was due to an "extraordinary event" and "uncertainty in the settlement process" when in fact Draddy had pulled the infamous "bluesheets" (the FINRA "Consolidated Tape Association Transaction File") on MMTLP which showed not only was it horrifically oversold, but it had short positions at a staggering level.

68.     Draddy had identified widespread fraud in MMTLP no later than 5 December 2022.

69.     Robert W. Cook, FINRA's President, wrote a 31 January 2024 letter to Congressman Ralph Norman that brings him clearly within the legal pincers of 18 USCS 1001 for "knowingly and willfully" lying to Congress in that in that letter Cook states: *"FINRA also did not provide any advance notice of the trading halt to broker-dealers, hedge funds, or any other market participant."*[5]

70.     *Prima facie* evidence that the looming U3 halt was coming was that there was no attempt by short sellers or owners of naked shorts to close out their positions in the last week of trading.[6]

---

[5] False Statements Act (18 U.S.C. § 1001): This law makes it a crime to make false statements or representations to any department or agency of the United States, including Congress. The penalty for violating this law can range from a fine to imprisonment for up to five years.

[6] Total unclosed short positions in MMTLP are approximately 900 million shares depending on what numbers available in the wild are used. FINRA refuses to provide "bluesheet" data that would give an accurate share count of long positions and short positions that were not closed out.

14

71.     Using a document off the SEC's own website that was and is considered the work of a securities industry expert entitled *Counterfeiting Stocks 2.0,* even the wildly understated admitted to 2.65 million shares acknowledged by FINRA are coupled with *at least* 50 times that number in naked shorts created by Rubinstein and GTS.

72.     Referencing the above, *Counterfeiting* states "one emerging company for which we have been able to get reasonable estimates of the total short interest, the disclosed short interest, the available stock lend, and fails-to-deliver, has fifty "buried" counterfeit shares for every FTD share, which is the only thing the SEC tracks, consequently the SEC has not acted on shareholder complaints that the stock is being manipulated."[7]

73.     Based on FINRA's spectacularly understated and *by their own admission* uninformed accounting regarding offshore shares and shares moved on alternative trading systems as attested to in the infamous Cook 31 January 2024 letter to Congressman Ralph Norman, and using the 50X factor of buried counterfeit shares as identified above, there are a *de minima* level of 132 million shares still short in MMTLP of all flavors: short and naked short counterfeits.

74.     Cook's statement above can immediately be dismissed as a "naked meadow muffin" (to twist a financial term for appropriate usage here) because the members of the UPC committee were comprised of the following individuals from the securities industries: John Meegan (Hefren-Tillotson), Tom Nicholson (D.A. Davidson & Co.), Mathew Price (Fidelity Investments), Jeffrey Sheftic (Lincoln Financial), Joseph Iraci (Robinhood), Christopher Haines (Edward Jones), Kelly Bell (Hilltop Securities), Steven Paul Dapcic (Pershing LLC) and to this date FINRA has *never* answered simple questions as to whether any of these individuals (like

---

[7] See https://www.sec.gov/comments/s7-07-23/s70723-20162302-331156.pdf

Mathew Price whose Fidelity Investments operation held 21,000,000 shares of MMTLP and Joe

Iraci whose Robinhood had 12,804,287 shares) had any counter-party risk.

75.    On or about 6 February 2023, FINRA personnel further tried CYA to no effect as

it was rapidly uncovered that certain paperwork in their files and publicly presented had been

altered; *inter alia* FINRA backdated the D-1 forms in MMTLP. This is at least tortious conduct

by FINRA or far worse an action in furtherance of a criminal conspiracy and racket under RICO.

76.    On 6 February 2023 the CEO of OTC Markets Cromwell Coulson stated that no

211's were filed on MMTLP because the company was in good standing under the SEC's

rules...but does not note that the company never filed its own paperwork as it did not want it to

trade; this is at variance with evidence that paperwork was filed by Rubinstein's GTS and

Cannacord.[8]

77.    On 6 February 2023 Coulson posted on Twitter (now "X" after Elon "The

Martian" Musk bought it) that "the ongoing question is how do short position holders resolve

their liability for the Next Bridge common stock if it is not easily transferable or tradable

publicly?"

78.    As a proximate cause of the U3 trading halt that has now lasted 19 months, Traudt

is damaged in the amount of the last verifiable dark pool share price for MMTLP at roughly

$4000 a share totaling $1,220,000 and with subsequent damages involving the loss of use of

those funds for at least another $1,000,000.

79.    After 9 December 2022, limit orders showing "too late to cancel" reflected shares

---

[8] It is clear that MMTLP was subject to such dumpster fire levels of fraud and regulatory insanity
on behalf of heavy breathers in the NYSE financial ecosystem that straight answers are only
going to be received through the discovery process utilizing FRCP Rule 34.

were being placed for sale in a variety of brokers anywhere from under $100 to as high as $200,000 per share.

80.     Traudt called TDA's 800-669-3900 account services number around 4:50pm EST on 20 March 2023 to inquire about tax paperwork that TDA had regarding Traudt's stock trading.

81.     Traudt remembers some confusion as to terminology in the conversation where Traudt asked about K2's and also other tax records and at all times on this date Traudt only spoke with Ron Fleming and was not transferred to anybody else. (Apparently his full name is Cameron Fleming, and he goes by Ron.)[9]

82.     After the tax issues were resolved, Traudt inquired broadly to Fleming about the MMTLP ticker which was apparently dead in the water as of 20 March 2023.

83.     Fleming seemed to Traudt that with some prodding he might discuss what he knew about the U3 halt of 9 December 2022 in MMTLP by FINRA.

84.     During the conversation, he made mention of three issues that Traudt thought clearly showed that trading was not shut down to protect small investors ("retail") but the broker dealers and potentially those shorting this:

85.     He stated that it was "trading at 100 times the (lit market) in the dark pools and people were crazy to think broker-dealers would pay out on that."[10]

86.     The U3 was done, according to Fleming, "because the share price bore no relation to the actual share value" and…most importantly:

---

[9] Fleming held Type 6, 7, and 63 Series brokerage licenses on or about the time of his conversation with myself and was in a position to know the request to halt trading was made.
[10] Orders were staging at TDA reportedly in a wide range from $298 to almost $25,000, and clear evidence exists that TDA was accepting limit orders over $4,000 a share, meaning, conceivably, that MMTLP trading had detonated with a velocity akin to a nuclear weapon and a short squeeze of Apocalyptic proportions was "on like Donkey Kong."

87.    *Fleming stated that "we had to protect ourselves" and that was why they requested the U3 halt.*

88.    Traudt  had requested to have copies of this conversation which was recorded by TDA sent to Traudt or made available for transcription.

89.    At first TDA said they would play them back, and then they refused.

90.    Traudt attempted again in February of 2024 to get Schwab trade desk people to play them back, and they refused.

91.    Schwab will not release the audios clearly as part of a cover up and an orchestrated, coordinated campaign to prevent the release of damning information not only to Traudt but also to 65,000 other MMTLP shareholders similarly worked over by this "cartel" in all but name.[11]

92.    FINRA suspected fraud as early as late November 2022, and was not obligated to go forward with any Corporate Actions but it did on 6 and 8 December 2022

93.    Rubinstein was a member of FINRA's Board of Governors from 2014 to 2019 and FINRA's Market Surveillance Advisory Group until 2017 which was working with advanced Artificial Intelligence (hereinafter "AI") and other machine learning systems to ostensibly detect and eliminate fraudulent activities in the market.

94.    GTS regularly *de facto* manipulates the market through the "market maker exemption" whereby a major market maker can create shares out of thin air with the stroke of a keyboard button and introduce them to the market or sell them off as part of a debt/equity swap to a hedge fund, bank, or other institution.

---

[11] TDA has been ordered in the past to produce audio files and recordings of customer calls in numerous cases.

18

95.     SEC Rule SHO 201(b)(3) is often referred to as the "naked short exemption" for it allows a market maker – in this case, GTS – to short sale a stock without even having to "locate" such a share; on the barest of promises a market maker can naked short a stock, which is exactly how GTS and Rubinstein have provided the financial hammers to pound smaller companies into oblivion by relentless shorting with shares literally backed by nothing, created by a few keystrokes, loaned out in debt-equity swaps in the millions of dollars, and with FINRA enforcing the "locate at some point in time when you can get around to it" rules the way prostitution ordinances are enforced during the US Navy's Fleet Week in NY City.[12]

96.     GTS and Rubinstein have literally used this exemption for *trillions* of stock transactions.

97.     FINRA nor the SEC has never audited GTS to identify if the Rubinstein has been abusing SHO 201(b)(3).

98.     The US Congress never granted the SEC the authority to allow naked short selling and in fact, in passing the 2010 ''Dodd-Frank Wall Street Reform and Consumer Protection Act'' stated *unambiguously* that "it shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange to effect, alone or with one or more other persons, a manipulative short sale of any security. *The Commission shall issue such other rules as are necessary or appropriate to ensure that the appropriate enforcement options and remedies are available for violations of this subsection in the public interest or for the protection of investors.*''

---

[12] This is the ultimate financial "trust me bro" but it has horrific consequences for a free and fair market putting that much manipulative horsepower in market makers' hands and by extension, to a hedge fund or whale investor they do a quickie debt-equity swap with.

99.     SHO 201(b)(3) is illegal and unconstitutional as written and *as applied* under **Loper**: "The purpose of statutory interpretation is to give effect to the will of Congress, not to create a new law that is not supported by the text." (Slip. Op. At 15).

100.    According to the Securities Exchange Act of 1934, Section 10(b): Schwab's failure to maintain accurate and complete records of Traudt's account, including the unauthorized sale to Traudt of counterfeit shares constituted fraud.

101.    According to the Securities Exchange Act of 1934, Section 10(a)(2): Schwab's failure to disclose material information to Traudt, including the existence of counterfeit shares in Traudt's account was a separate violation distinct from 10(b).

102.    According to the Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5: Schwab aided and abetted the fraud against Traudt by allowing the unauthorized sale of counterfeit shares, failing to prevent the fraud, and allowing the introduction of corrupted computer data into Traudt's computer and trading application software.

103.    The Computer Fraud and Abuse Act (CFAA) is a federal law that criminalizes unauthorized access to a computer system or unauthorized access to a computer system for the purpose of committing a crime. The CFAA also criminalizes the intentional access to a computer without authorization or exceeding authorized access.

104.    Since both GTS and Schwab knew or should have known that naked shorts (counterfeit shares, essentially) were now running into potentially the hundreds of millions by 3 November 2022,  Schwab knowingly traded in counterfeit shares by electronically transferring them into Traudt's account without Traudt's knowledge on or about 30 November 2022.

105.    Under 18 U.S.C. § 1030(a)(2), Schwab did not have authorization to access Traudt's account and emplace the counterfeit shares supplied by GTS.

106.   Even, *arguendo*, that Schwab had authorized access to Traudt's account to emplace shares purchased that *were* counterfeits via GTS/Ari Rubinstein, they exceeded their authorized access by trading in counterfeit shares and legitimate shares simultaneously degrading the value of all shares without Traudt's knowledge or consent.

107.   Schwab in concert with GTS/Ari Rubinstein intentionally accessed Traudt's account and traded in counterfeit shares without Traudt's knowledge or consent and is to be considered intentional access and part of a pattern and practice of conduct under 18 USCS 1961 (RICO) as Schwab, GTS, and Rubinstein do this routinely across thousands of securities.

108.   The counterfeit shares/naked shorts flooding the trading in MMTLP functioned as miniature computer viruses throughout the trading systems in and around MMTLP and caused harm to Traudt et. al. because they lead to financial losses, had dramatic legal consequences, destroyed data, compromised security, and disrupted financial operations of Traudt et. al. in violation of 18 USCS 1030(a)(2).

109.   GTS by and through the direction of Rubinstein distributed naked short shares that were fictional and never located and did so causing cascading system failure throughout the trading in MMTLP by creating a digital "false flag" operation (this has been done in numerous other stock tickers such as AMC and GME) completely depressing the share price of MMTLP but having the adverse effect to shorters of creating the proven potential for a short squeeze.[13]

110.   Under the CFAA, the naked shorts as distributed by GTS and traded by GTS were designed to evade detection in the market because FINRA turned a blind eye towards T+2

---

[13] A short squeeze is when people who have "borrowed" a security hoping it will then lose value to be able to "sell" that security later and net the difference as untaxable profits get caught with their pants down as a security instead gains value forcing a "squeeze" on available shares and a rapidly increasing share price for "long" position holders as the short borrowers attempt to "cover" their losses quickly before, as Warren Buffet observed: "Their losses can become infinite" due to the unavailability of shares to be bought to address the imbalance in the market.

settlement issues and because failure-to-delivers on MMTLP were a daily occurrence from the incept of trading in the OTC for MMTLP starting on 7 October 2021.

111.     Counterfeit shares are often created to mimic legitimate securities, making them difficult to identify, while computer viruses are designed to evade detection by security software and human analysts – the end result being that GTS and Rubinstein were strip mining investors with an algorithm-based machine-learning system that was a computer virus *at its core* making market-destabilizing and hedge fund enriching naked short shares available as debt/equity swaps from GTS.

112.     The CFAA defines "damage" as any impairment to the confidentiality, integrity, or availability of a computer, computer system, or computer network and does not distinguish between computer systems.

113.     The introduction of counterfeit shares from GTS into Traudt's computer system crippled Traudt's ability to trade, invest, and do his own "pursuit of happiness" as these actions by GTS and Rubinstein destroyed the inherent value of Traudt's original $3000 investment.

114.     As of 9 December 2022 the Depository Trust Corporation reported shares of MMTLP broken down as follows: TDA 53,000,000; Fidelity 21,000,000; eTrade 13,000,000; Robinhood 12,804,287; QuestTrade 906,000; BMO 481,000; CIBC 370,000; Citadel 2,900; Direct Registers 2,500,000 after the U3 halt out of a 30 September 2022 total allotment of MMTLP of 165,523,363.

115.     Broker-dealer TradeStation was given trading CUSIP# 591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

116. Broker-dealer Wells Fargo was given trading CUSIP# 591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

117. Broker-dealer Avanza was given trading CUSIP# 591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

118. Broker-dealer OpenBank was given trading CUSIP# 591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

119. Broker-dealer IBKR was given trading CUSIP# 591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

120. Broker-dealer Wealth Simple was given trading CUSIP# 591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

121. Broker-dealer Raiffeissen was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

122. Broker-dealer Nordea Bank was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

123.     Broker-dealer Trading 212 was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

124.     Broker-dealer Degiro was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

125.     Broker-dealer ING Bank was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

126.     Broker-dealer Pareto Bank was given trading CUSIP# 591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

127.     Broker-dealer Bolero was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or SEC.

128.     Broker-dealer BNY Mellon was given trading CUSIP# 629999590 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

129.     Broker-dealer Merrill Lynch was given trading CUSIP# 629999590 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

130.    Broker-dealer Park Avenue Sec was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

131.    Broker-dealer Alright Financial Solutions was given trading CUSIP# 629999590 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

132.    Broker-dealer Vanguard was given trading CUSIP# 629999590 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

133.    Broker-dealer Poem was given trading CUSIP# 629999590 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

134.    Broker-dealer CitiBank was given trading CUSIP# 629999590 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

135.    Broker-dealer Empower Brokerage was given trading CUSIP# PER653059 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

136.    Broker-dealer Cambridge was given trading CUSIP# 78699DD491 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

137.     Broker-dealer Scotia iTrade was given trading CUSIP# 8177104 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

138.     Broker-dealer Ally Invest was given trading CUSIP# SAQ9903 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

139.     Broker-dealer Firstrade was given trading CUSIP# SAQ9903 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

140.     Broker-dealer Webull was given trading CUSIP# SAQ9903 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

141.     Broker-dealer SoFi was given trading CUSIP# SAQ9903 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

142.     Broker-dealer LPL Financial was given trading CUSIP# 2855694 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

143.     Broker-dealer RBC D Invest was given trading CUSIP# US591994371 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

144.    Broker-dealer J.P. Morgan was given trading CUSIP# 9R33424 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

145.    Broker-dealer True Friend was given trading CUSIP# 942521489 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

146.    Broker-dealer North Western was given trading CUSIP# IM2999P62 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

147.    Broker-dealer Com Direct was given trading CUSIP# OE5388 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

148.    Broker-dealer Edward Jones was given trading CUSIP# 10599N105 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.[14]

149.    Broker-dealer Saxo Bank was given trading CUSIP# DUMEQ0000076 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

150.    Broker-dealer Dimet was given trading CUSIP# 48493J-U for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

---

[14] Edward Jones had Christopher Haines on the FINRA U3 halt committee.

151.    Broker-dealer LPL Financial was given trading CUSIP# 2865694 for its allotment but neither its share allocation nor percentage of the total shares allocated of the approximately 165 million for MMTLP was disclosed by the DTCC or the SEC.

152.    ***The DTCC refused to identify who broker-dealers #48 through #105 were, what the CUSIP#'s were given to them, whether it was a US or foreign company, whether it used an alternative trading system as identified by FINRA, nor did DTCC release the number of shares it was allocated nor its total percentage of the total 165 million share float in MMTLP for each and every one of them.***

153.    A total of 61,459, 176 shares were *undisclosed* meaning shares vanished into an alleged what might as well be called a trace-audit-reporting-pit  (a "TAR pit") into multiple countries, routed through alternate trading systems that according to Cook:

> "FINRA cannot perform a 'certified audited and consolidated count of shares.' FINRA's regulatory authority does not extend to domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers. Further, the regulatory tools available to FINRA do not provide the data that would enable FINRA to perform a share count (e.g. the Consolidated Audit Trail, Electronic Blue Sheets, and FINRA's trade reporting facilities do not contain information about securities *positions* [emphasis not added].[15]

154.    FINRA reported in Cook's letter to Rep. Norman that there were "only" 2,650,000 short shares not "closed out" in financial language meaning: those who had sold it short did not have to fulfill their financial obligations and were able to pocket millions of dollars

---

[15] 31 January 2024 Cook letter to Rep. Ralph Norman.

because FINRA, with the U3 halt, prevented them from having to "buy to close" per FINRA Rule 204 that MANDATES that all shorts must close out positions.

155.    FINRA admitted via Cook in that same letter that they were absolutely clueless when it came to shares sold into what a lay person might call the "shadow realm" of stock trading: alternative trading systems (ATS), offshore broker-dealers who had no obligations to report, non-reporting transferees; basically a witches' brew of electronic data black holes that FINRA then plead ignorance of in regulating.[16]

156.    Any claims by Cook and FINRA of there being a "not significant" 2,650,000 shares not covered are a fiction designed to placate outraged MMTLP shareholders and Congress.

157.    NBH corporate officers reported to FINRA on or about 19 January 2023 that they were approached by two representatives of short sellers to buy a significant amount of shares to close out their short positions that were unable to close on 9 December and 12 December 2022.

158.    NBH received information and disclosed on 21 November 2023 that financial firms had reported to them that short shares "may be significantly higher" than what FINRA was reporting.

159.    Another broker-dealer trading in MMTLP (TradeStation) reported on 21 February 2023 that: "At this time TradeStation has sent the majority of its original certificated shares to AST to be held on their books. There are a de minimis amount of shares remaining in the current certificate and therefore new requests cannot be accepted until a time when TradeStation

---

[16] In and of itself, this admission begs the question: what does FINRA *actually* do? And the follow on: if they can wash their hands of their supposed role "protecting small investors" by flat out not even trying to get a share count in MMTLP by calling all the broker-dealers and asking simply – as far as Traudt knows, phones still work – what were your sales of this stock? What were your buys in this stock..? How many unclosed short positions do you have..? Then they are nothing more than dilettantes, or worse, its part of the racketeering they play a role in.

receives any new certificates of owned shares or NBH becomes tradable in the open market or made electronically available…due to the physical certificate being produced as of a specific record date position and fully paid loans being active on that record date, *TradeStation was allocated less shares than the firm's overall customer position*…"

160.    TradeStation admitted to being oversold in MMTLP per the above referenced admission against interest.

161.    FINRA has thus far declined to investigate this oversold condition, which is apparently well documented in other broker-dealers who traded in MMTLP besides TradeStation.

162.    Upon information and belief, Fidelity Investments is oversold in MMTLP to date over its initial allotment of 21,000,000 shares by at least 210,000,000 shares. This number does not include short positions it was saved from closing out by the U3 halt of 9 December 2022.

163.    Upon information and belief, TDA is oversold in MMTLP to date over its initial allotment of 53,000,000 shares by at least 110,000,000 shares and potentially significantly more. This number does not include short positions it was saved from closing out by the U3 halt of 9 December 2022.

164.    Traudt asked Schwab (who now owns TDA) on 26 June 2024 if Schwab was in an oversold condition in MMTLP and Schwab has refused to answer Traudt.

165.    Upon information and belief, Schwab is oversold in MMTLP to date over its initial allotment of 12,000,000 shares by at least 60,000,000 shares. This number does not include short positions it was saved from closing out by the U3 halt of 9 December 2022.

166.    Hilltop Securities (hereinafter "Hilltop") traded in an omnibus account via Schwab and Kelly Bell (hereinafter "Bell"), Hilltop's Managing Director (and conveniently

positioned on the U3 halt board at FINRA) was forced to disclose that Hilltop was in a badly oversold position (through Schwab) at the time of the U3 halt in trading in MMTLP.[17]

167.    Tiger Global (hereinafter "Tiger"), an overseas broker-dealer, was oversold and/or needed to cover open short positions in MMTLP and was so desperate to do so it falsified and released a PR on 8 August 2023 stating that NBH had released a tender to buy back MMTLP shares and that Tiger clients could sell their shares to Tiger.

168.    NBH never authorized this tender.

169.    TDA clients attempted to transfer their former MMTLP shares from CUSIP number to NBH using the American Stock Transfer & Trust Company (hereinafter "AST") which was the designated operation to insure shares were converted as part of the 1:1 transfer identified in MMAT's S-1 approved by FINRA.

170.    Referencing the above, one TDA client reported: "TD Ameritrade said that I could ACAT 20k shares but no more without a steep fee. I called their bluff and offered to pay the massive fee and they basically told me *they didn't have enough in their allotment* to send everything over."

171.    On or about 22 July 2023 MMTLP shareholder Alexander Yon (hereinafter "Yon") sent a FOIA request to the SEC requesting emails and data traffic in the SEC's files concerning MMAT, TRCH, and MMTLP.

172.    Yon received an acknowledgement from the SEC on  24 July 2023.

173.    Yon was told in correspondence on 30 November 2023 from the SEC that the first 100 pages of his FOIA request would be free, but that there would be service fees from the

---

[17] Hilltop was fined $475,000 for regulatory failures in 2019-2020 yet managed to get a seat on the U3 board that halted MMTLP.

SEC's FOIA processing US government contractor at a processing rate of 50 pages an hour that would run from $29 to 89 an hour.

174.    Yon notices the SEC FOIA processing personnel keep searching for bastardized versions of "TRCH, "MMAT," and "MMTLP" further delaying the process and adding additional costs.

175.    The SEC's contractor conducted a search for Yon's requested information directly and specifically pertaining to emails and files relating to MMTLP and was informed his request *identified a breathtaking 636,000 separate documents*.

176.    The 636,000 pages would stack 200 feet tall if printed on standard 8.5inch x 11 inch printer paper.

177.    In order for Yon to get to the truth in the MMTLP matter, the financial math and billing provided by the SEC resulted in a staggering, US Constitutionally impermissible, insane $368,880 "research" tab (computed as 12,720 hours x $29 an hour minimum), to be followed by $95,000 in printing fees at 0.15 cents per page.

178.    Yon offered four separate payments to get this information and the SEC accepted it.

179.    Yon's requests were denied *in toto* on 7 February 2024 by the SEC, denied his appeal, closed his case, then took measures to prevent him from accessing the SEC site, which in and of itself is *prima facie* evidence of malicious intent and conduct at variance with the SEC's grant of authority under the Securities Act of 1934.

180.    There were at least 246 FOIA requests filed by MMTLP shareholders and one filed by a US Congressman. One of the  only ones answered produced the aforementioned Draddy emails. That is a breathtaking 99.59% failure to disclose rate.

181.    Yon returned to the SEC (there are now as of 15 July 2024 proven 246 FOIA requests for emails and documents associated with the MMTLP U3 halt, trading, and other matters) log page and after review discovered that his entire FOIA history of requests was expunged.

182.    Upon information and belief, Traudt believes the SEC has orchestrated a campaign to minimize or suppress the true extent of FOIA requests it has illegally denied in coordination with and consistent with a pattern of racketeering aiding and abetting FINRA, GTS, Rubinstein, and Schwab in concealing the full extent of the insider trading, fraud, and counterfeiting that occurred in the short OTC lifespan of MMTLP.

183.    In responding to a 16 August 2022 FOIA request, the SEC stated they could find no 15c-211 form for the registration to trade MMTLP.

184.    Traudt made and sent a demand letter to Schwab for $3,000,000 on 21 June 2024 and laid out claims in detail and limited evidence. This, at this juncture, has never been responded to.

185.    On or about 27 June 2024 Traudt sent questions via email to Schwab customer service requesting Schwab's FINRA Form 211's allowing them to trade MMTLP and also for Schwab to confirm or deny if they oversold shares in MMTLP. To date these questions, and others have not been answered in violation of FINRA Rules 2010 (commercial honor) and 4512 (customer account information records to be maintained…Traudt contends that that obligation extends into the chain of custody for information regarding any and all securities Traudt purchased.)

## FACTS 1 THROUGH 185 ALL INCORPORATED IN THE FOLLOWING COUNTS BY REFERENCE AND MADE A PART THEREOF

### COUNT I: RICO 19 USCS 1961(1)(d) and 15 USCS 78((j)(b) and 78(ff)
### FINRA: R.I.C.O Insider Trading Under the Securities Act of 1934 at Rule 10b-5
### Fraudulent Activities in Connection with the Purchase or Sales of Securities

186.    Defendant FINRA is an intrinsic component to the enterprise described herein and within the meaning of 18 U.S.C. § 1961(4), which includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which in the context of this claim means FINRA acted together with and in concert with GTS, Rubinstein, and Schwab to achieve, replicate, conceal, and profit from their enterprise.

187.    Defendant FINRA engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity within a 10-year period, including but not limited to multiple instances of  Securities Fraud (15 U.S.C. § 78j(b) and Rule 10b-5.)

188.    FINRA, while in possession of material, non-public information, engaged in the illegal and conspiratorial use of bluesheet data on MMTLP by and through the offices of Draddy at FINRA and to the financial gain and or/avoided losses of members of the U3 trading committee that took part in the U3 trading halt in MMTLP on 9 December 2022.

189.    FINRA facilitated insider trading in MMTLP and other transactions involving the MMTLP security using the insider knowledge in the form of bluesheets and access to cumulative FTD information showing there was at least 900 million short shares in MMTLP on or about 9 December 2022.

190.    FINRA shared insider information with Defendant Schwab by and through members of the U3 halt and also to at least three members of the SEC who were then able to

disseminate that information for illegal gain and/or avoided costs to other broker-dealers, hedge funds, and banks.

191.    FINRA did not enforce Rule 204 against short position holders in MMTLP in furtherance of and *prima facie* proof thereof of the racketeering enterprise they formed and intrinsic part of together with and in concert with GTS, Schwab, Casimates, Stone, Rubinstein, Cook, et. al.

**Conduct of the Enterprise's Affairs**

192.    Defendant FINRA, through the pattern of racketeering activity described above, conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs, in violation of 18 U.S.C. § 1962(c).

193.    Defendant FINRA acted as the lynchpin of an insider trading cartel where the predicate acts were largely enabled by GTS and Rubinstein creating hundreds of millions if not billions of counterfeit shares in TRCH and MMTLP.

194.    Defendant FINRA acted as a legal "cloak" by which the other members of the enterprise were able to conduct themselves using illegally provided information from FINRA to further their financial goals at the expense of Traudt et. al. FINRA's supervisory organization, the SEC, maintained and orchestrated a suppression of data available to US citizens regarding the trade halt in MMTLP and other related matters by actively thwarting or making data recovery of FINRA and SEC files in the MMTLP fiasco prohibitively expensive or impossible via FOIA requests.

195.    Defendant FINRA had the means to carry out its role in the enterprise, the past predicate acts were voluminous and included: accepting falsified paperwork in the MMTLP stock to facilitate the trading, setting the conditions to self-validate its trading halt while blaming

MMAT's corporate officers for FINRA's butchery of the 6 and 8 December 2022 Daily List notices that provided them the self-fulfilling false prophecy that justified their U3 halt, and without ever explaining exactly what the "extraordinary event" was that FINRA used to justify the U3 halt. FINRA completely covered up the misdeeds of Schwab in overselling its long positions and the misdeeds of GTS/Rubinstein in providing, *inter alia*, hundreds of millions of naked shorts for which no locate was ever done by FINRA.

**Injury to Traudt**

196.     As a direct and proximate result of Defendant FINRA's racketeering activities, Traudt has suffered significant financial losses, including but not limited to loss of investment value, loss of other investment opportunities, and expenses and time involved in this litigation.

<u>COUNT II: RICO 19 USCS 1961(1)(d) and 15 USCS 78((j)(b) and 78(ff)</u>
<u>SCHWAB: Insider Trading Under the Securities Act of 1934 at Rule 10b-5 Fraudulent</u>
<u>Activities in Connection with the Purchase or Sales of Securities</u>

197.     Defendant Schwab is an intrinsic component to the enterprise described herein and within the meaning of 18 U.S.C. § 1961(4), which includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which in the context of this claim means FINRA acted together with and in concert with GTS, Rubinstein, and FINRA to achieve, replicate, conceal, and profit from their enterprise.

198.     Defendant Schwab engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity within a 10-year period, including but not limited to multiple instances of Securities Fraud (15 U.S.C. § 78j(b) and Rule 10b-5).

199.     Schwab, together with and in concert with its subsidiary TDA et.al.,  while in possession of material, non-public information, engaged in the illegal and conspiratorial use of bluesheet data on MMTLP by and through the offices of Draddy at FINRA and to the financial gain and or/avoided losses of members of the U3 trading committee that took part in the U3 trading halt in MMTLP on 9 December 2022. Schwab's own records indicated it was oversold in MMTLP as early as 30 November 2022.

200.     Schwab facilitated insider trading in MMTLP and other transactions involving the MMTLP security using the insider knowledge in the form of bluesheet data and access to cumulative FTDs information showing there was at least 900 millions of short shares in MMTLP on or about 9 December 2022.

201.     FINRA shared insider information with Defendant Schwab by and through members of the U3 halt and also to at least three members of the SEC who were then able to disseminate that information for illegal gain and/or avoided costs to other broker-dealers, hedge funds, and banks. Schwab utilized this information to maximize returns knowing there would be a trading halt and like the other broker-dealers who cranked up the sales of shares they didn't have, Schwab was all-in on the grift.

202.     FINRA did not enforce Rule 204 against short position holders such as Schwab in MMTLP in furtherance of and prima facie proof thereof of the racketeering enterprise they formed and intrinsic part of together with and in concert with GTS, Schwab, Casimates, Stone, Rubinstein, Cook, et. al., and because of the nature of the longstanding relationship and revolving door at FINRA and the major US financial companies, it was agreed upon and understood that Schwab would benefit from the data shared by FINRA regarding the oversold

long positions at Schwab and the massive short and illegal naked short positions it held, and others, in MMTLP.

203.    Schwab was warned either directly by U3 halt members and/or constructively through the dissemination of bluesheet and FTDs available *en masse* at FINRA.

**Conduct of the Enterprise's Affairs**

204.    Defendant Schwab is a significant player in the US financial industry, through the pattern of racketeering activity described above, conducted and participated, directly or indirectly, in the conduct of the enterprise's affairs, in violation of 18 U.S.C. § 1962(c).

205.    Defendant Schwab continues to aid and abet the enterprise and uses the advanced, machine learning systems provided by and through GTS and Rubinstein to attempt to make its activities in the cartel untraceable and has demonstrated this by refusing to answer any questions from Traudt regarding its handling of the ticker MMTLP.

**Injury to Traudt**

206.    As a direct and proximate result of Defendant Schwab's racketeering activities, Traudt has suffered significant financial losses, including but not limited to loss of investment value, loss of other investment opportunities, and expenses and time involved in this litigation.

## COUNT III:  RICO 18 USCS 1962(c) Schwab: Conducting and Participating in the Affairs of an Enterprise Through a Pattern of Racketeering Activity

207.    Defendant Schwab engaged in a pattern of racketeering activity through its agents, officers, and employees, as defined by 18 U.S.C. § 1961(1) and (5). Specifically, Schwab has engaged in multiple acts under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1956 (money laundering) detailed as follows:

208.    **Mail Fraud (18 U.S.C. § 1341)**: Schwab used the United States Postal Service to

send false and misleading investment statements to investors, including Plaintiff, to perpetuate its

fraudulent scheme by omitting to report the emplacement of counterfeit long shares of MMTLP

in Traudt's account. It also on 11 December 2023 falsified information in a mailed proxy to

MMAT shareholders that was caught by some shareholders as an attempt to once again conceal

exposure to either counterfeited long positions in MMTLP and/or MMAT and also, at the very

least, showed that Schwab was attempting accounting and share counting "sleight of hand" to

further conceal its racketeering.

209.    **Wire Fraud (18 U.S.C. § 1343)**: Schwab transmitted false and misleading

information via interstate wire communications, including emails, but most importantly through

computer fraud and abuse in the form of knowingly utilizing counterfeit shares in its oversold

position in MMTLP which it counted on FINRA for the U3 halt in order to protect its criminal

enterprise.

210.    **Money Laundering (18 U.S.C. § 1956)**: Schwab engaged in financial

transactions using proceeds from unlawful activities, including mail and wire fraud, with the

intent to promote the carrying on of these unlawful activities, and in addition used computerized

trading systems to facilitate high-speed algorithmic trading across state lines to do so aided and

abetted by GTS and Rubinstein with GTS and Rubinstein providing the computerized, internet-

enabled cyber-architecture to supply counterfeit shares of MMTLP for Schwab to "oversell"

their allotment from DTCC. The profits from oversold shares sold by Schwab were effectively

laundered into other Schwab accounts.

211.    **Conspiracy to Violate RICO**: Schwab, in violation of 18 U.S.C. § 1962(d),

conspired with others to violate 18 U.S.C. § 1962(c), which prohibits any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

212.    **Overt Acts**: In furtherance of the conspiracy, Schwab and its co-conspirators committed numerous overt acts, including but not limited to the acts of mail fraud, wire fraud, counterfeiting, public corruption in the form of using Draddy's bluesheet information, money laundering detailed above, and to facilitate the investment of income derived from a pattern of racketeering activity.

213.    **Injury to Traudt**: As a direct and proximate result of Schwab's violations of 18 U.S.C. § 1962(d), Plaintiff has suffered injury to their business or property. Specifically, Plaintiff has lost money and property as a result of investing in Schwab's fraudulent schemes, and has incurred significant financial losses and damages.

**COUNT IV:  RICO 18 USCS 1962(c)**
**GTS: Conducting and Participating in the Affairs of an Enterprise Through a Pattern of Racketeering Activity**

214.    **Enterprise**: GTS, FINRA, Rubinstein, and Schwab constitute an "enterprise" as defined by 18 U.S.C. § 1961(4), which includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. GTS, through its business operations, has conducted its affairs through a pattern of racketeering activity with defendants FINRA, Schwab, and Rubinstein.

215.    **Pattern of Racketeering Activity**: GTS, through its agents, officers, and employees, has engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(1) and (5). Specifically, GTS has engaged in multiple acts indictable under 18 U.S.C. §§ 1343 (wire fraud), and computer abuse and fraud 18 USCS 1030 (Computer Fraud and Abuse Act). GTS relies almost 100% on computerized systems to create fraud, run high-frequency predatory

trading systems, and create naked synthetic shares, aided and abetted by co-defendant FINRA turning a blind eye to standard accounting and trading rules maintained by FINRA.

216.    **Wire Fraud (18 U.S.C. § 1343)**: GTS transmitted false and misleading information via interstate wire communications to include naked synthetic shares and counterfeit shares for long positions to be resold by the myriad broker-dealers in the MMTLP trading environment, and did so with knowledge that what was being done was illegal, that they took measures to conceal this activity, and that GTS had more than $73.5 billion in derivatives liabilities  for just 2023 alone coupled with $9.5 billion in "securities sold but not yet purchased" indicating they were routinely not closing out short positions they were obligated to because GTS had superior knowledge, by virtue of Rubinstein participating in the FINRA "Market Surveillance Group" and his intimate knowledge of the artificial intelligence/machine learning aspects of trading on the NYSE since 2017 that GTS and Rubinstein knew how and where to bury the (financial) bodies.[18] GTS transmitted known false and misleading data concerning the existence of knowingly illegal naked short synthetic shares to broker-dealers for the purpose of gaining illegal profits for its enterprise.

---

[18] Prof. James Angell's (a Georgetown professor who testified as a so-called expert witness before Congress in 2023 stating that there was no irregularities or abnormalities in the MMTLP fiasco despite the obviously schizophrenic regulatory birth, life, and death of MMTLP) association with Rubinstein paid dividends as some sort of market surveillance and trading software contracted by FINRA to Angell (Intelligent Cross LLC) provides Rubinstein with a system-within-a-system redundancy to insure the grift is virtually unstoppable. It shows up linked to FINRA's internal stock exchange (XADF) coupled with JP Morgan Chase, another delightfully non-compliant financial heavy breather. Interestingly enough, and added here parenthetically, JP Morgan had approximately 578 "disclosures" in 2023 to 2024 where it was caught with its hand in the cookie jar up to its eye sockets (by FINRA, no less) and got off with fines with "no admission of guilt." In other words, the SEC is going after poor ole John Brda and George Palikaras (former MMTLP officers) for their supposed roles in the MMTLP debacle, but the equivalent of the mafia *capo di tuti capi*  ("boss of bosses") or at least a *capo regime* ("captain") to use the *lingua naturalis* of the Cosa Nostra, is permitted access to the backwaters of FINRA's regulatory fringes in the alternative trading systems network and offshore trading?

217. **Computer Fraud and Abuse Act (18 U.S.C. § 1030)**: GTS engaged in illegal algorithmic predatory trading and created synthetic shares, compromising trading and banking software on Traudt's computer, invalidating the stored information contained in Traudt's applications, and depressed to zero value the value of Traudt's holdings in MMTLP.

218. **Racketeering Acts**: GTS committed numerous acts of mail and wire fraud, as well as violations of the Computer Fraud and Abuse Act and the Securities Exchange Act.

219. **Conduct of Enterprise Affairs**: GTS, associated with the enterprise's other named defendants Schwab, FINRA, and Rubinstein, conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

220. **Aiding and Abetting by FINRA**: Co-defendant FINRA, by turning a blind eye to standard accounting and trading rules it maintains, aided and abetted GTS's fraudulent activities, thereby facilitating and perpetuating the pattern of racketeering activity described herein. In addition, FINRA did not enforce any rules regarding the "market maker exemption" that would have throttled GTS' production and distribution of counterfeit long shares and naked shorts throughout the MMTLP financial ecosystem.

221. **Injury to Traudt**: As a direct and proximate result of GTS's violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1030, Traudt has suffered injury to their business or property. Specifically, Traudt has lost money and property as a result of investing in GTS's fraudulent schemes, and has incurred significant financial losses and damages, including the depression of the value of Traudt's holdings in MMTLP.

### COUNT V:  RICO 18 USCS 1962(c)
### Rubinstein: Conducting and Participating in the Affairs of an Enterprise Through a Pattern of Racketeering Activity

222.    **Enterprise**: GTS, Rubinstein, FINRA, and Schwab constitute an "enterprise" as defined by 18 U.S.C. § 1961(4), which includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. Rubinstein, through his business operations, has conducted its affairs through a pattern of racketeering activity with defendants FINRA, Schwab, and GTS.

223.    **Pattern of Racketeering Activity**: Rubinstein, through his agents, officers, and employees, has engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(1) and (5). Specifically, Rubinstein has engaged in multiple acts indictable under 18 U.S.C. §§ 1343 (wire fraud), and computer abuse and fraud 1030 (Computer Fraud and Abuse Act). Rubinstein controls GTS and GTS relies almost 100% on computerized systems to create fraud, run high-frequency predatory trading systems, and create naked synthetic shares, aided and abetted by co-defendant FINRA turning a blind eye to standard accounting and trading rules maintained by FINRA.

224.    **Wire Fraud (18 U.S.C. § 1343)**: Rubinstein designed, implemented, and had over watch on transmitting false and misleading information via interstate wire communications to include naked synthetic shares and counterfeit shares for long positions to be resold by the myriad broker-dealers in the MMTLP trading environment, and did so with knowledge that what was being done was illegal, that they took measures to conceal this activity, and that GTS under Rubinstein's plan and role in the enterprise had more than $73.5 billion in derivatives losses for just 2023 alone coupled with $9.5 billion in "securities sold but not yet purchased" indicating Rubinstein had knowledge that GTS was routinely not closing out short positions they were obligated to do so per FINRA Rule 204 and the "market maker exemption." Rubinstein had superior knowledge, by virtue of Rubinstein participating in the FINRA "Market Surveillance

43

Group" and his intimate knowledge of the artificial intelligence/machine learning aspects of trading on the NYSE since 2017 that GTS and Rubinstein knew how and where to bury the (financial) bodies. Rubinstein was the cartel *consigliere* ("counselor") for the duration of this enterprise and transmitted known false and misleading data concerning the existence of knowingly illegal naked short synthetic shares to broker-dealers for the purpose of gaining illegal profits for its enterprise.

225. **Computer Fraud and Abuse Act (18 U.S.C. § 1030)**: Rubinstein engaged in illegal algorithmic predatory trading and created synthetic shares, compromising trading and banking software on Traudt's computer, invalidating the stored information contained in Traudt's applications, and depressed to zero value the value of Traudt's holdings in MMTLP.

226. **Racketeering Acts**: Rubinstein committed numerous acts of mail and wire fraud, as well as violations of the Computer Fraud and Abuse Act, including but not limited to the following: 18 USCS 1030(a)(4) knowingly intending to access a computer to defraud, fraudulent transactions; 18 USCS 1030(a)(2) accessing a computer to manipulate account information; 18 USCS 1030(a)(5) transmission of fraudulent data; 18 USCS 1030(a)(6) counterfeiting using computer systems.

227. **Conduct of Enterprise Affairs**: Rubinstein, together with and in concert with other members of the cartel to include Schwab, FINRA, and GTS, conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

228. **Aiding and Abetting by FINRA**: Co-defendant FINRA, by turning a blind eye to standard accounting and trading rules it maintains, aided and abetted Rubinstein's fraudulent activities, thereby facilitating and perpetuating the pattern of racketeering activity described

herein. In addition, the SEC did not enforce any rules regarding the "market maker exemption" that would have throttled GTS' production and distribution of counterfeit long shares and naked shorts throughout the MMTLP financial ecosystem.

229.     **Injury to Traudt**: As a direct and proximate result of Rubinstein's violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1030, Traudt has suffered injury to his finances and the property interests in his shares of MMTLP. Traudt has lost money and property as a result of investing in a rigged OTC market system corrupted and turned into a money laundering good 'ole boy cartel.

### COUNT VI: RICO 18 USCS 1962(a)
### Schwab: Investing Income Derived From a Pattern of Racketeering Activity

230.     Traudt hereby incorporates all claims of misconduct and RICO activities attributable to Schwab in Counts I through IV here by reference.

231.     Defendant took profits in the form of illegally overselling its share allotment of MMTLP and re-invested these profits into other lucrative pursuits within the US financial industry in continuation of its role taking advantage of the enterprise/cartel it was an intrinsic part of with the other defendants.

232.     Schwab, in violation of 18 U.S.C. § 1962(a), received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, part of such income in the acquisition of an interest in, or the establishment or operation of, enterprises engaged in, or the activities of which affect, interstate or foreign commerce.

233.     **Injury to Traudt**: As a direct and proximate result of Rubinstein's violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1030, Traudt has suffered injury to his finances and the property interests in his shares of MMTLP. Traudt has lost money and property as a result of investing in a rigged OTC market system corrupted and turned into a money laundering good

'ole boy cartel.

## COUNT VII: Computer Fraud and Abuse Act 10 USCS 1030(g)
## GTS: Illegally Entering a Computer System and Software to Obtain Financial Gain

234.    Defendant GTS created naked synthetic shorts and counterfeit long shares of
MMTLP, entered them into the stream of commerce in the trading of the MMTLP security,
falsified the documentation of them, dispersed them via the internet using proprietary trading
algorithms and high-frequency trading systems not available to retail investors, insured that there
was no way the counterfeiting would be caught because FINRA was part of this endeavor, and
thus was able to illegally enter and deposit corrupted cyber-shares of MMTLP into Traudt's
account.

235.    GTS' actions were unauthorized and illegal, and were committed with the intent
to defraud and deceive Traudt et. al. As a result of the defendant's actions, Traudt's brokerage
account was compromised, and the plaintiff suffered significant financial losses.

236.    **Computer Fraud and Abuse Act (CFAA) Claim:** The defendant's unauthorized
access to and manipulation of the Traudt's brokerage account constitutes a violation of the
CFAA, 18 U.S.C. § 1030.

237.    **Injury**: As a proximate result of GTS' actions or omissions to act, Traudt
sustained damage to the integrity of his computer systems, software, financial account
information, and ability to trade.

## COUNT VIII: Computer Fraud and Abuse Act 10 USCS 1030(g)
## Schwab: Illegally Entering a Computer System and Software to Obtain Financial Gain

238.    Defendant GTS created naked synthetic shorts and counterfeit long shares of
MMTLP, entered them into the stream of commerce in the trading of the MMTLP security,
falsified the documentation of them, dispersed them via the internet using proprietary trading

algorithms and high-frequency trading systems not available to retail investors, insured that there

was no way the counterfeiting would be caught because FINRA was part of this endeavor, and

thus was able to illegally enter and deposit corrupted cyber-shares of MMTLP into Traudt's

account.

239.    GTS' actions were unauthorized and illegal, and were committed with the intent

to defraud and deceive Traudt et. al. As a result of the defendant's actions, the plaintiff's

brokerage account was compromised, and the plaintiff suffered significant financial losses.

240.    Defendant Schwab was aware of the counterfeit long shares in MMTLP when it

sold shares to Traudt and was aware there were hundreds of millions of naked shorts illegally

produced by GTS under the "market maker exemption."

241.    Defendant Schwab knowingly allowed falsified securities certificates representing

phantom shares of MMTLP to be illegally introduced into Traudt's brokerage account and by

virtue of that into Traudt's computer system and software thereby corrupting it's ability to

represent the financial data therein as accurate, in effect crippling the system.

242.    **Computer Fraud and Abuse Act (CFAA) Claim:** Defendant Schwab's

unauthorized access to and manipulation of the Traudt's brokerage account constitutes a violation

of the CFAA, 18 U.S.C. § 1030.

243.    **Injury:** As a proximate result of Schwab's actions or omissions to act, Traudt

sustained damage to the integrity of his computer systems, software, financial account

information, and ability to trade.

### COUNT IX: Securities Fraud 15 USCS 78j(b) and 17 CFR 240.10b-5
### Schwab: Knowingly Selling Counterfeit Securities

244.    Schwab, a broker-dealer, is liable for securities fraud under the Securities

Exchange Act of 1934 (SEA) and the Securities Act of 1933 (SA) for having knowingly sold

counterfeit shares in a security. On November 30, 2022, Charles Schwab sold 305 counterfeit

shares of MMTLP to Traudt, approximately valued at $3000. The Securities Exchange Act and

the Securities Act prohibit fraudulent and deceptive practices in the sale of securities, including

the sale of counterfeit or worthless securities.

245.   Schwab had actual knowledge that the shares were counterfeit, but nevertheless

sold them to the Traudt and other investors. Traudt alleges that Schwab's actions caused him to

suffer financial losses and other damages.

246.   **Macquarie Infrastructure Corp. v. Moab Partners** (L.P. No. 22-1165 US

Supreme Court 2024) held that a broker-dealer can be liable for securities fraud if it knowingly

sells counterfeit shares in a security or fails to disclose information regarding the legal status of

their shares in SEC forms and mandatory disclosures.

247.   **SEC Rules:** The relevant SEC rules that govern this claim are 15 U.S.C. § 78j(b),

which prohibits fraudulent and deceptive practices in the sale of securities and 17 C.F.R. §

240.10b-5, which prohibits the use of any device, scheme, or artifice to defraud, or the making of

any untrue statement of a material fact or omission of a material fact necessary to make the

statements made, in connection with the purchase or sale of any security.

248.   **Injury:** Traudt suffered economic damage as a result of the acts and/or omissions

to act of Schwab in that his finances were damages, his ability to trade with the funds now frozen

or lost due to the U3 halt is impossible, and he cannot use that money for other purposes.

### Count X: Vermont Securities Fraud 9 VSA 5605, 5607 (Right to sue)
### Schwab: Engaging in Securities Fraud

249.   Traudt incorporates facts #1 through #185 here by reference and Counts against

Schwab at II, III, VI, XIII, and IX by reference also.

250.   Under Vermont law, it is illegal for a broker-dealer to take part in any plan

employing any device, scheme, or artifice to defraud is illegal under Vermont securities law as is making any untrue statement of a material fact or omitting a material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading. In addition, engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person.

251.     Schwab sold Traudt counterfeit shares on 30 November 2022, refused to provide information on his account correctly, acted against Traudt's interests by requesting a trading halt (U3), participated in a value-destroying racket as described in the foregoing, and has concealed the true extent of its financial crimes against Traudt by refusing to provide answers as to the degree of its oversold condition in MMTL as of 9 December 2022.

252.     **Injury to Traudt**: Traudt suffered economic damage as a result of the acts and/or omissions to act of Schwab in that his finances were damages, his ability to trade with the funds now frozen or lost due to the U3 halt is impossible, and he cannot use that money for other purposes.

## DAMAGES

### Damages Sought for Each Individual RICO Counts I through VI

Pursuant to 18 U.S.C. § 1964(c), Traudt is entitled to recover threefold the damages sustained and the cost of the suit, including reasonable attorney's fees. Traudt estimates the total damages as follows:

**Compensatory Damages**: $3,000,000 in lost profits from the sale of MMTLP shares.

**Treble Damages**: Three times the compensatory damages amount, as allowed under 18 U.S.C. § 1964(c) mathematically gets Traudt to $9,000,000.

**Attorney's Fees and Costs**: to be determined.

WHEREFORE, Traudt respectfully prays that this Court enter judgment in favor of Traudt and against Defendant(s) as follows:

   a. Awarding Traudt compensatory damages in an amount to be determined at trial;

   b. Awarding Traudt treble damages as mandated by 18 U.S.C. § 1964(c);

   c. Awarding Traudt the costs of this suit, including *unreasonable* attorney's fees as Traudt
   has had to learn as much as possible in a short time frame about securities law and RICO
   and only owns 305 shares of MMTLP (well, its placeholder CUSIP so to speak).

   d. Granting such other and further relief as the Court deems just and proper.

### Damages Sought for Each Individual CFAA Counts VII to VIII

WHEREFORE, Traudt respectfully prays that this Court enter judgment in favor of Traudt and against Defendant(s) as follows:

   • Actual damages, including losses to the plaintiff's brokerage account, lost profits, and
     other financial losses.

   • *Unreasonable* attorneys' fees and costs as Traudt is expending thousands of dollars to
     recover in this matter and only owns 305 shares of MMTLP (well, its placeholder
     CUSIP so to speak).

   • Punitive damages, if applicable.

   • Injunctive relief, including an order to cease and desist from further violations.

### Damages Sought for Count IX (SEC)

WHEREFORE, Traudt respectfully prays that this Court enter judgment in favor of Traudt and against Defendant(s) as follows:

   • Actual damages, including losses to the plaintiff's brokerage account, lost profits, and

other financial losses;

- *Unreasonable* attorneys' fees and costs;

- Punitive damages, if applicable.

- Injunctive relief, including an order to cease and desist from further violations.

**Count X: Vermont Securities Fraud 9 VSA 5605**
**Schwab: Engaging in Securities Fraud**

WHEREFORE, Traudt respectfully prays that this Court enter judgment in favor of Traudt and

against Defendant(s) as follows:

- Actual damages, including losses to the plaintiff's brokerage account, lost profits, and

  other financial losses.

- *Unreasonable* attorneys' fees and costs and only owns 305 shares of MMTLP (well,

  its placeholder CUSIP so to speak).

- Punitive damages, if applicable.

**PRAYER FOR RELIEF**

Traudt requests of this court the following:

1. That a hearting date be designated and the attached Writ of Mandamus to Respondent

SEC Chairman Gary Gensler be approved and two days of trading in MMTLP be resumed if

need be under a new stock ticker symbol for logistics and simplicity purposes.

2. Traudt acknowledges that he has a good faith and common law duty to reduce costs,

fees and the expense of protracted litigation.

3. Should the Writ be approved, Traudt agrees to cease this litigation.

4. Traudt requests that this court do approve *MOTION IN LIMINE FOR LIMITED*

*CLASS ACTION CERTIFICATION PURSUANT TO F.R.C.P. 23 FOR EQUITABLE TOLLING*

_OF THE STATUTE OF LIMITATIONS IN THIS MATTER_ for **Traudt v. Rubinstein et. al**. as the degree of treachery and institutional corruption evidenced here and on going attempts to strip mine assets and then hollow out  MMAT prior to its bankruptcy filing by its current CEO and Board of Directors seems designed to obliterate MMAT shareholders with follow on effects for MMTLP shareholders.

5. Following from point 4, above, Traudt's understanding of the statute of limitations tolling on 8 December 2024 (the realistic due diligence discovery date of the fraud and racketeering that was the U3 halt in MMTLP) and the inability for MMTLP members to get any reasonable answers from the feckless, campaign contribution-sensitive politicians on both sides of the elephant-donkey divide, FOIA requests, and arbitration where attempted begs for a ruling stating if nothing else, **Traudt v. Rubinstein** satisfies the tolling requirements for all 65,000 MMTLP shareholders.

6. In the event trading is not ordered restarted, Traudt requests all damage figures as outlined in Counts I through X.

### DEMAND FOR JURY TRIAL

Traudt hereby claims and demands a trial by jury on all counts and portions of this complaint that are so triable.

Dated: July 19, 2024

Scott Traudt, _pro se ipso_
191 Kibling Hill Road
Strafford, VT 05072

52