UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

```
*************************************
SCOTT TRAUDT,                         *
Plaintiff                             *
                                      *
v.                                    *       Docket Number: 2:24-cv-782
                                      *       JURY TRIAL DEMANDED
ARI RUBENSTEIN                        *
Defendant                             *       1st Amended Complaint
                                      *
GTS SECURITIES LLC                    *
GTS EQUITY PARTNERS LLC               *
GTS EXECUTION SERVICES LLC            *
Defendant                             *
                                      *
CHARLES W. SCHWAB AND CO. INC.        *
SCHWAB HOLDINGS, INC.                 *
Defendant                             *
                                      *
FINANCIAL INDUSTRY                    *
REGULATORY AUTHORITY                  *
Defendant                             *
                                      *
GARY GENSLER                          *
US SECURITIES AND EXCHANGE            *
COMMISSION                            *
Respondent                            *
                                      *
*************************************
```

### PLAINTIFF TRAUDT'S REPLY MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FINRA'S MEMORANDUM OF LAW IN OBJECTION TO PLAINTIFF'S MOTION FOR EXPEDITED LIMITED DISCOVERY

I.    **Preliminary statements**

Traudt submits this memorandum in reply to Defendant Financial Industry Regulatory

Authority's ("FINRA") 30 August 2024 opposition to Traudt's "Motion for Expedited Limited

Discovery." As FINRA has introduced its supposed "absolute immunity" status in its

memorandum in opposition to Traudt's motion, Traudt addresses it here in part.

FINRA has no absolute immunity and in fact its "self-regulatory organization" ("SRO") status and mandate to work under the Securities and Exchange Commission ("SEC") is an unconstitutional delegation of authority from Congress under Article II, Clause 1 of the US Constitution in that as a private organization its role and function with near dictatorial, non-appealable control of the US financial markets coupled with its unappointed, privately employed officers exercising the authority of the Executive Branch is totally beyond the pale from a Constitutional perspective. FINRA should be, via Permanent Injunction, relieved of these duties and suffer a winding down in all activities, a cessation of regulatory enforcement, a freezing of its assets for distribution to aggrieved parties harmed in the illegal MMTLP U3 trading halt, and its operations and duties returned to the Securities and Exchange Commission ("SEC") in proper compliance with the Appointments Clause of the US Constitution.

In the instant matter, FINRA's well documented regulatory Pearl Harbor on shareholders of MMTLP (in the same position as Traudt) on 8-9 December 2022 was preceded by and continues to manifest itself in rampant abuses involving "dark pool" tradings,[1] unlimited and unchecked "naked shorting" that has played a role in compromising the integrity of the US stock market that it is leading to a *banking* crisis,[2] allowed for the fraud and grift on Wall Street to reach levels such that the entire world is now moving to an alternative international trading

---

[1] Over the past three years, just one company on the US exchanges (AMC Entertainment) has seen a significant portion of its trading conducted through dark pools. On average, around 60-65% of AMC's daily trading volume has been routed through dark pools (off exchange alternative trading systems). Dark pool activity is synonymous with obscuring price movements and preventing the stock's true value from reflecting accurately in the public market, and functions largely as a means of allowing "whale" investors and institutions to control the price of a stock.

[2] Unfilled "short" positions are often used in trading strategies by massive financial institutions; FINRA has allowed market makers to print unlimited computerized "nothing but air" shorts that create a debt bubble as interest rates rise, assets depreciate, and the dollar fades.

network (BRICS)[3] specifically designed by those countries to escape *inter alia* the gravity well that will occur when the US banking and finance system implodes under the twin black holes of dollar devaluation and the simple, well understood corruption of the US stock markets via the *trillions* in naked shorts hanging like a nuclear-tipped Sword of Damocles over the *entire* US economy.[4]

---

[3] BRICS (so named for its founding members Brazil-Russia-India-China-South Africa) is an organization comprising the original five nations and now includes Iran, Egypt, Ethiopia, the United Arab Emirates, and soon Turkey. Originally identified to highlight investment opportunities, the grouping evolved into an actual geopolitical bloc, with their governments meeting annually at formal summits and coordinating multilateral policies since 2009.

[4] In 2023 and 2024, several countries imposed or tightened restrictions on short selling to stabilize their financial markets in response to heightened volatility and economic challenges. China took decisive action through the China Securities Regulatory Commission (CSRC). In October 2023, the CSRC suspended securities lending for A shares placed in IPOs, and in January 2024, extended the ban to all A shares with lock-up restrictions. Additionally, from March 2024, the CSRC introduced a T+1 rule, preventing immediate resale of borrowed shares, aimed at curbing speculative trading. The move came after prolonged market declines and investor concerns about instability. Thailand followed suit, with the Stock Exchange of Thailand (SET) banning naked short selling and increasing fines for rule violations. In 2024, the SET began pursuing legal reforms to target individuals involved in illegal short selling, not just securities firms. The Thai government prioritized these reforms to restore investor confidence after significant market losses in 2023, with short-selling practices being linked to the country's market slump. US SEC personnel visited Thailand recently (summer, 2024) where it would appear from all outward appearances the buddhist Thai regulators had a "come to Jesus" (things are that bad) meeting with their American counterparts regarding the naked shorting in the US markets. South Korea also tightened short selling rules, aiming to level the playing field for investors. The country raised margin requirements and increased transparency requirements for institutional and foreign investors while easing restrictions slightly for retail investors. Meanwhile, the United Kingdom is reforming its short-selling regulations as it adjusts post-Brexit. In the European Union, short selling continues to be heavily regulated under the EU Short Selling Regulation (SSR). EU member states maintain stringent rules on transparency, including heightened reporting requirements for net short positions. National authorities have intervention powers to impose short-term bans in cases of market turbulence, ensuring that short selling does not unduly exacerbate market instability. Across these regions, governments and financial authorities are enacting these measures to mitigate market disruptions and protect investor confidence in a time of global economic uncertainty. These restrictions reflect a broader concern that

Article II specifically insured that there would be a clear separation of powers where citizens would know who exactly was behind decisions effecting their lives. FINRA's occupation of the regulatory space as a private actor violates the separation of powers in the branches mandated by the Constitution. As can be seen from the surfeit of arguments propounded opposing Traudt's preservation and expedited discovery motions, FINRA's position is loosely akin to the "Divine Right of Kings" in the way it treats those pesky American peasants silly enough to believe that "might does not make right."

There is nowhere in US law or the Congressional record specifically mandating any claim of immunity by FINRA; it's immunity is clearly and undeniably a judicial construct that the US Supreme Court just dispensed with in _Loper Bright Enterprises v. Raimondo (US Supreme Ct. #22-451, 2024)_ for the simple reason its immunity is an absolutist position, is a significant public policy, and is not an administratively minor "filling in the gaps" policy decision made by bureaucrats.

More tellingly, FINRA does not look long nor in depth at the recent US Supreme Court cases reining in the regulatory state nor does it vary from that lack of awareness regarding the 5th and D.C. Circuits' recent decision enforcing Article II not just on FINRA and the SEC, but most recently on the Federal Communications Commission ("FCC").

There were only two U3 trading halts ever instituted by FINRA in the US markets prior to MMTLP. None of those involved securities as per Traudt's complaint that were subject to the madness MMTLP was: illegally started in trading with the knowledge of FINRA regulators; were allowed to trade in Defendant Charles Schwab and Co.'s ("Schwab") accounts prior to

---

unchecked short selling can amplify downward market trends, leading to destabilizing effects on financial markets.

official trading; were subject to a (twice!) rewrite of its corporate action with terms and conditions in the corporate action never seen in over 967 prior corporate actions reviewed and issued by FINRA; had given advance notice to Defendant Charles Schwab and Co. ("Schwab") on the last day of trading that it would be closed for trading the next day; had direct statements under oath from Traudt that a Schwab broker had admitted Schwab had requested the trading halt to protect their own interests; that MMTLP was trading at "100 times" the price on the "lit" market…etc…etc…

Traudt's motion for a preservation order was referenced by FINRA in the memorandum Traudt is replying to herein. FINRA gets the 2nd Circuit's holdings wrong in being so dismissive as to the priority Traudt places on both motions. In **Plaintiff Traudt's Motion for a Preservation order Pursuant to FRCP 26(c)** ("**Preserve**")  the motion is to be seen as a motion for injunctive relief as per 2nd Circuit jurisprudence. In *United States v. Davis, 767 F.2d 1025 (2d Cir. 1985)*, the court held that a motion for a protective order under Rule 26(c) of the Federal Rules of Civil Procedure is functionally equivalent to a motion for a preliminary injunction because both seek to restrain certain actions temporarily pending a final determination of the issues in the case.

FINRA initially attributed the U3 halt to a "coding error" then backpedaled and then created two self-serving frequently asked questions ("FAQ") public relations pieces which, if introduced in this matter under oath by FINRA officers would constitute perjury for the deliberate misrepresentations contained therein.[5] (Traudt made multiple references in his 1st Amended Complaint to FINRA CEO Robert Cook doing quite the same for playing "fast and

---

[5] On 16 February 2023, FINRA began trail ballooning that the MMTLP U3 halt was a "D-1" halt due to a "coding error." **(See Appendix A)**

loose" with the facts responding to the Congressional letters and hearing questions in his 24 January 2024 letter to Rep. Ralph Norman.[6]) So much for FINRA's claims here that Traudt's complaint is full of conclusory allegations; more than 60 Congressman and Senators signed letters requesting explanations for the series of unprecedented events surrounding FINRA's naked move to protect the apex predators of the US financial system who were oversold in or naked shorted MMTLP and stood to be devastated in the last two days of trading that FINRA obliterated with the U3 halt.

It is laughable that FINRA claims it could be overly burdened by producing the bluesheets and that – this is high hilarity – Traudt is "weaponizing" the discovery process. Traudt has asked for bluesheet data already assembled by FINRA in the first part of his request along with outgoing and incoming emails to FINRA Fraud Officer Sam Draddy. Additional documents were simply follow on bluesheet data for two different dates: close of trading on 8 December 2022 at 3:59:59pm, and again on 15 August of 2024 for the same data to show that MMTLP is still trading as the numbers would be reduced under Traudt's theory of the case. The SEC and FINRA have in all likelihood already generated the blue sheets for MMTLP in preparation for the civil case of *Securities and Exchange Commission v. John Brda and Georgios Palikaras, No. 1:24-cv-04806.*

---

[6] The law that criminalizes lying to Congress is 18 U.S.C. § 1001, which makes it illegal to knowingly and willfully provide false statements to any branch of the federal government, including Congress. Under this statute, individuals can face criminal penalties, including fines or imprisonment, for making false statements, concealing information, or submitting fraudulent documents in any matter within the jurisdiction of the federal government.

FINRA Fraud Officer Sam Draddy ("Draddy") was emailed on 12 July 2024 by Traudt pursuant to FRCP 27 that he would seek the bluesheets in anticipation of litigation. **(See Appendix B).**

As for FINRA's claims of lack of personal jurisdiction, they function nationally as an (albeit) unconstitutional exercise of private actor over an enormous swath of the US economy. They are currently subject to personal jurisdiction in Florida in a case related to the same trade halt at issue here, but involving the TradeStation broker that has admitted it oversold MMTLP (so much for FINRA's claims that Traudt's facts and details are "conclusory allegations").

Traudt readily admits service of process was difficult and in fact multiple attempts to reduce litigation costs (FINRA's counsel has argued to save costs, and Traudt does agree) by contacting Defendants by phone and email failed and Traudt served process through agents or known corporate or administrative locations. In addition, Traudt admits that the subpoenas should have gone out after the discovery order was done, but misread FRCP 45. Traudt did alert all defendants with copies of all 6 subpoenas that went out, and after recognizing the error called or sent letters to the subpoena recipients alerting them to their prematurity. In one case (Hilltop Securities - "Hilltop") responded back (via email on 27 August 2024) stating it had evidence responsive to Traudt's subpoena. Traudt called counsel on 29 August 2024 and informed Hilltop to hold what they had and to NOT submit it to Traudt. **(See Appendix C).**

Finally, FINRA's characterization of Traudt being a "weaponizer" flies in the face of Traudt's motions: he is not seeking to have any documents given to him at this stage, merely to protect what will be needed to prove his case and to get delivered for *in camera* review as necessary to this court the narrow, focused, simple discovery of his motion for expedited discovery.

## II.   FINRA has zero immunity and is operating in violation of the Appointments Clause of the US Constitution Article II, Clause 2.

FINRA raised the use of its infamous "absolute immunity" defense in its memo so Traudt will attack it now. It's long overdue for this instinctively corrupt chimera of private corporate interests slavishly doing the bidding of the apex predators on Wall Street and other financial centers to be recognized for what it is: the modern incarnation of the British crown corporations (such as the Hudson Bay Company). This was co-despotic with the appointment of Crown officers and military officials to oversee the colonials. Our seditious American forebears eventually chose to engage the British over these and other issues at Namquid (now Gaspee) Point, Rhode Island in the Battle of the Gaspee (June, 1772), followed later by the 19 April 1775 fireworks in Lexington, Massachusetts, setting the stage for creating what President Abraham Lincoln would later refer to as "that government of the people, by the people, for the people…" in his 19 November 1863 Gettysburg Address.[7]

---

[7] Contrary to the history taught by the Massachusetts/Virginia-centric history books, the first shots of the US Revolutionary War were fired by Rhode Island sailor Joseph Bucklin who, after the packet sloop *Hannah* lured *HMS Gaspee,* a British revenue enforcement vessel notorious for its heavy hand in crushing Rhode Island trade so that British companies could benefit, onto the shoals of Namquid Point. Once *Gaspee* ran aground, *Hannah's* intrepid crew sailed north to Providence, enlisted local merchants, Indians, and others to take long boats with them and row out to *Gaspee* to destroy her. In the first shots of the US Revolutionary War, Captain William Duddingston (RN), was shot in the groin by Bucklin, an event that was by most historians considered the first shot of the US Revolutionary War where American insurgents attacked armed British military personnel and concomitantly set the standard for violence of action, speed, and audacity that would come to typify the exploits of the US Navy in the future. *Gaspee* was burned to the waterline, then blew up spectacularly. The Rhode Islanders celebrated the victory with drunken revelry and, in what would become the trademark for Rhode Islanders for generations, managed to keep their mouths shut collectively when the Crown came down with a full-court press terror campaign in Rhode Island to find out who destroyed one of the Crown's warships. (Well, except for one of the *Gaspee* raiders who would march across one of Providence's bridges wearing Capt. Duddingston's captured jacket on the somewhat regular occasion of his intoxication.)

Indeed, the US Supreme Court noted this capacity for abuse in appointing officers in *Freytag v. Comm'r, 501 U.S. 868 (1991)*, holding that "[T]he 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power... because 'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of 18th century despotism.'"[8]

This contempt for what FINRA is and is doing is exactly what formed part of the Declaration of Independence. Paragraph 12 could be describing FINRA (or *any* of the US government's alphabet agencies at this point). Paragraph 12 reads that the King "has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance."[9]

For these reasons and others, the Appointments Clause was incorporated into the Constitution to prevent the privatization of government and to ensure the accountability of public officials executing US government policy.

Congress is not permitted by the Constitution to abdicate, or to transfer to others, the essential legislative functions with which it is vested. Art. I, § 1; Art. I, § 8, par. 18. *Panama Refining Co. v. Ryan, 293 U.S. 388*. P. 529. *A.L.A Schechter Poultry Corp. v. United States* 295 U.S. 495.

In *Buckley v. Valero, 424 U.S. 1 (1976),* the Supreme Court considered challenges to the Federal Elections Campaign Act of 1971. The manner of appointing commissioners to the then newly created Federal Election Commission was to have the Speaker of the House choose two, two by the president pro tem of the Senate, and two by the President. All appointments required

---

[8] *Freytag, 501 U.S. 883* (quoting Gordon S. Wood, The Creation of the American Republic, 1776-1787, at 79 (1969)).
[9] The Declaration of Independence para 12 (U.S. 1776).

confirmation by Congress. The court's procedural analysis considered the structure of the FEC in light of the Appointments Clause and found it to be unconstitutional. Noting that there is "no provision of the constitution remotely providing any alternative means for the selection of the members of the Commission or for anybody like them," the court concluded that the FEC commissioners themselves must be subject to the Appointments Clause requirements. This is directly on point with *Traudt* and Traudt's contention that FINRA is operating illegally not just because it violates the non-delegation clause and the separation of powers innately contained in the Appointments Clause but because the chairman of FINRA, Robert Cook, and all of the executive officers of FINRA, were  appointed by the board of directors of FINRA and not by an act of the US government or an invocation of the Appointments Clause. His position clearly necessitates an appointed officer of the US – assuming here *arguendo* that FINRA itself is even Constitutionally based (which Traudt argues it isn't.)

The *Buckley* court went much further. The court conducted the more substantive analysis of the specific powers and duties granted to the FEC commissioners. The court determined that some of those powers were of the kind that could "be discharged only by persons who are 'Officers of the United States' within the language of the Appointments Clause." Since some of those powers granted to FEC commissioners were only available to Officers of the United States, those provisions of the act, the court opined, "violate the appointments clause."[10]

### III.    Recent caselaw holds that FINRA officers exercise unconstitutional power

In *Alpine Sec. Corp. v. FINRA, No. 23-5129 (2023),* the D.C. Circuit took great constitutional issue with FINRA's unappointed officers:

---

[10] *Id.,* at 140.

To ensure that the executive power remains with the President, the Constitution puts limits on those who exercise it on the President's behalf. Anyone who "wield[s] significant executive power" must be an Officer of the United States. *See Buckley v. Valeo, 424 U.S. 1, 126, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)*. Those officers must generally be removable by the President or an officer subordinate to the President. *See Seila Law LLC v. CFPB, 140 S. Ct. 2183, 2211, 207 L. Ed. 2d 494 (2020)* (principal officers must be removeable by the President). And they must be appointed by an appropriate government body under the *Appointments Clause*. *U.S. Const. art. II, § 2, cl. 2*; *Lucia v. **SEC**, 138 S. Ct. 2044, 2051, 201 L. Ed. 2d 464 (2018)*. *Alpine Sec. Corp. v. Fin. Indus. Reg. Auth.* No. 23-5129, 2023 U.S. App. LEXIS 16987, *5 D.C. Circuit, (2023).

*Alpine* is crucial as it eviscerates FINRA's use of its own hearing officers in the same context as the SEC's Administrative Law Judges (ALJ's). [11]The Alpine court didn't distinguish FINRA hearing officers as being any different from the SEC's ALJ's. FINRA's hearing officers are near carbon copies of those ALJs. They are tasked by statute with enforcing the nation's securities laws. 15 U.S.C § 78s(g)(1). They can "levy sanctions that carry the force of federal law."*Turbeville v. FINRA, 874 F.3d 1268, 1270 (11th Cir.2017) (citing 15 U.S.C. § 78o-3(b)(7))*. And like *Lucia's* ALJs, hearing officers demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt. See FINRA Rules 8210 (Provision of Information and Testimony), 9252 (Requests for Information), 9235 (Hearing Officer Authority), 9263 (Evidence Admissibility), 9280 (Contemptuous Conduct). In other words, if the ALJs in *Lucia* exercised "significant"

---

[11] What of FINRA's "arbitrators" too, Traudt asks?

executive power, then FINRA hearing officers probably do too. *Lucia, 138 S. Ct. at 2051. Alpine, *6, *7.*

More importantly, *Alpine* zeroed in on the reality that FINRA hearing officers have multiple barriers to removal – and as *Traudt* asserts, the evidence is compelling that it's the entire regulatory operation that is FINRA that is suffused with such unconstitutional delegation.

The *Alpine* court continued: Despite seeming to exercise the executive authority of the United States, FINRA hearing officers remain private employees. That presents two constitutional issues that will benefit from "full briefing, oral argument, and our usual extensive internal deliberations." *Merrill v. Milligan, 142 S. Ct. 879, 879 (2022)* (Kavanaugh, J., concurring). First, FINRA hearing officers are not appointed by a government body pursuant to the Appointments Clause. See *Lucia, 138 S. Ct. at 2051.* Second, they are shielded from removal by the SEC except for cause. 15 U.S.C. § 78s(h)(4). And the Supreme Court has assumed that the President may not remove SEC Commissioners at will. *Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 487, 130 S. Ct. 3138, 177 L. Ed. 2d 706(2010).* That means that there are two layers of removal protection—one for the Commissioners and one for the hearing officers. That may well infringe on the President's "ability to execute the laws . . . by holding his subordinates accountable for their conduct." *Id. At 496. Alpine, *8.* The *Alpine* court closes with a stark disapproval of FINRA's hearing officers exercising significant executive power: There is a serious argument that FINRA hearing officers exercise significant executive power. And it is undisputed that they do not act under the President. *That may be a constitutional problem.* (emphasis added). See *U.S. Const. art. II, § 1, cl. 1; id. art. II, § 2, cl. 2. Alpine, *9.* What does this say about FINRA's President, Robert Cook, and the FINRA Board of Directors chosen exclusively from the largest financial institutions in the country? And what of FINRA's

Uniform Practice Committee – talk about an innocuous misnaming – seizing the property of 65,000+/- 10,000 Americans in MMTLP with a trading halt that still, 636 days later, *has never been justified*.[12]

Prior to *Alpine,* US Supreme Court Justice Alito in his concurrence in *Department of Transportation v. Association of American Railroads 575 U.S. 43* pulled no punches with regards to delegation of government authority: [E]ven the United States accepts that Congress "cannot delegate regulatory authority to a private entity." *721 F. 3d, at 670*. Indeed, Congress, vested with enumerated "legislative Powers," Art. I, §1, cannot delegate its "exclusively legislative" authority at all. *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825) (Marshall, C. J.). The Court has invalidated statutes for that very reason. See *A. L. A. Schechter Poultry Corp.* v. *United States*;295 U. S. 495 (1935); *Panama Refining Co.* v. *Ryan*,293 U. S. 388 (1935); see also *Mistretta* v. *United States*,488 U. S. 361,373, n.7 (1989) (citing, *inter alia*, *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*,448 U. S. 607,646 (1980)).[13]

Alito continued:

The principle that Congress cannot delegate away its vested powers exists to protect liberty. Our Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints. See *INS* v. *Chadha*, 462 U. S. 919,959 (1983). It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints. The Constitution's deliberative process was viewed by the Framers as a valuable feature, see, *e.g.,* Manning, Lawmaking Made Easy, 10 Green Bag 2d

---

[12] Surely the "had enough of this crap" crew of *Hannah* and the assault rifle wielding crazies at Lexington would see FINRA and the other alphabet agencies as British crown operatives, no more, no less.

[13] *Amer. Assoc. Railroads, 575 U.S. 43*

202 (2007) ("[B]icameralism and presentment make lawmaking difficult *by design*" (citing, *inter alia*, The Federalist No. 62, p. 378 (J. Madison), and No. 63, at 443–444 (A. Hamilton))), not something to be lamented and evaded.[14]

Alito went all in on the illegitimacy of private corporations exercising government functions:  <u>*When it comes to private entities, however, there is not even a fig leaf of constitutional justification.*</u> (emphasis added) Private entities are not vested with "legislative Powers." Art. I, §1. Nor are they vested with the "executive Power," Art. II, §1, cl. 1, which belongs to the President. By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form." *Carter* v. *Carter Coal Co.*,298 U. S. 238, 311 (1936).[15]

Applied to *Traudt,* the parallels couldn't be more obvious: unelected, unappointed bureaucrats used their positions to issue a trading halt in a security thus effectively executing a theft of property upon 65,000 investors in MMTLP. None of the FINRA officers on the FINRA BOD or the Uniform Practice Code (UPC) committee that ordered the U3 halt in MMTLP were US government officials, yet they exercised utterly stratospheric levels of executive authority by unilaterally stripping 65,000 Americans of their investments.

And FINRA is self-supporting from its investments and fees, which makes it even more unaccountable. The power of the purse by Congress is always the final control on an agencies' conduct in the Executive Branch; the 5th Circuit most recently weighed in on this in *Consumers Rsch. Cause Based Commerce, Inc. v. Federal Communications Commission No. 22-60008*, 5th Cir. (2024)  holding [F]inally, the breadth of *§ 254*'s delegation is especially troubling because

---

[14] Id., Concurrence of Judge Alito
[15] Id., Concurrence of Judge Alito

the statute insulates FCC from the principal tool Congress has to control FCC's universal service decisions—the appropriations power. *See U.S. Const. art. I, § 9, cl. 7* ("No Money shall be drawn from the Treasury, but in Consequence  of Appropriations made by Law."). Ordinarily, when Congress delegates broadly, it retains a residuum of control over agency action because the agency is powerless to act without a congressional appropriation of funds. *See CFPB v. All Am. Check Cashing, Inc., 33 F.4th 218, 232 (5th Cir. 2022).*

Where *Alpine's* analysis stops at FINRA hearing officers and by extension other executive officers of FINRA, both *Biden v. Nebraska 143 S. Ct. 2355 (2023)* and *Loper* come in.

**IV.    "Major questions" and the death of  "(Chevron) deference" meet FINRA in the wild**

FINRA's house of cards on absolute immunity collapses into the gravity well of the two core rules at the center of *Traudt* that are easily within the crosshairs of both *Biden* and *Loper*.

**FINRA Rule 203(b)(2)** states: *A market maker engaged in bona fide market making activities is <u>exempt from the locate requirement</u> of this paragraph with respect to short sales in the course of bona fide market making activities in the security for which it is registered as a market maker, <u>provided that the short sale is not for the purpose of deceiving or creating a false appearance</u> of active trading in any security." (underline added)*

**FINRA Rule 6440(a)(3)** states: *"FINRA may impose a U3 trading halt where there is uncertainty in the marketplace for the security due to regulatory concerns, pending corporate actions, or other <u>extraordinary events</u> that could cause significant uncertainty in the market for the security."(underline added)*

Both of these rules have no grounding in legislative action directing such a broad power. In the former, to enable GTS and other market makers to print Carl Sagan numbers of computerized, fully artificial shares of a security ("naked shorts") and be able to loan these out in

debt-equity swaps to hedge funds with only the proviso that the market maker can't use them to manipulate the markets (when in fact the *only* purpose a hedge fund or broker-dealer would undertake such a deal would be to utterly destroy the share price of a security) is horrifically unconstitutional. As mentioned in Traudt's 1st Amended Complaint, this is the zenith of "trust me bro" and is unconstitutional for ambiguity and unenforceability.[16] Traudt maintains this happened with MMTLP for the benefit of the market maker (GTS) and the hedge funds or brokers who sold it short. This level of horsepower in rule making clearly was proscribed by Article II.

The major questions doctrine, reinforced by *Biden*, requires clear congressional authorization for significant regulatory actions. FINRA's authority to issue U3 trading halts under the vague term "extraordinary circumstances" lacks explicit statutory backing.

In *Biden,* the court evaluated a plan by President Biden to authorize the Secretary of Education to forgive nearly $430 billion in student loan debt. The court balked:

The Secretary also appeals to congressional purpose, arguing that Congress intended "to grant substantial discretion to the Secretary to respond to unforeseen emergencies." On this view, the unprecedented nature of the Secretary's debt cancellation plan is justified by the pandemic's

---

[16] See **TRAUDT'S MOTION FOR AN EVIDENTIARY HEARING UNDER FRCP 43(C) § 6:** FINRA Fraud VP Sam Draddy states under oath that *"20. Electronic Blue Sheet data does not contain information about whether or how a short position was covered or whether a short sale is "naked."* Though Traudt disputes this, it doesn't matter: FINRA here is "hoist on its own petard" legally speaking; if Draddy is truthful here then FINRA has no data tracking to hold market makers accountable under 203(B)(2), thereby sealing its fate as not just ambiguous but unenforceable and violative of SEC Rule 10B-5 in that it is a manipulative practice *de consillio*. If Traudt is correct, FINRA has the means to track short sales – even nakeds – but has chosen not to. That's worse. Either way, 203(b)(2) needs to be stricken by this court as unconstitutional.

unparalleled scope. But the question here is not whether something should be done; it is who has

the authority to do it. As in the Court's recent decision in *West Virginia* v. *EPA*, given the

" 'history and the breadth of the authority' " asserted by the Executive and the " 'economic and

political significance' of that assertion," the Court has " 'reason to hesitate before concluding that

Congress' meant to confer such authority." 597 U. S. ___, ___ (quoting *FDA* v. *Brown &*

*Williamson Tobacco Corp.*, 529 U. S. 120, 159-160).

  The court was no less enthusiastic about the usurpation of power by a bureaucracy:

  All this leads the Court to conclude that "[t]he basic and consequential tradeoffs" inherent

in a mass debt cancellation program "are ones that Congress would likely have intended for

itself." *West Virginia*, 597 U. S., at ___ (No. 20-150) (2022). In such circumstances, the Court

has required the Secretary to "point to 'clear congressional authorization' " to justify the

challenged program. *Id.*, at ___, ___ (quoting *Utility Air Regulatory Group* v. *EPA*, 573 U. S.

302, 324). And as explained, the HEROES Act provides no authorization for the Secretary's plan

when examined using the ordinary tools of statutory interpretation--let alone "clear congressional

authorization" for such a program. Pp. 19-25.

  Applied to *Traudt,* FINRA's Rule 6440(A)(3) allowing for FINRA to *unilaterally* stop

trading of a stock and to do so claiming unexplained, unelucidated "extraordinary

circumstances" forced their hand is the height of *Biden* and *West Virginia* "major questions"

jurisprudence; 65,000 Americans in MMTLP were affected by the U3 halt.[17] More importantly,

the U3 halt is an economic nuclear weapon that can be used now anytime a stock – let's take the

---

[17] As Traudt documents in his 1st Amended Complaint, orders were being placed and
accepted by brokers such that share values over a broad range from $300 (approximately)
to over $25,000 *per share* were accepted and onscreen Bloomberg videos show it going
quickly from the hundreds of dollars into the thousands; this puts the true extent of the
MMTLP fiasco at over $330 billion being taken from MMTLP holders.

Gamestop (ticker "GME") for example – that is a favorite for the small investors who have bought it would pose a "short squeeze" threat to the apex predators like Citadel, GTS, Jane Street, Virtu. If the arguments here fail, one can count on FINRA blowing away GME with a permanent U3 halt to protect the country club crowd that have the FINRA UPC Board permanently in their pockets.

But this U3 analysis inevitably circles back to the market maker exemption §203(b)(2) if not just for its breadth, its enforceability, and scope, but because the horror of an Education Secretary stroking a signature and writing off $430 billion (*Biden*) is simply not even in the same ball park as the economic firepower market makers like Defendant Ari Rubenstein ("Rubenstein") and the Tyrannosaurus Rex of the apex predators (Ken Griffin – Citadel Securities -  "Griffin") possess and use regularly.[18] Combined with the other computer systems[19]

---

[18] Way back in 2008, Robert J. Shapiro, former undersecretary of commerce for economic affairs, and a consultant to a law firm suing over naked shorting, claimed that naked short selling had cost investors $100 billion and driven 1,000 companies into the ground. See:  http://www.time.com/time/magazine/article/0%2C9171%2C1126706-3%2C00.html

[19] *High-Frequency Trading (HFT) Algorithms* operate by executing a large number of orders at extremely fast speeds, often within milliseconds. Market makers use sophisticated algorithms and physical proximity to exchanges to gain speed advantages. The potential for abuse comes from HFT exploiting microsecond differences in price movements, which makes it difficult for retail investors to compete. Techniques like quote stuffing, where the market is flooded with fake orders, and front-running, where market makers trade ahead of large orders, can manipulate the market and create artificial price movements.

*Payment for Order Flow (PFOF)* systems allow market makers to pay brokers to route retail orders to them for execution. This setup gives market makers the advantage of seeing orders before they are executed. The potential for abuse lies in situations where market makers may prioritize their profits over obtaining the best execution price for retail investors. By trading against the flow of incoming orders, they can extract profits from knowing about transactions in advance.

*Dark Pools* are private exchanges where large institutional trades can be made anonymously, without affecting the public market. Market makers with access to dark pools can execute trades in these private venues without retail investors seeing price

weaponized by the market makers and broker-dealers against small investors like Traudt, there is a perfect storm of major questions doctrine tripwires detonating constitutional claymore mines throughout the entire Traudt case and by reference the entire US stock market regulatory scheme not just with FINRA but the SEC too.[20]

In short, the two major FINRA rules are unconstitutional, at the very least. (Traudt also addresses this without waiving his constitutional arguments here by filing with this court on 19 July 2024 his **WRIT OF MANDAMUS** to reopen trading in MMTLP in the USA for the two days as approved in the Corporate Action initially approved by FINRA.)

V.     **SEC v. Jarkesy No. 22-859 (US Supreme Court 2024): what's good for the goose is good for the gander.**

Traudt argues that the US Supreme Court's determination in Jarkesy that somebody being pursued by the SEC for what amounts to common law fraud is to be afforded a jury trial in US District Court in keeping with the 7th Amendment right to civil trials, then Traudt is entitled to one pursuing a private corporation under the same standard: FINRA is being pursued for

---

movements. This can lead to front-running or manipulative pricing, where market makers take advantage of the lack of transparency to profit at the expense of small investors. *Order Routing and Internalization* occurs when market makers and large firms route orders to internal systems instead of public exchanges, allowing them to match trades within their own books. The potential for abuse arises when market makers internalize orders, meaning they execute trades within their own systems at prices that may not reflect the best available market price. This practice can lead to worse outcomes for smaller investors.
*Algorithmic Market Making* involves market makers using algorithms to provide liquidity and manage large volumes of orders across multiple exchanges. These algorithms adjust prices or hedge positions in real-time based on market data. The potential for abuse comes when these sophisticated algorithms are used to manipulate bid-ask spreads, making it more expensive for small investors to buy or sell securities. Market makers can also engage in predatory trading, deliberately driving down prices to trigger stop-loss orders from small investors, allowing them to buy shares at lower prices.

[20] The M18A1 claymore mine is a command detonated anti-personnel munition used by the US military since the Vietnam War.

19

common law fraud inter alia and 18 USCS 1961 Racketeer Influenced and Corrupt Organization ("RICO") claims. The SEC argued stridently against this, but the Supreme Court thought otherwise:

The foregoing from *Granfinanciera* already does away with much of the SEC's argument. Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be taken to an administrative tribunal." 492 U.S. at 52, 109 S.Ct. 2782. Nor does the fact that the SEC action "originate[d] in a newly fashioned regulatory scheme" permit Congress to siphon this action away from an Article III court. Ibid. The constructive fraud claim in *Granfinanciera* was also statutory, see id., at 37, 109 S.Ct. 2782, but we nevertheless explained that the public rights exception did not apply. Again, if the action resembles a traditional legal claim, its statutory origins are not dispositive. See id., at 52, 56, 109 S.Ct. 2782. *Jarkesy* §4.

More interestingly, the exact case cited as on point by FINRA in its claim of absolute immunity (here extracted from their memorandum in opposition to Traudt's Preserve motion) does nothing of the sort, anyway; in *Standard Inv. Chartered, Inc. v. National Ass'n of Securities Dealers, Inc., 637 F. 3d 112, 116 (2d Cir. 2011)* the 2nd Circuit held that [W]e have cautioned that the doctrine "is of a rare and exceptional character," *Barrett v. United States, 798 F.2d 565, 571 (2d Cir. 1986)* (internal quotation marks omitted), and courts must examine the invocation of absolute immunity on a case by case basis, DL Capital Group, 409 F.3d at 97. The party asserting immunity bears the burden of demonstrating its entitlement. *D'Alessio*, 258 F.3d at 104. We apply a functional test to determine whether an SRO is entitled to immunity based upon the facts before us, see *NYSE Specialists*, 503 F.3d at 96, which requires us to look at "the nature of the function performed, not the identity of the actor who performed it," *Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Standard Invst., § 115.*

20

Traudt supplied 80+ pages of evidence of the fraud in his **Preserve** motion. Clearly,

Traudt's fallback position is that this meets the standard set in Standard Invst., if nothing else.

**VI.**   <u>The Blue Sheet Data needs to be obtained under seal and stored at this court for in</u>
<u>camera review</u>

Traudt dispatches FINRA's arguments against the bluesheets release as follows:

1.  The costs are non-existent to FINRA as they have already been produced.

2.  FINRA submitted Draddy's affidavit, and it needs to be cross-examined otherwise

    Traudt is at a disadvantage in the evidentiary hearing he has filed a motion for.

    (Traudt here argues that any evidentiary hearing must have a *de minima* production of

    the bluesheets Draddy identified as being "pulled" by him on 5 December 2022.)

3.  There can be no claim of privilege if the bluesheets provided are sterilized and only

    report aggregates as requested by Traudt in long positions, short positions, and naked

    synthetics cranked out in celestial numbers by GTS and other market makers.

4.  Traudt contends that nothing exceeds like excess and the evidence of FINRA rule

    breaking, data insanity, fraudulent responses to Congress, contradictions, and the

    evidence of data corruption in **Preserve** and **Motion for an Evidentiary Hearing**

    **Pursant to FRCP Rule 43(c)** (incorporated here by reference) calls for immediate

    production of that laser focused limited discovery. Traudt is not on a "fishing

    expedition" – yet.[21]

Traudt's request for expedited limited discovery comes early in this case, no doubt, but
such expeditious timing is necessitated by the time-sensitive nature of preliminary

---

[21] Traudt works as a commercial fisherman, and was in fact once a crewman aboard *F/V*
*Persistence*, one of the fishing vessels ("F/Vs") owned by Relentless, Inc., which was a
plaintiff in *Loper.* As mentioned in the 1st Amended Complaint, Traudt may seek leave of
the court to work and go on a real "fishing expedition" shortly.

injunction proceedings. As the district court in *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841 (D.D.C. 1996), stressed, "[e]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Id.* at 844 (citing *Optic–Electronic Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987), and *Onan Corp. v. United States*, 476 F. Supp. 428, 434 (D. Minn. 1979)). *See also ALARIS Grp., Inc. v. Disability Mgmt. Network, Ltd.*, No. 12-cv-446, 2012 WL 13029504, at *2 (D. Minn. May 30, 2012) (quoting *Ellsworth Assocs., Inc.*, 917 F. Supp. at 844) (stating "[e]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings"). Accordingly, "courts have routinely granted expedited discovery in cases involving challenges to constitutionality of government action." *Id*.

Expedited discovery to provide the Court with the details necessary to craft an injunction tailored to prevent the irreparable harm caused by FINRA's continuing *ultra vires* and unconstitutional conduct is accordingly eminently justified under the "good cause" standard. Traudt relies on *St. Louis Grp., Inc.*, 275 F.R.D. at 239 (S.D. Tex. 2011) (stressing "courts have granted expedited discovery requests when there is some showing of irreparable harm that can be addressed by limited, expedited discovery"). *See also BKGTH Prods., LLC v. Does* 1–20, No. 13-cv-5310, 2013 Case 6:23-cv-00609-JDK Document 13 Filed 02/07/24 Page 14 of 20 PageID #: 5977 WL 5507297, at *5 (E.D. La. Sept. 30, 2013) (*accord*).

## VII.   Granting FINRA absolute immunity and denying Traudt access to economic documents used to cause him et. al. economic harm and disadvantage violates his 9th Amendment economic civil rights

*"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."* US Constitution, 9th Amendment.

Traudt closes out his reply memorandum here by putting forth, based on the economic exigencies of the day, the rapid rate of technological evolution prejudicing the common man in his right to enterprise and property and economic well-being, the obvious suffocation of his economic opportunities and economic security by multi-national corporations beyond the control of the US government or *deterior res* under the control of multi-national corporations, that there

is contained within the *penumbra* of rights held by American citizens to be one of *economic right*. Traudt looks to *Griswold v. Connecticut 381 U.S. 479 (1965)* to assert this.

The U.S. Constitution implicitly recognizes economic liberty through several key provisions that protect property rights and freedom of contract, supporting Traudt's argument that economic rights are substantive. The Commerce Clause, found in Article I, Section 8, grants Congress the power to regulate commerce with foreign nations and among the several states, acknowledging the right of individuals to engage in commerce and participate in economic activities across state lines. The Contract Clause, in Article I, Section 10, prohibits states from passing any law impairing the obligation of contracts, securing the right of individuals to enter into and enforce contracts, which is central to economic liberty. The Takings Clause of the Fifth Amendment reinforces this by stating that private property cannot be taken for public use without just compensation, ensuring that property rights, a fundamental aspect of economic autonomy, are protected. Finally, the Due Process Clauses of the Fifth and Fourteenth Amendments safeguard against deprivation of life, liberty, or property without due process of law, which courts have historically interpreted to include substantive economic rights such as the right to contract freely and engage in one's chosen occupation. These constitutional protections collectively support the argument that economic liberty is a substantive right, deeply intertwined with individual freedom and autonomy.

The Founding Fathers could not have perceived the wildly uneven playing field that constitutes the supposed capitalist structure of our economy, and Adam Smith would have heart palpitations seeing how the "unseen hand of the market" has been instead subordinated and rendered virtually immaterial by the financial system apex predators who, with just a few

keystrokes, can utterly obliterate investments and entire *companies* across massive swaths of America's citizenry.

Traudt has a separate and distinct cause of action against defendants that, for lack of better terminology, best attempts to level the playing field when the forces of high finance, government regulatory capture (as is the case incontrovertibly with FINRA and to some extent the SEC) and powerful stock market participants combine *si non consillio usu* to suppress other conventional options for the redress of grievances for those of us considered to be a part of the "unwashed mob" with the poor judgement to expect freedom and fairness play any role in Wall Street's carnival of corruption.[22]

So Traudt stands before this court knowing several motions to dismiss have or will be filed and a motion to put him in arbitration is on the record. No matter. Traudt contends that he should have leave to amend his 1st Amended Complaint by right anyway down the line, and he believes he should be able to bring a distinct cause of action for an "economic *Bivens* action" such that the standards employed in evidence in criminal trials is the standard when a regulatory or government action amounts to a takings under the 5th Amendment.[23]

Traudt posits that given the complexity of government and private computerized systems used to track and maintain securities trading systems, and the various ways in which these can be weaponized against the average American market participant (**See Footnote 17, above**), nothing less than an economic *Bivens* action for damages will address the modern industrialized, digitalized, speed-of-light transactional nature of the modern securities markets. The SEC rarely

---

[22] One only has to look at the incredibly high bar in securities fraud pleadings needing to survive 12(B)(6) motions and the fact that RICO civil cases cannot be brought if they involve securities fraud (ostensibly, though Traudt aims to change that) and the ground is fertile for some broken field constitutional running.

[23] See *Bivens v. Six Unknown Federal Narcotics Agents 403 U.S. 388 (1971)*

prosecutes criminally and instead looks at wrist slaps as even SEC/DOJ prosecutors admit securities fraud is hard to prove "beyond a reasonable doubt." Fines do not deter. Having an economic *Bivens* action available for those harmed with criminal discovery standards applied might be what the US markets need to clean up the corruption.

And the discovery standard would be *Brady v. Maryland 373 U.S. 83 (1963)*, tweaked so that the *Brady* mandate (law enforcement cannot suppress evidence favorable to anyone accused of a crime because it violates due process) is morphed in an "economic civil rights action." Traudt contends a re-imagining of *Brady* via *Bivens* would provide that any time there is a federal government action (even with private parties doing the government's bidding) depriving someone of their property, money, securities, or right of enterprise, all documents or data favorable to the aggrieved party associated with that decision should be *res ex necessitate* disclosed to the parties injured.

For all of the foregoing, Traudt requests oral argument on this motion and:

1. Find FINRA Rule 203(b)(2) unconstitutional.

2. Find FINRA Rule 6440(a)(3) unconstitutional.

3. Issue a permanent injunction against both FINRA and the SEC banning any implementation of any rule similar to Rule 203(b)(2), basically ending any and all naked short selling in the US markets.

4. Issue a temporary injunction against FINRA and the SEC on Rule 6440(a)(3) until its terms are constitutionally defined with specificity by Act of Congress and its timelines are also so defined.

5. Hold a hearing on the existence of FINRA and whether it is legally performing *any* duties on behalf of the US government or should be shut down as violative of the Appointments Clause *inter alia*.

6. Deny FINRA immunity in this action.

7. Grant Traudt's **Motion for Expedited Limited Discovery**.

Dated: September 5, 2024

Scott Traudt, *pro se ipso*
191 Kibling Hill Road
Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to all named defendants and respondent at the addresses delineated below either by 1st Class mail or via email on this 5 day of September, 2024.

SCOTT TRAUDT

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan R. Voegele, Morris Kandinov LLP, 4915 Mountain Rd., Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Aaron T. Morris, Morris Kandinov LLP, 4915 Mountain Rd.,  Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan Miller, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**Ari Rubenstein/GTS Securities LLC** Atty. Stephen Fraser, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**FINRA** Atty. Walter Judge, DRM, 199 Main St. POB 190 Burlington VT 054020-190

26

**FINRA** Atty. John P. Mitchell, Faegre, Drinker, Biddle & Reath LLP 105 College Road East 105 College Road East, POB 627 Princeton NJ 08542-0627

**Schwab** Atty. Justin Barnard, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Anne B. Rosenblum, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Felipe Escobedo, Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

**Schwab** Atty. Jeff Goldman Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

**SEC** Atty. Mike Bailey 100 F Street, NE Washington, D.C. 20549

# 3. Has the MMTLP trading halt ended?

APPENDIX A

Yes. As stated in the MMTLP trading halt notice published on December 9, the MMTLP halt ended concurrent with FINRA's deletion of the MMTLP symbol, which occurred on December 13, 2022. FINRA's website was updated on February 16, 2023, to reflect the December 13 end of the trading halt (this update occurred later than normal due to a coding issue introduced in connection with a system migration). The MMTLP shares were cancelled by the issuer on December 14 and therefore it has not been possible to trade them since that time, irrespective of the halt status displayed on FINRA's website.

Due to a systems coding issue, FINRA incorrectly classified MMTLP as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" showing that MMTLP met the FINRA threshold standard from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. While MMTLP did meet the quantitative criteria under FINRA Rule 4320, it was subject to the Regulation SHO standard instead because MMTLP was issued by an SEC-reporting company. Since it began trading in October 2021, MMTLP did not have fails-to-deliver of the size or duration that would have rendered it a threshold security under Regulation

Firefox
https://mail.proton.me/u/2/sent/4mi2yK7Rri44St_qSdhNT8d1PcLn2...

## MMTLP oversold and short numbers as of 2 January 2023/Federal Rules of Civil Procedure Request 27

| | |
|---|---|
| From | sct545 <SCT545@proton.me> |
| To | Sam.Draddy@finra.org |
| Date | Friday, July 12th, 2024 at 12:56 PM |

# APPENDIX B

Mr. Sam Draddy:

I am about to bring a "Racketeer Influenced Corrupt Organization" (RICO - 18 USCS 1961) case against a few participants in the ongoing MMTLP U3 trading halt saga as I an MMTLP shareholder. This will be filed in US District Court for Vermont. In support thereof, I am seeking documents from you now with specificity under Federal Rule of Civil Procedure 27.

I have reviewed emails where you seemed to have been familiar with potential fraud in MMTLP and even disclosed that on 5 December 2022 it was clearly on your radar from an investigative and enforcement standpoint. You noted that you pulled the "bluesheets" which I understand to be aggregated trading records of a particular security made possible with data supplied from broker-dealers to FINRA and compiled into a readily identifiable trade history and status of that security.

As the SEC is apparently going after former Torchlight (TRCH) and Meta Materials (MMAT) officers John Brda and George Palikaras only for events up to 31 December 2022, and are only pursuing civil charges, the documents I am asking you for are not part of any criminal investigation nor can any claim of privilege be asserted by FINRA or the SEC as there is no US law passed by Congress to grant either FINRA or the SEC the authority to *withhold* documents showing or tending to show fraud being committed against US investors nor, specifically, to withhold these "bluesheets." (*Loper Bright Enterprises v. Raimondo* US Supreme Court 22-451, 2024). In fact, per the holdings in *Loper*, my forthcoming litigation will ultimately challenge the very existence of FINRA as a self-regulatory organization. But for the moment, transparency is the issue, and it appears that broker-dealer members of the U3 halt committee you communicated with had substantial benefit of your bluesheet reviews of MMTLP in derogation of the supposed FINRA regulatory obligation to "protect small investors."

In essence, it appears you supplied what amounted to insider trading information to industry heavy weights and you did not take measures incumbent upon your position as Senior Vice-President of the National Cause and Financial Crimes Detection program to even evaluate the counter-party status of those in receipt of your bluesheet data as transmitted through Vice-President of Market Operations Patricia Casimates. One would think from the subsequent actions of the U3 halt committee that the data supplied lead them to shut down trading in MMTLP to protect their own corporate interests.

Therefore, I am requesting in either Microsoft DOCX, XLS, PDF, or JPEG format any and all bluesheet data showing or tending to show total long positions sold in MMTLP, total short positions sold in MMTLP, and to do so using any and all available records from broker-dealers (apparently there was 105 that received shares from DTCC in MMTLP) that were available to you as identified by your 5 December 2022 email referencing same. Furthermore I wish to have an affidavit of completeness attached, or a summary affidavit under oath attesting to

your compliance with this request under pain of perjury per the US Federal Code of Civil Procedure.

As you are familiar with this data, and its obtainment to myself will greatly simplify legal issues and expenses which I have a duty to minimize for all parties, I would expect this request to be honored no later than 19 July 2024.

Thank you for your time,

Scott Traudt
Strafford VT

Sent with Proton Mail secure email.

# APPENDIX C

 Gmail

---

## Subpoena duces tecum in "Traudt v. Rubinstein"

---

**Patrick Butts** <patrick.butts@hilltopsecurities.com>
To: Scott Traudt <sctraudt@gmail.com>

Tue, Aug 27, 2024 at 10:34 AM

Mr. Traudt:

We have reviewed Hilltop Securities Inc.'s records for information responsive to the subpoena you sent to me in connection with the referenced matter (the "Subpoena"). Following our review, we concluded there are records responsive to the Subpoena.

Patrick Butts

Hilltop Securities Inc.
Legal Ops & Information Governance Manager
717 N Harwood St, Suite 3400 | Dallas, TX 75201
direct: 214.953.4032 | work mobile: 469.351.6490

patrick.butts@hilltopsecurities.com | HilltopSecurities.com

**THIS COMMUNICATION IS PROTECTED BY THE ATTORNEY-CLIENT AND/OR WORK PRODUCT PRIVILEGES AND MAY NOT BE DISCLOSED OR FORWARDED TO ANY OTHER PARTY WITHOUT THE PRIOR AUTHORIZATION OF THE SENDER.**

**CONFIDENTIALITY NOTICE:**

The information contained in this email communication (including any attachment(s)) is legally privileged, strictly confidential and intended solely for the person or entity named above. If you are not the intended recipient of this email, you are hereby notified that any disclosure, distribution, reproduction, or other use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return email and permanently delete this communication (including any attachment(s)) from your system.

**CONTRACT NOTICE:**

Nothing within this email communication, including the signature block, should be construed as forming a contract, binding an offer, establishing acceptance, or constituting a signed agreement. The author of this email communication is not authorized, and has no intent, to make offers or enter into contracts or agreements via email communications.