UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| SCOTT TRAUDT, Traudt | * | |
| v. | * | Docket Number: 2:24-cv-782 **JURY TRIAL DEMANDED** |
| ARI RUBENSTEIN Defendant | * | 1st Amended Complaint |
| GTS SECURITIES LLC GTS EQUITY PARTNERS LLC GTS EXECUTION SERVICES LLC Defendant | * | |
| CHARLES W. SCHWAB AND CO. INC. SCHWAB HOLDINGS, INC. Defendant | * | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY Defendant | * | |
| GARY GENSLER US SECURITIES AND EXCHANGE COMMISSION Respondent | * | |

*"Spoliation" is a cardinal litigation vice. Bagley v. Yale Univ*. 318 F.R.D. 234 (D. Conn. 2016)

**MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE; OBJECTION TO MOTION TO STAY FOR ARBITRATION; MOTION FOR A PRESERVATION ORDER PURSUANT TO FRCP 26(c)**

NOW COMES Scott Traudt ("Traudt") and moves this Honorable Court for sanctions against Defendant Charles Schwab & Co., Inc. ("Schwab") for spoliation of evidence, to grant injunctive relief against Schwab for a preservation order under FRCP 26(c), to deny Schwab's motion for a

stay in favor of sending the dispute to arbitration, to enter an order pursuant to FINRA Rule 7510 to get MMTLP shareholders whose trades were confirmed but not made good by their brokers and thus are the exclusive province of the Depository Trust and Clearing Corporation as of 20 September 2024, to enter an order for an adverse inference jury instruction against Schwab on behalf of Traudt as the destruction of evidence has permanently crippled Traudt's case, has made justice impossible not just for Traudt but for others similarly situated legally (both TDA and Schwab clients), has undercut the fairness of these proceedings, has prejudiced Traudt, and was done by Schwab intentionally and with a "culpable mind."[1]

In support of this Motion, Traudt states as follows:

**<u>I. Schwab twice admits to destroying evidence critical to Traudt's claims</u>**

Traudt sent multiple emails to Schwab counsel per FRCP 7(a)(7) on or about 14 September 2024 through 16 September 2024 informing them of the damage done to Traudt and asked if they could seek the restoration of the data. **(See Appendix A)**. Counsel has refused and said Schwab would not extend based on Traudt's rational reason that data and electronically stored information ("ESI") was destroyed and dismissed the request as being irrelevant to Traudt's arbitration objections and refused to ask their client to restore. Hence, Traudt files this motion with the conclusive presumption that it has all been lost, damaged, or destroyed and was done not negligently but by design to frustrate any possible attempt by Traudt to recover in litigation or via arbitration if so, ordered by this Court.

**<u>1. Factual background setting the premise for a spoliation claim under FRCP 37</u>**

[1] Upon information and belief, there were approximately 7,493 Schwab clients at the time of the 9 December 2022 trade halts.

On or about September 14, 2024, Traudt discovered that Schwab had deleted critical data while preparing an **Objection to Schwab's Motion to Stay Proceedings for Arbitration** and requested Schwab to repopulate the emails. Schwab customer service representative Samantha Yenzer told Traudt on 15 September 2024 via email that they were deleted as they were "not going to transition" from Traudt's TD Ameritrade ("TDA") account to Schwab due to the merger. **(See Appendix B)**. The merger was initiated in 2020 and completed on or about Labor Day Weekend 2023. This missing data included electronically stored information ("ESI") and records of communications as emails. Yenzer did not address missing digital recordings between Traudt and TDA/Schwab personnel. These emails dealt exclusively with the MMTLP situation as well as digitally recorded conversations discussing with Schwab personnel the issues regarding MMTLP.  This information was relevant to the claims and defenses in this litigation.

For background history on the ESI, on or about 14 December 2022 Traudt sent an email using TDA's message center that stated he was aware from trading activity after the 9 December 2022 U3 halt that broker-dealers were closing out short positions after trading had officially ended. Traudt offered shares to Schwab at $5000 a share for Schwab or any other parties through Schwab to purchase to close out short positions. On 16 December 2022 Traudt revised the offer to $7,500 to $10,000 a share.  **(See Appendix C)** These emails were followed on 20 December 2022 by another message center email where Traudt requested TDA to contact the Depository Trust Clearing Corporation ("DTCC") for a WINS system validation that Traudt had purchased real shares and not counterfeit synthetics from TDA. TDA refused to do this. Finally, that same message squarely told TDA that Traudt was going to sue under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Computer Fraud and Abuse Act ("CFAA"), and also

FINRA rules that were broken.[2] **(See Appendix D)** *This sole communication established Schwab's obligation to preserve these emails and audio files, and other related evidence for litigation.* Traudt was also specifically told by a TDA representative, in a phone conversation on in the spring of 2023, that all data, including emails and audio recordings, would transition to Schwab when TDA was finally 100% merged with Schwab and Schwab had taken control and command of all TDA accounts on or about Labor Day Weekend in September, 2023.[3]

Under FRCP 37(e), when electronically stored information (ESI) that should have been preserved in anticipation of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced, sanctions may be imposed by the Court.

Additionally, Schwab is bound by SEC Rule 17a-4[4] and FINRA Rule 4511[5], which require broker-dealers to preserve relevant records, including electronic communications and emails, for specified periods. These rules mandate the preservation of such data for 3 to 6 years.[6] Schwab is routinely deleting emails and customer records in violation of these rules. Traudt has attached emails and screenshots of Schwab clients having the same admissions from Schwab personnel.[7] **(See Appendix E)**

---

[2] Traudt requested playback from Schwab on 24 January 2024 and was told on 31 January they would not play it back. **(See Appendix D)**

[3] Traudt is certain this phone call or email exchange took place and believes it was in spring of 2023 – immediately after getting the run around from TDA customer service (see the emails in **Appendix C**) about playing/not playing back the audio.

[4] https://www.finra.org/rules-guidance/guidance/interpretations-financial-operational-rules/sea-rule-17a-4-and-related-interpretations

[5] https://www.finra.org/rules-guidance/rulebooks/finra-rules/4511

[6] SEC Rule 17a-4 requires that *all* customer communications be preserved for 3 to 6 years.

[7] See statement from Cedric Asensio: "Hi Scott, During the transition from TD to Schwab , they deleted all the correspondence I had with them , mostly related to MMTLP, they mentioned that there is no way for me to get these messages back." Cedric Asensio, 9454 Cobblecrest Dr, Highlands Ranch, CO 80126. **(Appendix E)**

More importantly to Traudt's case, it appears that Schwab has deleted audio recordings that are absolute, beyond a reasonable doubt evidence that then TDA employee Ron Fleming, a Series 9, 7, and 63 broker dealer at the time, did acknowledge that TDA was instrumental in requesting the U3 trade halt in MMTLP; these excerpts are from Traudt's 1st Amended Complaint:

> 80. Traudt called TDA's 800-669-3900 account services number around 4:50pm EST on 20 March 2023 to inquire about tax paperwork that TDA had regarding Traudt's stock trading.
>
> 81. Traudt remembers some confusion as to terminology in the conversation where Traudt asked about K2's and also other tax records and at all times on this date Traudt only spoke with Ron Fleming and was not transferred to anybody else. (Apparently his full name is Cameron Fleming, and he goes by Ron.)
>
> 82. After the tax issues were resolved, Traudt inquired broadly to Fleming about the MMTLP ticker which was apparently dead in the water as of 20 March 2023.
>
> 83. Fleming seemed to Traudt that with some prodding he might discuss what he knew about the U3 halt of 9 December 2022 in MMTLP by FINRA.
>
> 84. During the conversation, he made mention of three issues that Traudt thought clearly showed that trading was not shut down to protect small investors ("retail") but the broker dealers and potentially those shorting this:
>
> 85. He stated that it was "trading at 100 times the (lit market) in the dark pools and people were crazy to think broker-dealers would pay out on that."
>
> 86. The U3 was done, according to Fleming, "because the share price bore no relation to the actual share value" and…most importantly:

87. *Fleming stated that "we had to protect ourselves" and that was why they requested the U3 halt.*

88. Traudt had requested to have copies of this conversation which was recorded by TDA sent to Traudt or made available for transcription.

89. At first TDA said they would play them back, and then they refused.

90. Traudt attempted again in February of 2024 to get Schwab trade desk people to play them back, and they refused.[8]

91. Schwab will not release the audios clearly as part of a cover up and an orchestrated, coordinated campaign to prevent the release of damning information not only to Traudt but also to 65,000 other MMTLP shareholders similarly worked over by this "cartel" in all but name.

Traudt made numerous requests to listen to the audio, get transcripts of it, or have the recording of that call sent to him. TDA and later Schwab personnel all refused this request but had reviewed the audio and knew exactly how damning it was to Schwab's interests. **(See Appendix F)**

**2. Destruction of evidence confirmed on 16 September 2024**

On 15 September 2024, Schwab notified Traudt that all the requested data, including the emails sent in early 2023 and other electronic records, had been deleted, despite Traudt's explicit notice that he was going to sue them.

The spoliation of evidence was confirmed by Schwab Customer Service Representative Noah Marks (Westlake, TX office of Schwab) on 16 September 2024 at 12:20 PM EST who said

[8] This statement was in the 1st Amended Complaint and is in error – the dates were 28 January 2024 and 31 January 2024.

policy was to delete all phone message recordings one year after they were made. This took place even after Traudt had given them sufficient notice to preserve all evidence that could be used in litigation and with them having a special duty of care to take special precautions once litigation was forthcoming. They cannot claim no notice was given.

Both Schwab employees were at variance with each other indicating Schwab has no clear policy for records retention (violating SEC 17a-4 and FINRA Rule 4511); Yenzer said Traudt's emails were lost in transition and Marks stated there was a one year audio retention policy used by Schwab to delete recorded customer service phone calls. All of these deletions took place against a backdrop of Traudt having informed TDA of litigation forthcoming, and Traudt did so on 20 December 2022. (Another employee at Schwab (Grant Wells) when questioned by Traudt about preserving records, acknowledged that TDA could not delete messages). **(See Appendix F)**

**<u>3. Relevance of the Evidence:</u>**

The deleted data includes critical records, including emails, electronic communications, audio recordings, and other electronically stored information (ESI), directly impacting Traudt's claims. These records are key to Traudt's claims regarding damages related to MMTLP trading losses and Schwab's failure to protect Traudt's interests. The audio alone was produceable at trial under the Federal Rules of Evidence. In a case dealing with admissibility of recorded calls in a securities case, it was held that it is in the interest of justice to give the fact finder access to the most reliable evidence of what Lines volunteered to the SEC in the midst of these swiftly unfolding events, and that evidence is the recorded call. *SEC v. Lines*, 669 F. Supp. 2d 460, 466, 2009

**<u>4. Prejudice and Impact:</u>**

The loss of this electronic data, communications, and audio recordings, particularly the emails detailing Traudt's claims and notice of legal action, as well as the 20 March 2023 audio recordings from TDA, severely prejudices Traudt's ability to litigate his case. These emails and audio recordings were critical in documenting Traudt's claims for damages and providing formal notice of litigation to Schwab, impairing Traudt's ability to substantiate his claims, oppose the Schwab motion attempting to stay this case and put Traudt in arbitration, and undermining the fairness of the proceedings. Since in the audio TDA's Ron Fleming states that MMTLP was trading at over "100 times" the lit market price, Traudt can quickly calculate that the *de minima* share price that TDA/Schwab was seeing on 8 December 2022 was the closing price on 8 December 2022 of $2.90 a share multiplied by 100 to $290 a share.[9]

**5. Dereliction and culpable mindset proving the spoliation was intentional**

The following fact pattern establishes the appropriate state of mind evidencing that this was no random act of simple negligence:

a. Schwab knew it was oversold in MMTLP at the time of the U3 halt and told MMTLP holders that under no circumstances and despite a FINRA order (potentially) to get MMTLP trading again, Schwab would not do so.[10] **(See Appendix G)** This is specific anticipatory non-performance of the contract with not just Traudt, but all Schwab shareholders in MMTLP, and it

[9] Though Traudt argues that he should not go into arbitration, the audio and that higher math indicates that no TDA/Schwab clients should get anything less than $290 a share for their MMTLP as of 18 September 2024; Traudt has seen video proof and other documents detailed in the 1st Amended Complaint that there were huge bid/ask spreads and accepted orders for up to $25,000 a share being created.

[10] The FINRA Rule 11111 explicitly states: *It shall be considered conduct inconsistent with just and equitable principles of trade for any member to refuse to take any action that is necessary to effectuate a final decision of a FINRA officer or the UPC Committee under the UPC Code (FINRA Rule 11000 Series) or other FINRA rules that permit review of FINRA decisions by the UPC Committee.* See https://www.finra.org/rules-guidance/rulebooks/finra-rules/11111

voids the contract *in toto* as violative of FINRA Rule 2010.[11] Schwab has contractual duties to Traudt *et. al.* that require conformity and compliance with FINRA and SEC rules. Schwab has effectively burned its own house down contractually with this stunning bit of corporate *espirit de corps.*

b. Traudt offered to sell his shares to TDA for $5,000 and then up to $10,000 and requested a WINS accounting from TDA to prove his shares were not counterfeits. TDA refused to do both. The WINS accounting would have shown Traudt's shares were illegally issued.

c. Traudt, on 20 December 2022, noticed TDA of a lawsuit to be filed against them.

d. On 20 March 2023, TDA recorded the Traudt/Fleming conversation.

e. On 20 March 2024, Schwab deleted the Traudt/Fleming conversation after assuring Traudt on two occasions (discussed above) that emails and audio would be preserved.

f. On 21 June 2024, Traudt sent Schwab a demand letter for damages. **(See Appendix H)** Schwab's only response was to state FINRA was responsible for the U3 halt – not them, *despite* admissions against interest by Fleming on 20 March 2023.

g. On 26 June 2024, Traudt sent a set of questions with supporting documents to Schwab that, *inter alia*, would elicit information regarding whether or not Schwab was legally able to sell MMTLP and if it had a valid form 211 approved by FINRA to deal in MMTLP; whether or not Schwab was oversold in MMTLP; whether or not Schwab had been tipped off to the U3 trade halt earlier than 9 December 2022. . **(See Appendix I)** They refused to answer any of these questions. Schwab knew in advance that MMTLP was going to be halted; this dovetailed with Fleming's admissions to Traudt on 20 March 2023.

---

[11] Rule 2010 states: "A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." https://www.finra.org/rules-guidance/rulebooks/finra-rules/2010

h. Schwab made a *calculated* decision that the destruction of the emails and audio were a better option for Schwab than producing them and risking the audio getting into the wild; better, it can be presumed, that they use the arbitration clause as a club and the “limited discovery” contained therein in the client agreement with Traudt to insure their destruction of evidence would not be discovered until Traudt was in arbitration – if at all. This can be seen in Attorney Jeff Goldman’s emails to Traudt where he refuses to even investigate the destruction of the evidence that Schwab was under a duty to preserve.[12]

**II. Standard of review**

**1. Adverse inference**

Held in *FDIC v. Horn* 2015 U.S. Dist. Lexis 44226: a party seeking an adverse inference sanction under *Rule 37(b)* must establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Corp*., 306 F.3d at 107 (quoting *Byrnie v. Town* (2d Cir. 2001)). "[A] showing of prejudice is not required." *Syntel Best Ltd. v. Grp*., 328 F.R.D. 100, 120 2018).

[12] On 18 September 2024, Schwab representative Stacie Haden used the Schwab messaging center to tell Traudt that he had been bad information and Schwab had found the audio. **(See Appendix J)** Traudt is proceeding under the conclusive presumption that the 16 September 2024 call was definitive as Schwab representative Noah Marks placed Traudt on hold for approximately 10 minutes while he consulted with other Schwab employees and presumably supervisory personnel to locate the audio. It is apparent that Traudt’s filing of a Motion for an Extension of Time on 17 September 2024 stimulated some sort of full Sherman Williams activity (the paint that covers up nicely) probably coupled with sulphurous language, but Traudt digresses here… any one of the four attorney’s representing Schwab in this matter could have made the call to sort it out and they chose not to. The only way to confirm its existence is to deliver a copy of the audio, unedited and clean, to Traudt with affidavits attesting to its fullness, authenticity, and originality.

Moreover, this 2nd Circuit case continued that:

In this Circuit, "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Corp.*, 306 F.3d at 108 (quoting *Byrnie*, 243 F.3d at 109) (internal alterations and emphasis omitted); *Curcio*, 283 F.R.D. at 111. *FDIC* at 28.

The 2015 amendments to the Federal Rules of Civil Procedure replaced former Rule 37(e) with new language that specifically addresses spoliation of ESI, providing that, "[i]f [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court may, on a finding of prejudice, "order measures no greater than necessary to cure the prejudice[.]" Fed.R.Civ.P. 37(e)(1). On a "finding that the party acted with the intent to deprive another party of the information's use in the litigation[, ]" the court may: "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed.R.Civ.P. 37(e)(2). *In re Keurig Green Mountain Single Serve Coffee Antitrust Litig.* 14 MD 2542 (VSB)(SLC)

**2. Duty to preserve and reasonable steps**

As to the first step, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). As explained in the seminal case of *Zubulake v. UBS Warburg LLC*: "While a litigant is under no duty to keep or retain every document in its possession[, ] . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably

calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("*Zubulake IV*") (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)). Thus, the duty to preserve arises "when a party should have known that the evidence may be relevant to future litigation." *Kronish v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). "[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008) (quoting *Zubulake IV*, 220 F.R.D. at 218). "Relevance, " for purposes of Rule 37(e), "is 'an extremely broad concept.'" *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)).

Once the duty to preserve attaches, a party and its counsel must "take reasonable steps to preserve" relevant evidence. *Moody v. CSX Transp., Inc.*, 271 F.Supp.3d 410, 426 (W.D.N.Y. 2017); *see* Fed.R.Civ.P. 37(e)(1). Counsel's "obligations extend further than simply advising her clients as to what documents might be necessary in the litigation . . . . Counsel has an obligation to 'become fully familiar with her client's document retention policies, as well as the client's data retention architecture.'" *Cruz v. G-Star, Inc.*, No. 17 Civ. 7685 (PGG), 2019 WL 4805765, at *12 (S.D.N.Y. Sept. 30, 2019) (quoting *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("*Zubulake V*")). *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, Civil Action 14 MD 2542 (VSB) (SLC), 12-13 (S.D.N.Y. Apr. 11, 2022)

**<u>3. A fair arbitration is impossible</u>**

Under the Federal Arbitration Act ("FAA") arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2. Accordingly, and under *Morgan v. Sundance Inc.* 596 U.S. 411, [T]hat policy "is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Granite Rock Co. v. Teamsters, 561 U. S. 287, 302, 130 S. Ct. 2847, 177 L. Ed. 2d 567*

Traudt argues that under contract law, Schwab has breached the arbitration contract with Traudt conspicuously through its multiple acts of spoliation and in doing so it has created more than a presumption of bad faith. Bad faith is defined as: [T]he opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. *Hiigenberg v. Northup*, 134 Ind. 92, 33 N. E. 780; *Morton v. Immigration Ass'n*, 79 Ala. 617; *Coleman v. Billings*, 89 111. 191*; Lewis v. Holmes*, 109 La. 1030, 34 South. 66, 61 L. R. A. 274; *Harris v. Harris*, 70 Pa. 174; *Penn Mut. L. Ins. Co. v. Trust Co*., 73 Fed. 653, 19 C. C. A. 310, 38 L. R. A. 33, 70; *Insurance Co. v. Edwards*, 74 Ga. 230.

Schwab raises *Rodriguez de Quijas v. Shearson/Am. Exp. Inc.,* 490 US 477, 485 as forcing arbitration under the federal securities laws; Traudt counters with *Hemispherx Biopharma v. Johannesburg Consol. Invs., 553 F.3d 1351, 1367, 2008* as much of Traudt's claims are outside the walls of the arbitration agreement. For the same reason, Schwab's use of *Shearson/Amer. Exp., Inc. v. McMahon,* 482 US 220, 238 (1987) similarly fails off *Hemispherx* too: the arbitration agreement was engineered to cover things not worthy of a US District Court's time such as minor price/order disputes, sales of securities under botched orders, limit orders not

being filled or market orders being poorly executed…the arbitration agreement wasn't written with all of the madness in *Traudt* Schwab and its co-defendants orchestrated.

**4. The arbitration agreement is unconscionable, ambiguous, and has conflict**

The interpretation of a contract is ordinarily a matter of state law to which a federal court defers. *DIRECTV, Inc. v. Imburgia, 577 U.S. 47, 47, 136 S. Ct. 463, 464.*

Traudt contests the contract as unconscionable because:

a. Under Vermont law, arbitration contracts are void if they involve questions of Constitutional law, 12 VSA 5652 even has it incorporated into the language of arbitration agreements as a standard term: "I understand that (this agreement/my agreement with __________ of __________) contains an agreement to arbitrate. After signing (this/that) document, I understand that I will not be able to bring a lawsuit concerning any dispute that may arise which is covered by the arbitration agreement, *unless it involves a question of constitutional or civil rights.* (emphasis added) Instead, I agree to submit any such dispute to an impartial arbitrator." 12 VSA 5652 (b) Traudt met this burden by making a claim for a cause of action under the 9th Amendment for economic civil rights in his **Plaintiff Traudt's Reply Memorandum of law in Opposition to Defendant FINRA's Memorandum of Law Objecting to Plaintiff's Motion for Expedited Limited Discovery.** Traudt asserted in that filing that he had stated a claim against all the defendants in this matter for actions and omissions to act that rose to the level warranting an economic *Bivens* action as his property rights were the subject of an involuntary takings without just compensation under the 5th and 14th amendments to the US Constitution. Schwab had Traudt's money, Schwab did the takings, aided and abetted by FINRA in circumstances and predicate acts as the uglier half of a co-joined twin with Defendant

GTS. More to the point: these were takings without just compensation again under the 5th Amendment.

b. The arbitration agreement states that members of the securities industry may sit as members of any arbitration panel. Traudt posits that the entire process starts with built in bias; a fairer standard would not have inserted that proviso which basically states that Schwab will have plants on any arbitration panel as a matter of *contract*.

c. The controlling rules per the arbitration agreement are FINRA's Code of Arbitration. Per these rules, Traudt is hamstrung in discovery: Rule 12507 states that interrogatories are not allowed; Rule 12510 states that "depositions are strongly discouraged;" Rule 12512(a)(1) states that only the arbitrator can issue subpoenas. Unlike a situation where Traudt could bring FRCPs 30, 33, 34, and 36, online as part of a legal "shock and awe and probably a little more shock" campaign, Traudt would be going into a gun fight against Schwab armed only with his good looks and his imperial bearing. (They used to carry the day when younger; not so much at 58).

Traudt would seek in discovery trading records for all 105 broker-dealer/trading entities in MMTLP, Electronic Blue Sheets ("bluesheets") from FINRA, locate proof or lack thereof that GTS did locates for the potentially hundreds of millions of naked synthetics it created in MMTLP, Depository Trust Clearing Corporation records for the total allotment of the 165 million shares of MMTLP as to where they went originally, discovery into the FINRA "XADF" internal stock exchange data showing how and where MMTLP began getting shipped overseas to hide short positions pursuant to FINRA Rule 4560, and much more. But in arbitration, Traudt begins with the unconscionable premise that not just the deck but the entire casino is stacked against him in arbitration because of these rules. The matters in Traudt are not subject to treatment as if this was a simple age or employment discrimination case where testimony from

eyewitness or a simple paper trail could easily lead to a fair result; in *Gilmer v. Interstate/Lane Corp. 500 US 20 (1991)* the Supreme Court compared them and found limited discovery was acceptable and defensible for such uncomplicated situations "since it is unlikely that such claims require more extensive discovery than RICO and antitrust claims." Numerous factors may make an arbitration provision substantively unconscionable, including severe restrictions on discovery, *Walker v. Ryan's Family Steak Houses, Inc., 400 F.3d 370, 387-88 (6th Cir. 2005); Ostroff v. Alterra Healthcare Corp., 433 F. Supp. 2d 538, 543, 2006*. Traudt, after all, involves RICO claims for fraud that are ostensibly barred but will be challenged under the Equal Protection Clause. Traudt has more than made a case for market manipulation under RICO which is permitted. And of course the Computer Fraud and Abuse Act cited in the claims by Traudt will require expert testimony and analysis somewhat more complicated than a wrongful termination case for weight gain of an employee at a health club in Montpelier, Vermont.

**5. Most of Traudt's claims lay far outside the arbitration agreement and were not "reasonably forseeable" at the time Traudt signed either the TDA or Schwab contracts**

In the 11th Circuit it was held that [W]e have previously focused on foreseeability as proper standard for resolving the scope of an arbitration clause that covers disputes "arising out of or pursuant to" the contract between the parties. *See Telecom Italia*, 248 F.3d at 1116. In *Telecom Italia*, we held that if the defendant *"could have been" engaged in the allegedly tortious actions even if it "had no contractual relationship with" the plaintiff, then the dispute is not "an immediate, foreseeable result of the performance of the contractual duties"* (emphasis added) and thus not within the scope of an arbitration clause within that contract. *Id*. We stated that "[d]isputes that are not related--with at least some directness--to performance of duties

specified by the contract do not count as disputes 'arising out of the contract." *Hemispherx Biopharma v. Johannesburg Consol. Invs., 553 F.3d 1351, 1367, 2008*

"Whether a party has agreed to arbitrate an issue is a matter of contract interpretation..." *Telecom Italia, SpA v. Wholesale Telecom Corp., 248 F.3d 1109, 1114 (11th Cir. 2001)* cited by *Phillips v. NCL Corp., 824 Fed. Appx. 675, 678-679, 2020*

Having set the table above, and applying it to *Traudt*, it is clear that Schwab's tortious conduct was broad rule violations that enabled the destruction of investments and property rights to the securities not just to Traudt but to approximately 65,000 other investors; this generalized storm surge of malfeasance clearly existed *independent* of any arbitration agreement with Traudt. Going further, Schwab's violation of the rules begins with FINRA Rule 2010, which they violated by overselling MMTLP to the tune of over 90,000,000 shares. By selling shares that did not exist or were otherwise counterfeit, Schwab violated this fundamental rule. The sale of non-existent long shares, without ensuring the proper possession or control of the securities, breaches the standard of fairness and integrity expected in all broker-dealer activities.

SEC Rule 15c3-3, known as the Customer Protection Rule, further underscores the gravity of Schwab's conduct. This rule requires brokers to maintain control or possession of fully paid or excess margin securities for the benefit of their customers. Selling long shares without having actual shares in possession directly violates this rule.

Finally, Schwab's conduct violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, which prohibit fraudulent practices in securities trading. By selling shares that did not exist, Schwab engaged in deceptive practices, misleading investors into believing they were purchasing legitimate securities. This fraudulent activity is actionable under the anti-fraud provisions, which aim to protect the market from manipulation and deception.

The laundry list of tortious conduct that existed apart from and was not “related to” the arbitration agreement is incomplete without the following issues being listed for the Court’s review, all of which beg the question of how they could be “reasonably forseeable” under an arbitration agreement.

**6. Market manipulation, RICO predicate acts, and the conflict of interest in the U3 halt involving Schwab and FINRA all mitigate against arbitration**

The illegal registration and trading of MMTLP, orchestrated by GTS Securities in coordination with Schwab VP Michael Dunn, constitutes a clear case of market manipulation. This scheme, executed in violation of FINRA Rule 6622(b) and SEC Rule 15c-211, involves multiple predicate acts under the Racketeer Influenced and Corrupt Organizations Act (RICO). The start of trading was confirmed by FINRA Market Operations’ Jessica Roberson in an email to an MMTLP shareholder on 29 September 2022 when asked exactly how MMTLP started trading without the company’s consent.[13] **(See Appendix K)** The unlawful activities surrounding the creation and trading of MMTLP demonstrate not only a fraudulent attempt to manipulate the market but also a significant conflict of interest involving Schwab and FINRA, particularly with regard to the U3 halt.

The scheme began visible between July 28, 2021, and July 31, 2021, when GTS Securities reported a single trade to create the MMTLP ticker. That single trade enabled MMTLP to appear immediately in Schwab’s index fund SWTSX on July 31, 2021. According to FINRA Rule 6622,[14] market makers or broker-dealers are allowed to use a one-trade rule to create a ticker

---

[13] Roberson’s exact words were “The symbol MMTLP was set up for trade reporting purposes – one of our member firms had a trade to report and per our rules in order to report the trade they needed a symbol – see 6622 – Transaction Reporting.”
[14] See https://www.finra.org/rules-guidance/rulebooks/finra-rules/6622

only if the action is not "in furtherance of a trading or investment strategy." However, in this case, the one trade was clearly part of a broader trading strategy. The deliberate creation of MMTLP facilitated CUSIP and ticker confusion by transferring the old TRCH CUSIP into MMTLP, allowing pre-existing short positions, including naked shorts, to be hidden within the new ticker. This action created a misleading perception of the security's value and obscured the true financial risks involved. The coordination between Schwab VP Michael Dunn and GTS Securities was a crucial element of this illegal scheme, which enabled Schwab to profit at the expense of market integrity.

Further compounding this fraud, GTS and Rubenstein utilized outdated 2012 information from TRCH filings to create the necessary paperwork for MMTLP to begin trading. This was discussed by former Meta Materials CEO Georgio Palikaras in an affidavit submitted in *Inter-Coastal Waterways LLC v. Tradestation Securities, Inc.* ):24-cv-60891-AHS US District Court for the Southern District of Florida **(See Appendix L #15):**

*"15. On October 7, 2021, META II's management responded to FINRA's letter via email and strenuously objected to the assignment of this new symbol in light of the false and misleading information regarding it and meta Materials Inc. that was published on the OTC Marlet's website. We further requested that FINRA provide the Company with the contact information of the individual(s) or group(s) that requested the assignment of this symbol, and requested that profile information shown on the OTC Markets site be immediately deleted and corrected to reflect the readily available information for Meta II which was contained in our Form 10-Q…*This recycling of old data underscores the fraudulent nature of the entire process. Despite requests for transparency, FINRA Vice President Patricia Casimates later refused to inform MMAT personnel of who was responsible for these actions, **(See Appendix L #20)**

This lack of disclosure further demonstrates FINRA's complicity in the scheme and raises questions about its role as a regulator. But Schwab benefited and had to have known what was going on in advance as it was listed in Schwab's SWTSX fund on 31 July 2021. **(See Appendix M)**

The manipulation extended to FINRA's regulatory decisions, as evidenced by the U3 halt on MMTLP trading. At the time of the U3 halt, Schwab Managing Director Chris Kendall was serving on the FINRA Fixed Income Committee, a position that granted him influence over FINRA's policies and decisions. **(See Appendix N)** This committee, comprising 12 members from the financial industry, is tasked with advising FINRA "on regulatory initiatives, rules, public policy issues… transparency, pricing…and *conflicts of interest* involving debt securities. (emphasis added) The presence of Schwab personnel in such a critical regulatory role created a direct conflict of interest. Schwab was strategically positioned to shape regulatory outcomes, including the U3 halt, to protect its own interests.

The overlap of influence between Schwab and FINRA cannot be ignored. Kendall's position on the FINRA Fixed Income Committee—responsible for advising on regulatory and public policy matters—raises serious concerns about the impartiality of FINRA's decision-making process. Traudt posits that this is clear evidence of the cartel-like nature of the GTS, Schwab, FINRA axis. Schwab is conflicted out because of Kendall's presence on the FINRA board.

**7. Schwab, GTS, FINRA: "vertical agreements" are not exempt from antitrust laws: *Silver v. New York Stock Exchange*, 373 US 341 (1963)**

Traudt finishes this memorandum of law and fact by asserting that the operations, events, acts, and evidence submitted establish that a "vertical agreement" of kindred (albeit financially predatory) spirits exists in the implied covenant that appears to exist throughout the players most

proximate as antagonists (Schwab, FINRA, and GTS/Rubenstein) to Traudt in the MMTLP trade halt and financial assault on 65,000 Americans. Because the anti-trust elements established here identified that Schwab was part of a *pactum superveniens* involving its participation on FINRA boards, its ability to circumvent FINRA rules as needed to get a ticker trading as examined earlier in this brief, and to get profit from this monopolistic trust, it stands to reason that Traudt could not have foreseen this when he signed his brokerage agreement with TDA. To move the cross hairs a little more onto the point being made: Traudt and others have been victims of violations of the Sherman Antitrust Act.[15] In *Silver v. New York Stock Exchange* 373 US 341 (1963)*,* the Supreme Court held that [T]he duty of self-regulation imposed upon the Exchange by the Securities Exchange Act of 1934 did not exempt it from the antitrust laws nor justify it in denying petitioners the direct-wire connections without the notice and hearing which they requested. *Silver v. New York Stock Exchange* 373 US 341 (1963) The Securities Exchange Act contains no express exemption from the antitrust laws or, for that matter, from any other statute. This means that any repealer of the antitrust laws must be discerned as a matter of implication, and "[i]t is a cardinal principle of construction that repeals by implication are not favored." *United States v. Borden Co*., 308 U.S. 188, 198 *; see Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 456 -457; *California v. Federal Power Comm'n*, 369 U.S. 482, 485 .

The *Silver* court went further, and its almost prescient anticipation of *Traudt's* Chinese take out menu of securities horrors, fraud, the farsical "extraordinary event" that triggered the U3 halt, and manipulation could not be more obvious: [S]ince the antitrust laws serve, among other things, to protect competitive freedom, i. e., the freedom of individual business units to compete unhindered by the *[*373 U.S. 341, 360*]* group action of others, it follows that the antitrust laws

---

[15] 15 U.S.C. §§ 1-7.

are peculiarly appropriate as a check upon anticompetitive acts of exchanges which conflict with their duty to keep their operations and those of their members honest and viable. Applicability of the antitrust laws, therefore, rests on the need for vindication of their positive aim of insuring competitive freedom. Denial of their applicability would defeat the congressional policy reflected in the antitrust laws without serving the policy of the Securities Exchange Act. Should review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented. *Silver* § II. Congress in effecting a scheme of self-regulation designed to insure fair dealing cannot be thought to have sanctioned and protected self-regulative activity when carried out in a fundamentally unfair manner. *Silver* § III.

In a 2nd Circuit case, the court held that [T]he crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. *Interstate Circuit, [*346 U.S. 537, 541*]*

Tying it all together in *Traudt* inevitably drills down to (1) active price fixing by GTS in the flow of supplying infinite naked synthetics to fix the price of MMTLP in place and then crush it in the run up to the trade halt on 9 December 2022 and (2) Schwab overselling the security for gain at the expense of pure price discovery in the market leading to (3) FINRA's UPC "halt" committee sitting highest in this vertical conspiracy as the ultimate antitrust player as described in *Silver* using its self-regulatory oversight and kill-switch horsepower to protect those in the monopoly.

**8. Traudt has an antitrust claim for damages under the Clayton Act (15 USCS 15)**

The Clayton Act states: Except as provided in subsection (b), any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.[16]

The arbitration agreement between Traudt and Schwab is void under the Sherman Antitrust Act. [M]ore than a half-century ago, the Supreme Court stated that “in view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action,” an agreement which confers even “a partial immunity from civil liability for future violations” of the antitrust laws is inconsistent with the public interest. *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 329 (1955); cited by *In re American Express Merchants Litigation (2011)* Docket No. 06-1871-cv. (2nd Cir.)

**9. A conclusion reduced to the lowest common denominator**

The question before this Court: how can Schwab seek to enforce provisions for arbitration in a contract it has already explicitly declared, by virtue of its statements to MMTLP investors that it will not trade again in MMTLP even if forced by FINRA, it will not honor itself.

**10. Requested Relief:**

Under FRCP 37(e), Traudt requests sanctions due to the spoliation of evidence, as the destroyed ESI, including emails and audio recordings, cannot be restored or replaced. Traudt respectfully requests that this Court impose sanctions as appropriate follows:

A. Issue an adverse inference instruction that the destroyed emails, electronic data, and audio recordings would have been unfavorable to Schwab's defense, under FRCP 37(e)(2).

[16] 15 USCS 15.

B. Impose sanctions pursuant to FRCP 37(e) against Schwab in the form of immediate monetary fines in the amount of 20 hours of legal work by Traudt @ $300 an hour pursuant to FRCP 37(b) for failure to comply with its duty to preserve evidence.[17]

C. Issue a global preservation order pursuant to FRCP 26(c) commanding Schwab and any and all of its affiliates and assigns to cease deleting and destroying customer records of any kind.

D. Deny Schwab's Motion for a Stay in Favor of Arbitration pursuant to FRCP 37(e).

E. Allow Traudt to amend the complaint against Schwab to include claims of breach of contract, reliance, and market manipulation.

WHEREFORE, Traudt Scott Traudt respectfully requests this Court grant the relief requested herein and issue any further sanctions or remedies this Court deems appropriate.

Respectfully submitted,

Dated: September 20, 2024

Scott Traudt, *pro se ipso*
191 Kibling Hill Road
Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to all named defendants and respondent at the addresses delineated below either by 1st Class mail or via email on this 21 day of September, 2024.

---

[17] That may put *pro se* litigant Traudt at the higher range of local lawyers but Traudt asserts he is worth it after defeating Sheehey, Furlong, & Behm P.C., 30 Main St., 6th Floor, Burlington, VT 05402-0066 in the matter of *Scott Traudt v. Comcast Xfinity*, CANO: 20-CV-00844 in June, 2021. In that matter the law firm attempted to keep the identity of a corporation secret whose information technologies department was attempting to hack, using a US government virtual private network ("VPN"), people in Vermont. Traudt prevailed and the offending company was identified as none other than Novo Nordisk, a massive Danish multi-national doing biological defense research in Lebanon, NH. Traudt doesn't deny that he is a procedural train wreck but is attempting to do better.



SCOTT TRAUDT

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan R. Voegele, Morris Kandinov LLP, 4915 Mountain Rd., Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Aaron T. Morris, Morris Kandinov LLP, 4915 Mountain Rd.,  Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan Miller, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**Ari Rubenstein/GTS Securities LLC** Atty. Stephen Fraser, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**FINRA** Atty. Walter Judge, DRM, 199 Main St. POB 190 Burlington VT 054020-190

**FINRA** Atty. John P. Mitchell, Faegre, Drinker, Biddle & Reath LLP 105 College Road East 105 College Road East, POB 627 Princeton NJ 08542-0627

**Schwab** Atty. Justin Barnard, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Anne B. Rosenblum, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Felipe Escobedo, Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

**Schwab** Atty. Jeff Goldman Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

**SEC** Atty. Mike Bailey 100 F Street, NE Washington, D.C. 20549