Scott Traudt
191 Kibling Hill Rd.
Strafford, VT 05072

21 June 2024

Richard A. Wurster, President
Charles Schwab & Co. Inc.
3000 Schwab Way
Westlake, TX 76262-8104
CRD#: 5393
SEC#: 801-29938, 8-16514

**Appendix H**

Mr. Wurster:

Significant evidence exists within Charles Schwab & Co. Inc.'s (hereinafter, "Schwab") data files, corporate communications, and admissions by Schwab personnel at the trade desk station that TD Ameritrade (hereinafter, "TDA") - which as of 9 December 2022 was not owned by Schwab but is now having completed a corporate merger and acquisition by Schwab – was the primary driver for shutting down trading in the ticker MMTLP on or about 9 December 2022.[1] It did so in collusion with GTS Securities, used electronic means to do so, and did so in derogation of numerous federal laws.

Upon information and belief, Schwab contacted the Financial Industry Regulatory Authority (FINRA) about its exposure to potentially devastating financial losses as the time period subject to the FINRA-approved S-1 governing the conversion of MMTLP into a privately traded company to be named Next Bridge Hydrocarbons drew to a close. Upon trade data accessed, it appears Schwab, and other broker-dealers, knew that MMTLP had millions of failures to deliver as early as mid-November 2022, and knew or should have known by simple mathematics that shares sold to me in November 2022 were statistically, financially, and purely counterfeits.[2]

This was, and continues to be, a violation of the Securities Exchange Act of 1934, Section 10(a)(2): Schwab's failure to disclose material information to me, *especially* the existence of counterfeit shares in my account.

---

[1] MMTLP was the ticker for "Non-Voting Series A Preferred Shares of Meta Materials (MMAT)."

[2] The float of MMTLP was 165 million shares. It is now also acknowledged by broker-dealer Tradestation that MMTLP had a share imbalance between long and short positions, and Tradestation cannot move customer's former MMTLP shares into Next Bridge Hydrocarbons as promised in the S-1 because the shorts were never covered properly when the 9 December 2022 U3 trade halt in MMTLP was detonated by FINRA.

1

Illegal activities and fraud in MMTLP trading were acknowledged by elements of FINRA as early as 5 December 2022 in emails obtained by Freedom of Information Act (FOIA) requests by similarly defrauded MMTLP investors with long positions. These emails from Sam Draddy ("MMTLP has now hit my fraud team's radar screen") were widely distributed to members of the Securities and Exchange Commission (SEC) and other FINRA personnel. (**See Appendix A**).

I – and many others - have suffered significant financial losses as a result of the U3 trading halt that FINRA executed on 9 December 2022 in the stock ticker MMTLP. Schwab's actions and omissions to act were the proximate cause of my damages as I was not allowed to close out my position as promised with the abrupt U3 halt of 9 December 2022.[3] I should have been allowed to sell MMTLP on both 9 December 2022 and 12 December 2022. I was not.

### A. Schwab acknowledges making request for illegal 9 December 2022 FINRA U3 trade halt

I dialed into TDA's 800-669-3900 account services number around 4:50pm EST on 20 March 2023 to inquire about my tax paperwork that TDA had regarding my stock trading. I do remember some confusion as to terminology in the conversation where I asked about K2's and also other tax records. At all times, I only spoke with Ron Fleming. I was not transferred to anybody else. Apparently his full name is Cameron Fleming, and he goes by Ron.[4]

After the tax issues were resolved, I inquired broadly about the MMTLP ticker, which I owned shares of and had bought them via TDA in November 2022.

Fleming seemed to me that with some prodding he might discuss what he knew about the U3 halt of 9 December 2022 in MMTLP by FINRA.

During the conversation, he made mention of three issues that I thought clearly showed that trading was not shut down to protect small investors ("retail") but the broker dealers and potentially those shorting this:

1. He stated that it was "trading at 100 times the (lit market) in the dark pools and people were crazy to think broker-dealers would pay out on that."[5]

---

[3] TDA clients held 53,000,000 shares of MMTLP total as of 9 December 2022.
[4] Fleming held Type 6, 7, and 63 Series brokerage licenses on or about the time of his conversation with myself and was in a position to know the request was made.
[5] Orders were staging at TDA and other broker-dealers from $298 to almost $25,000, and clear evidence exists that TDA was accepting limit orders over $4,000 a share, meaning, conceivably, that MMTLP trading had detonated with a velocity akin to a nuclear weapon and a short squeeze of Apocalyptic proportions was "on like Donkey Kong." (**See Appendix B**).

2

2. The U3 was done "because the share price bore no relation to the actual share value" and...most importantly:

3. *Fleming stated that "we had to protect ourselves" and that was why they requested the U3 halt.*

I had requested to have copies of this sent to me by TDA or made available for transcription. At first TDA said they would play them back, and then they refused. **(See Appendix C)**. I attempted again in February of 2024 to get Schwab trade desk people to play them back, and they refused. **(See Appendix D)**. This is obviously being done to prevent the release of damning evidence that would effect not only the financial fortunes of Scott Traudt, but also the 65,000 other shareholders in MMTLP that were similarly harmed by the illegal U3 halt.[6]

### B. Notice of Demand and Notice of Suit

For all of the foregoing and for what will follow, I hereby make demand of Schwab to make me whole by paying me the sum of $3 million US for which I will surrender all interest and ownership of CUSIP 629999590 (the SEC placeholder for my former shares of MMTLP) in my Schwab brokerage account.[7]

Schwab has damaged me by knowing that the S-1 was not going to be honored regarding MMTLP and the notice **(See Appendix E)** was fraudulent. As the U3 halt by FINRA **(See Appendix F)** caused significant financial losses to myself and others, Schwab orchestrated through illegally employed financial instruments, insider trading data, computer fraud and abuse, the willing distribution of counterfeit shares, and acting as a surrogate for the distribution of counterfeit shares and fulfillment of its role as part of a stock market counterfeiting operation made possible by market maker GTS using computers, stored communications, computer programming, and high frequency predatory trading programs to destroy the structural integrity of free market trading in the stock market. I have lost significant monies from this trading halt and Schwab's fraud.

1. The Securities and Exchange Commission (SEC) laws broken in this matter include:

**Securities Exchange Act of 1934, Section 10(b):** Schwab's failure to maintain accurate and complete records of my account, including the unauthorized sale to me of counterfeit shares.

---

[6] TDA has been ordered in the past to produce audio files and recordings of customer calls in numerous cases.

[7] Due to the nature of newly discovered data regarding Schwab being 5X oversold (20 June, 2024) in MMTLP, if this has to go to court I will add another zero to that $3,000,000 demand.

3

**Securities Exchange Act of 1934, Section 10(a)(2):** Schwab's failure to disclose material information to me, including the existence of counterfeit shares in my account.

**Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5:** Schwab's aiding and abetting the fraud by allowing the unauthorized sale of counterfeit shares and failing to prevent the fraud.

2. Schwab is implicated in more than just SEC violations; if my demands are not met, litigation will involve other claims under federal law, to include claims under the Bank Secrecy Act:

The BSA violations include:

**31 U.S.C. § 5318(g):** TD Ameritrade's failure to maintain accurate and complete records of my account, including the unauthorized insertion of counterfeit shares.

**31 U.S.C. § 5318(h):** TD Ameritrade's failure to report the suspicious activity of the unauthorized purchase of counterfeit shares and emplacement into my account.

3. The Computer Fraud and Abuse Act (CFAA) is a federal law that criminalizes unauthorized access to a computer system or unauthorized access to a computer system for the purpose of committing a crime. The CFAA also criminalizes the intentional access to a computer without authorization or exceeding authorized access. Since both GTS and Schwab knew or should have known that naked shorts (counterfeit shares, essentially) were now running into potentially the hundreds of millions by 6 December 2022, Schwab knowingly traded in counterfeit shares by electronically transferring them into my account without my knowledge.

There are several stark ways in which Schwab's actions (and GTS will not get off the hook in litigation as they will be a named defendant) are illegal:

1. **Unauthorized access** 18 U.S.C. § 1030(a)(2): Schwab did not have authorization to access my account and emplace the counterfeit shares supplied by GTS.
2. **Exceeding authorized access:** Even, *arguendo*, that Schwab had authorized access to my account to emplace shares I purchased that were counterfeits via GTS/Ari Rubinstein, they exceeded their authorized access by trading in counterfeit shares and legitimate shares simultaneously thereby degrading the value of my counterfeit shares without my knowledge or consent.
3. **Intentional access:** Schwab in concert with GTS/Ari Rubinstein intentionally accessed my account and traded in counterfeit shares without my knowledge or consent could be considered intentional access and part of a pattern and practice of conduct that has severe Racketeer Influenced Corrupt Organization (RICO) implications for Ari Rubinstein never mind the CFAA.[8]

---

[8] See 18 USCS 1961.

4

Ari Rubinstein's GTS maintains and operates high frequency trading systems and has access by virtue of its position as one of the largest market makers to easily create synthetic shares on demand…in fact, one only has to look at trading patterns in other stocks popular with retail investors (AMC and GME) to see a clear pattern of virtually unlimited creation of counterfeit shares to suppress price action.[9]

My promised litigation will obviously make certain to use CFAA and show how the counterfeiting is purely cyber enabled and is ripe for its first test in US District Court, Burlington, Vermont. The parallels between computer viruses and counterfeiting, or in the alternative, between malware and counterfeiting as it is obvious what Schwab had a huge role in exploiting for financial gain at first and then, finally, for covering its tracks.

### C. The comparison between counterfeit shares and computer viruses and why 18 USCS 1030 (the Computer Fraud and Abuse Act) applies to GTS, Ari Rubinstein, and Schwab

Modern computerized stock trading makes use almost exclusively of silicon based, software enabled trade platforms, distribution networks, pricing formulas, trading formulas, and most importantly, shares that in reality only exist inside the electronic cyber ecosystems largely controlled by market makers and broker dealers. As such, these "snakes in the grass" electronically speaking are virtually identical, and bring GTS and Schwab's actions in my circumstance to be recoverable under the CFAA.

With most trading now being entirely cyber-based, and with market makers and broker-dealers being in a superior position to exploit this technology to their clients' disadvantage (as in my case), getting CFAA to apply to GTS and Schwab malfeasance will be partly based on comparing computer viruses and counterfeit shares:

**Damage and Insidiousness**: Both counterfeit shares and computer viruses are designed to cause harm to their respective systems. Counterfeit shares and computer viruses can lead to financial losses, damage to reputation, legal consequences, destroyed data, compromised security, disrupted operations.

**Cascading System Failures**: Both counterfeit shares and computer viruses can have a ripple effect, causing a chain reaction of failures. In the case of counterfeit shares, a single fake share can lead to a cascade of fraudulent transactions and potential "sympathetic detonations" in other shareholders' accounts while a computer virus can spread from one system to another, causing a domino effect of failures.

**Design for Havoc**: Both counterfeit shares and computer viruses are intentionally designed to wreak havoc. Counterfeit shares are created to deceive and manipulate financial markets, while computer viruses are designed to exploit vulnerabilities and disrupt systems. In that sense, counterfeit shares and computer viruses are nearly

---

[9] I will be seeking subpoenas for the bluesheets for Gamestop Corp. (GME) and American Entertainment Holdings, Inc. (AMC) as I owned them both and sold for a loss each stock using TDA and it is obvious the same counterfeiting program was run against those companies too by the same bad actors here.

5

identical.

**Undetectability**: Both counterfeit shares and computer viruses are designed to evade detection. Counterfeit shares are often created to mimic legitimate securities, making them difficult to identify, while computer viruses are designed to evade detection by security software and human analysts.

**Strategic Parallels**:

1. **Stealth**: Both counterfeit shares and computer viruses rely on stealth to achieve their goals. They are designed to remain undetected, allowing them to spread and cause harm without being detected.
2. **Adaptability**: Both counterfeit shares and computer viruses can adapt to changing circumstances. Counterfeit shares can be created to mimic different securities, while computer viruses can evolve to evade detection and exploit new vulnerabilities.
3. **Network Effects**: Both counterfeit shares and computer viruses can have a significant impact when they spread through a network. A single counterfeit share can lead to a cascade of fraudulent transactions, while a computer virus can spread rapidly through a network, causing widespread disruption.
4. **Economic Impact**: Both counterfeit shares and computer viruses can have significant economic consequences. Counterfeit shares can lead to financial losses and damage to reputation, while computer viruses can cause significant economic losses and disrupt critical infrastructure.

Under the CFAA, individuals who have been harmed by a violation of the statute can bring a civil lawsuit against the violator to seek damages, which is exactly what I intend to do. The statute provides that a person who has suffered "damage" as a result of a violation of the CFAA may bring a civil action against the violator to recover damages. The CFAA defines "damage" as any impairment to the confidentiality, integrity, or availability of a computer, computer system, or computer network. As corrupted data was inserted into my system and my online brokerage account with the counterfeit shares facilitated by Schwab and in concert with GTS, I am squarely poised to play offense in US District Court in Burlington, Vermont.

I am certainly aware that if my demand letter goes into arbitration and litigation is paused while there I will still pursue the bluesheets as a matter of course as they will be instrumental to prosecuting my case and presenting a fair share price in arbitration. Once litigation commences, in fact, I will ask for a "*motion in limine*" and seek via Federal Rule of Civil Procedure 31.1 the bluesheets from FINRA if at that juncture I have not brought them in as a defendant. For reasons below this may be more likely than not.

**D. The US Supreme Court and the nuclear option for FINRA: guaranteed challenges to the actions of FINRA in the U3 carnage of 9 December 2022 and a challenge to the very existence of FINRA under *West Virginia v. Environmental Protection Agency* (No. 20-1530, 22 June 2022)**

6

**West Virginia v. EPA** is a significant case that has implications for the regulation of self-regulatory organizations (SROs) like FINRA. While the case specifically deals with the Environmental Protection Agency's (EPA) authority to regulate greenhouse gas emissions, the principles established in the case will be applied to other SROs like FINRA.

In **West Virginia v. EPA**, the Supreme Court held that the EPA's decision to regulate greenhouse gas emissions from power plants was an unconstitutional exercise of legislative power. The Court held that the EPA's action was not authorized by Congress and that the agency had overstepped its authority.

*Similarly, FINRA imposed a trading halt on MMTLP without a discernible reason.* It will be argued that FINRA has overstepped its authority as it is not a legislative body and does not have the authority to make laws.

FINRA is awash from bow to stern in conflicts of interests and a whole host of other issues namely, and with particularity, that a former member of the BOD for FINRA (Ari Rubinstein was from 2011 to 2014) is a current member of FINRA's "market surveillance advisory board" and had essentially the same role in MMTLP that he orchestrated in the case of OSTKO, another stock he created shares out of in derogation of FINRA/SEC market rules (and made it trade illegally, too). Rubinstein is truly the "Bond villain" in all of this chaos aimed at defrauding 65,000 American families, and his market over watch lieutenant – Patrick Murphy – clearly was the go-to guy for Schwab to go to arm and detonate the nuclear weapon on unsuspecting MMTLP shareholders.

GTS controls $14 trillion and 32% of traded stocks on the NYSE as a market maker.

Murphy knew MMTLP had roared past $4,000 a share a/o 6 December 2022 to 8 December 2022. Of the 105 broker-dealers dealing in MMTLP, "Code 505" was being transmitted on the Financial Information Exchange (FIX) in abundance for those dates.

## E. Questions to be presented to the US Supreme Court

If I am forced to litigate, I will be going to the US Supreme Court on a request for an emergency grant of certiorari as the US government's SEC and FINRA are keenly aware that shareholders defrauded in MMTLP have until 8 December 2024 to file suit as the statute of limitations will toll.

I didn't want this fight, but if there is one circumstance that may force a complete and utter destruction of the current FINRA and SEC "old boy" and "old girl" networks currently treating retail "mom and pop" investors as cannon fodder for their hedge fund/Big Bank buddies, its this case. The graft here is breathtaking and readily provable.

I guarantee these will be filed:

> *1. Did the Financial Industry Regulatory Authority (FINRA) exercise powers ultra vires when it unilaterally suspended trading two days before its agreed upon and approved trade suspension date in the stock MMTLP and in doing so by effectively seizing the assets of 65,000 Americans did*

*that decision rise to the level of "major question" and therefore require clear Congressional law making?*

*2. Is FINRA an illegal organization under the US Constitution despite its grant of power from the Securities and Exchange Commission because its members do not have to disclose any conflicts of interest, because FINRA has its own investments in markets it regulates without any legal requirement for members of its board of directors to recuse themselves, and because FINRA can make decisions that cannot be properly investigated as they do not have a legal obligation to provide rationales or evidence for their decisions vis-a-vis the U3 trading halt in MMTLP stock on 9 December 2022?*

### F. "Qui tam" filing for unpaid taxes and monies GTS and Schwab owe the United States of America under the IRS Code

In tandem with my litigation against Schwab and GTS/Rubinstein, I intend to file a parallel "qui tam" action under 31 U.S.C. § 3730, which allows private citizens to bring lawsuits on behalf of the government to recover damages for fraud and other illegal activities. The complete history of the entire MMTLP debacle clearly warrants the covetous eyes of Internal Revenue Service investigators and the US Attorney's office for Vermont to assess how much tax revenue the US government was defrauded out of in the MMTLP U3 trade halt.

### G. 2nd US Circuit Court of Appeals – Proposed Writ of Mandamus Ordering SEC Chairman Gary Gensler to Restart Trading in MMTLP for Two Days of "Buy to Close" Market Activity Supervised by Artificial Intelligence Hybrid Human/Machine Team "Special Master"

In parallel with actions in US District Court for Burlington, Vermont, I intend to go to the 2nd Circuit Court (US) of Appeals for a "writ of mandamus" to compel SEC Chairman Gary Gensler to restart trading. The proposed order will be filed in the 2nd Circuit at the outbreak of hostilities in US District Court in Vermont.

Proposed Writ of Mandamus in the Matter of "*Scott Traudt v. Charles Schwab & Co. Inc., GTS Securities, Ari Rubinstein, et. al., US District Court for the District of Vermont, Case No: XXXXXX.*"

WHEREAS, on or about December 9, 2022, the Securities and Exchange Commission ("SEC") by and through powers delegated by the SEC to the Financial Industry Regulatory Authority ("FINRA") halted trading of the ticker MMTLP without just cause or justification; and

8

WHEREAS, the halt in trading was illegal, as there was no threat to the market posed by the closing out of the MMTLP; and

WHEREAS, the decision to halt trading was done for arbitrary and capricious reasons, namely to protect Ari Rubinstein, a member of FINRA's 'market surveillance advisory group'; and Charles Schwab and Co Inc. ("Schwab")

WHEREAS, Charles Schwab and Co. Inc. contacted via FIX and communicated to the largest market maker on the NYSE (GTS Securities, the market maker for MMTLP) its overwhelming desire for self-preservation as the MMTLP "short squeeze" detonated in Dark Poll trading on or about December 6, 2022; and

WHEREAS, the halt in trading caused irreparable harm to the market and the investors who held positions in MMTLP; and

WHEREAS, FINRA's actions were in violation of the Securities Exchange Act of 1934 and the Administrative Procedure Act; and

WHEREAS, FINRA's actions were arbitrary, capricious, and an abuse of discretion;

NOW, THEREFORE, IT IS ORDERED that Gary Gensler, Chairman of the Securities and Exchange Commission, shall resume trading of the ticker MMTLP immediately.

### ORDERED

That the SEC shall take all necessary steps to restore trading in MMTLP to comport with the S-1 on file with FINRA as of November 30, 2022, including lifting the halt in trading and allowing for 2 days of supervised trading in a "buy to close out short positions only" and "sell to exit long positions" posture and that a hybrid team of humans and machine capable of advanced machine learning ("AI") shall be appointed as "Special Masters" under Federal Rules of Civil Procedure 53 to conduct augmented market surveillance, trade fraud detection, the introduction of counterfeit shares on the market, order tracking, spooking detection, wash trade detection, all limited to the 2 days of trading in MMTLP.[10]

Such a hybrid team shall be able to access all nodes of the NYSE, all trade desks in the 105 broker-dealers involved in trading MMTLP, shall be embedded at GTS Securities as the prime market maker for MMTLP, shall have access to INET, ARCA, BATS, EDGA, EDGX, and ITS.

### ORDERED

That the SEC shall provide a full and complete explanation for the halt in trading, including any and all communications related to the decision to halt trading.

### ORDERED

That the SEC shall take all necessary steps to prevent similar arbitrary and capricious actions in the future.

---

[10] US Department of the Treasury's FINCENS (Financial Crimes Enforcement Network) personnel would be second chair with the H(AI) team.

**ORDERED**

That the SEC shall provide a full and complete report on the actions taken by the SEC in response to this writ of mandamus.

**ORDERED:**

That the human-AI team's AI component shall be composed of machine learning engineers with experience in natural language processing, computer vision, and predictive modeling, data scientists who can wrangle and analyze the vast amounts of market data, identify patterns, and develop predictive models, software developers with expertise in Apache Arrow and Apache Parquet, and that human oversight shall include and be not limited to regulated professionals with securities experience, such as former regulators, compliance officers, or financial analysts, lawyers with expertise in securities law, market manipulation, and regulatory compliance, and traders and analysts brought in who can verify AI-driven insights and provide human intuition.

## Summary

1. I have provable damages over $3,000,000.

2. Schwab and Ari Rubinstein were and continue to be the proximate cause of my damages.

3. Schwab has breached its duties to me under the "Client Agreement."

4. I intend to conduct scorched earth litigation in the same way I prevailed against two larger corporations in *Scott Traudt v. Comcast/Xfinity - Novo Nordisk* (No. 20-CV-00844 Decided 7 May 2021).

5. *Ari Rubinstein has defrauded the US government out of approximately $175 billion in tax revenue and I look forward to filing the Qui Tam (31 USCS 3730) action on behalf of the Citizens of the United States of America. And potentially generating a criminal case against Rubinstein along the way under RICO.*

I will commence suit at a time of my choosing but will give Schwab until 5 July 2024 to review my claim and make me whole.

SIGNED

*[signature: Scott Traudt]*

SCOTT TRAUDT

DATE: