UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 NOV -8 PM 4:01

CLERK

BY_____
DEPUTY CLERK

```
*************************************
SCOTT TRAUDT,                       *
    Plaintiff                       *
                                    *
v.                                  *
                                    *
ARI RUBENSTEIN                      *
    Defendant                       *
                                    *
GTS SECURITIES LLC                  *
GTS EQUITY PARTNERS LLC             *
GTS EXECUTION SERVICES LLC          *
    Defendant                       *
                                    *
CHARLES W. SCHWAB AND CO. INC.      *
SCHWAB HOLDINGS, INC.               *
    Defendant                       *
                                    *
FINANCIAL INDUSTRY                  *
REGULATORY AUTHORITY                *
    Defendant                       *
                                    *
GARY GENSLER                        *
US SECURITIES AND EXCHANGE          *
COMMISSION                          *
    Respondent                      *
                                    *
*************************************
```

Docket Number: 2:24-cv-00782
**JURY TRIAL DEMANDED**

1st Amended Complaint

## PLAINTIFF SCOTT TRAUDT'S ("TRAUDT") MOTION FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF

**SUMMARY:** Traudt challenges the unconstitutional operation and structure of Defendant

Financial Industry Regulatory Authority ("FINRA") which has garnered and now wields massive

power and governmental authority over the securities broker-dealer industry, large and small

investors, and the financial markets without adherence to the United States Constitution. Traudt

has standing to assert these claims because Traudt has experienced the direct impact of FINRA's

unconstitutional operations, of particular rules (as discussed in detail later), and FINRA's unaccountability for its actions in the form of the illegal trading halt in MMTLP.

## I. Introduction

1.      This motion asserted is a pure challenge to the constitutionality of FINRA's structure and its very existence. As such, Traudt's claims are collateral to any other claims in this case or any form of arbitration if so ordered by this Court in the matter of Traudt's claims against Defendant Charles Schwab and Co. Inc. ("Schwab").  The claims asserting constitutional violations are beyond the expertise of FINRA and are appropriately before this Court.

2.      FINRA is an entity empowered by Congress through the Securities Act of 1934 ("Act") to enforce federal securities laws and regulate the securities industry. FINRA is a national securities association registered with the SEC pursuant to 15 U.S.C. § 78s and is authorized thereunder to enforce the Exchange Act, the SEC's rules and regulations thereunder, and its own rules (all of which are enforceable only by virtue of the SEC's approval of such rules). FINRA is a Delaware not-for-profit corporation with its principal place of business located at 1735 K Street NW, Washington D.C. FINRA maintains offices and conducts business throughout the United States, including in the State of Florida and in this District. Notwithstanding, FINRA is an agency and/or establishment and/or instrumentality of the United States.

3.      However, FINRA's current structure and operations, particularly in light of the transformation of the organization over the course of the last two decades, contravene the separation of powers, violate the Appointments Clause of the United States Constitution (the "Constitution") and constitute an impermissible delegation of powers. Because it purports to be a private entity, FINRA is unaccountable to the President of the United States (the "President," or "POTUS"), lacks transparency, and operates in contravention of the authority under which it was

2

formed. It utilizes its own in-house tribunals in a manner contrary to Article III and the Seventh Amendment of the Constitution and deprives entities and individuals of property without due process of law as seen in the 65,000 Americans who lost 100% of their investments in MMTLP due to FINRA's illegal U3 halt.[1]

4.    FINRA wields expanded and comprehensive governmental police power, including the power to "enforce compliance" with the Act and other federal securities laws, to regulate the conduct of its members through rulemaking and adjudication, and to set its own budget and to fund its own operations by fixing and levying a tax on its membership. For example, FINRA has the power and discretion to promulgate rules and standards and the ability to enforce compliance with those rules and standards by levying fines on its members and barring its members from the industry.

5.    In connection with these open-ended powers, FINRA's Board of Governors (the "Board" or "FINRA's Board") has the power to set FINRA's budget at any level desired and to fund its operation through the collection of a "fee" levied on its members and by imposing "penalties" on its members. In 2021, for example, FINRA extracted more than $100 million in fines from its members, most of whom capitulate to FINRA's allegations and penalties precisely because of the enormous and unchecked power that it wields. FINRA has the authority to use the amounts that it collects to set its own salaries and is incentivized to continuously increase the amounts of penalties it imposes, expending those funds *inter alia* on exorbitant salaries of more

---

[1] Under *SEC v. Sloan* 436 US 103 (1978), FINRA could authorize a trading halt for no more than 10 days.

than $3,000,000.00 per year to its Chief Executive Officer and over $1,000,000.00 per year to its Chief Financial Officer, Chief Legal Officer, Head of Member Supervision and Chief of Exams.[2] FINRA also deploys its broad powers to impose burdensome, arbitrary, and ill-defined standards that it requires its members to follow, and it enforces those standards in an arbitrary, discriminatory, and unfair manner, all of which ultimately harms the investing public.

6.      While FINRA came into existence as a "self-regulatory" organization, it has been transformed into an organization operated and controlled by non-members that exercises vast governmental authority while failing to comply with its enabling act.

7.      FINRA's failure to abide by fundamental constraints on the delegation and exercise of governmental authority has caused and will continue to cause profound injury to participants in the securities industry, to the markets, and to the investors that FINRA claims to protect.

8.      Over the last twenty years, FINRA's initial formative structure, purpose, authority, and powers, which focused on regulating members within the narrow parameters set by FINRA rules, have transformed into a "for-profit" behemoth that is incentivized to and does exercise its unchecked power in a manner that maximizes its profits while avoiding any actual accountability to the executive branch.

9.      As a result of its characteristics and conduct, and notwithstanding FINRA's purported status as a private corporation, FINRA is a governmental entity and state actor subject to the limits of the United States Constitution, including the Constitution's separation of powers principles, the requirements of the Appointments Clause, the Seventh Amendment, and the obligation to provide due process of law when depriving an individual of his livelihood or an

---

[2] Since 2001, in comparison, the President of the United States makes only $400,000 a year.

4

entity of its property or investors of their property interests in the securities they hold as is the case with MMTLP shareholders such as Traudt.

10.     Further, because FINRA exercises governmental powers, it is, for constitutional purposes, part of the federal government, and its employees — who exercise significant authority pursuant to the laws of the United States — are officers of the United States.

11.     FINRA and its officers are, however, not adhering to the Constitutional requisites that are essential for the proper oversight and function of any governmental entity that wields such enormous power, controls the livelihood of so many professionals and businesses, and impacts the market every day.

12.     Despite its vast authority and the far-reaching consequences of its actions, FINRA is immune from the supervision and control of the President. FINRA's Board is not appointed or removable by the President or by the head of any Executive Branch department answerable to the President. Thus, although FINRA exercises significant, core governmental powers, the FINRA Board is selected in a manner inconsistent with Article I of the Constitution.

13.     Indeed, the one government agency charged with the duty of operating as an Executive Branch "check" on FINRA's actions, the Securities and Exchange Commission ("SEC"), is empowered to and *only* exercises limited review and control of FINRA's governing body. The SEC may only remove members of the FINRA Board if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse."

14.     FINRA's structure and operation, including its freedom from Presidential oversight and control and the method by which its Board is appointed and its in-house tribunals are

5

constructed, contravene the separation of powers and the Appointment Clause. For this reason, FINRA and all power and authority exercised by FINRA violate the Constitution.

15.    Similarly, FINRA's use of an in-house judicial construct and its employment of its adjudicators violates Article III of the Constitution and the Seventh Amendment.

16.    FINRA's unique ability to create and enforce its own rules such as the trading halt rule employed to shut down trading in MMTLP shows it is beyond the control of the Executive Branch, Congress, and the SEC.

17.    FINRA possesses and deploys improperly and unconstitutionally delegated legislative power, including, but not limited to, its broad power to enact law, its authority to set its own budget without any constraint or legislative cap, and its authority to fund that budget through the imposition of a levy on all persons wishing to conduct business in the over-the-counter ("OTC") markets and, indirectly, on those investors that wish to participate in those markets.

18.    FINRA exercises its sweeping and coercive powers in a discriminatory manner designed to disadvantage market participants who operate in sectors of the markets that FINRA disfavors, particularly those like Traudt whose investment in MMTLP focused on the microcap market.

19.    FINRA's failure to adhere to the same Constitutional principles and requisites as any other governmental entity is more than just a matter of principle and adherence to law. It is negatively impacting the markets, burdening competition and impinging on the rights of investors and market participants. It has enabled FINRA to improperly exercise its sweeping authority to constrain and control the operation of securities firms, without regard for fundamental principles of free enterprise, the rights of private parties to enter into contracts, or the prohibition against deprivation of property without due process of law. It has enabled FINRA

6

to create onerous and often ambiguous rules and standards that increase costs for industry members that are passed on to investors.

20.     FINRA has created rules that allows for *prima facie* market manipulation, the hiding of short positions in overseas affiliates that can be or easily brought under the control of foreign adversaries, or the creation of naked shorts that can never be traced and can be loaded to whatever hedge fund or broker that wants to depress and manipulate a security. As such, FINRA has broken a variety of US laws. As it is a private SRO, its rules are subordinate to US statutory and case law.

21.     FINRA Rule 4560 facilitated the *offshore laundering* of shares by allowing market participants to hide short positions overseas, further violating anti-money laundering standards under 31 U.S.C. § 5318(h) (the Bank Secrecy Act). FINRA fails to report suspicious trading activities and market manipulation not just related to MMTLP but in other securities regularly because it gives itself and the mega-finance crowd a pass via 4560 (and of course by SHO), violating the requirement to ensure compliance with suspicious activity reporting under 31 U.S.C. § 5318(g). The hiding of short shares offshore under Rule 4560 added to the failure to detect and report suspicious transactions.

22.     When viewed through the lense of the Foreign Corrupt Practices Act (15 USCS 78m(b0(2), FINRA fails regularly and *by design* to ensure no transparency and no accurate reporting of financial activities related to securities, violating its duty to maintain proper internal controls over the market under 15 U.S.C. § 78m(b)(2). Again, Rule 4560's structure contributes 24/7 to hiding critical data about short positions, further compromising financial integrity in the markets. By allowing the concealment of shares overseas under Rule 4560, FINRA facilitates

foreign financial misconduct, a breach of 15 U.S.C. § 78dd-3. This rule enabled the obscuring of crucial short-selling data, which could be tied to foreign entities manipulating the market.

23.     FINRA Rule 4560 sets up Section 352 of the Patriot Act ((in particular 31 U.S.C. § 5318(h) for unenforceability because major financial institutions can bury shorts sales in their foreign affiliates. FINRA Rule 4560 frustrates the goals of the anti-money laundering (AML) compliance programs to detect and prevent market manipulation. Rule 4560 is a convenient vehicle for the market makers and major hedge funds and financial firms to obtain debt-equity swaps *inter alia*, utterly short to death a security, then launder the short positions into their foreign subsidiaries.

24.     FINRA has claimed ownership of the OTC-UTC markets and the securities traded on them. This indicated the expansive overreach FINRA has become accustomed to and further illustrates its unchecked *modus operandi*.

25.     On 6 December 2022 FINRA issued an intentionally erroneous  "Daily List" corporate action notice regarding MMTLP that was at odds with prior approved MMTLP guidance by stating that MMTLP shares would be "cancelled" on 13 December 2022 – a date never entertained nor mentioned by NBH or MMAT management - despite other wording stating in the same notice that shares would transition from MMTLP into Next Bridge Hydrocarbons (NBH) on 14 December 2022 and did so stressing to NBH that NBH was "not to edit or interpret it."

26.     FINRA only had authority to review the corporate notice provided by Meta Materials Inc. ("Meta") under FINRA Rule 6490 – not to edit it. FINRA personnel therefore – once again – exercised abuse of powers and set the table for the "confusion" it would later falsely rely on for the U3 trading halt that smothered MMTLP shareholders property rights. This constituted an unjust takings without just compensation under the 5th Amendment.

## II. FINRA's History

27.     In 1938, Congress passed the Maloney Act adding a new section 15A to the Exchange Act that authorized associations of brokers or dealers meeting certain statutory requirements to register with the SEC as a "national securities association." The Maloney Act's voluntary national securities associations were to be the OTC market counterparts to the regulatory arms of the exchanges (i.e., self-regulatory organizations ("SRO")).

28.     As the SEC explained shortly after the Maloney Act's passage, the act embodied "the principle of conferring upon regulatory groups from business a primary responsibility for enforcing high standards of business conduct upon their members . . [by setting] up a system of regulation in the over-the-counter markets through the formation of voluntary associations of investment bankers, dealers and brokers doing business in these markets under appropriate Governmental supervision." SEC, *Fourth Annual Report of the Securities and Exchange Commission: Fiscal Year Ended June 30, 1938* (Washington, D.C., SEC 1938), at 3. Thus, the purpose and intent of the legislation was to rely on "voluntary associations" comprised of those who possess the knowledge and practical experience borne of "doing business in these markets."

29.     A year later, the National Association of Securities Dealers ("NASD") became the first and only registered national securities association. Because no other associations had registered with the SEC, the NASD was the only SRO with "responsibility for enforcing a system of regulation" for brokers and dealers in the OTC markets.

30.     In 1945, the NASD began requiring principal and customer-facing employees of broker-dealers to register with the NASD.

9

31.     In 1983, Congress mandated that broker-dealers wishing to conduct business in the OTC markets must register with the NASD and become subject to the NASD's regulatory powers. Membership was no longer "voluntary."

32.     In addition to the NASD, the New York Stock Exchange ("NYSE") played a significant historic role as an SRO enforcing securities laws and implementing a regulatory framework through its own rules.

33.     In 2007, the Securities and Exchange Commission (the "SEC") approved a plan that merged the member regulation operations of the NASD and the NYSE.

34.     The NASD absorbed the regulatory arm of the NYSE and changed its name to FINRA.

35.     FINRA now oversees virtually every aspect of the securities industry, regulating approximately 3,400 brokerage firms, 150,000 branch offices, and more than 610,000 individual registered securities representatives.

### III. Enabling acts and lack of SEC oversight

36.     Pursuant to 51 U.S.C. § 780(a)(1), brokers and dealers, both natural persons and other than natural persons, are required to register with a registered securities association in order to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills).

37.     To participate in the securities industry, a broker dealer is required to maintain its membership with FINRA-a purportedly private entity.

38.     15 U.S.C. § 780-3(b)(2) requires a registered securities association to have the capacity to enforce compliance by its members and persons associated with its members, with the provisions

of the securities laws, the rules and regulationsthereunder, the rules of the Municipal Securities Rulemaking Board, and the rules of the association.

39.     15 U.S.C. § 78o-3(b)(7) requires a registered securities association to implement rules that provide for the "discipline" of its members for violations of its rules and the federal securities laws by "by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction."

40.     As a registered securities association, FINRA agreed to "comply with the (Exchange Act] and its own rules," (id. § 78s(g)(1)(A)) and to "enforce [such] compliance

. . . by its members and persons associated with its members" (id.; see also 15 U.S.C. § 78s(h) (emphasis added).

41.     FINRA's Rule 6440 was cited as authority for it to shut down trading in MMTLP on 9 December 2022. This was in contravention of SEC rule 15 USCS 78l(k) which stipulates that trading can only be suspended for 10 days. FINRA has kept MMTLP suspended for almost 2 years. The SEC has never reviewed this decision nor validated it despite the FINRA Rule 6440 itself allowing – in contradiction of the SEC rule cited above – unlimited duration trading halts.

35.     Thus, as alleged above, and as set forth in the relevant enabling provisions of 15 U.S.C. § 78, FINRA is both empowered and required by Congress to execute the laws of the United States.

## IV. FINRA's command structure and decision making matrix violates the Constitution

42.     Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board exercises significant authority pursuant to the laws of the United States, FINRA's Board members are officers of the United States whose

appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

43.     The Appointments Clause provides in relevant part that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

44. By virtue of the discretion, duties, functions, and independence of the FINRA Board, members of the FINRA Board are principal officers whose appointments must be made by the President with the advice and consent of the Senate as is required in relation to other government agencies. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

45.     In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board violates the Appointments Clause.[3]

---

[3] The SEC also has extremely limited control over the Board's membership. The agency plays no role in appointing the Board's Governors. See By-Laws art. VII § 5 (noting that Public Governors are appointed by the Board), art. I para,. Z, dd, x (noting that Industry Governors are appointed by FINRA's membership). And while the SEC has formal power to remove a Governor or other FINRA "officer," the standard is exceedingly high—it requires that he or she "willfully violated" an applicable law or regulation, "willfully abused his authority," or "failed to enforce compliance" with an applicable law or regulation "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4). The SEC may make that finding only "after notice and [an] opportunity for [a] hearing." Id. And because the Board must contain between 16 and 25 members, see By-Laws art. VII § 4, the requirement of an individualized hearing is a separate barrier to

46.     FINRA Hearing Officers' decisions, like those of Administrative Law Judges of the Securities and Exchange Commission, may become final and effective without any further consideration or review.

47.     FINRA Hearing Officers are therefore "officers of the United States" within the meaning of the Appointments Clause, not mere employees.

48.     Under the Appointments Clause, even "inferior Officers," must be appointed by "the President, in the Courts of Law, or in the Heads of Departments."

49.     FINRA's Hearing Officers are chosen by FINRA staff and are not appointed in the manner prescribed by the Appointments Clause. Their actions and decisions are therefore unconstitutional and invalid.

50.     Although FINRA's predecessor organizations were once truly "self- regulatory", that has transformed over the years such that FINRA is not. Pursuant to both its articles of incorporation and its bylaws, the number of its "public governors" (those not chosen by the industry) "shall exceed the number of Industry Governors." Thus, the industry does not control FINRA. And because the industry does not control FINRA, it is inappropriate to regard FINRA as an SRO. See Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2; McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011) ("far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's regulatory policy or corporate governance").

---

materially changing the Board's composition. These same provisions cabin the SEC's control over FINRA's Hearing Officers. See Order, Case No. 23-5129 at 6 (Walker, J. concurring) (App.422).

13

51.    Similar requirements have developed regarding the composition of critical FINRA

committees such that industry members now occupy only a minority position in relation to

regulatory actions and review of disciplinary matters.

52.    FINRA's transformation has been characterized by and is particularly unsavory because

of its aggressive posturing to avoid accountability to its membership, the SEC, Congress or the

courts. As SEC Commissioner Pierce emphasized, the member firms over which "FINRA exerts

meaningful control given the statutory requirement for membership" have only a limited ability

to influence FINRA:

> Broker-dealers in the United States are regulated by the Financial Industry Regulatory
> Authority (FINRA). Although commonly perceived to be a self-regulator, FINRA is
> not accountable to the industry in the way a self-regulator would be. Nor is it
> accountable to the public, Congress, the president, or the courts. FINRA's structure
> and monopoly status shield it from close oversight. Consequently, an important part of
> the securities markets is under the control of a regulator with limited accountability.

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*

Mercatus Center of George Mason University, Abstract (Jan. 2015).

53.    As noted in connection with FINRA's efforts to further expand its authority:

> FINRA's status as a nongovernmental regulator, however, enables it to avoid the
> scrutiny and procedural requirements to which a government agency performing the
> same tasks would be subject. Before FINRA succeeds in further expanding its
> regulatory footprint by taking on additional responsibilities, policymakers should
> revisit the long-debated questions about whether self-regulation works in its current
> manifestation and, if not, what should be done about it. One option would be to
> acknowledge that FINRA looks a lot like the SEC and accordingly fold FINRA into
> the SEC. Alternatively, FINRA could be remade into an organization that is run by the
> industry it regulates. In other words, FINRA could become a true self-regulator.
> Competing SROs might emerge to tailor regulation to a particular group of firms, such
> as smaller broker-dealers. Another option would be to enhance FINRA's public
> disclosure and procedural obligations. Procedural requirements should include a clear
> requirement to conduct and document economic analysis and greater procedural
> protections in connection with disciplinary actions.

Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All*,

Mercatus Center of George omitted). Mason University, at 27-28 (Jan. 2015)

## V. A declaration from this Court is the only remedy available to stop FINRA from further abuses

54.    Despite its characterization as a "self-regulatory" organization, FINRA is anything but. Indeed, FINRA's members are incapable of exerting any meaningful control of or change to the entity, and FINRA's articles and bylaws—requiring that the majority of its Board be comprised of non-industry members— ensure that it will remain that way.

55.    Nevertheless, this "self-regulatory" organization has expansive power to regulate the entire broker-dealer securities industry subjecting each person and entity in that industry, to FINRA's rules, regulations, obligations, requirements, fines, fees, and enforcement actions, and to also have unbridled, totalitarian authority to act in contravention of SEC rules, available securities case law, and its own rules as evidenced in the trading halt of MMTLP.

56.    FINRA's very existence and its exercise of unbridled and unchecked powers violates the United States Constitution. FINRA's members and the trading public are powerless to effectuate change within the organization. Thus, the Court is the only forum that affords the opportunity for relief.

## VI. Arguments of law and fact:  the "private non-delegation doctrine" and three US Supreme Court justices have invited challenges to SRO's (and by extension, FINRA)

In a series of cases involving the nominally private operator of the Amtrak train system, this Court has "detailed extensively why private entities cannot wield the coercive power of government." *Ass'n of Am.R.R.s v. Dep't of Transp.*, 821 F.3d 19, 37 (D.C. Cir. 2016) ("Amtrak III") (citing and reaffirming relevant holding of *Ass'n of Am. R.R.s v. Dep't of Transp.*, 721 F.3d 666, 670-74 (D.C. Cir. 2013) ("Amtrak I')). Other circuits generally agree. "A cardinal constitutional principle is that federal power can be wielded only by the federal government.

Private entities may do so only if they are subordinate to an agency." *Nat'l Horsemen's*

*Benevolent &Protective Ass'n v. Black,* 53 F.4th 869, 872 (5th Cir. 2022) (citing *A.L.A.*

*Schechter Poultry Corp. v. United States,* 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.,*

298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939); and *Sunshine Anthracite*

*Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). "If it were otherwise-if people outside

government could wield the government's power-then the government's promised accountability

to the people would be an illusion." Id. at 880 (citing *THE FEDERALIST No. 51*); see also *Dep't*

*of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) ("Amtrak II") (Alito, J., concurring)

("When it comes to private entities, ... there is not even a fig leaf of constitutional justification"

for delegating regulatory power). Starting from this foundational principle, courts have

developed something called the "private nondelegation doctrine," which three Supreme Court

justices recently signaled the need to fortify through an appropriate future case.[4] *Texas v.*

*Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022) (statement of Justice Alito, joined by

Justices Thomas and Gorsuch, respecting denial of certiorari).  The doctrine generally forbids

delegation of government power to a private actor unless the private actor operates subordinately

- or "as an aid"- to a governmental actor and subject to that governmental actor's "pervasive

surveillance and authority." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940);

see also *Carter v. Carter Coal Co,*. 298 U.S. 238, 311 (1936); *Oklahoma .v United States*, 62

---

[4] Traudt argues that this is the appropriate case because the issue of the U3 trade halt not only checks the boxes under non-delegation, it also (as explained later) calls into question the "major questions doctrine" (*Biden v. Nebraska* US Sup. Ct. No. 22-506 (2023*))* and holdings in the wake of *Loper Bright Enterprises v. Raimondo* US Sup. Ct. No. 22-451, No. 22-1219 (2024) regarding the imperial overreach and rule making authority of US government agencies.

F.4th 221, 231 (6th Cir. 2023), reh'g denied, 2023 WL 3815095 at *1 (6th Cir. May 18, 2023); *Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 881 (5th Cir. 2022).

Cases in this area have often focused on the participation of private actors in promulgating rules that bind a particular industry rather than on the private actors' investigation and punishment of rulebreakers. See, e.g., *Sunshine Anthracite Coal*, 310 U.S. 381; *Carter Coal*, 298 U.S. 238; *Amtrak 1*, 721 F.3d 666. Indeed, in those cases it appears likely that the relevant private actors lacked any enforcement powers at all. In other cases, constitutional scrutiny of the private entity's enforcement powers was premature because the private actor was only recently created and had not yet taken steps to establish its enforcement system, much less to investigate anyone. *Oklahoma v. United States*, 62 F.4th at 231-33; *Nat'l Horsemen's Benevolent and Protective Ass'n,* 53 F.4th at 890.

Here, by contrast, FINRA's long-established, prolific, and punitive enforcement regime twinned to the U3 trading halt carnage caused to the finances of 65,000 Americans who held MMTLP stock fairly screams for Court review. It is ripe for constitutional scrutiny, despite other court rulings that shy away from any true analysis of the SEC's "hands off" policy if not in name then in fact in the way it allows FINRA a wide berth in its operations.

As nominally private actors, FINRA and its staff are also largely exempt from many of the basic checks, balances, and transparency requirements designed to protect individuals from overzealous governmental coercion and punishment. For example, FINRA and its staff are not constrained by the Administrative Procedure Act, the Sunshine Act, the Freedom of Information Act, the Advisory Committee Act, the Equal Access to Justice Act, or countless other laws applicable to traditional government regulators. Despite wielding vast legislative and executive power, none of FINRA's trustees, officers, or employees is required, like their governmental

counterparts, to take an oath to "support and defend the Constitution" and to "bear true faith and allegiance to the same." (5 U.S.C. § 3331.)

In the circumstance of the MMTLP U3 trading halt, all of these discretionary, property taking executive decisions were made by parties on one of FINRA's boards (the Uniform Practices Committee) where six of its members represented firms that had counterparty risk in MMTLP. These decisions were made solely by the private citizens who work for and manage FINRA. Those decisions were made with no input, direction, or supervision from anyone at SEC, much less by the presidentially appointed and Senate-confirmed SEC commissioners, who are the only constitutionally appointed Principal Officers of the government anywhere within sight at FINRA. Indeed, with exceedingly rare exceptions, SEC commissioners are entirely oblivious to what actions FINRA is taking in investigations, trade halts, disciplinaries, and specific targeting of investigations.[5]

FINRA cannot have it both ways: It cannot evade the Constitution's appointment,

_____

[5] This is especially problematic given the practical realities of
FINRA's enforcement docket. First among those realities is that, of the more than 1,000 cases FINRA investigates in any given year, very few run their full course to reach an appeal to SEC's commissioners.
Compare FINRA, Regulatory Actions and Corporate Financing Review 2017-2022, www.finra.org/media-center/statistics (reporting per-year enforcement case totals ranging from a low of 743 in 2022 to a high of
1,316 in 2017) with FINRA, Comment Letter to SEC, Nov. 24, 2015, at 2 (reporting that over the preceding three-year period, only 32 FINRA
cases were appealed to SEC), and SEC, Report on Administrative Proceedings for the Period October ,1 2022 through March 31, 2023, SEC Exchange Act Rel. No. 97400 at 5 (Apr. 28, 2023) (reporting only 38 total
appeals docketed from FINRA and all other securities industry self- regulatory organizations combined, including the Public Company Accounting Oversight Board, during the period from October 1, 2021
through March 31, 2023).

18

removal, due process, and jury trial requirements by claiming to be a private actor free of government entanglement, while at the same time evading the equally important constitutional requirement that private actors be subject to the "pervasive surveillance and authority" of governmental officers when they wield vast governmental power typically exercised by government officials.

## VII. FINRA is jeopardizing the US economy

FINRA should be, via Declaratory Judgement by this Court, relieved of its duties and suffer a winding down in all activities, a cessation of regulatory enforcement, and its operations and duties returned to the Securities and Exchange Commission ("SEC") in proper compliance with the Appointments Clause of the US Constitution.

In the instant matter, FINRA's well documented regulatory Pearl Harbor on shareholders of MMTLP (in the same position as Traudt) on 8-9 December 2022 was preceded by and continues to manifest itself in rampant abuses involving "dark pool" trading,[6] unlimited and unchecked "naked shorting" that has played a role in compromising the integrity of the US stock market that it is leading to a *banking* crisis,[7] allowed for the fraud and grift on Wall Street to reach levels such that the entire world is now moving to an alternative international trading

---

[6] Over the past three years, just one company on the US exchanges (AMC Entertainment) has seen a significant portion of its trading conducted through dark pools. On average, around 60-65% of AMC's daily trading volume has been routed through dark pools (off exchange alternative trading systems). Dark pool activity is synonymous with obscuring price movements and preventing the stock's true value from reflecting accurately in the public market, and functions largely as a means of allowing "whale" investors and institutions to control the price of a stock.

[7] Unfilled "short" positions are often used in trading strategies by massive financial institutions; FINRA has allowed market makers to print unlimited computerized "nothing but air" shorts that create a debt bubble as interest rates rise, assets depreciate, and the dollar fades.

network (BRICS)[8] specifically designed by those countries to escape *inter alia* the gravity well that will occur when the US banking and finance system implodes under the twin black holes of dollar devaluation and the simple, well understood corruption of the US stock markets via the *trillions* in naked shorts hanging like a nuclear-tipped Sword of Damocles over the *entire* US economy.[9]

---

[8] BRICS (so named for its founding members Brazil-Russia-India-China-South Africa) is an organization comprising the original five nations and now includes Iran, Egypt, Ethiopia, the United Arab Emirates, and soon Turkey. Originally identified to highlight investment opportunities, the grouping evolved into an actual geopolitical bloc, with their governments meeting annually at formal summits and coordinating multilateral policies since 2009.

[9] In 2023 and 2024, several countries imposed or tightened restrictions on short selling to stabilize their financial markets in response to heightened volatility and economic challenges. China took decisive action through the China Securities Regulatory Commission (CSRC). In October 2023, the CSRC suspended securities lending for A shares placed in IPOs, and in January 2024, extended the ban to all A shares with lock-up restrictions. Additionally, from March 2024, the CSRC introduced a T+1 rule, preventing immediate resale of borrowed shares, aimed at curbing speculative trading. The move came after prolonged market declines and investor concerns about instability. Thailand followed suit, with the Stock Exchange of Thailand (SET) banning naked short selling and increasing fines for rule violations. In 2024, the SET began pursuing legal reforms to target individuals involved in illegal short selling, not just securities firms. The Thai government prioritized these reforms to restore investor confidence after significant market losses in 2023, with short-selling practices being linked to the country's market slump. US SEC personnel visited Thailand recently (summer, 2024) where it would appear from all outward appearances the Budhist Thai regulators had a "come to Jesus" (things are that bad) meeting with their American counterparts regarding the naked shorting in the US markets. South Korea also tightened short selling rules, aiming to level the playing field for investors. The country raised margin requirements and increased transparency requirements for institutional and foreign investors while easing restrictions slightly for retail investors. Meanwhile, the United Kingdom is reforming its short-selling regulations as it adjusts post-Brexit. In the European Union, short selling continues to be heavily regulated under the EU Short Selling Regulation (SSR). EU member states maintain stringent rules on transparency, including heightened reporting requirements for net short positions. National authorities have intervention powers to impose short-term bans in cases of market turbulence, ensuring that short selling does not unduly exacerbate market instability. Across these regions, governments and financial authorities are enacting these measures to mitigate market disruptions and protect investor confidence in a time of global economic uncertainty. These restrictions reflect a broader concern that

Article II specifically insured that there would be a clear separation of powers where citizens would know who exactly was behind decisions effecting their lives. FINRA's occupation of the regulatory space as a private actor violates the separation of powers in the branches mandated by the Constitution.

## VIII. FINRA's precedents under British rule and other historical analogies

FINRA's officers are not appointed by the president nor are they removeable by the President. FINRA's CEO is elected by its Board of Directors. It should be recognized for what it is: the modern incarnation of the British crown corporations (such as the Hudson Bay Company). This was co-despotic with the appointment of Crown officers and military officials to oversee the colonials. Our seditious American forebears chafed under these "privatization of enforcement" issues which eventually stirred the Americans to open rebellion.

Indeed, the US Supreme Court noted this capacity for abuse in appointing officers in *Freytag v. Comm'r,* 501 U.S. 868 (1991), holding that "[T]he 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power... because 'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of 18th century despotism.'"[10]

This contempt for what FINRA is and is doing is exactly what formed part of the Declaration of Independence. Paragraph 12 could be describing FINRA (or *any* of the US government's alphabet agencies at this point). Paragraph 12 reads that the King "has erected a

---

unchecked short selling can amplify downward market trends, leading to destabilizing effects on financial markets.

[10] *Freytag, 501 U.S. 883* (quoting Gordon S. Wood, The Creation of the American Republic, 1776-1787, at 79 (1969)).

21

multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance."[11]

For these reasons and others, the Appointments Clause was incorporated into the Constitution to prevent the privatization of government and to ensure the accountability of public officials executing US government policy.

Congress is not permitted by the Constitution to abdicate, or to transfer to others, the essential legislative functions with which it is vested. Art. I, § 1; Art. I, § 8, par. 18. *Panama Refining Co. v. Ryan, 293 U.S. 388*. P. 529. *A.L.A Schechter Poultry Corp. v. United States* 295 U.S. 495.

In *Buckley v. Valero, 424 U.S. 1 (1976),* the Supreme Court considered challenges to the Federal Elections Campaign Act of 1971. The manner of appointing commissioners to the then newly created Federal Election Commission was to have the Speaker of the House choose two, two by the president *pro tem* of the Senate, and two by the President. All appointments required confirmation by Congress. The court's procedural analysis considered the structure of the FEC in light of the Appointments Clause and found it to be unconstitutional. Noting that there is "no provision of the constitution remotely providing any alternative means for the selection of the members of the Commission or for anybody like them," the court concluded that the FEC commissioners themselves must be subject to the Appointments Clause requirements. This is directly on point with *Traudt* and Traudt's contention that FINRA is operating illegally not just because it violates the non-delegation clause and the separation of powers innately contained in the Appointments Clause but because the chairman of FINRA, Robert Cook, and all of the executive officers of FINRA, were appointed by the board of directors of FINRA and not by an

---

[11] *The Declaration of Independence* para 12 (U.S. 1776).

act of the US government or an invocation of the Appointments Clause. His position clearly necessitates an appointed officer of the US to an Executive Branch agency – and FINRA's existence itself is not even Constitutionally permissible.

The *Buckley* court went much further. The court conducted the more substantive analysis of the specific powers and duties granted to the FEC commissioners. The court determined that some of those powers were of the kind that could "be discharged only by persons who are 'Officers of the United States' within the language of the Appointments Clause." Since some of those powers granted to FEC commissioners were only available to Officers of the United States, those provisions of the act, the court opined, "violate the appointments clause."[12]

## IX. *Alpine Sec. Corp. v. FINRA*, No. 23-5129 (2023)

In *Alpine Sec. Corp. v. FINRA,* No. 23-5129 (2023), the D.C. Circuit took great constitutional issue with FINRA's unappointed officers:

To ensure that the executive power remains with the President, the Constitution puts limits on those who exercise it on the President's behalf. Anyone who "wield[s] significant executive power" must be an Officer of the United States. *See Buckley v. Valeo*, 424 U.S. 1, 126, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). Those officers must generally be removable by the President or an officer subordinate to the President. *See Seila Law LLC v. CFPB,* 140 S. Ct. 2183, 2211, 207 L. Ed. 2d 494 (2020) (principal officers must be removeable by the President). And they must be appointed by an appropriate government body under the *Appointments Clause*. *U.S. Const. art. II, § 2, cl. 2*; *Lucia v. SEC,* 138 S. Ct. 2044, 2051, 201 L. Ed. 2d 464 (2018). *Alpine Sec. Corp. v. Fin. Indus. Reg. Auth.* No. 23-5129, 2023 U.S. App. LEXIS 16987, *5 D.C. Circuit, (2023).

---

[12] *Id.,* at 140.

23

*Alpine* is crucial as it eviscerates FINRA's use of its own hearing officers in the same context as the SEC's Administrative Law Judges (ALJ's). [13]The Alpine court didn't distinguish FINRA hearing officers as being any different from the SEC's ALJ's. FINRA's hearing officers are near carbon copies of those ALJs. They are tasked by statute with enforcing the nation's securities laws. 15 U.S.C § 78s(g)(1). They can "levy sanctions that carry the force of federal law."*Turbeville v. FINRA, 874 F.3d 1268, 1270 (11th Cir.2017) (citing 15 U.S.C. § 78o-3(b)(7))*. And like *Lucia's* ALJs, hearing officers demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt. See FINRA Rules 8210 (Provision of Information and Testimony), 9252 (Requests for Information), 9235 (Hearing Officer Authority), 9263 (Evidence Admissibility), 9280 (Contemptuous Conduct). In other words, if the ALJs in *Lucia* exercised "significant" executive power, then FINRA hearing officers probably do too. *Lucia, 138 S. Ct. at 2051. Alpine, \*6, \*7.*

More importantly, *Alpine* zeroed in on the reality that FINRA hearing officers have multiple barriers to removal – and as *Traudt* asserts, the evidence is compelling that it's the entire regulatory operation that is FINRA that is suffused with such unconstitutional delegation. The *Alpine* court continued: Despite seeming to exercise the executive authority of the United States, FINRA hearing officers remain private employees. That presents two constitutional issues that will benefit from "full briefing, oral argument, and our usual extensive internal deliberations." *Merrill v. Milligan,* 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring). First, FINRA hearing officers are not appointed by a government body pursuant to the Appointments Clause. See *Lucia*, 138 S. Ct. at 2051. Second, they are shielded from removal by the SEC

---

[13] What of FINRA's "arbitrators" too, Traudt asks?

24

except for cause. 15 U.S.C. § 78s(h)(4). And the Supreme Court has assumed that the President

may not remove SEC Commissioners at will. *Free Enterprise Fund v. Public Company*

*Accounting Oversight Board*, 561 U.S. 477, 487, 130 S. Ct. 3138, 177 L. Ed. 2d 706(2010). That

means that there are two layers of removal protection—one for the Commissioners and one for

the hearing officers. That may well infringe on the President's "ability to execute the laws . . . by

holding his subordinates accountable for their conduct." *Id. At 496. Alpine,* *8*. The *Alpine* court

closes with a stark disapproval of FINRA's hearing officers exercising significant executive

power: There is a serious argument that FINRA hearing officers exercise significant executive

power. And it is undisputed that they do not act under the President. *That may be a constitutional*

*problem.* (emphasis added). See *U.S. Const. art. II, § 1, cl. 1; id. art. II, § 2, cl. 2. Alpine,* *9.*

What does this say about FINRA's President, Robert Cook, and the FINRA Board of Directors

chosen exclusively from the largest financial institutions in the country? And what of FINRA's

Uniform Practice Committee – talk about an innocuous misnaming – seizing the property of

65,000+/- 10,000 Americans in MMTLP with a trading halt that still, 699 days later, *has never*

*been justified*.

Prior to *Alpine,* US Supreme Court Justice Alito in his concurrence in *Department of*

*Transportation v. Association of American Railroads* 575 U.S. 43 pulled no punches with

regards to delegation of government authority: [E]ven the United States accepts that Congress

"cannot delegate regulatory authority to a private entity." *721 F. 3d, at 670.* Indeed, Congress,

vested with enumerated "legislative Powers," Art. I, §1, cannot delegate its "exclusively

legislative" authority at all. *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825) (Marshall, C. J.).

The Court has invalidated statutes for that very reason. See *A. L. A. Schechter Poultry*

*Corp.* v. *United States*;295 U. S. 495 (1935); *Panama Refining Co.* v. *Ryan*, 293 U. S. 388

(1935); see also *Mistretta* v. *United States*,488 U. S. 361,373, n.7 (1989) (citing, *inter alia*, *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*,448 U. S. 607, 646 (1980)).[14]

Alito continued:

The principle that Congress cannot delegate away its vested powers exists to protect liberty. Our Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints. See *INS* v. *Chadha*, 462 U. S. 919,959 (1983). It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints. The Constitution's deliberative process was viewed by the Framers as a valuable feature, see, *e.g.,* Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 202 (2007) ("[B]icameralism and presentment make lawmaking difficult *by design*" (citing, *inter alia*, The Federalist No. 62, p. 378 (J. Madison), and No. 63, at 443–444 (A. Hamilton))), not something to be lamented and evaded.[15]

Alito went all in on the illegitimacy of private corporations exercising government functions and as quoted earlier:  *When it comes to private entities, however, there is not even a fig leaf of constitutional justification.* (emphasis added) Private entities are not vested with "legislative Powers." Art. I, §1. Nor are they vested with the "executive Power," Art. II, §1, cl. 1, which belongs to the President. By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form." *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311 (1936).[16]

---

[14] *Amer. Assoc. Railroads, 575 U.S. 43*

[15] Id., Concurrence of Judge Alito

[16] Id., Concurrence of Judge Alito

Applied to *Traudt,* the parallels couldn't be more obvious: unelected, unappointed bureaucrats used their positions to issue a trading halt in a security thus effectively executing a theft of property upon 65,000 investors in MMTLP. None of the FINRA officers on the FINRA BOD or the Uniform Practice Code (UPC) committee that ordered the U3 halt in MMTLP were US government officials, yet they exercised utterly stratospheric levels of executive authority by unilaterally stripping 65,000 Americans of their investments.

And FINRA is self-supporting from its investments and fees, which makes it even more unaccountable. The power of the purse by Congress is always the final control on an agencies' conduct in the Executive Branch; the 5th Circuit most recently weighed in on this in *Consumers Rsch. Cause Based Commerce, Inc. v. Federal Communications* Commission No. 22-60008, 5th Cir. (2024) holding [F]inally, the breadth of *§ 254*'s delegation is especially troubling because the statute insulates FCC from the principal tool Congress has to control FCC's universal service decisions—the appropriations power. *See U.S. Const. art. I, § 9, cl. 7* ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). Ordinarily, when Congress delegates broadly, it retains a residuum of control over agency action because the agency is powerless to act without a congressional appropriation of funds. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 232 (5th Cir. 2022).

## X. "Major questions" (*Biden*) and rulemaking without authority from Congress (*Loper*)

FINRA's Constitutional house of cards further on collapses into the gravity well of the two core rules at the center of *Traudt* that are easily within the crosshairs of both *Biden* and *Loper*:

**FINRA Rule 203(b)(2)** states: A market maker engaged in bona fide market making activities is exempt from the locate requirement of this paragraph with respect to short sales in the course of

bona fide market making activities in the security for which it is registered as a market maker, provided that the short sale is not for the purpose of deceiving or creating a false appearance of active trading in any security."[17]

**FINRA Rule 6440(a)(3)** states: FINRA may impose a U3 trading halt where there is uncertainty in the marketplace for the security due to regulatory concerns, pending corporate actions, or other extraordinary events that could cause significant uncertainty in the market for the security.

Both of these rules have no grounding in legislative action directing such a broad power. In the former, to enable market makers to print Carl Sagan numbers of computerized, fully artificial shares of a security ("naked shorts") and be able to loan these out in debt-equity swaps to hedge funds with only the proviso that the market maker can't use them to manipulate the markets (when in fact the *only* purpose a hedge fund or broker-dealer would undertake such a deal would be to utterly destroy the share price of a security) is horrifically unconstitutional. As mentioned in Traudt's 1st Amended Complaint, this is the zenith of "trust me bro" and is unconstitutional for ambiguity and unenforceability.[18]   This level of horsepower in rule making clearly was proscribed by Article II.

---

[17] This is derogatorily referred to on Wall Street as the "Madoff Exemption" so named for the now departed legendary fraudster Bernie Madoff because it allows market makers to commit fraud in a security at will, with zero accountability, and in a way that can only benefit whale or institutional investors.

[18] See **TRAUDT'S MOTION FOR AN EVIDENTIARY HEARING UNDER FRCP 43(C) § 6:** FINRA Fraud VP Sam Draddy states under oath that *"20. Electronic Blue Sheet data does not contain information about whether or how a short position was covered or whether a short sale is "naked."* Though Traudt disputes this, it doesn't matter: FINRA here is "hoist on its own petard" legally speaking; if Draddy is truthful here then FINRA has no data tracking to hold market makers accountable under 203(B)(2), thereby sealing its fate as not just ambiguous but unenforceable and violative of SEC Rule 10B-5 in that it is a manipulative practice *de consillio*. If Traudt is correct, FINRA has the means to track short sales – even nakeds – but has chosen not to. That's worse. Either way, 203(b)(2) needs to be stricken by this court as unconstitutional.

The major questions doctrine, reinforced by *Biden*, requires clear congressional authorization for significant regulatory actions. FINRA's authority to issue U3 trading halts under the vague term "extraordinary circumstances" lacks explicit statutory backing.

In *Biden,* the court evaluated a plan by President Biden to authorize the Secretary of Education to forgive nearly $430 billion in student loan debt. The court balked:

The Secretary also appeals to congressional purpose, arguing that Congress intended "to grant substantial discretion to the Secretary to respond to unforeseen emergencies." On this view, the unprecedented nature of the Secretary's debt cancellation plan is justified by the pandemic's unparalleled scope. But the question here is not whether something should be done; it is who has the authority to do it. As in the Court's recent decision in *West Virginia* v. *EPA*, given the " 'history and the breadth of the authority' " asserted by the Executive and the " 'economic and political significance' of that assertion," the Court has " 'reason to hesitate before concluding that Congress' meant to confer such authority." 597 U. S. ___, ___ (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159-160).

The court was no less enthusiastic about the usurpation of power by a bureaucracy:

All this leads the Court to conclude that "[t]he basic and consequential tradeoffs" inherent in a mass debt cancellation program "are ones that Congress would likely have intended for itself." *West Virginia*, 597 U. S., at ___ (No. 20-150) (2022). In such circumstances, the Court has required the Secretary to "point to 'clear congressional authorization' " to justify the challenged program. *Id.*, at ___, ___ (quoting *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324). And as explained, the HEROES Act provides no authorization for the Secretary's plan

---

29

when examined using the ordinary tools of statutory interpretation--let alone "clear congressional authorization" for such a program. Pp. 19-25.

Applied to *Traudt,* FINRA's Rule 6440(A)(3) allowing for FINRA to *unilaterally* stop trading of a stock and to do so claiming unexplained, unelucidated "extraordinary circumstances" forced their hand is the height of *Biden* and *West Virginia* "major questions" jurisprudence; 65,000 Americans in MMTLP were affected by the U3 halt.[19] More importantly, the U3 halt is an economic nuclear weapon that can be used now anytime a stock – let's take the Gamestop (ticker "GME") for example – that is a favorite for the small investors who have bought it would pose a "short squeeze" threat to the apex predators like Citadel, GTS, Jane Street, Virtu. If the arguments here fail, one can count on FINRA blowing away GME with a permanent U3 halt to protect the country club crowd that have the FINRA UPC Board permanently in their pockets.

But this U3 analysis inevitably circles back to the market maker exemption §203(b)(2) if not just for its breadth, its enforceability, and scope, but because the horror of an Education Secretary stroking a signature and writing off $430 billion (*Biden*) is simply not even in the same ball park as the economic firepower major market makers wield unchecked by FINRA.[20]

---

[19] As Traudt documents in his 1st Amended Complaint, orders were being placed and accepted by brokers such that share values over a broad range from $300 (approximately) to over $25,000 *per share* were accepted and onscreen Bloomberg videos show it going quickly from the hundreds of dollars into the thousands; this puts the true extent of the MMTLP fiasco at over $330 billion being taken from MMTLP holders.

[20] Way back in 2008, Robert J. Shapiro, former undersecretary of commerce for economic affairs, and a consultant to a law firm suing over naked shorting, claimed that naked short selling had cost investors $100 billion and driven 1,000 companies into the ground. See: http://www.time.com/time/magazine/article/0%2C9171%2C1126706-3%2C00.html

Combined with the other computer systems[21] weaponized by the market makers and broker-

dealers against small investors like Traudt, there is a perfect storm of major questions doctrine

tripwires throughout the entire Traudt case and by reference the entire US stock market

regulatory scheme not just with FINRA but the SEC too.

## 1st Issue:  Violation of the Separation of Powers - Improper Exercise of Executive Power

---

[21] *High-Frequency Trading (HFT) Algorithms* operate by executing a large number of orders at extremely fast speeds, often within milliseconds. Market makers use sophisticated algorithms and physical proximity to exchanges to gain speed advantages. The potential for abuse comes from HFT exploiting microsecond differences in price movements, which makes it difficult for retail investors to compete. Techniques like quote stuffing, where the market is flooded with fake orders, and front-running, where market makers trade ahead of large orders, can manipulate the market and create artificial price movements.

*Payment for Order Flow (PFOF)* systems allow market makers to pay brokers to route retail orders to them for execution. This setup gives market makers the advantage of seeing orders before they are executed. The potential for abuse lies in situations where market makers may prioritize their profits over obtaining the best execution price for retail investors. By trading against the flow of incoming orders, they can extract profits from knowing about transactions in advance.

*Dark Pools* are private exchanges where large institutional trades can be made anonymously, without affecting the public market. Market makers with access to dark pools can execute trades in these private venues without retail investors seeing price movements. This can lead to front-running or manipulative pricing, where market makers take advantage of the lack of transparency to profit at the expense of small investors. *Order Routing and Internalization* occurs when market makers and large firms route orders to internal systems instead of public exchanges, allowing them to match trades within their own books. The potential for abuse arises when market makers internalize orders, meaning they execute trades within their own systems at prices that may not reflect the best available market price. This practice can lead to worse outcomes for smaller investors.

*Algorithmic Market Making* involves market makers using algorithms to provide liquidity and manage large volumes of orders across multiple exchanges. These algorithms adjust prices or hedge positions in real-time based on market data. The potential for abuse comes when these sophisticated algorithms are used to manipulate bid-ask spreads, making it more expensive for small investors to buy or sell securities. Market makers can also engage in predatory trading, deliberately driving down prices to trigger stop-loss orders from small investors, allowing them to buy shares at lower prices.

Traudt hereby incorporates all FACTS as stated in his 1st Amended Complaint as incorporated here by reference with the addition of Numbers 1 to 56 in this motion. The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

As set forth above, FINRA exercises wide-ranging executive power, including the power to suspend trading in securities at will, to "enforce compliance" with the Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

FINRA's wide-ranging exercise of executive or administrative power is immune from Presidential supervision or control. FINRA's Board of Governors are not appointed or removable by the President; rather, they are selected by FINRA's members.

Even the SEC has limited authority review of FINRA's actions. The SEC may remove FINRA's Board of Governors only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

FINRA's exercise of wide-ranging, core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives. As a result, the creation of FINRA, as well as its

implementation of its delegated responsibilities by the SEC and the Maloney Act, violates the separation of powers.

## 2nd Issue:  Violation of the Appointments Clause of the U.S. Constitution

Traudt hereby incorporates all FACTS as stated in his 1st Amended Complaint as incorporated here by reference with the addition of Numbers 1 to 56 in this motion. FINRA is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.

Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board of Governors exercise significant authority pursuant to the laws of the United States and are therefore officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

By virtue of the wide-ranging discretion, duties, functions and independence of the FINRA Board, members of the Board are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board by its membership violates the Appointments Clause.

### 3rd Issue: Unconstitutional delegation

Traudt hereby incorporates all FACTS as stated in his 1st Amended Complaint as incorporated here by reference with the addition of Numbers 1 to 56 in this motion. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

By virtue of the grant of wide-ranging authority the SEC delegated to the FINRA Board, the Act improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch. This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.

### PRAYER FOR RELIEF

**WHEREFORE,** Traudt prays for the following relief:

1. An order and judgment declaring unconstitutional the provisions of law empowering FINRA to enforce compliance with the securities laws;

2. An order and judgment enjoining FINRA from carrying out any of the powers delegated to them by Congress or the SEC;

3. An order and judgment pursuant to 28 U.S.C. § 2201, 2202 declaring that FINRA is presently constituted and operating in a manner that violates the separation of powers set forth in the Article I of the Constitution;

4. An order and judgment pursuant to 28 U.S.C. 8§ 2201, 2202 declaring that FINRA, in its exercise of disciplinary functions, is a state actor and subject to the obligation to respect the rights guaranteed under the Unites States Constitution;

5. An order of this Court finding that the U3 trade halt issued by FINRA was *ultra vires* and illegal.

6. An injunction immediately against FINRA continuing to execute operations using Rule 4560 or Rule 203(b)(2) and ordering FINRA to cease allowing the movement of shares held short to overseas affiliates of US companies or individuals trading in the US stock market.

5. Costs and attorneys' fees pursuant to any applicable statute or authority;

6. Such further relief as this Court deems just and appropriate.

Dated: November _____

_____
Scott Traudt, *pro se ipso*
191 Kibling Hill Rd.
Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to all named defendants and respondent at the addresses delineated below either by 1st Class mail or via email on this _____ day of November, 2024.

_____
SCOTT TRAUDT

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan R. Voegele, Morris Kandinov LLP, 4915 Mountain Rd., Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Aaron T. Morris, Morris Kandinov LLP, 4915 Mountain Rd., Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan Miller, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**Ari Rubenstein/GTS Securities LLC** Atty. Stephen Fraser, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**FINRA** Atty. Walter Judge, DRM, 199 Main St. POB 190 Burlington VT 054020-190

**FINRA** Atty. John P. Mitchell, Faegre, Drinker, Biddle & Reath LLP 105 College Road East 105 College Road East, POB 627 Princeton NJ 08542-0627

**Schwab** Atty. Justin Barnard, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Anne B. Rosenblum, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Felipe Escobedo, Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

**Schwab** Atty. Jeff Goldman Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

**SEC** Atty. Mike Bailey 100 F Street, NE Washington, D.C. 20549