UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SCOTT TRAUDT,                          \*
Plaintiff                              \*
                                       \*
v.                                     \*        Docket Number: 2:24-cv-782
                                       \*        **JURY TRIAL DEMANDED**
ARI RUBENSTEIN                         \*
Defendant                              \*        2nd Amended Complaint
                                       \*
GTS SECURITIES LLC                     \*
GTS EQUITY PARTNERS LLC                \*
GTS EXECUTION SERVICES LLC             \*
Defendant                              \*
                                       \*
CHARLES W. SCHWAB AND CO. INC.         \*
SCHWAB HOLDINGS, INC.                  \*
Defendant                              \*
                                       \*
FINANCIAL INDUSTRY                     \*
REGULATORY AUTHORITY                   \*
Defendant                              \*
                                       \*
MERRICK GARLAND                        \*
US ATTORNEY GENERAL                    \*                            +
UNITED STATES OF AMERICA               \*
Defendant in his official capacity     \*
                                       \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## 2nd **AMENDED COMPLAINT**

## INTRODUCTION

This action is brought by Plaintiff Scott Traudt to recover damages for violations of the

Securities Exchange Act of 1934 (15 USCS 78a et seq.), the Sherman Antitrust Act (15 U.S.C.

1), with recovery for damages under the Clayton Act (15 USCS 15), and Vermont state law

claims (9 VSA 5605). Traudt also brings this action for Declaratory Judgment and Injunctive Relief under the Declaratory Judgment Act (28 USCS 2201) and Federal Rule of Civil procedure 57. Diversity jurisdiction is also claimed under 13 USCS 1332. US Attorney general Merrick Garland is added as a Defendant due to Plaintiff adding an Action for Declaratory Judgment to find the Private Securities Litigation Reform Act of 1995 (15 USCS 78u-4) unconstitutional. The amount in controversy is over $75,000. This Second Amended Complaint is filed pursuant to FRCP 15(a)(2).

## **PARTIES**

1.      Plaintiff Scott Traudt (hereinafter referred to either as "Plaintiff" and/or "Traudt") has at all times mentioned herein been a resident and citizen of the Town of Strafford, Orange County, Vermont, and is a commercial fisherman and truck driver.

2.      Defendant Ari Rubenstein (hereinafter "Rubenstein") is Chief Executive Officer of GTS Securities, a market maker in the New York Stock Exchange. Upon information and belief, Rubinstein has multiple homes in multiple jurisdictions within the USA, but the headquarters for GTS Securities is in New York City at 545 Madison Avenue, 15th Floor, NY, NY 10022. Rubinstein's primary residence is in NY, NY.[1]

---

[1] "GTS" as used in this document includes Rubenstein at this point herein where "GTS" is mentioned. The two are admittedly indistinguishable as the role Rubenstein has played in this monopoly is largely known but certainly contains matters exclusively known to the defendants. Rubenstein was responsible for corporate compliance with the SEC and FINRA rules, had management oversight, set policy within GTS, and had signatory authority for GTS and other GTS related entities.

3.      Defendant GTS Securities (hereinafter "GTS") is a market maker herein sued in its corporate capacity and is located as its primary place of business at 545 Madison Avenue, 15th Floor, NY, NY 10022.

4.      Defendant Charles Schwab Co. Inc. (hereinafter "Schwab"), address 3000 Schwab Way, Westlake, TX 76262,  is Traudt's broker-dealer for the transaction involving the purchase of "Non-Voting Series A Preferred Shares of Meta Materials" (hereinafter "MMTLP"). Schwab merged with TD Ameritrade (hereinafter "TDA") in 2023.

5.      Defendant Financial Industry Regulatory Agency (hereinafter "FINRA") is a Securities and Exchange Commission "self-regulatory organization" charged with regulating the US financial markets. It is headquarters is at 1735 K Street NW, Washington, D.C., 20006. Robert W. Cook is its President. FINRA conducts business in Vermont, has local offices in New York City, conducts trainings of broker-dealers for approximately 1,000 broker-dealers in Vermont, is chartered by Congress to conduct business as a national securities exchange, and works in local communities across the USA. See https://www.finra.org/about/locations. It has sufficient local contacts to be sued in this jurisdiction.

6.      Defendant Merrick Garland is added to this Second Amended Complaint ("SAC") as a Party as he is the US Attorney General and represents the United States' interests in defending the additional Action for Declaratory Judgment added to this SAC asking this Court to find the Private Securities Litigation Reform Act of 1995 declared unconstitutional under the 1st, 5th, 14th amendments to the US Constitution, *inter alia*. His primary place of business is Washington D.C., but the US Department of Justice has offices in Burlington, VT. His address is USDOJ, 950 Pennsylvania Ave. NW, Washington D.C., 20530-0001.

## JURISDICTION

7.      The Court has original jurisdiction over this action in accordance with 28 U.S.C. § 1361 (Mandamus Act), 28 U.S.C. § 1651 (All Writs Act), 28 USCS § 1331 (Federal Question), and 15 USCS § 78 (Securities Exchange Act of 1934).

## VENUE

8.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa. Plaintiff resides in Vermont and the US District Court for Vermont is the most convenient forum. Federal laws implicated in this case (Mandamus, All Writs, Securities Exchange Act) grant jurisdiction to any federal district court, and Vermont is the most logical choice given Plaintiff's residency.

## FACTS

9.      On 14 December 2020 Torchlight Energy Resources Inc. (ticker "TRCH"), a Texas-based oil exploration company, initialized a merger plan with Meta Materials Inc. (ticker "MMAT"), a Canada-based high-technology materials firm.

10.     From 2010 to 2020, TRCH traded a total of 745 million shares on US securities markets.

11.     From 1 January 2021 to 21 June 2021, TRCH traded 3.6 billion shares.

12.     Upon information and belied, naked shorts were added to TRCH by Rubenstein and GTS together with and in concert with others for the first 6 months of 2021.

13.     A proxy statement issued by TRCH and dated 5 May 2021 and filed with the SEC on 7 May 2021 stated that "Prior to the Effective Time, Torchlight will declare a dividend, on a one-for-one basis, of shares of Series A Preferred Stock to the holders of Torchlight Shares as of

4

the Series A Preferred Record Date. The Series A Preferred Stock is not expected to be listed on a securities exchange and will be administered by the Combined Company's transfer agent."

14.    In June, 2021, GTS, under orders from Rubenstein, and CanaccordGenuity (hereinafter "Canaccord") a Canadian market maker, jointly filed paperwork without MMAT nor TRCH executives' permission to facilitate registering the "Series A Preferred Stock" to enable it to trade on the Over The Counter (hereinafter "OTC") market for NASDAQ. This was done with forethought and could only have been done with scienter.

15.    GTS and Canaccord used 10 year old dated information in derogation of FINRA rules and submitted falsified Form 211's in order to make what would become MMTLP tradable. This was done with forethought knowing it would harm investors in MMTLP.

16.    The confirmation that FINRA would allow for all manner of irregular stock trading in MMTLP was written in plain English: in a letter dated 21 June 2021, the OCC stated that the "Series A Preferred Shares" would not trade, yet noted to options traders that they did not have to close out any short positions through the merger until OTC could get what would become "MMTLP" could trade – exactly the opposite of what the merged companies had wanted and had filed. FINRA knew or should have known that this was an inducement to illegality in the trading of TRCH and eventually MMTLP by not forcing shorts to close out positions prior to a merger. FINRA was aware of this being at odds with common and legal securities trading practice and allowed it to pass unchallenged  showing its institutional scienter in the MMTLP trading and later U3 halt is committed.

17.    The OCC 21 June 2021 memoranda outlined above was only shared with market makers, hedge funds, and certain broker-dealers to include GTS and Rubenstein.

18.     GTS had a duty under Rubenstein's supervision to record all short sales to include naked shorts and was in addition given extra time to close out fails-to-deliver under the "market maker exemption" rule.

19.     Referencing the above, FINRA Rule 204(b) provides exceptions for bona fide market making activities in that market makers engaged in bona fide market making are given additional time to close out fails-to-deliver arising from such activities but are also bound to maintain daily records of their fails-to-deliver and report them "as required to ensure transparency and regulatory oversight."

20.     GTS and Rubenstein know exactly how man shares of MMTLP were sold both long, short, and naked short from 21 June 2021 to 9 December 2022.[2]

21.     The Depository Trust & Clearing Corporation (hereinafter "DTCC") is chartered to maintain exacting records of securities trades and to provide electronic means for recovering and disseminating information related to securities on the US stock markets.

22.     The DTCC  has an auxiliary way of knowing exactly how many shares of MMTLP were sold both long, short, and naked short from 21 June 2021 to 9 December 2022 not only from record keeping but also via payments for clearing and settlement made by GTS to them for shares moved in any capacity from GTS computerized trading systems; DTCC collects clearing fees, settlement fees, and custody fees.

---

[2] The Depository Trust Clearing Corporation also has this data as does the New York Stock Exchange. Only through discovery of GTS' internal files and electronically stored information ("ESI") will the exact extent of the overselling and distribution of "naked shorts" be possible.

23.    FINRA was allegedly made aware of this falsification by TRCH CEO John Brda (hereinafter "Brda") and MMAT CEO George Palikaras (hereinafter "Palikaras") and took no action to keep MMTLP from trading.[3]

24.    Brda did not challenge the illegal registration of MMTLP. Upon information and belief, Brda did not want SEC scrutiny of TRCH or the merger because it would have shown other illegalities in TRCH.[4]

25.    TRCH and MMAT completed their merger on 28 June 2021.[5]

26.    There were approximately still outstanding 200 million to potentially 900 million shares sold short of TRCH that carried, unclosed, into the merger with MMAT.[6] Other data involving the 3.6 billion in total trade volume points to the possibility that the TRCH merger

---

[3] Brda and Palikaras are both the subject of US District Court (Southern District of New York) civil cases for fraud in the MMTLP fiasco.

[4] Brda had paid approximately $900,000 in another fraud case prior to the TRCH merger. On or about April 23, 2019, Brda, then CEO of Torchlight Energy Resources (TRCH), and Greg McCabe, then Chairman of TRCH, made statements inflating the valuation of the oil and gas properties that would later form NBH. They announced that a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting. As of this writing, these fields are effectively worthless.

[5] Circumstantial evidence shows that Brda and Rubenstein/GTS were in cahoots as there is social media acknowledgement that Brda actually filed for a cusip number (a specific stock trading serial number for each security registered to trade under FINRA rules) for MMTLP but – again – FINRA and OTC-UTC records are not available to private citizens and have been the subject of FOIA's to the SEC and they have been routinely denied. Discovery is the only way to sort it out.

[6] "A short sale is a sale of a security that the seller does not own or does not have the right to sell, with the expectation of buying the same security later at a lower price to cover the short sale." (SEC Rule 200(g)(1)).

with MMAT saddled MMTLP with more than 1 billion naked short shares from the moment it started trading.

27.    On 15 July 2021, MMAT filed an S-1 to create a spinoff of MMAT (which would come to be MMTLP) into a private company to be named Next Bridge Hydrocarbons (hereinafter "NBH").

28.    Circumstantial evidence suggests that Rubenstein conspired with Michael Dunn at Schwab to prematurely get MMTLP entered into the books at Schwab on 31 July 2021 (it became a component of Schwab's Index Fund "SWTSX" on that date) and allow for certain traders using Schwab to begin naked shorting a stock that did not even exist legally for trading until 6 October 2021. This shows a horizontal monopoly in place, scienter because of the forethought.

29.    Referencing the prior FACT, Schwab noted in its statement regarding the index fund that *"holdings may include collateral held by the fund for securities on loan. In addition, certain securities may be designated as collateral for transactions such as open futures contracts or delayed-delivery solutions."*

30.    MMTLP began trading in the OTC market on 6 October, 2021.

31.    In an email dated 12 October 2021 from Schwab's Michael Dunn, states to a Schwab customer with questions over how MMTLP came to trade in so many different ways at variance with normal procedure, Dunn states:

> *Hello,*
> *In regard to a couple of items we discussed (keeping everything non-account specific to be in line with Schwab email policies):*
> *Upon review, this was never restricted by Schwab. I didn't fully realize on our call 10/7 was the first day of trading it was a new issue that had never traded before*

8

*and wasn't able to sync up with all the OTC info so it could be restricted. The OTC markets site was apparently updated mid day on 10/7 and before the opening on 10/8 as far as allowing normal quoting/trading not only in a non-electronic market going forward.*

*This is an extremely unique situation in which a stock would simultaneously be a new issue (of sorts), but also be still amid a process of getting updated financials so that on day 1 of trading , it wasn't fully eligible for market maker quoting.*

*Kind regards,*
*Michael S. Dunn*
*Resolution Manager*
*Denver Trade Support*
*Specialty Trading Group*

32.    MMTLP immediately became violently shorted as it started to trade and never came off FINRA's OTC "Threshold List" for the entirety of its brief trading history after being tagged on that list on 14 October 2021.[7]

33.    Between 6 September 2022 and 9 November 2022, MMAT filed S-1s and revisions that were eventually to become effective on or about 18 November 2022.[8]

---

[7] The Threshold Security List is a list of securities that have a high level of fails-to-deliver (FTD) activity, which is when a broker-dealer sells a security but does not have the security available to deliver to the buyer. The list is used to identify securities that may be subject to increased regulatory scrutiny and to help broker-dealers identify and address potential issues with their trading and clearing activities. (FINRA Rule 4320).

[8] The SEC defines an S-1 as a "registration statement under the Securities Act of 1933" that is used to register the offer and sale of securities, including common stock, preferred stock, debt securities, and other types of securities. The S-1 registration statement typically includes information about the company, its business, its financial condition, its management, and its securities being offered. The statement is designed to provide investors with a comprehensive overview of the company and its securities, and to ensure that the company is in compliance with federal securities laws.

34.    GTS sold naked shorts using the market maker exception in MMTLP and *there is no evidence available that they ever did a FINRA mandated "locate" of those shares at any time whatsoever* to legally emplace them into the stream of securities commerce involving MMTLP.

35.    GTS routinely closes out its books for each reporting year by having billion dollars in total securities sold but not yet bought. In 2023, for example, GTS had $62 billion (approximately) of securities in derivatives and about $9 billion in securities sold but not purchased (shorts).

36.    Traudt has documented prior actions by GTS that mimic what happened in MMTLP in what has come to be known as "The Overstock Squeeze" in 2019.

37.    GTS clears through Goldman Sachs. Traudt has established the same playbook used by GTS during the Overstock Squeeze was used in MMTLP. Former Overstock CEO Patrick Byrne just won (again) in the 10th Circuit when short sellers who shorted his company failed to cover their short positions, brought claims against Overstock and Byrnes, and then were defeated at the 10th Circuit after the lower US District Court dismissed the case. The United States Court of Appeals for the Tenth Circuit reviewed the case and affirmed the district court's dismissal. The appellate court held that the plaintiff failed to plausibly allege reliance on the defendants' misstatements, as the plaintiff admitted that it bought shares to avoid breaching lending contracts, not because of the defendants' statements. The court also found that the fully disclosed dividend did not constitute manipulative conduct, as it did not deceive investors about the market value of Overstock's shares. Additionally, the court dismissed the plaintiff's claims of material omissions, finding no evidence that the defendants intended to register the dividend all

along or that issuing the unregistered dividend was illegal. *In re: Overstock Securities Litigation,* No. 21-4126 (10th Cir. 2024).

38.    GTS got hurt financially in the Overstock play by Byrne when the shorters were forced to cover, but the depths to which Traudt can't know. But as a market maker who worked to get Overstock trading, GTS would have been scorched and would therefore have taken future steps to prevent that from happening again – hence the MMTLP corruption.

39.    Byrne called out the SEC on 18 September 2019 and the major financial apex predators in the market to confirm exactly the same methods and "cartel-like" behavior to protect the finances of the elites on display in MMTLP's trade halt:

> *"Something funny happened to me over the weekend here in Asia. I started receiving detailed messages saying that since the morning of last Friday (13th), major prime brokers on Wall Street (e.g. JP Morgan, Morgan and Goldman) were telling clients that the SEC had let them know last Thursday night and Friday morning that they going to do something special to let short-sellers off the hook (and incidentally I can easily trace back the names of the people at the prime saying that). They (sic) SEC informed the prime brokers that if Overstock went forward with the dividend, they (the SEC) would be sending them Wells Notices (essentially, letters that say "We are going to come after you!") these prime brokers were telling that to clients. In short the prime brokers were promising clients that the SEC would call "Bazoomba!" for them.[9]*

40.    If the cartel could do it in a much larger company than Meta Materials Inc., the cartel of which GTS was a part could have done it with ease in MMTLP.[10]

41.    GTS had capacity, motive and opportunity to print millions of both counterfeit shares for long positions and naked synthetics for short positions. Traudt also stated with

---

[9] *The SEC Cries "Bazoomba!"* Deep Capture, by Patrick Byrne, 18 September 2019 see https://www.deepcapture.com/2019/09/the-deep-state-cries-bazoomba/

[10] They just caught in MMTLP with all the oversold conditions as what was acknowledged by Tradestation.

particularity that they never located the millions of naked short shares of MMTLP they printed under Rule 203.[11] This was by design showing the requisite scienter needed to be established for Traudt to proceed under the PSLRA.

42.    Traudt had no way of knowing that MMTLP was so heavily shorted nor so heavily oversold, and GTS was in a position to know this but violated its duties under SEC Rule 15c3-5 – *Market Access Rule* which ensures that broker-dealers, including market makers, maintain proper controls to prevent trading practices that could harm market integrity. Market makers must have risk management and supervisory systems to manage risks and ensure compliance with applicable rules.

43.    GTS violated SEC Rule 15c2-11 – *Initiation or Resumption of Quotations Without Current Information* in that market makers must collect and review sufficient information about the securities they create markets for have quotations they publish are not fraudulent or misleading.

44.    Finally, Exchange Act Section 11A – *National Market System Requirements* instructs that the SEC emphasizes that market makers must contribute to the efficiency, transparency, and integrity of the market system by upholding standards and practices that promote fair markets. GTS did not by virtue of the 600 million shorts still outstanding that they knew were unclosed on 9 December 2022.

---

[11] Further discovery would come up with these numbers; Traudt is at a disadvantage to get these exact numbers from GTS externally but production requests would achieve this coupled with FINRA's bluesheets on MMTLP.

45.    Traudt learned by email to another MMTLP shareholder that GTS was the only market maker for MMTLP when Traudt made his massive 305 share purchase on 30 November 2022:



46.    Schwab is oversold in MMTLP by 500%, has denied on 10 July 2024 being oversold, yet had admitted that it had 1.8 million shares sold short on its books in June, 2023 via a TDA client.[12]

---

[12] US Congressional staffers have privately told MMTLP shareholder activists that they have seen the FINRA bluesheets on MMTLP and know that there are still almost 700 million unclosed short positions in MMTLP.

47.    Two online survey of MMTLP shareholders done in 2023 showed that MMTLP was oversold by at least 400 million shares, with both surveys estimating that number could be as high as 600-700 million.

48.    Traudt conducted a survey of proven MMTLP shareholders on or about 1 October 2024 and received 257 responses. The extrapolation off the data Traudt received concurred that at least 400 million and as many as 600+ million shares were oversold in MMTLP by the broker-dealers, to include Schwab.

49.    Broker-dealer TradeStation was oversold and admitted it publicly, the exact extent is at least 200% according to online "share registration polling" conducted in the summer of 2023.

50.    FINRA operates, maintains, and controls its own stock exchange (XADF) on the OTC-UTC exchange and coordinates activities therein with JP Morgan Chase in complete contravention of its rules and mandate from SEC and uses a trading system created and owned by Prof. James Angell from Georgetown University to manage it through Intelligent Cross LLC.

51.    FINRA as a self-regulatory organization (SRO) has no standing under *Loper Enterprises v. Raimondo* (US Supreme Ct. #22-451, 2024) and *West Virgina v. EPA* (#20-1530, 2022) to maintain the U3 halt and is routinely using powers and authority not delegated to it by Congress.

52.    FINRA's U3 halt was illegal under *West Virginia* as the rarity by which the U3 halts happen (only three times since the Securities Act of 1934 was passed) and because it is illegal under the revised "major questions" doctrine by which the US Supreme Court reined in a federal agency making policy decisions for Americans when it had no power to do so; the U3

14

halt was orchestrated by two Wall Street back benchers and aided and abetted with a cartel sitting in the room with them with vested financial interest in seeing the shorts remaining unclosed because of their exposure to catastrophic losses.

53.    That FINRA has "immunity" from a damage claim as a *private* SRO is impossible to sustain in the wake of *Loper* as the decision was not appealable, was done by a private organization usurping Congressional law making powers, contravenes the clear and unambiguous language of 2010's Dodd-Frank laws, and because as an SRO it was – if the legality of its existence is not called into question – simply impossible for it, and the US government, to not be seen as one. FINRA's immunity allows it to routinely make and break its own rules, which is *prima facie* evidence of scienter. (It mangled the Corporate Action for MMTLP end-of-trading conversion to NBH specifically to induce confusion into the market and provide it the "plausible deniability" it would need for the U3 halt that devastated investors in MMTLP. This is pure evidence of scienter.

54.    On 22 November 2024, the DC Circuit Court of Appeals ruled in *Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of America* (Case No. 1:23-cv-01506, https://media.cadc.uscourts.gov/opinions/docs/2024/11/23-5129-2086156.pdf)  that Alpine (a private securities broker that has raised non-delegation and Appointments Clause constitutional challenges against FINRA after FINRA attempted to shut them down prior to court review of the suspension process used by FINRA) demonstrated a likelihood of success on its private nondelegation claim, as FINRA's expulsion orders take effect immediately without prior SEC review, effectively barring Alpine from the securities industry. The court held that this lack of governmental oversight (by the SEC over FINRA) likely violates the private nondelegation

doctrine. The court also found that Alpine faced irreparable harm if expelled before SEC review, as it would be forced out of business.

55.    The key event in *Traudt* was the U3 trading halt issued by FINRA to halt trading in MMTLP stock on 9 December 2022. This U3 halt was never validated by the Securities Exchange Commission ("SEC"). Mirroring this new ruling in *Alpine*, this clearly ran afoul of the private non-delegation doctrine.

56.    Traudt will suffer irreparable harm if the U3 halt continues and this harm exactly mirrors the harm identified in *Alpine*.

57.    All of the factors identified in *Alpine* are evident in *Traudt*: irreparable harm in the 100% loss of all investments made into MMTLP (ergo "destruction in its current form"); there is no ability save for injunctive relief (a restart in trading in MMTLP for example) to make Traudt whole; and the public interest in a fair market not subject to an arbitrary and capricious decision made by an "illegitimate proceeding, led by an illegitimate decisionmaker" to quote Judge Walker in *Alpine*.

58.    The nondelegation doctrine underscores the importance of ensuring that quasi-governmental entities like FINRA operate with accountability and within constitutionally defined limits, particularly in situations where their actions impose significant and lasting consequences on market participants. FINRA's actions with the U3 halt were taken in excess of its authority.

59.    On or about 26 November 2024 Traudt emailed SEC Atty. Mike Bailey (Office of General Counsel) and requested pursuant to *Alpine* that the SEC reopen trading in MMTLP for 2 days pay to close trading only so that short positions outstanding in MMTLP could be closed and anybody not wanting to have their shares carry over into NBH could sell.

60.     Traudt nor any other investor cannot bring a claim against FINRA under the Administrative Procedures Act because FINRA is not a US federal agency.

61.     Traudt nor any other investor cannot bring FOIA requests to FINRA because it is not a US federal agency.

62.     Between October 1, 2022, and December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50.

63.     During this period, the market capitalization for MMTLP, a relatively unknown oil and gas exploration company, fluctuated between approximately $1.5 billion and $6.5 billion.

64.     Given the company's total authorized share count of 165.5 million, this level of market capitalization and volatility suggests the potential influence of synthetic (rehypothecated) shares or naked short selling.

65.     Between November 15 and December 5, 2022, John Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price of MMTLP ranged between $2.90 and $9.90. Based on this price range, Brda's transactions generated proceeds estimated between $870,000 and $2,970,000.[13]

66.     Publicly available social media posts from this timeframe show that Brda encouraged others to purchase MMTLP shares and denied selling any of his own shares.

67.     Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt. At the time of the sale, Brda was a paid consultant to NBH.

68.     On or about November 30, 2022, to 8 December 2022, NBH CEO and majority owner Gregory McCabe ("McCabe") sold approximately 6.8 million shares of MMTLP out of his total holdings of 18,758,249 shares, which constituted 11.37% of the float.[14]

---

[13] Upon information and belief, Brda either sold because he was tipped off to the MMTLP trading halt or he knew the NBH oil field leases were worthless having been in and around these same fields with virtually zero productive capacity since 2014.

[14] This is an uncertain number as different bookkeeping records (10ks) show him owning over 13%.

69.    Based on this price range, McCabe's transactions generated proceeds estimated between $13,000,000 and $78,000,000. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float.

70.    The "temporal proximity" of the Brda and McCabe trades demonstrated that they may have been tipped off to the looming U3 halt by others.

71.    Brda and McCabe knew that the NBH oil well leases were valueless and knew as much as early as 2014 and made the decision to use the price run up to execute the "pump and dump" that was the MMTLP trading.

72.    On June 28, 2021, during the merger of Torchlight Energy Resources and Metamaterial Technologies Inc., Gregory McCabe, a key executive and shareholder, highlighted the substantial value of the Orogrande Basin oil and gas assets.

73.    Public filings and disclosures at the time valued these assets at $47 million—significantly lower than the estimated $20.96 billion to $41.92 billion based on the below-ground valuation of probable reserves. Subsequent disclosures during the Next Bridge Hydrocarbons spin-off revealed notable discrepancies in this valuation.

74.    Brda had stated on a recorded public call on Twitter that MMTLP would go to $100, and that he and McCabe had no plans to sell.

75.    McCabe has refused to answer any and all questions from Traudt as an NBH shareholder. McCabe was served with a books and records request by eight MMTLP/NBH investors (including Traudt) on or about 20 November 2024.

76.    McCabe would not identify the entity nor the amount sought to be purchased after issuing an NBH public relations statement (23 January 2024) stating he had been approached by a short seller of MMTLP who held "multiples" of the 2.65 million shares short that FINRA's Cook acknowledged to Congress. Traudt questioned McCabe on this in October, 2024.

77.    MMAT's S-1 became effective after FINRA review on 18 November 2022.

78.    Traudt purchased 305 shares of MMTLP at $9.62 a share on 30 November 2022 from TDA for a total of $2,934.95 relying on a free and fair market and unaware of the GTS, Schwab, and FINRA monopoly that had already created millions of counterfeit shares.

79.    At various times between 30 November 2022 and 8 December 2022, Traudt attempted to set sell his MMTLP shares and TDA's online trading system refused to accept orders for anything other than a dollar value within approximately 30 to 50 dollars of whatever the lit market trading price was that day.

80.    Traudt attempted to sell his MMTLP shares at prices that were being accepted as orders from other broker-dealers but was barred by TDA from doing so.

81.    Traudt was unable to sell any of his shares due to the U3 trading halt requested by Schwab effectively wiping out the last 2 days of trading in MMTLP.

82.    On 29 November 2022, heavily redacted emails obtained by MMTLP shareholders from the SEC under 5 USCS 552 - the Freedom of Information Act (hereinafter "FOIA") – showed that FINRA Vice President of Market Operations for Transparency Services Patricia Casimates (hereinafter "Casimates") was emailed by FINRA Fraud Officer Sam Draddy (hereinafter "Draddy") ostensibly about MMTLP and included three SEC officers.

83.    On 2 December 2022 Richard Boyle from FINRA's National Cause and Financial Crimes Detection Program emailed Jay Gibbon at FINRA and courtesy copied another SEC officer who was redacted from the email that stated that *"I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer [Meta Materials/Next Bridge Hydrocarbons] and its proposed spin-off transaction. Would one of you have time on Monday or Tuesday to discuss this matter? FINRA's Market fraud Investigations team recently received several tips that appear to have also been sent to the SEC."*

84.    On 5 December 2022 Draddy emailed three redacted SEC officers, FINRA's Boyle and Jay Gibbon, and stated in the email that it *"-looks like this MMAT/MMTLP matter has now*

*hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well). I know*

*you have spoken to Patti Casimates and our General Counsel's office – but was wondering if it*

*made sense for my Fraud team to have a conversation directly with you and your folks working*

*on the matter so we are not duplicating efforts. We are looking at the two issuers from a fraud/*

*manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak."*

85.     On December 8, 2022, John Mendl, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action. Mendl confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

86.     FINRA's Fraud Team did not halt nor advise a halt in any and all further regulatory approvals by FINRA subsequent to Draddy's email, above.

87.     On 6 December 2022 FINRA issued an intentionally erroneous  "Daily List" Corporate Action notice regarding MMTLP that was at odds with prior approved MMTLP guidance by stating that MMTLP shares would be "cancelled" on 13 December 2022 – a date never entertained nor mentioned by NBH or MMAT management - despite other wording stating in the same notice that shares would transition from MMTLP into NBH on 14 December 2022 and did so stressing to NBH that NBH was "not to edit or interpret it."

88.     In the same notice as above, FINRA changed the language of the pay date and simply stated that MMTLP shareholders with settled positions as of 12 December 2022 would now receive one share of NBH per share of MMTLP.

89.    Schwab marked MMTLP short share ability at "limited" on 6 December 2022 during the trading day "lit" (normal daytime OTC market) and set a borrow fee of 23% and at the same time the parent to MMTLP (MMAT) had an enormous borrow rate of 115% indicating that Schwab was having great difficulty finding clients' shares to lend.

90.    On 9 December 2022, after the U3 halt, Schwab's MMTLP's borrow rate increased to 27.5% even *with* a trading halt and its availability was marked "not available." This indicates it was still trading in dark pools/alternative trading systems.

91.    On 6 December 2022, MMTLP started trading at $7.15 a share, ran as high as $9.50 a share, and eventually closed at $8.18 with a total volume of 5,000,000 shares traded.

92.    On 7 December 2022 (the day after the FINRA released its intentionally confusing and damaging Corporate Action to the Daily List), MMTLP started trading at $9.90 a share, never ran higher, and closed at its daily low of $7.00 on 4,220,000 shares traded for volume.

93.    On 8 December 2022 (the last day of trading for MMTLP as on 9 December 2022 the U3 halt occurred), MMTLP started trading at $6.15 a share (which was the high point for the day), and eventually closed at $2.90 a share with a total volume of 13,710,000 shares traded and in total defiance of financial physics as the volume was indicative of short position holders not closing out their positions, and also that algorithmic trading facilitated by GTS was systematically destroying MMTLP's share price by supplying naked shorts illegally to enable a "short attack" wherein GTS, with a nod of approval or at least quiet acquiescence from the major players in the brokerages to include Schwab, flooded the trading with counterfeit shares and used the weaponized-against –retail-investors high-frequency trading systems at GTS to utterly

eviscerate the possibility of a "short squeeze" in MMTLP. This was in keeping with its participation in the horizontal monopoly that was the GTS, Schwab, FINRA axis.

94.     From the closing bell on 6 December 2022 to the closing bell on 8 December 2022, MMTLP lost 53% of its value.

95.     Various exchanges trading in MMTLP began to report "505" codes across the board on 6 December 2022 which is trading code for "I am out of shares" signaling that MMTLP was wildly oversold and shorted to apocalyptic levels.

96.     More uncertainty and confusion were deliberately added to MMTLP investors when on 8 December 2022 FINRA issued another "Daily List" notice stating (now) that MMTLP would be "deleted" on 13 December 2022.

97.     On 8 December 2022 MMTLP was trading in the pre-market on OTC in significant volume in what appeared to be an obvious attempt to scare investors.

98.     In the same notice as #86, above, FINRA changed the language of the pay date and simply stated that MMTLP shareholders with settled positions as of 12 December 2022 would now receive one share of NBH per share of MMTLP. This was clearly done with malice and to cause confusion and is the requisite scienter for securities fraud allegations.

99.     Per FINRA's own rule 6490, any issues with regards to *settlement or fraud* should have been discovered during the review of not one but two confusing Corporate Actions notices dated on 6 and 8 December 2022 respectively. FINRA broke its own rule. More scienter.

100.    It was FINRA's pattern and practice of conduct in securities prior to the MMTLP 0U3 halt of 9 December 2022 to state, in stocks going from publicly traded to private, that short

position holders had to "buy to close out short positions only" or reasonable facsimile thereof. This was not stated for MMTLP's trading closeout and is more evidence of scienter.

101.    On 8 December 2022, FINRA at 3pm EST placed a "caveat emptor" notice on MMTLP stock the night before they officially halted trading in it leaving 65,000 shareholders holding long positions no ability to sell, nor make use of the farcical "caveat emptor" warning.

102.    Proof Schwab was alerted to the U3 trade halt (and thus evidence of insider trading) began early on 8 December 2022 when a customer service representative warned TDA client Ryan Franz to make sure he sold his shares in MMTLP on 8 December 2022 as it would not be trading the following day. Franz has submitted an affidavit to this effect and Schwab/TDA has a recording of this call. This is clear evidence that Schwab/TDA knew in advance of a trade halt and did not share with all customers. This is more evidence of scienter in terms of data being withheld to protect its corporate interests.

        Months after the 9 December 2022 U3 trade halt, Charles Schwab & Co. sent emails and/or text messages to MMTLP shareholders, Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares. Numerous other shareholders received the same guidance from Schwab. This violates the terms of the client agreements with Schwab by shareholders as Schwab, under the terms and conditions of the client agreement, must maintain regulatory adherence to the SEC and FINRA rules. This refusal is anticipatory breach of contract and also is clear proof of scienter.

104.    FINRA, citing some "extraordinary event" and acting under the auspices of FINRA Rule 6440(a)(3) and by decision of the Vice President of Transparency Services Chris Stone, initiated a U3 halt in trading of MMTLP "officially" on 9 December 2022.

105.    The trade halt in MMTLP was without notice to retail investors (save for one documented case, above, involving Franz and Schwab) but with plenty of notice to corporate, hedge, market makers, and "whale" investors as the members of the UPC were aware of the halt and *acted accordingly in their own institutions.*

Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition.

FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt. Two others followed on later from FINRA.

Despite receiving thousands of complaints from shareholders these FAQs remained, to date, FINRA's only significant communication with shareholders regarding the halt were these self-serving and erroneous FAQs.

109.    A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt.

On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning

24

Meta Materials Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress.

111.    On January 15, 2024, NBH executives, including Clifton DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition.

112.    As of November 26, 2024, there is no publicly available information indicating that Representative Ralph Norman's December 22, 2023, letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

114.    Throughout 2019 to 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic shares

From late 2022 through early 2023, AST/EQ, acting as the designated transfer agent to convert MMTLP shares into NBH shares, managed the shareholder reconciliation process during the transition of MMTLP shares to NBH. Shareholder records during this period reflected discrepancies in share counts, which were left unresolved

The prolonged inaction by FINRA over the last two years combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S.

financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

Information from Casimates and Stone was provided to UPC board members on or about 2 December 2022.

119.    Casimates chaired the "halt" committee (the UPC, more or less) and without challenging industry representatives if they had a counter-party interest in the information she provided about MMTLP (how much were their respective institutions exposed either from oversold pure counterfeit positions or from deep exposure to synthetic shorts or conventional shorts?), brought them all into the fold with Stone having the final say as "Transparency" vice-president for FINRA in moving to halt trading.

Upon information and belief, FINRA purposely mislead the public and Congress about the reasons for the U3 halt issued by Stone (approved by Cook) by stating it was due to an "extraordinary event" and "uncertainty in the settlement process" when in fact Draddy had pulled the infamous "bluesheets" (the FINRA "Electronic Blue Sheets") on MMTLP which showed not only was it horrifically oversold, but it had short positions at a staggering level.

121.    Draddy had identified widespread fraud in MMTLP no later than 5 December 2022.

122.    Robert W. Cook, FINRA's President, wrote a 31 January 2024 letter to Congressman Ralph Norman that brings him clearly within the legal pincers of 18 USCS 1001 for "knowingly and willfully" lying to Congress in that in that letter Cook states: *"FINRA also did not provide any advance notice of the trading halt to broker-dealers, hedge funds, or any*

*other market participant.*"[15] Cook had a duty to be truthful to Congress, and by extension, investors in MMTLP. This continued contempt for the truth shows a cover up at FINRA was ongoing and thus, scienter is evident.

123.    *Prima facie* evidence that the looming U3 halt was coming was that there was no attempt by short sellers or owners of naked shorts to close out their positions in the last week of trading.[16]

124.    Using a document off the SEC's own website that was and is considered the work of a securities industry expert entitled *Counterfeiting Stocks 2.0,* even the wildly understated admitted to 2.65 million shares acknowledged by FINRA are coupled with *at least* 50 times that number in naked shorts created by Rubinstein and GTS.

125.    Referencing the above, *Counterfeiting* states "one emerging company for which we have been able to get reasonable estimates of the total short interest, the disclosed short interest, the available stock lending, and fails-to-deliver, has fifty "buried" counterfeit shares for every FTD share, which is the only thing the SEC tracks, consequently the SEC has not acted on shareholder complaints that the stock is being manipulated."[17]

---

[15] False Statements Act (18 U.S.C. § 1001): This law makes it a crime to make false statements or representations to any department or agency of the United States, including Congress. The penalty for violating this law can range from a fine to imprisonment for up to five years.

[16] Total unclosed short positions in MMTLP are approximately 900 million shares depending on what numbers available in the wild are used. FINRA refuses to provide "bluesheet" data that would give an accurate share count of long positions and short positions that were not closed out.

[17] See https://www.sec.gov/comments/s7-07-23/s70723-20162302-331156.pdf

126.    Based on FINRA's spectacularly understated and *by their own admission* uninformed accounting regarding offshore shares and shares moved on alternative trading systems as attested to in the infamous Cook 31 January 2024 letter to Congressman Ralph Norman and using the 50X factor of buried counterfeit shares as identified above, there are a *de minima* level of 132 million shares still short in MMTLP of all flavors: short and naked short counterfeits.

127.    Cook's statement above can immediately be dismissed as false because the members of the UPC committee were comprised of the following individuals from the securities industries: John Meegan (Hefren-Tillotson), Tom Nicholson (D.A. Davidson & Co.), Mathew Price (Fidelity Investments), Jeffrey Sheftic (Lincoln Financial), Joseph Iraci (Robinhood), Christopher Haines (Edward Jones), Kelly Bell (Hilltop Securities), Steven Paul Dapcic (Pershing LLC) and to this date FINRA has *never* answered simple questions as to whether any of these individuals (like Mathew Price whose Fidelity Investments operation held 21,000,000 shares of MMTLP and Joe Iraci whose Robinhood had 12,804,287 shares) had any counter-party risk.

128.    On or about 6 February 2023, FINRA personnel further tried to cover up to no effect as it was rapidly uncovered that certain paperwork in their files and publicly presented had been altered; *inter alia* FINRA backdated the D-1 forms in MMTLP. This is at least tortious conduct by FINRA.

129.    On 6 February 2023 the CEO of OTC Markets Cromwell Coulson stated that no 211's was filed on MMTLP because the company was in good standing under the SEC's rule but

does not note that the company never filed its own paperwork as it did not want it to trade; this is at variance with evidence that paperwork was filed by GTS and Cannacord.[18]

130.    On 6 February 2023 Coulson posted on Twitter (now "X" after Elon Musk bought it) that "the ongoing question is how do short position holders resolve their liability for the Next Bridge common stock if it is not easily transferable or tradable publicly?"

131.    As a proximate cause of the U3 trading halt that has now lasted 19 months, Traudt is damaged over $75,000 and asserts his true damages in loss of use of that money, the calculation of dark pool/ATS trading share prices available on 7 to 9 December 2022, and other factors could lead to significantly higher damages at trial. 15 USCS 78u-4e provides for a 90 day window after "disclosure" to obtain a share price for compensation. Since the U3 halt only stopped trading on US lit markets, and evidence proves it was trading as late as June 2024 in foreign markets as high as $1039 a share, Traudt's true damages could be well over $300,000.

132.    After 9 December 2022, limit orders showing "too late to cancel" reflected shares were being placed for sale in a variety of brokers anywhere from under $100 to as high as $200,000 per share.

133.    Traudt called TDA's 800-669-3900 account services number around 4:50pm EST on 20 March 2023 to inquire about tax paperwork that TDA had regarding Traudt's stock trading.

134.    Traudt remembers some confusion as to terminology in the conversation where Traudt asked about K2's and also other tax records and at all times on this date Traudt only spoke

---

[18] It is clear that MMTLP was subject to such dumpster fire levels of fraud and regulatory insanity on behalf of heavy breathers in the NYSE financial ecosystem that straight answers are only going to be received through the discovery process utilizing FRCP Rule 34.

with Ron Fleming and was not transferred to anybody else. (Apparently his full name is

Cameron Fleming, and he goes by Ron.)[19]

135.    After the tax issues were resolved, Traudt inquired broadly to Fleming about the

MMTLP ticker which was apparently dead in the water as of 20 March 2023.

136.    Fleming seemed to Traudt that with some prodding he might discuss what he

knew about the U3 halt of 9 December 2022 in MMTLP by FINRA.

137.    During the conversation, he made mention of three issues that Traudt thought

clearly showed that trading was not shut down to protect small investors ("retail") but the broker

dealers and potentially those shorting this:

138.    He stated that it was "trading at 100 times the (lit market) in the dark pools and

people were crazy to think broker-dealers would pay out on that."[20]

139.    The U3 was done, according to Fleming, "because the share price bore no relation

to the actual share value" and…most importantly:

140.    *Fleming stated that "we had to protect ourselves" and that was why they*

*requested the U3 halt.*

141.    Traudt  had requested to have copies of this conversation which was recorded by

TDA sent to Traudt or made available for transcription.

142.    At first TDA said they would play them back, and then they refused.

---

[19] Fleming held Type 6, 7, and 63 Series brokerage licenses on or about the time of his
conversation with myself and was in a position to know the request to halt trading was made.

[20] Orders were staging at TDA reportedly in a wide range from $298 to almost $25,000, and clear
evidence exists that TDA was accepting limit orders over $4,000 a share, meaning, conceivably,
that MMTLP trading had detonated with a velocity akin to a nuclear weapon.

143.    Traudt attempted again in February of 2024 to get Schwab trade desk people to play them back, and they refused.

144.    Schwab will not release the audios clearly as part of a cover up and an orchestrated, coordinated campaign to prevent the release of damning information not only to Traudt but also to 65,000 other MMTLP shareholders similarly worked over by this "cartel" in all but name. Again, this shows the core monopolistic behavior by Schwab, and this refusal is more evidence of scienter.

145.    Schwab admitted to deleting Traudt account records, emails, and the audios of the above Traudt-Fleming phone call on or about 16 September 2024 and did so even after Traudt had sent a demand letter for damages and notice of litigation on or about 29 December 2022 to Schwab via message center accounts at Schwab. (This should have served as a litigation hold on these electronically stored information ("ESI") items and also because SEC rules state that this data was to be preserved a minimum of 3 years anyway.) Clearly this confirms "scienter" by Schwab

This destruction of evidence also helps defendants GTS, Rubenstein, and FINRA because the core of *Traudt* is that they were all in a horizontal monopolistic relationship to profit from shorting MMTLP with the safety valve available in the U3 weapon that FINRA had.

147.    FINRA suspected fraud as early as late November 2022, and was not obligated to go forward with any Corporate Actions but it did on 6 and 8 December 2022

Rubenstein was a member of FINRA's Board of Governors from 2014 to 2019 and FINRA's Market Surveillance Advisory Group until 2017 which was working with advanced Artificial Intelligence (hereinafter "AI") and other machine learning systems to ostensibly detect

31

and eliminate fraudulent activities in the market.

149.   GTS regularly *de facto* manipulates the market through the "market maker exemption" whereby a major market maker can create shares out of thin air with the stroke of a keyboard button and introduce them to the market or sell them off as part of a debt/equity swap to a hedge fund, bank, or other institution.

150.   SEC Rule SHO 201(b)(3) is often referred to as the "naked short exemption" for it allows a market maker – in this case, GTS – to short sale a stock without even having to "locate" such a share; on the barest of promises a market maker can naked short a stock, which is exactly how GTS and Rubinstein have provided the financial hammers to pound smaller companies into oblivion by relentless shorting with shares literally backed by nothing, created by a few keystrokes, loaned out in debt-equity swaps in the millions of dollars, and with FINRA enforcing the "locate at some point in time when you can get around to it" rules.[21]

151.   GTS and Rubinstein have literally used this exemption for *trillions* of stock transactions.

152.   Rubenstein had superior knowledge, by virtue of Rubenstein participating in the FINRA "Market Surveillance Group" and his intimate knowledge of the artificial intelligence/ machine learning aspects of trading on the NYSE since 2017 that GTS and Rubenstein knew how and where to bury the (financial) bodies. Rubenstein was a key part of the monopoly for the duration of the monopolistic entity and provided unlimited shares for naked shorting to crush the price of MMTLP for the purpose of gaining illegal profits for the monopoly.

---

[21] This is the ultimate financial "trust me bro" but it has horrific consequences for a free and fair market putting that much manipulative horsepower in market makers' hands and by extension, to a hedge fund or whale investor they do a quickie debt-equity swap with.

153.    FINRA nor the SEC has never audited GTS to identify if the Rubenstein has been abusing SHO 201(b)(3).

154.    GTS was hit by the New York Stock Exchange Regulatory Enforcement on 13 April 2023 for fines within a Letter of Acceptance, Waiver, and Consent ("LAWC"). More importantly, under the terms of the LAWC, the NYSE *still* has GTS under supervision with an embedded compliance officer that is to go on for 18 months due to the abuse of the TMS-45E machine algorithm/high frequency trading system ("HFT") within GTS. Since the start date for this supervision was 13 April 2023, it ostensibly ended on 4 October 2024.[22] GTS and Rubenstein having numerous activities in the past that could have been pursued criminally by the Securities and Exchange Commission ("SEC") to include in particular predatory trading using high-speed algorithms that saw it fined $10,000,000, and two employees fined $150,000 each.[23]

155.    On the last day of trading for MMTLP alone, GTS allowed short positions to be opened in the amount of 15,000,000 shares alone, creating a vast field of failures-to-deliver in pure Carl Sagan numbers.

156.    Upon information and belief, GTS is using GTS Systematic Equity Index Master Fund LP (Ser # 805-2750972255) ("GTSSEIMF") to launder shares offshore. This is an ongoing scheme.

---

[22] Id 1§ 1.

[23] See *Letter of Acceptance, Waiver, and Consent No. 2019-07-00023 RE: GTS Securities LLC, Respondent* (13 April 2023); https://www.nyse.com/publicdocs/nyse/markets/nyse-arca/ disciplinary-actions/2023/AWC_-_NYSE_Reg._No._2019-07-00023.pdf

157.    MMTLP continues to be traded post U3 in offshore markets hidden in FINRA OTC-trading platforms, and GTS still plays a role, and GTS had motive, opportunity, and past illegalities as proof that the corporate mindset is never about compliance but skirting or ignoring regulations because of the complexity of catching them in fraud with their high-speed trading systems.

158.    GTS provided counterfeit "long" shares to create huge oversold conditions at Schwab and other brokers. It washed its own naked shorts into the Cayman Islands and into its subsidiary there using FINRA Rule 4560 to remove its own short positions from its U.S. books in violation of anti-money laundering ("AML") statutes.

159.    In 2020, GTS was fined by several exchanges a total of $70,000 to settle allegations of a failure to comply with certain regulations regarding short sale transactions.

160.    As noted previously herein, on 13 April 2023, GTS was fined $10,000,000 for the abuse of the TMS-45E machine algorithm/high frequency trading system ("HFT") within GTS. Two employees (Yaron Katz and Jinglei Zhou) were each fined $150,000 and GTS still has an SEC-mandated compliance officer embedded with GTS.

161.    In July-August 2020, the Overstock Squeeze took place under conditions similar to the MMTLP smash and grab by brokers and market makers. GTS played a role in getting the Overstock dividend trading illegally and without Overstock CEO Patrick Byrne's permission and (once again) the illegal trading was rubber stamped by FINRA. The OSTKO dividend – like MMTLP - was never supposed to trade. As in MMTLP, Georgetown University Prof. James Angel (an employee of Ari Rubenstein at the Modern Markets Initiative and under contract to the SEC for $600,000 with an IT deal with FINRA for his proprietary trading systems in "Intelligent

34

Cross LLC") held himself out in both MMTLP and OSTKO as just a shareholder and launched attacks against company management. (At the time, Rubenstein was a member of the FINRA "Market Surveillance Advisory Group.")

162.    GTS and Rubenstein possess a Cayman Islands trading account (Ser # 5493003K4HST0B1TCP32) which upon information and belief is being used to transfer naked short positions on the books of GTS (USA) into the Cayman Islands to take advantage of FINRA Rule 4560 in furtherance of money laundering operations by GTS in violation of the Patriot Act, the Foreign Corrupt Practices Act, and the Bank Secrecy Act. The Cayman Islands have a well-earned reputation as an excellent tourist destination for money laundering and hiding funds from the wildly myopic eyes of US regulators.

163.    GTS and Rubenstein have another fund in the Cayman Islands (Ser # 549300L8LDOXOXP8EB61) which lapsed as of 3 August 2023. Traudt suspects this was allowed to shutter because it dovetails with the SEC's compliance action against GTS on 13 April 2023, and there may have been things about this account GTS did not want its embedded compliance officer to have access to.

164.    GTS own a hedge fund GTS Systematic Equity Index Master Fund LP (Ser # 805-2750972255) that existed at the time of the MMTLP U3 halt and would have been a perfect vehicle to execute virtually unlimited short sales. Together with GTS, the two, upon information and belief, may have taken part in "spoofing operations" to drive the MMTLP share price to its peak ($12.26) on 22 November 2022 with a volume of 3.45 million shares.

165.    GTS has never done locates for any of the naked synthetics it provided for MMTLP as per Rule 203(b)(2), and thus the book is not closed "officially" on MMTLP;

FINRA's CEO Robert Cook admitted on 31 January 2024 that there were still 2.65 million unclosed short positions in MMTLP indicating that MMTLP is not finished yet, legally.[24]

166.    On 1 December 2022, GTS and other market makers and hedge funds[25] were sued in *Northwest Biotherapeutics, Inc. v. Canaccord Genuity et.* CANO: 1:22-cv-10185-GHW-GS. The primary claim in *Northwest* was that GTS took part in an orchestrated, coordinated scheme to use "spoofing" to destroy the price of a security (in this case, Northwest Biotherapeutics, Inc., which was trading under the ticker NWBO).[26]

167.    Northwest's plaintiff laid out in detail numerous specific examples of spoofing/ monopolistic conspiracy by GTS and its corporate alumni association of market predators. From 5 December 2017 to 1 August 2022, GTS took part in a campaign to destroy NWBO's value and ultimately its investors. This is the aggregate over a year's long market tampering and price fixing operation coordinated by the market predators with GTS:

"The following table lists by Defendant the share volume of Baiting Orders which

---

[24] Upon information and belief, the shorts in MMTLP may be over 600,000,000.

[25] Canaccord Genuity LLC, Citadel Securities LLC, G1 Execution Services LLC, Instinet LLC, Lime Trading Corp., Susquehannah International Group LLP, and Virtu Americas were all named defendants.

[26] According to the SEC (Securities and Exchange Commission), *spoofing* refers to the illegal practice of placing orders to buy or sell securities with the intent to cancel them before execution, to manipulate the market. This tactic is used to create a false impression of demand or supply, influencing the stock price or trading volumes. For example, a trader may place a large buy order with no intention of completing the trade. This could deceive other traders into thinking that the price of the stock will rise, leading them to buy shares. Once the price increases, the spoofer cancels the original order and sells their holdings at a higher price, profiting from the price manipulation.

were subsequently cancelled, the share volume of just one of the Executing Purchases which were executed at depressed prices per Spoofing Episode, and the resulting price decline in NWBO shares over the Relevant Period.

| Defendant | No. of Episodes | Baiting Orders | Executing Purchases | Average Price Decline |
|---|---|---|---|---|
| CANACCORD GENUITY LLC | 135 | 3,329,826 | 478,988 | -4.8244% |
| CITADEL SECURITIES LLC | 671 | 11,598,613 | 3,274,511 | -3.3561% |
| G1 EXECUTION SERVICES, LLC | 161 | 2,687,551 | 760,365 | -4.5192% |
| GTS SECURITIES LLC | 154 | 2,722,466 | 660,556 | -5.6843% |
| INSTINET, LLC | 1,142 | 5,111,436 | 784,241 | -1.8015% |
| LIME TRADING CORP. | 408 | 2,050,000 | 1,000,153 | -1.911% |
| VIRTU AMERICAS LLC | 178 | 2,614,141 | 532,611 | -4.4977% |

And another from *Northwest*:

For each Defendant, the following table lists the share volume of Baiting Orders which were subsequently cancelled, share volume of one of the Executing Purchases per Spoofing Episode which were executed at depressed prices, and the resulting price decline in NWBO shares on October 12, 2020.

| Defendant | No. of Episodes | Baiting Orders | Executing Purchases | Average Price Decline |
|---|---|---|---|---|
| CANACCORD GENUITY LLC | 2 | 5,770 | 5,100 | -2.322% |
| CITADEL SECURITIES LLC | 19 | 355,179 | 82,245 | -3.241% |
| GTS SECURITIES LLC | 6 | 106,164 | 22,279 | -2.859% |
| VIRTU AMERICAS LLC | 1 | 5,178 | 728 | -3.636% |

During the Baiting Period for each Spoofing Episode that day, Defendants submitted new sell-side orders for an average of 22,583 shares per Executing Purchase. During the same time

window prior to non-spoofed executed purchases that day, market participants submitted new sell-side orders for an average of 6,006 shares per purchase.

GTS committed over 160 separate and distinct acts of market manipulation as identified above *in just one ticker*.

168.    GTS had "disclosures" with FINRA running the gamut from failure to train employees in anti-money laundering operations (AML) to abuses of the Rule 203(b)(2) failures to

locate naked short shares it created.[27]

169.    FINRA would not disclose to former MMAT CEO Georgio Palikaras who had illegally got MMTLP trading. This is an excerpt from Palikaras' affidavit in another MMTLP related lawsuit in US District Court in Florida: "#20.  On or about October 14, 2021, Mr. Rice had a phone call with Ms. Casimates regarding META II's MMTLP complaint. During the call, Mr. Rice reported to me that FINRA refused to provide the identity of the broker(s) or individual(s) who applied for the exemption would not edit, delete, or modify the false and outdated Company information that was listed on the OTC Market's website."[28]– Georgio Palikaras, CEO.

---

[27] In *Executive Summary of the Aggregate FINRA Broker Check Regulatory Events Data for GTS Securities LLC From February 3, 2011 to March 13, 2024* by Marcos Montiero, it is clear that even with embedded supervision pursuant to an SEC LAWC, GTS still manages to run afoul of trading regulations.

[28] Mr. Ken Rice was META's Chief Financial Officer; Ms. Patricia Casimates was FINRA's Vice-President for Market Operations for FINRA's Market Transparency Services. She was also identified numerous times by Sam Draddy in the FOIA-obtained emails Traudt seeks as part of this motion, and she sat on the FINRA UPC committee that used the U3 trade halt to nuke MMTLP trading on 9 December 2022.

170.    Put another way, five members of the UPC Committee had been issued almost 22% of the float of MMTLP.[29] This was more than a conflict of interest and the overwhelming presence of counter-party interest violated a host of FINRA and the SEC's own rules, but suffice to say 4.14(a) is the most pivotal in this instance:

171.    This was the original distribution of shares to the following corporate members of the FINRA Uniform Practices Committee ("UPC") on or about 20 October 2021. The UPC members are listed with their companies:

> Tom Nicholson, D.A. Davidson – 26,000
> Steven Paul Dapcic, Pershing LLC – 1,259,929
> Steven Paul Dapcic, The Bank of Mellon NY – 573,158[30]
> Kelly Bell, Hilltop Securities – 26,711
> Joseph Iraci, Robinhood – 12,804, 287
> Mathew Price, Fidelity Clearing Canada – 125
> Mathew Price, Nat'l Fin. Serv. LLC (Fidelity Div.) – 21,012,498[31]

172.    FINRA'S own rules at Sec. 4.14 state this conflict of interest was illegal: (a) A Director or a committee member shall not directly or indirectly participate in any determinations regarding the interests of any party if that Director or committee member has a conflict of interest or bias, or if circumstances otherwise exist where his or her fairness might reasonably be

---

[29] The exact float of MMTLP was 163,258,152 shares as of 9 December 2022 but NBH CEO gave himself another (roughly) 50,00,000 shares in return for a loan to NBH.

[30] Dapcic listed here twice as The Bank of Mellon NY owns Pershing LLC.

[31] Nat'l Fin. Srvcs. LLC is Fidelity's clearing arm.

questioned. In any such case, the Director or committee member shall recuse himself or herself or shall be disqualified in accordance with the Rules of the Corporation.[32]

173.    FINRA is in violation of its charter as it *trades* under the UTP Plan as OOTC which is composed of numerous exchanges to include GTS Securities LLC's ("GTS") trading in this through its subsidiary NYSE ARCA. FINRA has commercial interests in trading.[33] Traudt posits that FINRA may have made a fortune off transactional fees in MMTLP alone.

174.    SEC Chair Gary Gensler and FINRA CEO Robert Cook (starting in May 2021) had numerous discussions about TRCH (to become the preferred dividend that would become MMTLP) knowing full well that the shares sold short and not closed out in TRCH prior to the merger transferred into MMTLP meaning the carried over shorts were staggering. These meetings are well documented in the publicly available daily schedule for Chairman Gensler.

175.    The US Congress never granted the SEC the authority to allow naked short selling and in fact, in passing the 2010 "Dodd-Frank Wall Street Reform and Consumer Protection Act" stated *unambiguously* that "it shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange to effect, alone or with one or more other persons, a manipulative short sale of any security. *The Commission shall issue such other rules as are necessary or appropriate to ensure that the*

---

[32] https://www.finra.org/rules-guidance/rulebooks/corporate-organization/conflicts-interest-contracts-and-transactions-0

[33] See *Trading Halts Amendments to the UTP Plan* at https://www.utpplan.com/DOC/UTP_PlanAmendment50.pdf

*appropriate enforcement options and remedies are available for violations of this subsection in the public interest or for the protection of investors."*

176.   SHO 201(b)(3) is illegal and unconstitutional as written and *as applied* under *Loper:* "The purpose of statutory interpretation is to give effect to the will of Congress, not to create a new law that is not supported by the text." (Slip. Op. At 15).

177.   According to the Securities Exchange Act of 1934, Section 10(b): Schwab's failure to maintain accurate and complete records of Traudt's account, including the unauthorized sale to Traudt of counterfeit shares constituted fraud.

178.   According to the Securities Exchange Act of 1934, Section 10(a)(2): Schwab's failure to disclose material information to Traudt, including the existence of counterfeit shares in Traudt's account was a separate violation distinct from 10(b).

179.   According to the Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5: Schwab aided and abetted the fraud against Traudt by allowing the unauthorized sale of counterfeit shares and failing to prevent the fraud.

180.   Since both GTS and Schwab knew or should have known that naked shorts (counterfeit shares, essentially) were now running into potentially the hundreds of millions by 3 November 2022, Schwab knowingly traded in counterfeit shares by electronically transferring them into Traudt's account without Traudt's knowledge on or about 30 November 2022.

181.   GTS by and through the direction of Rubenstein distributed naked short shares that were fictional and never located and did so causing cascading system failure throughout the trading in MMTLP by creating a digital "false flag" operation (this has been done in numerous other stock tickers such as AMC and GME) completely depressing the share price of MMTLP

41

but having the adverse effect to shorters of creating the proven potential for a short squeeze.[34]

(Video taken of Bloomberg machines by Wyatt Marks of the Schwab Street Smart Edge trading platform (a Schwab product) at 6pm on 6 December 2022 showed a wide range of limit sell orders being placed by Schwab clients with these sell orders being accepted through a vast range. Marks submitted an affidavit attesting to this screenshot. Clearly retail investors were placing orders in anticipation of a short squeeze that at that juncture was becoming of supreme concern to FINRA, hedge funds, and brokers. One order for 6,279 shares at $3000 a share was accepted.[35]

---

[34] A short squeeze is when people who have "borrowed" a security hoping it will then lose value to be able to "sell" that security later and net the difference as untaxable profits get caught with their pants down as a security instead gains value forcing a "squeeze" on available shares and a rapidly increasing share price for "long" position holders as the short borrowers attempt to "cover" their losses quickly before, as Warren Buffet observed: "Their losses can become infinite" due to the unavailability of shares to be bought to address the imbalance in the market.

[35] The video is viewable at: https://x.com/StonkDoc/status/1600268962901549057/video/2



Orders at the broker E-Trade were accepted and deemed "too late to cancel" – meaning they had already taken place - up until 12 December 2022, with one trade for $200,000 per share being accepted into the system:

36 The video is viewable at: https://x.com/StonkDoc/status/1600268962901549057/video/2



182.    FINRA CEO Cook stated

"FINRA cannot perform a 'certified audited and consolidated count of shares.' FINRA's

regulatory authority does not extend to domestic or foreign non-member entities that could act as

custodians or agents holding securities for others, including foreign-registered broker-dealers.

Further, the regulatory tools available to FINRA do not provide the data that would enable

FINRA to perform a share count (e.g. the Consolidated Audit Trail, Electronic Blue Sheets, and

FINRA's trade reporting facilities do not contain information about securities *positions*

[emphasis not added].[37]

183.    Cook knew or should have known that the above statement (#171) was false, and that all FINRA had to do was check DTCC and NYSE trading records for the OITC-UTC owned and operated by FINRA to get accurate numbers.

184.    FINRA reported in Cook's letter to Rep. Norman that there were "only" 2,650,000 short shares not "closed out" in financial language meaning: those who had sold it short did not have to fulfill their financial obligations and were able to pocket millions of dollars because FINRA, with the U3 halt, prevented them from having to "buy to close" per FINRA Rule 204 that mandates that all shorts must close out positions. At the very least, this is indicative of a flawed U3 halt. It's also indicative that Cook was lying; this is the exact close out data on the last day of trading for MMTLP from *FINRA's own website* showing volume (13,693,421) and short positions opened (9,519,125) just on that last day:



185.    FINRA admitted via Cook in that same letter that they were absolutely clueless when it came to shares sold into what a lay person might call the "shadow realm" of stock trading: alternative trading systems (ATS), offshore broker-dealers who had no obligations to report, non-reporting transferees; basically a witches' brew of electronic data black holes that FINRA then plead ignorance of in regulating.[38]

186.    Any claims by Cook and FINRA of there being a "not significant" 2,650,000 shares not covered are a fiction designed to placate outraged MMTLP shareholders and Congress.

187.    NBH corporate officers reported to FINRA that on or about 19 January 2023 that they were approached by two representatives of short sellers to buy a significant amount of shares to close out their short positions that were unable to close on 9 December and 12 December 2022.

188.    NBH received information and disclosed on 21 November 2023 that financial firms had reported to them that short shares "may be significantly higher" than what FINRA was reporting.

189.    Another broker-dealer trading in MMTLP (TradeStation) reported on 21 February 2023 that: "At this time TradeStation has sent the majority of its original certificated shares to AST to be held on their books. There are a de minimis amount of shares remaining in the current

---

[38] In and of itself, this admission begs the question: what does FINRA *actually* do? And the follow on: if they can wash their hands of their supposed role "protecting small investors" by flat out not even trying to get a share count in MMTLP by calling all the broker-dealers and asking simply – as far as Traudt knows, phones still work – what were your sales of this stock? What were your buys in this stock..? How many unclosed short positions do you have..? Then they are nothing more than monopoly participants and players.

certificate and therefore new requests cannot be accepted until a time when TradeStation receives

any new certificates of owned shares or NBH becomes tradable in the open market or made

electronically available…due to the physical certificate being produced as of a specific record

date position and fully paid loans being active on that record date, *TradeStation was allocated*

*less shares than the firm's overall customer position…*"

190.    TradeStation admitted to being oversold in MMTLP per the above referenced

admission against interest.

191.    FINRA has thus far declined to investigate this oversold condition, which is

apparently well documented in other broker-dealers who traded in MMTLP besides TradeStation.

MMTLP and MMAT illegally shared the same Central Index Key (CIK) number (1431959)

used by the Securities and Exchange Commission (SEC) and FINRA as a unique intra-system

identifier. This unusual and rule breaking sharing of the CIK number pertaining to CIK number

1431959 and the related stocks, MMTLP and MMAT was then made even more obviously

conspiratorial by FINRA as of 24 April 2024 FINRA has overseen the issuance of the former

Torchlight Energy Resources Inc. "CUSIP number" (89102U103) to a new security ("Bitech

Technologies Corporation") for trading.[39] *In doing so, it has chosen to contaminate the trading*

*records to include the Trade Reporting Facility (TRF) data regarding TRCH, Consolidated Audit*

*Trail (CAT) data, CNS accounting summaries, and a plethora of other data combines through*

---

[39] The CUSIP number, as defined by FINRA (Financial Industry Regulatory Authority), is a
unique identifier assigned to securities, including stocks, bonds, and mutual funds, in the United
States and Canada. CUSIP stands for "Committee on Uniform Securities Identification
Procedures." The CUSIP number is a nine-character alphanumeric code that helps to uniquely
identify a specific security for the purpose of facilitating clearing and settlement of trades.

*this deliberate act of evidence destruction.* The destruction, alteration, or spoliation of this evidence would severely prejudice the Traudt's case and could impede a potential criminal investigation.[40]

193.    Upon information and belief, TDA is oversold in MMTLP to date over its initial allotment of 53,000,000 shares by at least 110,000,000 shares and potentially significantly more. This number does not include short positions it was saved from closing out by the U3 halt of 9 December 2022.

194.    On 8 December 2022, there were at least 15,402,238 shares short that *never closed* on that day alone, in MMTLP. Schwab loaned 6.4 million shares on 8 December 2022 and they were never closed out.

195.    Traudt asked Schwab (who now owns TDA) on 26 June 2024 if Schwab was in an oversold condition in MMTLP and Schwab has refused to answer Traudt.

196.    Upon information and belief, Schwab is oversold in MMTLP to date over its initial allotment of 12,000,000 shares by at least 60,000,000 shares. A share survey of MMTLP shareholders conducted by Russell Race in 2023 confirmed dramatically oversold conditions in MMTLP; the methodology he used was unassailably conservative and involved not including whale (large) shareholders as part of the calculus to get to a share count but only added them in at the termination of the mathematics when average shareholders were analyzed. The results lead inescapably to the conclusion that MMTLP was oversold at least to almost 500,000,000 shares –

---

[40] TRCH's unique CUSIP number is especially relevant here due to the fact that it was TRCH's unclosed out short positions that carried over from its conversion to MMTLP in October, 2021.

and its initial, legal allotment from DTCC was approximately 164,000,000 (despite the trade start to it being of dubious/illegal origin:

| Estimating MMTLP shares | | | |
|---|---|---|---|
| **Russ's Share Counts** | | **Outliers - Extra Large Shareholders** | |
| 39,919,636 | Shares counted | McCabe | 19,600,000 |
| 5,941 | Shareholders | William | 17,800,000 |
| 6,719 | Shares / Shareholder | David | 11,890,000 |
| 65,000 | Est. # shareholders | Brda | 2,000,000 |
| 436,757,505 | Est. shares circulating | | |
| | | Total (outliers) | 51,290,000 Total shares |
| 51,290,000 | Large Shareholders | | |
| 488,047,505 | Total Est. MMTLP Shares | | |

Conservative Estimate
- using Russ's Numbers
- Not counting ANY outliers, and adding in 4 KNOWN outliers
- # of actual shares is likely to be higher

197.     Hilltop Securities (hereinafter "Hilltop") traded in an omnibus account via Schwab and Kelly Bell (hereinafter "Bell"), Hilltop's Managing Director (and conveniently positioned on the U3 halt board at FINRA)  was forced to disclose that Hilltop was in difficulties (through Schwab) at the time of the U3 halt in trading in MMTLP.[41] Multiple sources have information pertaining to just how oversold Schwab was in MMTLP.[42]

---

[41] Hilltop was fined $475,000 for regulatory failures in 2019-2020 yet managed to get a seat on the U3 board that halted MMTLP.

[42] Investigative journalist Kristen Shaughnessy ("The 5 of Us" podcast, TEDx Speaker, Women in Tech Global Conf. Spkr, Top 50 Irish America Power Women, former NY1 Anchor/Reporter) tweeted on 20 June 2024: "Charles Schwab has about 12 Million certificates of $MMTLP/NBH at the DTCC. The $MMTLP community has verified investor data that Charles Schwab potentially oversold 5x the amount of their certificates. And according to FINRA, Hilltop Securities does third party broker services with Charles Schwab so the question is also for Charles Schwab how many $MMTLP shares are held in your customer accounts... the ticker hasn't traded for 18 months Where is the trade settlement?"

198.    Tiger Global (hereinafter "Tiger"), an overseas broker-dealer, was oversold and/or needed to cover open short positions in MMTLP and was so desperate to do so it falsified and released a PR on 8 August 2023 stating that NBH had released a tender to buy back MMTLP shares and that Tiger clients could sell their shares to Tiger.[43]

199.    NBH never authorized this tender.

200.    TDA clients attempted to transfer their former MMTLP shares from CUSIP number to NBH using the American Stock Transfer & Trust Company (hereinafter "AST") which was the designated operation to insure shares were converted as part of the 1:1 transfer identified in MMAT's S-1 approved by FINRA. Some were able to, some were not. There is a share imbalance easily provable at AST/EQ by one third party subpoena.

201.    On or about 22 July 2023 MMTLP shareholder Alexander Yon (hereinafter "Yon") sent a FOIA request to the SEC requesting emails and data traffic in the SEC's files concerning MMAT, TRCH, and MMTLP.

202.    Yon received an acknowledgement from the SEC on  24 July 2023.

203.    Yon was told in correspondence on 30 November 2023 from the SEC that the first 100 pages of his FOIA request would be free, but that there would be service fees from the SEC's FOIA processing US government contractor at a processing rate of 50 pages an hour that would run from $29 to 89 an hour.

---

[43] Tiger Global was trading MMTLP as TRCHN in Singapore markets in 2024 at as high as $1039 a share.

204.     Yon notices the SEC FOIA processing personnel keep searching for bastardized versions of "TRCH, "MMAT," and "MMTLP" further delaying the process and adding additional costs.

205.     The SEC's contractor conducted a search for Yon's requested information directly and specifically pertaining to emails and files relating to MMTLP and was informed his request *identified a breathtaking 636,000 separate documents*.

206.     The 636,000 pages would stack 200 feet tall if printed on standard 8.5inch x 11 inch printer paper.

207.     In order for Yon to get to the truth in the MMTLP matter, the financial math and billing provided by the SEC resulted in a staggering, US Constitutionally impermissible, insane $368,880 "research" tab (computed as 12,720 hours x $29 an hour minimum), to be followed by $95,000 in printing fees at 0.15 cents per page.

208.     Yon offered four separate payments to get this information and the SEC accepted it.

209.     Yon's requests were denied *in toto* on 7 February 2024 by the SEC, denied his appeal, closed his case, then took measures to prevent him from accessing the SEC site, which in and of itself is *prima facie* evidence of malicious intent and conduct at variance with the SEC's grant of authority under the Securities Act of 1934.

210.     There were at least 246 FOIA requests filed by MMTLP shareholders and one filed by a US Congressman. One of the  only ones answered produced the aforementioned Draddy emails. That is a breathtaking 99.59% failure to disclose rate.

211.    Yon returned to the SEC (there are now as of 15 July 2024 proven 246 FOIA requests for emails and documents associated with the MMTLP U3 halt, trading, and other matters) log page and after review discovered that his entire FOIA history of requests was expunged.

212.    Upon information and belief, Traudt believes the SEC has orchestrated a campaign to minimize or suppress the true extent of FOIA requests it has illegally denied in coordination with and consistent with a pattern of monopolistic concealment conducted by FINRA, GTS, Rubenstein, and Schwab in concealing the full extent of the insider trading, fraud, and counterfeiting that occurred in the short OTC lifespan of MMTLP.

213.    In responding to a 16 August 2022 FOIA request, the SEC stated they could find no 15c-211 form for the registration to trade MMTLP.

214.    On or about 27 June 2024 Traudt sent questions via email to Schwab customer service requesting Schwab's FINRA Form 211's allowing them to trade MMTLP and also for Schwab to confirm or deny if they oversold shares in MMTLP. To date these questions, and others have not been answered in violation of FINRA Rules 2010 (commercial honor) and 4512 (customer account information records to be maintained…Traudt contends that that obligation extends into the chain of custody for information regarding any and all securities Traudt purchased.)

The Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) was created as law by Congress in 1995 to prevent frivolous lawsuits.

216.    The PSLRA's main components are heightened pleading standards for securities plaintiffs as private parties, a heightened "scienter" requirement, a stoppage of any discovery by

52

plaintiffs until motions to dismiss have been heard and decided, and the plaintiffs must state with exacting specificity each and every misleading statement by defendants.

217.    Traudt contends that the PSLRA is unconstitutional as applied and in practice under the 1st, 5th, and 14th Amendments to the US Constitution and also under the Appointments Clause at Article 2 § 2. as it creates a two-tiered legal system completely crippling the smaller investors and thus is violative of the 5th Amendment's Equal Protection Clause and the 1st Amendment's right to petition for redress of grievances (in court if necessary.)

Traudt also argues that it is a clear encroachment on the separation of powers as Congress set the bar far too restrictively against an already disadvantaged class (small retail investors) who cannot have the same resources as the leviathans the law actually protects, and in doing so precludes the disadvantaged class from pursuing recovery for damages from members of the financial community with long histories in fraud and routine market regulation violations.

219.    In short, PSLRA was implemented to cover up and conceal fraud on an industrial scale. More importantly, Traudt does maintain here that were all of the foregoing not enough, technological advances in trading systems available to market makers, hedge funds, and brokers have now brought an overwhelming technological advantage that further insures there is no level playing field at all for small investors: modern trading technology has dramatically shifted the landscape, and retail investors often find themselves at a significant disadvantage compared to institutional players using AI, high-frequency trading (HFT), order internalization, and payment for order flow (PFOF).

220.    These all constitute grounds for an "as applied" challenge to the application of PSLRA in any situation involving small investors trying to recover in securities fraud, insider

53

trading, reliance, fraud-upon-the-market, etc.; all of the following technologies existed have increased in power exponentially since 1995 when the PSLRA was enacted, and all have been used *routinely* to brutalize small investors: High-Frequency Trading (HFT) firms use sophisticated algorithms to trade thousands of shares in milliseconds, making decisions faster than human perception allows. This gives them a massive edge over retail investors.

221.    Using latency arbitrage systems coupled with AI, HFT traders exploit small price discrepancies in various exchanges and quickly buy or sell shares before the retail investor's trade can even execute. By the time a retail investor's trade goes through, prices may have shifted, leaving them with a worse price.

With flash orders and dark pools, some HFT firms pay for access to "flash orders" (i.e., seeing orders milliseconds before the public). This gives them the ability to front-run trades, further eroding the ability of retail traders to get fair execution.

223.    HFT firms sometimes enter markets just to create the *illusion* of liquidity (liquidity removal) and then pull orders when they sense a price change, leaving retail traders unable to get filled on orders, or worse, buying into a price spike created by HFT tactics.

224.    AI and algorithmic trading allow institutional players increasing use of AI-driven algorithms that can process enormous datasets in real-time, including market sentiment analysis where AI algorithms scrape social media, news, and other public sentiment data to predict stock price movements before the retail crowd catches on. Retail investors, relying on delayed or incomplete information, simply can't compete with these AI-powered predictions.

225.    With pattern recognition and back testing, AI systems analyze historical data to find patterns invisible to human traders. These algorithms can adjust to micro-market conditions,

tweaking strategies in real-time, something retail investors could never match manually. The gap between institutional and retail access to AI tools leads to a significant imbalance, with retail traders effectively gambling in an arena where institutional players can see around corners.

Order internalization refers to how brokers like Robinhood or Schwab fill their customers' orders internally or route them to market makers, who may not give the best execution. Here's why it matters: retail orders are considered an "asset" by brokers and market makers and are also considered "dumb flow" because they're seen as less informed compared to institutional orders. Market makers that internalize these orders can take the other side of the trade, knowing they are up against less sophisticated traders. This can result in price slippage or suboptimal fills for retail trades. When too many orders are internalized, price discovery becomes distorted because the public market doesn't get to see the true depth of buy and sell interest. This can push retail traders into unfair pricing environments. This is known as "distorted price discovery."

Payment for order flow (PFOF) is the practice where brokerages sell their clients' order flow to market makers. This has led to concerns about conflicts of interest because retail traders/ investors do not get the best execution for their trades despite what brokers like Schwab contract to do in their client agreements and generally the best execution is sacrificed for profit. When brokers receive payment to route trades to certain market makers, they are incentivized to send trades to the highest-paying market maker rather than the one that would offer the best execution. Retail traders often think they're getting free trades, but they end up paying in the form of worse prices.

Latency disadvantages occur by routing retail orders through these channels, institutional market makers can front-run or trade against retail orders. This is made worse by the fact that

retail orders are often delayed, while HFT firms can exploit these delays. Dark pools – no coincidence here – became able to process voluminous hidden trades (starting in 1998, essentially, when computer firepower began to effect dramatic market changes) by major market participants (hedge funds, market makers, brokerages) as institutional players had access to these private exchanges where large orders can be executed without affecting the public price of a stock. Retail traders don't have access to them which insures here is no price transparency for retail traders as there is no access to supply and demand numbers (this is an ongoing "fraud-upon-the-market" made possible by the PSLRA as access to trading data in the dark pools is prohibited to retail traders).

Market fragmentation is another example of retail investor abuse and disadvantage: with trades happening across numerous exchanges and dark pools, retail investors can't get a full picture of the market. While HFT firms thrive in this fragmented environment by exploiting differences between venues, retail traders are left confused or stuck with slower order fills that are exacerbated by bid-ask spread and speed disadvantages: retail investors generally suffer from worse bid-ask spreads, and without the tools for ultra-fast execution, they are vulnerable to wider spreads in the prices of securities. Market makers widen spreads for retail orders compared to institutional ones, meaning that retail investors are paying more to buy and getting less to sell. Even though brokers like Robinhood offer "free" trades, the reality is that the execution delay (even by milliseconds) can result in price slippage that harms the retail investor. In contrast, institutions benefit from near-instantaneous execution at better prices due to superior access to liquidity.

Institutions create synthetic financial products or leverage options, while retail traders get access only to the less sophisticated or high-risk versions; for example, hedge funds and institutions can trade in derivatives that allow them to hedge or manipulate market conditions, while retail investors might only have access to highly risky leveraged products without understanding the complexities involved, which leads inevitably to a much higher risk exposure for retail traders as they often end up overexposed to risky strategies due to the availability of leveraged products, without the algorithms or tools to manage that risk. Meanwhile, institutional players use these products in conjunction with risk-management AI to capitalize on volatility.

231.    Regulatory arbitrage describes the wild advantages institutions use in loopholes in regulations or even regulatory capture to manipulate markets to their advantage such as Regulation SHO and Naked Shorting as institutions can exploit loopholes in regulations  to conduct naked shorting, which undermines price discovery and can disproportionately hurt retail traders who believe in the underlying fundamentals of a stock.

232.    As seen in spades in *Northwest Biotherapeutics, Inc. v. Cannacord Genuity et. CANO: 1:22-cv-10185-GHW-GS,* all of the super predators/market makers (GTS and Rubenstein included there) were routinely proven to have employed spoofing algorithms to destroy the share price of company by placing trades only designed to crush the stock price to the visible market, sometimes making and cancelling trades in milliseconds. The inescapable conclusion is that the PSLRA is now unconstitutional by virtue of the technological advances that create and sustain an embedded, stratified, class-based discriminatory market system.

**FACTS 1 THROUGH 232 ALL INCORPORATED IN THE FOLLOWING COUNTS BY REFERENCE AND MADE A PART THEREOF**

## COUNT I (FINRA): VIOLATION OF SECURITIES EXCHANGE ACT RULE 10b-5 (Insider Trading)

233.    At all relevant times, FINRA had access to material non-public information regarding the trading of MMTLP in which Traudt held a financial interest.

FINRA, either directly or through its agents, engaged in disseminating information in the blue sheets for MMTLP not available to the trading public and did so for the specific benefit of at least 6 of the members of the UPC Board that halted MMTLP trading on 9 December 2024 in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

FINRA's insider trading lead to the Schwab requested trading halt that destroyed the value of Traudt's MMTLP shares resulting in financial loss to Traudt.

As a direct and proximate result of FINRA's unlawful insider trading, Traudt suffered damages, including but not limited to the devaluation of securities, lost investment opportunities, and consequential losses.

## COUNT II (FINRA): VIOLATION OF SECTION 9(a)(2) OF THE SECURITIES EXCHANGE ACT (Market Manipulation)

At all relevant times, FINRA, in its role as a self-regulatory organization, engaged in practices that were designed to manipulate the market for MMTLP securities.

Specifically, FINRA colluded with market makers and brokers to artificially control the price of MMTLP and allowed naked synthetic short shares to enter the market destroying the MMTLP price. FINRA did not ever force GTS to do a locate on the naked synthetics it created. FINRA

knew there were problems with MMTLP shorts from at least October 2021 to the present. This was done creating a false impression of market activity and distorting price discovery.

FINRA's conduct violated Section 9(a)(2) of the Securities Exchange Act of 1934, which prohibits the creation of an artificial price level or the appearance of active trading when such activity is not reflective of the actual market but instead an artificial construct allowed certain market makers.

240.    As a direct and proximate result of FINRA's market manipulation, Traudt suffered damages, including the devaluation of securities and the loss of investment returns.

### COUNT III (FINRA): CLAYTON ACT CLAIM FOR DAMAGES UNDER SECTION 4 (15 U.S.C. § 15)

241.    This claim arises under Section 4 of the Clayton Act (15 U.S.C. § 15), which provides for the recovery of treble damages, costs, and attorney's fees for injuries caused by antitrust violations. Defendant FINRA has engaged in monopolistic operations in collaboration with GTS and Schwab. Through its regulatory practices, trading halts, and selective enforcement of rules, FINRA has facilitated:

Market manipulation and price suppression by allowing market makers to create and conceal naked short positions in securities such as MMTLP, directly harming Plaintiff's investments.

- Frustration of price discovery by failing to enforce transparency rules under Regulation SHO and enabling brokers to hide short positions through FINRA Rule 4560.

- Collusive activities between FINRA and hedge funds, brokers, and market makers that foreclose small investors like Plaintiff from participating in fair markets.

FINRA's monopoly over arbitration and dispute resolution, tied through brokers like Schwab, has deprived investors of access to the courts, forcing reliance on a system that shields FINRA and its market participants from accountability.

243.    FINRA's conduct has created anti-competitive market conditions, allowing brokers, market makers, and hedge funds to operate without transparency or meaningful oversight, to the detriment of Traudt and other small investors.

244.    As a direct and proximate result of Defendant's unlawful monopolistic operations, Traudt has suffered significant financial harm, including:

245.    Loss of the value of MMTLP shares due to the U3 trading halt.

246.    Financial injury from the artificial manipulation of share prices through undisclosed short positions.

247.    Ongoing harm resulting from exclusion from fair and open markets.

## COUNT IV(FINRA): VIOLATION OF SEC RULE 10b-5 – RELIANCE ON THE INTEGRITY OF THE MARKET

This claim arises under SEC Rule 10b-5, which prohibits any act, practice, or course of business that operates as a fraud or deceit upon any person in connection with the purchase or sale of securities. FINRA, through its improper conduct, including the U3 halt of MMTLP trading, manipulation of short position data, and failure to enforce Regulation SHO, facilitated market practices that deceived investors. Specifically, FINRA's actions and omissions created the false appearance of a fair and transparent market, upon which Plaintiff reasonably relied.

249.    Traudt relied on the integrity of the market, assuming that all trading activity in MMTLP and other securities was conducted in accordance with the rules and regulations governing securities markets. This reliance is consistent with the fraud-on-the-market theory, which presumes that the prices of publicly traded securities reflect all material information.

250.    FINRA's facilitation of naked short selling, concealment of short positions under Rule 4560, and arbitrary halting of MMTLP trading corrupted the market and misled Traudt into believing that he was trading in a fair and lawful market environment. This reliance was reasonable given FINRA's role as a regulator tasked with ensuring market integrity.

As a direct and proximate result of FINRA's conduct, Plaintiff suffered significant financial harm, including:

a. Loss of value of MMTLP shares to zero.

b. Prevention of being able to trade, manage, or liquidate positions in MMTLP due to the illegal U3 halt.

c. Reliance on distorted market information, leading to Traudt's losses.

### V: (FINRA) ACTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

#### 1st Issue:  Violation of the Separation of Powers - Improper Exercise of Executive Power

252.    Traudt hereby incorporates all FACTS 1 through 219.

253.    The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

254. As set forth above, FINRA exercises wide-ranging executive power, including the power to suspend trading in securities at will, to "enforce compliance" with the Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

255. FINRA's wide-ranging exercise of executive or administrative power is immune from Presidential supervision or control. FINRA's Board of Governors are not appointed or removable by the President; rather, they are selected by FINRA's members.

256. Even the SEC has limited authority review of FINRA's actions. The SEC may remove FINRA's Board of Governors only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

257. FINRA's exercise of wide-ranging, core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives. As a result, the creation of FINRA, as well as its implementation of its delegated responsibilities by the SEC and the Maloney Act, violates the separation of powers.

### 2nd Issue:  Violation of the Appointments Clause of the U.S. Constitution

258. FINRA is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.

259.    Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board of Governors exercise significant authority pursuant to the laws of the United States and are therefore officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

260.    The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

261.    By virtue of the wide-ranging discretion, duties, functions and independence of the FINRA Board, members of the Board are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

262.    In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board by its membership violates the Appointments Clause.

### 3rd Issue: Unconstitutional delegation

263.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

264.    By virtue of the grant of wide-ranging authority the SEC delegated to the FINRA Board, the Act improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch. This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.

**PRAYER FOR RELIEF - DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**WHEREFORE,** Traudt prays for the following relief:

1. An order and judgment declaring unconstitutional the provisions of law empowering FINRA to enforce compliance with the securities laws;

2. An order and judgment enjoining FINRA from carrying out any of the powers delegated to them by Congress or the SEC;

3. An order and judgment pursuant to 28 U.S.C. § 2201, 2202 declaring that FINRA is presently constituted and operating in a manner that violates the separation of powers set forth in the Article I of the Constitution;

4. An order and judgment pursuant to 28 U.S.C. 8§ 2201, 2202 declaring that FINRA, in its exercise of disciplinary functions, is a state actor and subject to the obligation to respect the rights guaranteed under the Unites States Constitution;

5. An order of this Court finding that the U3 trade halt issued by FINRA was *ultra vires* and illegal.

6. An injunction immediately against FINRA continuing to execute operations using Rule 4560 or Rule 203(b)(2) and ordering FINRA to cease allowing the movement of shares held short to overseas affiliates of US companies or individuals trading in the US stock market.

7. Costs and attorneys' fees pursuant to any applicable statute or authority;

8. Such further relief as this Court deems just and appropriate.

### COUNT VI (GTS): MARKET MANIPULATION IN VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT OF 1934 AND RULE 10B-5(a) and 10B-5(c)

265.    GTS engaged in and employed devices, schemes, illegal acts, practices, and a course of conduct that were intended to manipulate the market price of MMTLP shares which were listed and traded on the OTC Link LLC and NYSE ARCA Global OTC trading venues, and which operated as a fraud and deceit upon MMTLP shareholders to include Traudt.

266.    By reason of the conduct described above, GTS directly used the mails, and instrumentalities of interstate commerce, and a facility of a national securities exchange, to affect a series of transactions in MMTLP securities that was designed to create oversold conditions in MMTLP securities at Defendant Charles Schwab and Co. Inc. ("Schwab") and also to provide enormous quantities of naked synthetic shares into the market to provide for the destruction of the MMTLP share price. GTS engaged in a market manipulation strategy which was essentially a predatory trading strategy made possible by a high frequency trading system which artificially affected the prices of MMTLP securities. GTS provided the systemic risk inherent in creating approximately one billion naked synthetic shares and overselling of 700 million shares of MMTLP to broker-dealers. GTS made a safe and efficient market impossible.

267.    As a direct and proximate result of Defendants' wrongful conduct, Traudt suffered damages in that he held his shares in MMTLP only to have them wiped out when MMTLP was U3 halted by FINRA on 9 December 2024. Traudt relied on an assumption of an efficient market free of manipulation. Traudt would never have bought MMTLP shares had these behind the scenes machinations by GTS been known to Traudt.

268.    Defendants' conscious misbehavior or recklessness artificially affected the price of MMTLP shares, that Traudt held from 30 November 2022 to the present. Traudt's financial injuries would not have been as extensive but for the Defendants' conscious misbehavior or recklessness.

## COUNT VII (GTS):  ADDITIONAL CLAIM FOR RELIEF UNDER COMMION LAW FRAUD UNDER 9 VSA 5501

269.    The illegal registration and trading of MMTLP orchestrated by GTS Securities, constitutes a clear case of market manipulation and common law fraud not just upon Traudt but on the general market so as to be clearly a fraud upon the market. This scheme, executed in violation of FINRA Rule 6622(b) and SEC Rule 15c-211, knowingly created an illegal trading situation in MMTLP that was fraudulent and in so doing violated 6622(b) in that it was "in furtherance of a trading or investment strategy" which is illegal per the rule. This gives rise to a claim under 9 VSA 5501 for falsity.

270.    GTS knowingly and recklessly created a deceptive device in the form of a ticker for MMTLP and thus knowingly or recklessly injected into the market false and misleading information concerning the origins, supply, and market durability of MMTLP shares that

appeared available for trading. This interfered with the natural market forces of supply and demand and made the share price of MMTLP subject to the whims of GTS and others.

271.    Market confusion was evidenced in the final days of US trading on the OTC as GTS' and others had superior knowledge that a trade halt was coming and acted accordingly. GTS has never done locates for any of the shares it naked shorted and created for MMTLP as required by law. Traudt suffered damages as a result of the U3 trade halt executed by FINRA in concert with GTS and others. Traudt damages were directly and proximately caused by GTS' fraud.

272.    When Traudt bought MMTLP shares, he did not possess any specific facts demonstrating that the market price of MMTLP shares were being manipulated and therefore, he relied on the efficiency of the market that had been unlawfully manipulated. Traudt suffered damages that were directly and proximately caused by GTS' fraud.

## Count VIII (GTS): VIOLATION OF THE CLAYTON ACT FOR ANTITRUST VIOLATIONS UNDER THE SHERMAN ANTITRUST ACT – TREBLE DAMAGES AT SECTION 4, 15 USCS 15

273.    Traudt alleges that GTS Securities, in concert with Charles Schwab & Co. and FINRA, violated Section 1 of the Sherman Antitrust Act (15 U.S.C.S. § 1) and the Clayton Act 15 USCS 15 by engaging in anti-competitive practices, including price-fixing and market manipulation, which suppressed fair competition in the trading of MMTLP securities, and the creation of a horizontal monopoly.

274.    GTS, Schwab, and FINRA, acting as a monopoly, manipulated the price of MMTLP shares by artificially inflating the price to $12.26 on 22 November 2022, then flooding

the market with counterfeit shares to depress the price. This manipulation directly harmed Traudt and other retail investors.

275.    GTS and Schwab conspired to control the supply and pricing of MMTLP shares through illegal naked short selling, which violated the SEC's Best Execution Rule (Regulation NMS, Rule 611). This rule mandates that brokers seek the most favorable terms for their customers when executing trades. By manipulating the supply of shares and artificially depressing the price, GTS, Schwab, and FINRA prevented retail investors, including Traudt, from receiving the best execution on their trades. GTS and Schwab's actions amounted to price-fixing, as they set the market price below the true value of the shares by introducing counterfeit shares into the market.

276.    GTS, Schwab, and FINRA acted together as a monopoly to suppress competition in the MMTLP market. By coordinating to manipulate share prices and trading activity, they created artificial barriers that limited fair market access for retail investors. This conduct violated antitrust principles by stifling competition and preventing fair pricing mechanisms from functioning in the market.

277.    On 8 December 2022, computerized trading platforms showed sell orders for MMTLP being accepted at prices ranging from $200 per share to thousands of dollars per share. Despite this, GTS's manipulation ensured that Traudt could not sell his 305 shares at fair market value, effectively denying him access to fair competition and pricing.

278.    This coordinated effort between GTS, Schwab, and FINRA resulted in the violation of the Clayton Act by restraining trade, fixing prices, and creating monopolistic control over the trading of MMTLP shares.

279.    As a result of GTS's anti-competitive conduct, Traudt lost the opportunity to sell his 305 shares at prices ranging from $200 to thousands of dollars per share. The damage from this price-fixing and market manipulation far exceeds $5,000. Under the Clayton Act, 15 U.S.C.S. § 15(a), Traudt is entitled to recover three times the damages he sustained. Based on the potential value of his shares, Traudt seeks treble damages, as well as interest, costs, and attorney's fees.

280.    Traudt seeks treble damages under 15 U.S.C.S. § 15(a) of the Clayton Act, compensatory damages, attorney's fees, and other relief as deemed just and proper by this Court.

## COUNT IX (SCHWAB): VIOLATION OF SEC RULE 10b-5 – RELIANCE ON THE INTEGRITY OF THE MARKET

281.    This claim arises under SEC Rule 10b-5, which prohibits any act, practice, or course of business that operates as a fraud or deceit upon any person in connection with the purchase or sale of securities. Schwab, through its improper conduct, including the self-requested, self-serving U3 halt of MMTLP trading facilitated market practices that deceived investors. Specifically, Schwab's actions and omissions created the false appearance of a fair and transparent market, upon which Plaintiff reasonably relied.

282.    Traudt relied on the integrity of the market, assuming that all trading activity in MMTLP and other securities was conducted in accordance with the rules and regulations governing securities markets. This reliance is consistent with the fraud-on-the-market theory, which presumes that the prices of publicly traded securities reflect all material information.

283.    Schwab's massive overselling of MMTLP constituted counterfeiting, and requesting the arbitrary halting of MMTLP trading corrupted the market and misled Traudt into believing that

he was trading in a fair and lawful market environment. This reliance was reasonable given

Schwab's role as the largest broker-dealer in the US markets.

284.    As a direct and proximate result of FINRA's conduct, Plaintiff suffered significant

financial harm, including:

a. Loss of value of MMTLP shares to zero.

b. Prevention of being able to trade, manage, or liquidate positions in MMTLP due to the illegal

U3 halt.

c. Reliance on distorted market information, leading to Traudt's losses.

### COUNT X (SCHWAB): VIOLATION OF THE CLAYTON ACT FOR ANTITRUST VIOLATIONS UNDER THE SHERMAN ANTITRUST ACT – TREBLE DAMAGES AT SECTION 4, 15 USCS 15

285.    Traudt alleges that Schwab, in concert with GTS and FINRA, violated Section 1 of

the Sherman Antitrust Act (15 U.S.C.S. § 1) and the Clayton Act at 15 USCS 15 by engaging in

anti-competitive practices, including price-fixing and market manipulation, which suppressed

fair competition in the trading of MMTLP securities.

286.    GTS, Schwab, and FINRA, acting as a monopoly, manipulated the price of

MMTLP shares by artificially inflating the price to $12.26 on 22 November 2022, then flooding

the market with counterfeit shares to depress the price. This manipulation directly harmed Traudt

and other retail investors.

287.    GTS and Schwab conspired to control the supply and pricing of MMTLP shares

through illegal naked short selling, which violated the SEC's Best Execution Rule (Regulation

NMS, Rule 611). This rule mandates that brokers seek the most favorable terms for their

customers when executing trades. By manipulating the supply of shares and artificially

depressing the price, GTS, Schwab, and FINRA prevented retail investors, including Traudt, from receiving the best execution on their trades. GTS and Schwab's actions amounted to price-fixing, as they set the market price below the true value of the shares by introducing counterfeit shares into the market.

288.    GTS, Schwab, and FINRA acted together as a monopoly to suppress competition in the MMTLP market. By coordinating to manipulate share prices and trading activity, they created artificial barriers that limited fair market access for retail investors. This conduct violated antitrust principles by stifling competition and preventing fair pricing mechanisms from functioning in the market.

289.    On 8 December 2022, computerized trading platforms showed sell orders for MMTLP being accepted at prices ranging from $200 per share to thousands of dollars per share. Despite this, GTS's manipulation ensured that Traudt could not sell his 305 shares at fair market value, effectively denying him access to fair competition and pricing.

290.    This coordinated effort between GTS, Schwab, and FINRA resulted in the violation of the Sherman Antitrust Act (15 U.S.C.S. § 1) by restraining trade, fixing prices, and creating monopolistic control over the trading of MMTLP shares.

291.    As a result of Schwab's anti-competitive conduct, Traudt lost the opportunity to sell his 305 shares at prices ranging from $200 to thousands of dollars per share. The damage from this price-fixing and market manipulation far exceeds $5,000. Under the Clayton Act, 15 U.S.C.S. § 15(a), Traudt is entitled to recover three times the damages he sustained. Based on the potential value of his shares, Traudt seeks treble damages, as well as interest, costs, and attorney's fees.

292.    Traudt seeks treble damages under 15 U.S.C.S. § 15(a) of the Clayton Act, compensatory damages, attorney's fees, and other relief as deemed just and proper by this Court.

## COUNT XI (SCHWAB): SECURITIES FRAUD AT 15 USCS 78j(b) AND 17 CFR 240.10b-5 (NOWINGLY SELLING COUNTERFEIT SECURITIES)

293.    Schwab, a broker-dealer, is liable for securities fraud under the Securities Exchange Act of 1934 (SEA) and the Securities Act of 1933 (SA) for having knowingly sold counterfeit shares in a security. On November 30, 2022, Charles Schwab sold 305 counterfeit shares of MMTLP to Traudt, approximately valued at $3000. The Securities Exchange Act and the Securities Act prohibit fraudulent and deceptive practices in the sale of securities, including the sale of counterfeit or worthless securities.

294.    Schwab had actual knowledge that the shares were counterfeit, but nevertheless sold them to the Traudt and other investors. Traudt alleges that Schwab's actions caused him to suffer financial losses and other damages.

295.

## Count XII (SCHWAB): VERMONT SECURITIES FRAUD 9 VSA 5605 (ENGAGING IN SECURITIES FRAUD)

296.    Under Vermont law, it is illegal for a broker-dealer to take part in any plan employing any device, scheme, or artifice to defraud is illegal under Vermont securities law as is making any untrue statement of a material fact or omitting a material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading. In addition, engaging in any act, practice, or course of business that operates or would operate as a

fraud or deceit upon any person.

297.    Schwab sold Traudt counterfeit shares on 30 November 2022, refused to provide information on his account correctly, acted against Traudt's interests by requesting a trading halt (U3), participated in a price-fixing monopoly as described in the foregoing, and has concealed the true extent of its financial crimes against Traudt by refusing to provide answers as to the degree of its oversold condition in MMTL as of 9 December 2022.

298.    Traudt suffered economic damage as a result of the acts and/or omissions to act of Schwab in that his finances were damages, his ability to trade with the funds now frozen or lost due to the U3 halt is impossible, and he cannot use that money for other purposes.

## COUNT XIII (SCHWAB): VIOLATION OF SECURITIES EXCHANGE ACT RULE 10b-5 (INSIDER TRADING)

299.    At all relevant times, Schwab had access to material non-public information regarding the trading of MMTLP in which Traudt held a financial interest.

300.    Schwab knew that it's overselling of MMTLP lead it to a precarious position in the market and made the decision to request the U3 trade halt. The halt was for Schwab's and other broker-dealers' benefit to the detriment of Traudt and other investors similarly situated.

301.    The Schwab requested trading halt that destroyed the value of Traudt's MMTLP shares resulted in financial loss to Traudt.

302.    As a direct and proximate result of Schwab's unlawful insider trading, Traudt suffered

damages, including but not limited to the devaluation of securities, lost investment opportunities,

and consequential losses.

### XIV (UNITED STATES OF AMERICA): ACTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF FINDING THE PRIVATE SECURITIES LITIGATION REFORM ACT (15 U.S.C. § 78u-4) UNCONSITUTIONAL AS APPLIED 1ST ISSUE: SEPARATION OF POWERS

303.    Plaintiff incorporates all preceding FACTS 1 through 232 by reference

and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is unconstitutional

on multiple grounds, necessitating its invalidation and an injunction against its continued

enforcement.

303.    The PSLRA infringes upon the separation of powers doctrine by imposing

judicially enforceable pleading standards that substantially restrict the judiciary's ability to

adjudicate securities fraud cases. Congress's mandate under the PSLRA, particularly its

requirements for heightened pleading under Rule 9(b) and its stay of discovery provisions,

undermines the inherent authority of courts to manage litigation and apply well-established

procedural rules. By dictating the evidentiary and procedural burdens in a manner that subverts

the judiciary's traditional role, the PSLRA constitutes an impermissible legislative intrusion into

judicial functions, thereby violating the separation of powers.

### 2ND ISSUE: 1ST, 4TH, AND 15TH AMENDMENT VIOLATIONS

304.    Plaintiff incorporates all preceding paragraphs by reference.

305.    The PSLRA's stringent pleading requirements also violate the First Amendment

by chilling access to the courts. The Act's requirement that plaintiffs plead fraud with

particularity, coupled with its heightened scienter requirement, creates a nearly insurmountable barrier for aggrieved investors, particularly those lacking access to evidence locked within the control of defendants. This restriction effectively denies individuals their right to petition the government for redress of grievances, as guaranteed by the First Amendment. Courts have long recognized that access to the judicial process is a core constitutional right, and the PSLRA's framework undermines this principle by foreclosing meritorious claims at the pleading stage.

306.    Moreover, the PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small investors while shielding institutional actors from accountability. By raising the barriers to bringing securities fraud claims, the Act insulates powerful corporate entities, such as broker-dealers, market makers, and large institutional shareholders, from scrutiny. This disparate impact results in a two-tiered system of justice, favoring well-resourced defendants and disadvantaging retail investors, contrary to the principles of equal protection and fundamental fairness.

307.    The PSLRA also contravenes the Due Process Clause of the Fifth Amendment by effectively denying plaintiffs the opportunity to prove their claims. The Act's stay of discovery provision prevents plaintiffs from obtaining the evidence necessary to meet the heightened pleading standards, creating a procedural Catch-22. Plaintiffs are required to plead with specificity facts that are often exclusively within the defendants' knowledge, yet they are barred from accessing discovery until they survive the very pleading standards that require such evidence. This structure deprives plaintiffs of their right to a meaningful opportunity to be heard, a core guarantee of due process.

308.    Additionally, the PSLRA violates the Equal Protection Clause of the Fourteenth Amendment, particularly as it applies to state-law securities fraud claims. By effectively preempting state-law remedies and imposing federal standards that favor corporate defendants, the PSLRA denies state plaintiffs equal protection under the law. This disparate treatment between federal and state claims creates a de facto barrier to justice for those seeking redress in state courts. The Constitution guarantees that all individuals, irrespective of jurisdictional distinctions, are entitled to equal protection under the law. The PSLRA disrupts this balance by disproportionately favoring powerful financial entities while undermining the ability of individual investors to pursue justice in state forums.

309.    Furthermore, the PSLRA's safe harbor provision for forward-looking statements enables corporate malfeasance and undermines the deterrent effect of securities laws. By granting near-immunity to companies that issue misleading or false forward-looking statements, the PSLRA incentivizes fraudulent conduct and weakens the regulatory framework designed to ensure market integrity. This provision constitutes a legislative overreach that disrupts the balance between investor protection and corporate accountability, contrary to the broader purposes of federal securities laws.

310.    Additionally, the PSLRA's legislative history demonstrates that it was enacted under substantial lobbying pressure from industry groups, raising concerns about regulatory capture. The Act's provisions reflect a bias toward protecting corporate defendants at the expense of retail investors, evidencing an abdication of Congress's duty to serve the public interest. By prioritizing the interests of powerful financial entities over those of individual investors, the

PSLRA violates the public trust and undermines confidence in the judicial and regulatory systems.

311.    The Act also conflicts with the principle of judicial economy. By requiring plaintiffs to meet heightened pleading standards without access to discovery, the PSLRA increases the likelihood of piecemeal litigation and interlocutory appeals. Courts are forced to adjudicate motions to dismiss based on incomplete records, leading to inefficiencies and increased costs for all parties. This undermines the purpose of federal procedural rules, which are designed to promote the just, speedy, and inexpensive resolution of disputes.

312.    Finally, the PSLRA's limitations on joint and several liability for defendants exacerbate the harm to investors and weaken deterrence. By restricting liability to a proportional basis, the Act shields culpable parties who engage in fraudulent schemes in concert with others. This provision undermines the deterrent effect of securities laws and leaves victims of fraud inadequately compensated for their losses.

**WHEREFORE:**

For these reasons, Plaintiff seeks declaratory relief declaring the PSLRA unconstitutional in its entirety and injunctive relief prohibiting its enforcement. The Act's provisions conflict with fundamental constitutional principles and should be struck down to preserve the rights of investors and maintain the integrity of the judicial system.

## **PRAYER FOR RELIEF**

Traudt asks this court to:

1. Declare the PSLRA unconstitutional in whole or in part.

2. Provide injunctive relief in the immediate suspension of enforcement of the PSLRA.

## Count XV (FINRA): Traudt Has a Claim Under the 9th Amendment for Violations by FINRA of his Economic Liberties

312.    Traudt hereby incorporates Facts #1 through 232 by reference and makes them a part herein.

313.    Under the Uniform Commercial Code Article 8, specifically Section 8-503, Traudt has a legally recognized property interest in his MMTLP shares.[44] These interests entitle him to exercise ownership, trade freely, and realize the value of his holdings. When FINRA imposed an indefinite U3 halt under Rule 6440, it interfered with these rights, depriving Traudt of control over his property without justification.

314.    In *Connecticut v. Doehr*, 501 U.S. 1 (1991), the Supreme Court held that property cannot be interfered with arbitrarily and without procedural safeguards, such as notice, evidence, or an opportunity to be heard. FINRA's halt, imposed without providing such procedural protections, amounts to an illegal taking of Traudt's property.[45]

315.    "The Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause." *Fuentes*, 407 U.S., at 86. " *Doehr*, 501§15 (1991)

---

[44] See https://www.law.cornell.edu/ucc/8/8-503

[45] See *In re 650 Fifth Ave. Co.*, Docket No. 20-1212(L), 7-8 (2d Cir. Mar. 9, 2021) (""A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). As to real property, the Supreme Court has ruled that property is "seized" where the government takes from the owner all management rights, including the "right to prohibit sale, . . . the right to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property," even absent physical possession. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 54 (1993); *see id.* at 59.")

316.    The 9th Amendment ensures the protection of unenumerated rights, including economic liberties, which encompass the ability to own, use, and dispose of property. These economic rights are deeply rooted in the Constitution, as evidenced by several provisions:

- Article I, Section 8, which reflects the importance of economic activities through Congress's power to regulate commerce
- Article I, Section 10, which prohibits laws impairing contractual obligations
- The 5th Amendment, which protects against takings without just compensation
- The 14th Amendment, which guarantees due process protections, ensuring that property cannot be seized arbitrarily

317.    Traudt's ownership of MMTLP shares and the corresponding right to trade them fall squarely within the scope of these protections. FINRA's indefinite halt, implemented without any disclosed evidence or procedural fairness, deprives Traudt of his 9th Amendment right to economic liberty. Just as criminal defendants have the right to know the charges and evidence against them, Traudt is entitled to know the reasons for FINRA's interference with his property rights. Without transparency or proper process, FINRA's actions are arbitrary, unlawful, and unconstitutional under the 9th, 5th, and 14th Amendments.

318.    Plaintiff submits to the Court something that might loosely be called "The Iron Pentagon Theory" as all of the facts on display in Traudt coalesce into five interlocking mechanisms that suppress small investors such as Traudt, deny meaningful access to justice, and consolidate power in the hands of financial elites in a monopolistic fashion under the Sherman Antitrust Act.

319.    *First,* the exemption (the "Madoff Exemption") under FINRA Rule 203(d)(2) allows market makers to create naked short positions that manipulate asset prices. This undermines genuine price discovery and forces small investors to absorb financial losses while market insiders reap profits. In effect, this exemption deprives small investors of economic agency. Combined with Rule 4560, industrial level economic players can then move unclosed short positions to foreign markets to keep their profits and holdings secret. This is legal as approved by FINRA and the SEC.

320.    *Second,* arbitration agreements are routinely imposed by brokers on clients and attendance – with rare and statistically insignificant exemptions – is compulsory under the Federal Arbitration Act (FAA). Court access almost becomes a privilege. These agreements almost universally compel investors to resolve disputes through mandatory arbitration overseen by FINRA or via FINRA rules, and as such the proceedings are tainted with an almost impossible aura of conflict of interest.

321.    *Third,* FINRA's current absolute immunity further entrenches these inequities by shielding it from liability, even when it facilitates harmful practices like the U3 halt on MMTLP. This immunity fosters regulatory capture, allowing FINRA to protect the interests of powerful market players at the expense of smaller participants.

322.    *Fourth,* High-Frequency Trading (HFT) technologies, which constitute what can be termed predatory financial technology or PREDFINTECH, exacerbate the systemic disadvantages faced by small investors. These technologies enable institutional players to exploit speed advantages, preempting trades and manipulating prices.

323.    *Fifth,* the Private Securities Litigation Reform Act (PSLRA) erects further barriers by imposing heightened pleading and scienter requirements, making it nearly impossible for small investors to bring fraud claims. Although the public relations campaign by industry heavyweights that lead to its passage cited "frivolous" lawsuits often called "strike suits" that occurred, the simple truth is that President Clinton rightly concluded it would prevent the average person from having access to the courts to pursue legitimate fraud claims. The PSLRA has become a shield for market participants engaging in fraudulent practices.

324.    As a proximate cause of FINRA's actions in taking actions in the U3 halt in violation of the non-delegation clause and for all the summarized issues regarding the interlocking and overwhelming rules, regulations, and industry favorable mandates such as mandatory arbitration clauses,  Traudt has been damaged in his property and finances, as well as many others similarly situated in the MMTLP trade halt, and his economic civil liberties under the 9th Amendment have been abrogated.

## PRAYER FOR RELIEF

Traudt requests of this court the following:

1. Reasonable attorney's fees.

2. Treble damages for all Clayton Act claims.

3. Compensatory damages, costs, and punitive damages if allowed by this Court.

4. That the Declaratory Judgment and Injunctive Relief be granted against FINRA.

5. That the Declaratory Judgment and Relief be granted against United States of America.

## DEMAND FOR JURY TRIAL

Traudt hereby claims and demands a trial by jury on all counts and portions of this complaint that are so triable.

Dated: December _____, 2024

                                     _____

                                     Scott Traudt, *pro se ipso*
                                     191 Kibling Hill Road
                                     Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to all named defendants and respondent at the addresses delineated below either by 1st Class mail or via email on this _____day of December, 2024.

                                     _____

                                     SCOTT TRAUDT

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan R. Voegele, Morris Kandinov LLP, 4915 Mountain Rd., Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Aaron T. Morris, Morris Kandinov LLP, 4915 Mountain Rd., Stowe, VT 05672

**Ari Rubenstein/GTS Securities LLC** Atty. Jonathan Miller, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**Ari Rubenstein/GTS Securities LLC** Atty. Stephen Fraser, Williams, Barber & Morel Ltd., Willis Tower, 233 S. Wacker Dr., Ste. 6800, Chicago, IL 60606

**FINRA** Atty. Walter Judge, DRM, 199 Main St. POB 190 Burlington VT 054020-190

**FINRA** Atty. John P. Mitchell, Faegre, Drinker, Biddle & Reath LLP 105 College Road East 105 College Road East, POB 627 Princeton NJ 08542-0627

**Schwab** Atty. Justin Barnard, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Anne B. Rosenblum, Dinse P.C. 209 Battery St., Burlington VT 05401

**Schwab** Atty. Felipe Escobedo, Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

Atty. Jeff Goldman Morgan, Lewis & Bockius LLP One federal St., Boston MA 02110-1726

**SEC** Atty. Mike Bailey 100 F Street, NE Washington, D.C. 20549