U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2024 DEC 16 PM 4: 25

CLERK
BY _____
DEPUTY CLERK

SCOTT TRAUDT,                              )
                                           )
        Plaintiff,                         )
                                           )
    v.                                     )  Case No. 2:24-cv-782
                                           )
ARI RUBENSTEIN,                            )
GTS SECURITIES LLC,                        )
GTS EQUITY PARTNERS LLC,                   )
GTS EXECUTION SERVICES LLC,                )
CHARLES W. SCHWAB AND CO. INC.,            )
SCHWAB HOLDINGS, INC.,                     )
FINANCIAL INDUSTRY REGULATORY              )
AUTHORITY,                                 )
        Defendants.                        )

**ORDER GRANTING DEFENDANTS CHARLES W. SCHWAB AND CO. INC.
AND SCHWAB HOLDINGS, INC.'S MOTION TO STAY THE ACTION
AND REFER THE MATTER TO ARBITRATION**
(Doc. 8)

Plaintiff Scott Traudt brings this action against Defendants Ari Rubenstein, GTS Securities LLC, GTS Equity Partners LLC, GTS Execution Services LLC, Charles W. Schwab and Co. Inc., Schwab Holdings, Inc., and the Financial Industry Regulatory Authority ("FINRA") seeking damages for alleged violations of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j; Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964; Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and Vermont Uniform Securities Act, 9 V.S.A. § 5605. Plaintiff's claims against Schwab are related to his purchase of "Non-Voting Series A Preferred Shares of Meta Materials" ("MMTLP") on November 30, 2022, through his TD Ameritrade brokerage account. (Doc. 4 at 2.)

Pending before the court is a motion filed by Charles Schwab and Co., Inc. ("Charles Schwab") and Schwab Holdings., Inc. ("CSH," and together with Charles

Schwab, "Schwab") to stay and compel arbitration. Schwab argues the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 2, et seq., requires the court to compel Plaintiff to present his claim for arbitration because Plaintiff's claims fall under the arbitration clause of the agreements he signed with Schwab and Schwab's predecessor, TD Ameritrade. (Doc. 8.) Plaintiff opposed the motion on September 20, 2024 (Doc. 50) and Schwab filed a reply on October 7, 2024 (Doc. 69), at which point the court took the matter under advisement.

Plaintiff is self-represented. Schwab is represented by Anne B. Rosenblum, Esq., Jeff Goldman, Esq., Justin B. Barnard, Esq., and Luis Felipe Escobedo, Esq.

**I.   Factual Background.**

Charles Schwab is a federally registered broker-dealer based in Westlake, Texas, and CSH is its parent. TD Ameritrade was a federally registered broker-dealer based in Omaha, Nebraska, that was acquired by Schwab. On June 26, 2020, Plaintiff applied to open a TD Ameritrade account.[1] In doing so, he checked a box stating he "agree[s] to the terms of the Client Agreement." (Doc. 8-5 at 4.) Above his electronic signature, the application stated the following:

> The Client Agreement applicable to this brokerage account contains a predispute arbitration clause. By signing this agreement, the parties agree to be bound by the terms of the Client Agreement, including the arbitration agreement located in Section 12 of the Client Agreement on page 8.

*Id.* The Client Agreement states in relevant part:

> 1. INTRODUCTION
>
> This Agreement governs all brokerage accounts that I open with you, all transactions in my Account, the use of your websites, the Brokerage Services, the TD Ameritrade Content, and the Third-Party Content; is binding on my heirs, executors, administrators, successors, and assigns; and will inure to the benefit of your successors. By opening an Account with you, I acknowledge that I have received, read, and understand this Agreement and agree to be bound by its terms. Accounts opened with the

---

[1] Schwab's motion states that Plaintiff applied to open his account on July 26, 2020. The exhibit Schwab attaches to its motion and describes as "a true and correct copy of the TD Ameritrade Account Application that Plaintiff Scott Traudt ('Plaintiff') completed and executed on July 26, 2020[,]" (Doc. 8-1 at 2), however, is dated June 26, 2020. (Doc. 8-5 at 2.)

TD Ameritrade Institutional Division are governed by a separate agreement.

. . .

## 12. ARBITRATION

This Agreement contains a predispute arbitration clause. By signing an arbitration clause, the parties agree as follows:

- All parties to this Agreement are giving up their right to sue each other in court, including the right to jury trial, except as provided by the rules of the arbitration forum in which a claim is filed.
- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
- The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.
- The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.
- The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.
- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.
- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.
- No person will bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (1) the class certification is denied; (2) the class is decertified; or (3) the client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate will not constitute a waiver of any rights under this Agreement except to the extent stated herein.

I agree that any controversy between you and your affiliates, any of their respective officers, directors, employees, or agents and me (including any of my officers, directors, employees, or agents) arising out of or relating to this Agreement, our relationship, any Services provided by you, or the use

3

of the Services, and whether arising before or after the date of this Agreement, shall be arbitrated and conducted under the provisions of the Code of Arbitration of the FINRA.

(Doc. 8-6 at 2, 9.)

On September 14, 2023, TD Ameritrade notified Plaintiff by email that his brokerage account would be automatically converted into a Schwab brokerage account on November 6, 2023, unless he opted out. The email stated, "[b]y not opting out and by having your account transferred to Schwab, you agree to the terms and conditions in the applicable Schwab Account Agreement." (Doc. 8-7 at 5.) The email instructed Plaintiff he could opt out "by either liquidating [his] account or moving [his] assets to another broker-dealer." *Id.* at 4-5. The Schwab Account Agreement, for which the email provided a link, states:

> Arbitration Agreement. Any controversy or claim arising out of or relating to (i) this Agreement, any other agreement with Schwab, an instruction or authorization provided to Schwab or the breach of any such agreements, instructions, or authorizations; (ii) the Account, any other Schwab account or Services; (iii) transactions in the Account or any other Schwab account; (iv) or in any way arising from the relationship with Schwab, its parent, subsidiaries, affiliates, officers, directors, employees, agents or service providers ("Related Third Parties"), including any controversy over the arbitrability of a dispute, will be settled by arbitration.
>
> This arbitration agreement will be binding upon and inure to the benefit of the parties hereto and their respective representatives, attorneys-in-fact, heirs, successors, assigns and any other persons having or claiming to have a legal or beneficial interest in the Account, including court-appointed trustees and receivers. This arbitration agreement will also inure to the benefit of third-party service providers that assist Schwab in providing Services ("Third-Party Service Providers") and such Third-Party Service Providers are deemed to be third-party beneficiaries of this arbitration agreement.
>
> The parties agree that this arbitration agreement will apply even if the application to open the Account is denied and will survive the closure of your Account and/or the termination of services rendered under this Agreement.
>
> Such arbitration will be conducted by, and according to the securities arbitration rules and regulations then in effect of, the Financial Industry Regulatory Authority (FINRA) or any national securities exchange that

4

> provides a forum for the arbitration of disputes, provided that Schwab is a member of such national securities exchange at the time the arbitration is initiated. Any party may initiate arbitration by filing a written claim with FINRA or such eligible national securities exchange. If arbitration before FINRA or an eligible national securities exchange is unavailable or impossible for any reason, then such arbitration will be conducted by, and according to the rules and regulations then in effect of, the American Arbitration Association (AAA). If arbitration before the AAA is unavailable or impossible for any reason, the parties agree to have a court of competent jurisdiction appoint three (3) arbitrators to resolve any and all disputes or controversies between or among the parties. Each party shall bear its own initial arbitration costs, which are determined by the rules and regulations of the arbitration forum. In the event of financial hardship, the arbitration forum may waive certain costs in accordance with such rules. At the conclusion of the hearing, the arbitrators will decide how to assess the costs of the arbitration among the parties.
>
> Any award the arbitrator makes shall be final and binding, and judgment on it may be entered in any court having jurisdiction. This arbitration agreement shall be enforced and interpreted exclusively in accordance with applicable federal laws of the United States, including the Federal Arbitration Act. Any costs, fees or taxes involved in enforcing the award shall be fully assessed against and paid by the party resisting enforcement of said award.

(Doc. 8-8 at 41.) Plaintiff did not opt out, and his TD Ameritrade account was converted into a Schwab brokerage account.

Plaintiff's claims against Schwab are related to his "purchase[] [of] 305 shares of MMTLP at $9.62 a share on 30 November 2022 from TD[ Ameritrade] for a total of $2,934.95." (Doc. 4 at 10, ¶ 43.) On December 9, 2022, FINRA halted trading of MMTLP due to an "extraordinary event[,]" which Plaintiff claims proximately caused him more than $1,000,000 in damages. (Doc. 4 at 13, ¶ 63) (internal quotation marks omitted).

Plaintiff alleges Schwab violated the Exchange Act, RICO, CFAA, and the Vermont Uniform Securities Act by, among other things, (1) "misusing" bluesheet data to facilitate insider trading; (2) sending fraudulent statements to investors; (3) selling him counterfeit shares; and (4) knowingly allowing falsified securities certificates to be introduced into his brokerage account. He claims Schwab has spoliated evidence and

5

failed to properly respond to third parties' Freedom of Information Claims. He seeks compensatory, treble, and punitive damages as well as injunctive relief and attorney's fees and costs.

## II. Conclusions of Law and Analysis.

Schwab asks the court to compel arbitration because Plaintiff agreed to arbitrate "[a]ny controversy or claim arising out of or relating to" his account, the transactions therein, "or in any way arising from the relationship with Schwab[.]" (Doc. 8 at 4) (quoting Doc. 8-8 at 41.) By signing the Client Agreement, which "inures to the benefit of any of TD Ameritrade's successors[,]" and declining to opt out of the Schwab Account Agreement, Plaintiff is bound by the arbitration agreements, according to Schwab. *Id.* at 5-6. Schwab contends that Plaintiff's claims fall squarely within the scope of arbitration because they arise from November 2022 transactions in his brokerage account.

Plaintiff further agreed that "any controversy over the arbitrability of a dispute[] will be settled by arbitration." (Doc. 8-8 at 41.) Plaintiff counters that the arbitration agreements are unenforceable and unconscionable, violate the federal antitrust laws, and that arbitration was not reasonably foreseeable when he signed the agreements.

### A. Standard of Review.

When considering a motion to compel arbitration, the court must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits[,]" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks, citation, and ellipses omitted).

The FAA "requires the federal courts to enforce arbitration agreements, reflecting Congress'[s] recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) (internal quotation marks and citation omitted). Congress's "clear" intent in passing the FAA was "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury*

*Constr. Corp.*, 460 U.S. 1, 22 (1983). "To achieve these goals, [the FAA] provides that arbitration clauses in commercial contracts 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (citing 9 U.S.C. § 2).

"By its terms," the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). In deciding a motion to compel arbitration, a court "must therefore determine: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; and, (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable." *Daly*, 939 F.3d at 421 (alterations, citation, and internal quotation marks omitted).

## B.   Whether the Arbitration Clauses in the Client Agreement and Schwab Account Agreement Are Enforceable.

Plaintiff argues that the arbitration clauses should not be enforced because Schwab breached the agreements and acted in bad faith by, among other things, permitting counterfeit shares, interfering with his account, and spoliating evidence. He further contends the arbitration clauses are unconscionable because they permit members of the securities industry to serve as members of an arbitration panel and provide for limited discovery under the FINRA Code of Arbitration.[2] He makes no claim of fraud in the inducement but, rather, claims Schwab's malfeasance occurred in the course of Plaintiff's MMTLP transactions and thereafter.

Although "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements," *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996), "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator

---

[2] Plaintiff also argues that Vermont law requires arbitration agreements to exempt disputes "involv[ing] a question of constitutional or civil rights." 12 V.S.A. § 5652(b). He has not pled any such claims against Schwab.

7

in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006). Courts generally look to state law to determine whether generally applicable contract defenses such as unconscionability apply. *See Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) (noting that "state law . . . is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally") (emphasis in original); *see also Gingras v. Think Fin. Inc.*, 922 F.3d 112, 127 (2d Cir. 2019) (finding arbitration agreements "substantively unconscionable under Vermont law").

"Under Vermont law, a contract provision may be unenforceable where the provision is procedurally unconscionable, substantively unconscionable, or both." *Gingras*, 922 F.3d at 126 (citing *Glassford v. BrickKicker*, 2011 VT 118, ¶ 13, 191 Vt. 1, 9, 35 A.3d 1044, 1048-49). A contract may be unconscionable if there is "unequal bargaining power between the parties, lack of opportunity to read the contract, [or] use of fine print in the contract[.]" *Val Preda Leasing, Inc. v. Rodriguez*, 540 A.2d 648, 652 (Vt. 1987) (citing *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986)); *see also KPC Corp. v. Book Press, Inc.*, 636 A.2d 325, 329 (Vt. 1993) ("In considering whether a party has been unfairly surprised by a contract term or its application, we take into account the party's relative business experience and education, the party's opportunity to understand the terms of the contract, and whether the terms were hidden in the fine print."). Courts also consider "the terms of the contract, including substantive unfairness." *Val Preda Leasing, Inc.*, 540 A.2d at 652.

Arbitration clauses are not unconscionable merely because they permit a member of the securities industry to serve on the arbitration panel. And courts have rejected the proposition that arbitrators are biased solely because of their affiliation with a certain industry. *See Harter v. Iowa Grain Co.*, 220 F.3d 544, 555 (7th Cir. 2000) ("[B]y virtue of their expertise in a field, arbitrators may have interests that overlap with the matter they are considering as arbitrators. Such overlap has not amounted to prima facie partiality.") (citation omitted); *Van Buren v. Cargill, Inc.*, 2016 WL 231399, at *5 (W.D.N.Y. Jan. 19, 2016) (applying reasoning in *Harter v. Iowa Grain Co.* to reject

claim of biased arbitration panel). In any event, the Client Agreement merely provides that "[t]he panel of arbitrators may include a *minority* of arbitrators who were or are affiliated with the securities industry." (Doc. 8-6 at 9) (emphasis supplied).

To the extent Plaintiff argues the arbitration clauses are unconscionable because they identify FINRA's Code of Arbitration (the "FINRA Code") as the governing rules or limit the discovery that may be undertaken, the possibility of limited discovery was disclosed in the arbitration agreements. *See id.* ("The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.").

*Walker v. Ryan's Fam. Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005) and *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538 (E.D. Pa. 2006), cited by Plaintiff, are inapposite. In *Walker*, the Sixth Circuit found an arbitration agreement unenforceable because it allowed only one deposition as of right and additional depositions at the discretion of the arbitration panel, which the court found to be "potentially biased" due to an unfair arbitrator-selection process. 400 F.3d at 387 (citation and internal quotation marks omitted). In *Ostroff*, the Eastern District of Pennsylvania found an arbitration agreement invalid because it did not allow any depositions other than of the defendant's expert witnesses. 433 F. Supp. 2d at 545.

In contrast, the FINRA Code grants the arbitration panel discretion over the number of depositions to allow and does not limit the potential category of witnesses. Although Plaintiff identifies records he claims he would be prevented from seeking in discovery under the FINRA Code, he does not explain how the FINRA Code's limits on depositions and interrogatories would prevent him from requesting those documents. *See Moss v. Rent-A-Center, Inc.*, 2007 WL 2362207, at *6 (E.D.N.Y. Aug. 15, 2007) (finding arbitration agreement valid where it limited the discovery process to one deposition but "other means of discovery are at [p]laintiffs' disposal[,]" including the arbitrator "order[ing] additional discovery, if necessary").

A claim of unconscionability must be tethered to the agreement to arbitrate and cannot, as here, exist in a vacuum. This is because a federal court may only decide claims

9

of "fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate[.]" *Cardegna*, 546 U.S. at 445 (citation omitted). As the Supreme Court has held, "regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 449.

Because Plaintiff does not allege fraud in the inducement, his unconscionability claim does not bar arbitration. *See Williams v. Holiday Inn Club Vacations*, 2020 WL 6086647, at *5 (D. Vt. Mar. 10, 2020) (holding that arbitrator, not court, should determine whether arbitration agreement was unenforceable where "[p]laintiffs challenge the validity of the . . . agreements as a whole; they do not claim that they were fraudulently induced to agree to arbitration"). Indeed, Plaintiff has agreed that "any controversy over the arbitrability of a dispute[] will be settled by arbitration." (Doc. 8-8 at 41.) "Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189-90 (2d Cir. 2019).

Under the FAA, a valid written agreement to submit disputes to arbitration "shall be valid, irrevocable, and enforceable[.]" *Byrd*, 470 U.S. at 218 (internal quotation marks omitted) (quoting 9 U.S.C. § 2), and "courts must 'rigorously enforce' arbitration agreements according to their terms[.]" *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Byrd*, 470 U.S. at 221). Accordingly, the court must order arbitration if Plaintiff's claims appear to fall within the scope of arbitration, with the arbitration panel making the final determination regarding arbitrability. (Doc. 8-8 at 41) (listing "any controversy over the arbitrability of a dispute" as being subject to arbitration).

### C. Whether the Foreseeability of Plaintiff's Claims is Relevant.

Relying on Eleventh Circuit cases, Plaintiff argues that his claims against Schwab are not covered by the arbitration clauses in the Client Agreement and Schwab Account

Agreement because his claims were not foreseeable when he entered into those agreements. In *Hemispherx Biopharma, Inc. v. Johannesburg Consolidated Investments*, the court found the arbitration clause did not cover a dispute that "was not foreseeable at the time of the licensing agreement" where the agreement "by its own terms covers only disputes arising out of or pursuant to the licensing agreement, and not 'the working relationship between the parties.'" 553 F.3d 1351, 1368 (11th Cir. 2008) (quoting *Seaboard Coast Line R.R. Co. v. Trailer Train Co.*, 690 F.2d 1343, 1351 (11th Cir. 1982)). In *Telecom Italia, SpA v. Wholesale Telecom Corporation*, the court found that an arbitration clause "call[ing] for arbitration of 'any disputes arising out of or relating to'" a lease agreement between the parties did not extend to a tort claim that "neither arises out of nor is related to [the] lease[.]" 248 F.3d 1109, 1114, 1116 (11th Cir. 2001). Finally, by letter notice dated November 24, 2024, Plaintiff cites to the Court of Appeals for the D.C. Circuit's recent decision in *Alpine Securities Corporation v. Financial Industry Regulatory Authority and United States of America*, 2024 WL 4863140 (D.C. Cir. Nov. 22, 2024). There, the court addressed FINRA's expulsion of the plaintiff for trading without prior SEC review. *Id.* at *1.[3]

      Each case cited by Plaintiff is not controlling and is easily distinguishable. In this case, the arbitration clauses are broad and encompass Plaintiff's trading activities, and therefore claims arising from those trades were reasonably foreseeable. More importantly, the Second Circuit has not adopted a reasonable foreseeability test, nor would such an approach be appropriate in light of the policies underpinning the FAA. *See Dill v. JPMorgan Chase Bank, N.A.*, 2020 WL 4345755, at *7 (S.D.N.Y. July 29, 2020) (noting that plaintiffs did not cite any binding Second Circuit authority "stand[ing] for the proposition that a claim must have been foreseeable at the time of forming the arbitration agreement"); *see also Vera*, 335 F.3d at 116 (noting that FAA "reflect[s] Congress'[s] recognition that arbitration is to be encouraged as a means of reducing the costs and

---

[3] This case involves no similar expulsion.

delays associated with litigation") (internal quotation marks omitted) (quoting *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1063 (2d Cir. 1993)).

Plaintiff argues in a cursory manner that the arbitration agreements are "void under the Sherman Antitrust Act." (Doc. 50 at 23.) No court has held that arbitration clauses, as a matter of law, violate the Sherman Act as an illegal restraint of trade, and courts have approved of arbitration for each federal claim Plaintiff asserts.[4] The only remaining question is whether Plaintiff's claims fall within the scope of the arbitration agreements at issue.

### D. Whether Plaintiff's Claims Are Within the Scope of Arbitration.

"Ordinary principles of contract law guide the inquiry into . . . whether the parties consented to arbitrate a particular dispute." *Local Union 97, Int'l. Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023). "When considering whether claims fall within the scope of an arbitration clause," courts "analyze the factual allegations made in the plaintiff's complaint. 'If the allegations underlying the claims touch matters covered by the parties' . . . agreements, then those claims must be arbitrated[.]'" *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (first alteration in original) (quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l*, 198 F.3d 88, 99 (2d Cir. 1999)).

The Client Agreement states that it "governs all brokerage accounts that [the account owner] open[s] with [TD Ameritrade]" and "will inure to the benefit of [TD Ameritrade's] successors." (Doc. 8-6 at 2.) The arbitration clause in the Client Agreement encompasses "any controversy . . . arising out of or relating to this

---

[4] The Supreme Court has held that claims brought under the Exchange Act and RICO are arbitrable. *See Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 242 (1987) (allowing arbitration of Exchange Act claims brought by customers against their brokerage firms and finding "no basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate RICO claims"). Other courts have permitted the arbitration of CFAA claims. *See, e.g., TravelClick, Inc. v. Open Hosp. Inc.*, 2004 WL 1687204, at *5 n.4 (S.D.N.Y. July 27, 2004) ("Congress did not intend for claims arising under the Computer Fraud and Abuse Act . . . to be nonarbitrable."); *Torbit, Inc. v. Datanyze, Inc.*, 2013 WL 572613, at *3 (N.D. Cal. Feb. 13, 2013) (compelling arbitration of CFAA claim).

12

Agreement, [the account owner's and TD Ameritrade's] relationship, any Services provided by [TD Ameritrade], or the use of the Services[.]" *Id.* at 9. "[S]ubmitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement[]" is the paradigm of a broad clause." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (second and third alterations in original).

Plaintiff's claims against Schwab, TD Ameritrade's successor, arise from transactions in Plaintiff's brokerage account opened with TD Ameritrade after he signed the Client Agreement. His claims, therefore, come squarely within the scope of the Client Agreement, which requires "any controversy between [TD Ameritrade] and [its] affiliates . . . arising out of or relating to [the] [a]greement, [TD Ameritrade and Plaintiff's] relationship, any [s]ervices provided by [TD Ameritrade], or the use of the [s]ervices" to be arbitrated. (Doc. 8-6 at 9.) *See State v. Philip Morris USA Inc.*, 2008 VT 11, ¶ 17, 183 Vt. 176, 184, 945 A.2d 887, 893 ("The phrase 'related to' is broad, ordinarily encompassing matters 'connected to,' 'associated with' and 'brought with reference to' that which is subject to arbitration."). The same rationale applies to the arbitration clause in the Schwab Account Agreement, which similarly covers "[a]ny controversy or claim arising out of or relating to (i) this Agreement, . . . the Account, any other Schwab account or Services . . . or in any way arising from the relationship with Schwab[.]" (Doc. 8-8 at 41.)

Because Plaintiff's claims fall squarely within the broad scope of the arbitration clauses in the Client and Schwab Account agreements, because Congress has not deemed any of his federal statutory claims nonarbitrable, and because Plaintiff has not established the unconscionability of the arbitration agreements, the FAA mandates arbitration.

## CONCLUSION

For the reasons stated above, the court GRANTS Schwab's motion to stay the action and refers the matter to arbitration with regard to the claims against Schwab (Doc. 8).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 16th day of December, 2024.

Christina Reiss, Chief Judge
United States District Court