# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| SCOTT TRAUDT, <br>       Plaintiff, <br> v. <br><br> ARI RUBENSTEIN, GTS SECURITIES LLC, GTS EQUITY PARTNERS LLC, GTS EXECUTION SERVICES LLC, CHARLES W. SCHWAB AND CO. INC., SCHWAB HOLDINGS, INC., and FINANCIAL INDUSTRY REGULATORY AUTHORITY, <br><br>       Defendants, <br> and <br><br> GARY GENSLER, US SECURITIES AND EXCHANGE COMMISSION, <br><br>       Respondents. | Docket No.: 2:24-cv-782 <br><br> Judge Christina Reiss |

**THE GTS DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION TO AMEND THE FIRST AMENDED COMPLAINT**

Plaintiff's December 9 Motion to Amend, Dkt. No. 112,[1] is nothing but the latest salvo in his efforts to conjure up a claim. In his myriad public statements about this litigation, he confirms that this litigation is animated by a desire to impose undue costs upon the GTS Defendants. This Motion comes amidst his public efforts to recruit other MMTLP investors to file self-described "incendiary lawsuits" with "clone filing[s]," Ex. 1, in an effort to "sue the reproductive components off Brand-X." Ex. 2; *see also* Ex. 3 ("Tomorrow AM, 'SCORCHED EARTH' begins with something EVERY MMTLP shareholder can do, a template" to "[t]urn[] each MMTLP shareholder into a financial insurgent"). After acknowledging in September that if he "los[t] the RICO counts, we have multiple fall back positions against GTS," Ex. 4, he comes now to pursue those "fall back positions," after months of "scorched earth" litigation failed to yield results and notwithstanding the Court's prior warning about "vexatious filings." *See* Dkt. No. 102.

Plaintiff's litigation conduct against the GTS Defendants confirms Plaintiff's public statements about his "SCORCHED EARTH" strategy. *See* Ex. 3. After attempting to plead RICO and CFAA claims against certain of the GTS Defendants in his initial Complaint, Dkt. No. 1, and First Amended Complaint, Dkt. No. 4, he then sought to add more claims via his opposition to the GTS Defendants' Motion to Dismiss. Dkt. No. 18. Those proposed claims were as follows:

| Count # | Proposed Claim |
|---|---|
| XI | Section 10(b) of the Exchange Act; Rule 10b-5(a), and Rule 10b-5(c) |
| XII | Vermont Securities Act § 5501 |
| XIII | CFAA § 1030(a)(4) |
| XIV | CFAA § 1030(a)(5)(C) |
| XV | Stored Communications Act |
| XVI | FINRA Rule 203(b)(2) |

---

[1] Citations to the Motion to Amend and the Exhibits thereto are in the following forms: Mot. at _ and Mot. Ex. _ at _. This Response adopts the abbreviations set forth in the GTS Defendants' dismissal papers. *See* Dkt Nos. 18, 74.

| Count # | Proposed Claim |
|---|---|
| XVII | Sherman Act, 15 U.S.C. § 1 "et seq." |

*See* Dkt. No. 60 at App. J. At the time, Plaintiff remarked that "we have multiple fall back positions against GTS." *See* Ex. 4.

Then, after briefing closed on the GTS Defendants' Motion to Dismiss, Dkt. No. 74 at 6–9, Plaintiff attempted to wipe the slate clean through a proposed fourth iteration of his pleading, jettisoning his proposed Stored Communications Act claim and a claim based upon an alleged violation of FINRA Rule 203(b)(2), leaving claims against GTS Securities alone. *See* Dkt. No. 88.[2]

In then seeking leave, Plaintiff noted the claims in his new pleading would "super cede [sic] and supplant any already filed" (except maybe Plaintiff's FINRA Rule claim). *See id.* at 2; *see also id.* at 6 ¶ 2 ("Traudt hereby wishes to super cede any and all claims for damages filed in prior motions against GTS . . . ."). This meant that Plaintiff "abandon[ed] his RICO and CFAA claims" (presumably including the CFAA claims in his prior proposed amendment, *see* Dkt. No. 60 at App. J), Dkt. No. 90 at 2, and claims against every GTS Defendant, except GTS Securities, but not before briefing on their Motion to Dismiss was complete.[3]

---

[2] In a surreply, Plaintiff suggested he wished to pursue the FINRA Rule 203(b)(2) claim after all, Dkt. No. 90 at 5 (potential fifth iteration of pleading), even though there was no such count in his Motion for Leave. Dkt. No. 88.

[3] Despite these efforts to "supplant," Plaintiff then appeared to be seeking to unwind such supplementation, by purporting to verify, under oath, his September 30 opposition to the GTS Defendants' Motion to Dismiss, which related only to claims that he potentially "supplant[ed]" in his proposed amendment. *See* Dkt. No. 93.[3] In short, the merry-go-round continued.

2

In the fifth iteration of his proposed pleading,[4] the one that is the subject of the instant Motion, Plaintiff seeks to pursue three claims against GTS Securities (as he continues to name two additional GTS affiliates as defendants without ever pursuing claims against them) and, maybe, Mr. Rubenstein. *See* Mot. Ex. 3 at 2 n.1 ("'GTS' as used in this document includes Rubenstein at this point herein where 'GTS' is mentioned."). These claims include (i) alleged market manipulation in violation of Section 10(b) of the Exchange Act of 1934 and Rules 10b-5(a) and 10b-5(c) (Count VI), (ii) alleged fraud under Section 5501 of the Vermont Securities Act (Count VII), and (iii) alleged violations of the Sherman Act (Count VIII). The GTS Defendants previously argued that Plaintiff failed to state a claim upon which relief may be granted as to these claims. *See* Dkt. No. 74 at 6–9. This remains so today. For this and the reasons that follow, Plaintiff's latest proposed amendment should be rejected.

## ARGUMENT

Plaintiff's Motion to Amend is improper. While the GTS Defendants acknowledge that leave should be freely given when justice requires, the Court has "broad discretion" to deny leave, Dkt. No. 90 at 2, including where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and the] futility of

---

[4] While this brief takes Plaintiff's allegations as true, the GTS Defendants vigorously dispute them and intend to disprove them should this litigation proceed. Indeed, many of Plaintiff's allegations appear to be, putting it charitably, crowdsourced by him on Twitter without any independent investigation. *See, e.g.*, Ex. 7 ("I have to write a reply memo to Ari/GTS in the next few days. If I win that and we keep GTS in the crosshairs by surviving their motion to dismiss, @Ds00000Dj will have played a YUGE role in it. Top marks boys and girls, another one gets added to The Brain Trust."); Ex. 8 ("Thank you @MyDollarSign for sleuthing it out in the wild . . . ."); Ex. 9 ("If you are on Stocktwits I need a quick DD dive into a post of some value to us."); Ex. 10 (thanking ten people and "if I left people out its because I haven't got immunity for them . . . yet. (Just kidding, Mr. Bluewindbreaker.)").

3

amendment." *See Foman v. Davis*, 371 U.S. 178, 182 (1962). The circumstances here warrant denial on multiple grounds.

I.      **Subjective Considerations under *Foman* Warrant Denial of Leave**

Plaintiff's Motion for Leave improperly seeks to avoid a dispositive ruling, after Plaintiff caused the GTS Defendants to incur costs. Indeed, it follows full briefing on GTS's Motion to Dismiss the second iteration of Plaintiff's pleading, with its RICO and CFAA claims directed to certain of the GTS Defendants. Plaintiff now "abandon[s]" those claims because they "were in error or did not meet legal thresholds." *See* Mot. at 2 ¶ 1; *see also* Dkt. No. 90 at 2 (recognizing that initial claims "will most likely fail for a variety of reasons"). Accordingly, Plaintiff's Motion for Leave is improperly presented for dilatory reasons and should be rejected for that reason alone. *E.g.*, *Kamden-Ouaffo v. PepsiCo, Inc.*, 160 F. Supp. 3d 553, 559 n.8 (S.D.N.Y. 2016) (collecting cases, and finding that such approach "has no support in the law"); *see also Marotte v. City of N.Y.*, Civ. No. 16-8953, 2019 U.S. Dist. LEXIS 21049, at *37–38 (S.D.N.Y. Feb. 7, 2019) (pro se case); *PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 764–65 (S.D.N.Y. 1995) ("The plaintiff's motion to amend . . . is denied because its timing demonstrates that it is clearly a dilatory tactic to avoid the dismissal of this action. The motions to dismiss were fully briefed and argued, at considerable expense, . . . .").

Likewise, seriatim presentation of case theories through a proposed amendment is improper. *See Sanders v. Thrall Car Mfg. Co.*, 582 F. Supp. 945, 953 (S.D.N.Y. 1983) ("[T]he liberality with which a court grants leave to amend does not impart to litigants the privilege of re-shaping their legal theories endlessly, even where there is no evidence of improper motive or dilatory objectives. . . . [W]e . . . must protect a busy district court [from being] imposed upon by the presentation of theories seriatim." (quotation marks omitted)), *aff'd*, 730 F.2d 910 (2d Cir.

4

1984) (per curiam); *see also Turkenitz v. Metromotion, Inc.*, Civ. No. 97-2513, 1997 U.S. Dist. LEXIS 19762, at *25–26 (S.D.N.Y. Dec. 12, 1997) (noting that courts "will generally be denied when the motion to amend is filed solely . . . to prevent the Court from granting a motion to dismiss . . . , particularly when the new claim could have been raised earlier" (quotation marks omitted)). Plaintiff recognizes that he is presenting his claims seriatim, stating when he first opposed the GTS Defendants' Motion to Dismiss that "we have multiple fall back positions against GTS." *See* Ex. 4. He is simply rolling those out now for improper strategic reasons. *E.g.*, Ex. 11 ("It's not over dude, these aren't important motions. Wildcards."); Ex. 12 ("Dude I've filed close to 400 pages I can't remember a lot of it already. It's a blur.").

Plaintiff's amendment is further improper because it does not present any new, material facts. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (Plaintiff's case) (affirming denial of leave where Plaintiff "suggested no new material she wishes to plead"). Plaintiff's Motion for Leave follows Plaintiff's efforts to plead "violations of the Securities Exchange Act" in his initial Complaint, *e.g.*, Dkt. No. 1 at 1, 47, albeit without naming the GTS Defendants on such claims. *See also* Dkt. No. 4 at 1 (First Amended Complaint). Plaintiff's Motion also follows efforts in his First Amended Complaint to plead violations of the Vermont Securities Act, again without naming any of the GTS Defendants. *See* Dkt. No. 4 at 48. And it follows his allegations in his First Amended Complaint that Defendants were engaged in a "cartel in all but name"—albeit without any antitrust claims of any kind pleaded against any of them. *See id.* at 18 ¶ 91 (quotation marks omitted); *see also, e.g., id.* at 35 ¶ 193. Plaintiff has admitted as much. *See* Mot. at 2 ¶ 2 ("The new filing contains claims that have been noticed to the defendants in total over the last two months of motions . . . ."). Courts routinely deny amendments in these circumstances where a plaintiff "simply adds conclusory allegations and legal arguments already . . . included in the original

5

complaint," rather than matters that were initially overlooked or unknown. *See Lusmat v. Papoosha*, Civ. No. 20-1386, 2022 U.S. Dist. LEXIS 114787, at *9–10 (D. Conn. June 29, 2022) (quotation marks omitted); *see also Ruotolo v. City of N.Y.*, 514 F.3d 184, 191–92 (2d Cir. 2008) (affirming denial of leave where plaintiff sought to allege another past conversation as basis for First Amendment retaliation claim).

Additional circumstances further demonstrate the impropriety of Plaintiff's litigation conduct. Plaintiff has now filed a second action, *see* Mot. at 3 ¶ 7 (referencing *Traudt v. Gensler*, Civ. No. 24-1360 (D. Vt. Dec. 9, 2024)), against a defendant that he had voluntarily dismissed from this action. *See* Dkt. No. 63. Plaintiff is more than willing to prejudice the GTS Defendants using the newly filed action, indeed suggesting that such action could proceed first with the (misplaced) hope that it would constructively moot the above-captioned case. *See* Mot. at 3–4 ¶ B. The list goes on. In short, far from "preserving *some* judicial economy," Plaintiff has multiplied these proceedings. *See* Mot. at 2 ¶ 1 (emphasis added). He now wishes to obtain a fresh start upon factual theories that are materially identical to what he started with. Plaintiff's Motion is nothing more than an attempt to "throw everything in," Ex. 6, after "all else fails." Ex. 8.

## II.    Plaintiff's Proposed Amendment Is Futile

As further evidence of Plaintiff's improper purposes here, he did nothing to cure defects with his proposed new claims that the GTS Defendants previously identified. *See* Dkt. No. 74 at 6–9. Nor has he served Mr. Rubenstein. As set forth below, these and additional defects render his proposed amendment futile.

### A. The Court Should Reject Plaintiff's Proposed Market Manipulation Claims (Count VI)

#### 1. Plaintiff Cannot and Does Not Adequately Allege Reliance

Plaintiff has done nothing to cure his defective reliance allegations. He cannot and does not allege that the GTS Defendants communicated with him as to the price of MMTLP shares. *See* Dkt. No. 74 at 6 (quoting *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18 (2d Cir. 2013) ("*Fezzani I*"), *clarified on denial of rh'g by* 777 F.3d 566 (2d Cir. 2015) ("*Fezzani II*")). If the defendant does not so communicate with the plaintiff, liability may not attach even if the defendant "engaged in phony trading activity that created an 'impression' of 'value and liquidity' in securities being pedaled by" the broker-dealer. *See id.* at 23. Importantly here, Plaintiff does not allege that he learned pricing from the GTS Defendants. *See* Mot. Ex. 3 at 17 ¶ 78 ("Traudt purchased 305 shares of MMTLP at $9.62 a share . . . from TDA . . . .").

Thus, Plaintiff attempts to pivot through a conclusory assertion—well short of particularity requirements under Rule 9(b)—that he "relied on an assumption of an efficient market free of manipulation," *id.* at 61 ¶ 267, in order to attempt to create a rebuttable presumption of reliance, a path left open in *Fezzani II*. *See* 777 F.3d at 572; *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263–64 (2014). Plaintiff's allegations, however, are self-defeating. In reality, according to his own allegations, he understood at the time of his investment that MMTLP was trading in an inefficient market and being manipulated.[5] Indeed, Plaintiff places himself among a

---

[5] *See* Mot. Ex. 3 at 8 ¶ 32 ("MMTLP immediately became violently shorted as it started to trade and never came off FINRA's OTC 'Threshold List' for the entirety of its brief trading history . . . ."); *see also id.* at 4 ¶ 12 ("Upon information and belief, naked shorts were added to TRCH by Rubenstein and GTS together with and in concert with others for the first 6 months of 2021."); *id.* at 6 ¶ 26 (alleging that a prior merger "saddled MMTLP with more than 1 billion naked short shares from the moment it started trading"); *id.* at 16 ¶ 62 (referencing "significant volatility" on MMTLP even before Plaintiff invested).

group of late-stage investors in MMTLP intending to effectuate a "short squeeze" to "rapidly increas[e] share price for 'long' position holders," *see* Mot. Ex. 3 at 39 ¶ 181 & n.34, a circumstance that undermines his assumption as to market efficiency. *E.g.*, *Bratya SPRL v. Bed Bath & Beyond Corp.*, Civ. No. 22-2541, 2024 U.S. Dist. LEXIS 175313, at *40–42 (D.D.C. Sept. 27, 2024) (denying class certification, and holding that "[B]BBY was gripped by a short squeeze during the Class Period . . . . [T]he Court cannot simply ignore these dynamics . . . in determining whether BBBY's market was efficient."). His allegations are telling in other ways—conjuring up a market price "as high as $1039 a share" or "dark pool" pricing, Mot. Ex. 3 at 27 ¶ 131, as a basis for his alleged damages, even while he alleges that the issuer's key assets were "worthless" and had "virtually zero productive capacity since 2014." *See id.* at 16 n.13. A market for a security, however, is not efficient where a stock's price does not "rapidly" or "fully" reflect all available information. *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 12, 16, 19 (1st Cir. 2005).

Given his own allegations of market inefficiencies, Plaintiff cannot invoke the fraud-on-the-market presumption. Who "would knowingly roll the dice in a crooked crap game," after all. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246–47 (1988) (quotation marks omitted); *see also, e.g.*, *Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784, 786 (2d Cir. 2015) (summary ord.) ("Even assuming that Doe's post caused CodeSmart's precipitous stock price drop, Salvani purports he knew about this 'market manipulation,' and he cannot 'be said to have relied on the integrity of a price he knew had been manipulated.'"). He cannot rely on a fraud-on-the-market presumption for an independent reason. Numerous courts have declined to allow plaintiffs to pursue a fraud-on-the-market theory as to OTC securities, such as MMTLP, Mot. Ex. 3 at 4–5 ¶ 14. *See*

---

Plaintiff describes the above-referenced Threshold List as "a list of securities that have a high level of fails-to-deliver (FTD) activity, which is when a broker-dealer sells a security but does not have the security available to deliver to the buyer." *See* Mot. Ex. 3 at 8 n.7.

8

*ScripsAm., Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1252 (C.D. Cal. 2015) (collecting cases); *Burke v. China Aviation Oil Corp.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005) ("[T]he Court is unaware of any court holding that the OTCBB or Pink Sheets meets" the standard of an efficient market).

### 2. Plaintiff Does Not and Cannot Adequately Allege Causation

Nor can Plaintiff allege that his injuries were "*caused by* reliance on . . . an efficient market free of manipulation." *See Fezzani I*, 716 F.3d at 22 (emphasis added) (quoting *ATSI Commc'ns, Inc. v. Shear Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)); *see also* 15 U.S.C. § 78u-4(b)(4); *Fezzani II*, 777 F.3d at 573. Plaintiff's own allegations defeat causation, as he attributes his damages to actions that FINRA undertook. *See* Mot. Ex. 3 at 27 ¶ 131 ("As a proximate cause of the U3 trading halt that has now lasted 19 months, Traudt is damaged . . . ."). And there, he does not allege anything cognizable against the GTS Defendants. Rather, his allegations point the finger at FINRA alone in its capacity as a regulator, including for allegedly providing indications of an impending U3 halt to certain market participants. *See id.* at 22 ¶ 105.

Because FINRA is the sole cause of his alleged damages, Plaintiff cannot obtain relief from the GTS Defendants. *See Egervary v. Young*, 366 F.3d 238 (3d Cir. 2004). Put simply, while Plaintiff at times takes issue with FINRA's decision-making, he alleges that FINRA was "acting under the auspices" of its own Rule when it initiated the U3 halt, which allegedly caused Plaintiff's injuries. *See* Mot. Ex. 3 at 22 ¶ 104. And, at most, he raises concerns about how FINRA halted MMTLP trading (without any agreement by the GTS Defendants), having allegedly "identified widespread fraud in MMTLP no later than 5 December 2022." *See id.* at 25 ¶ 121. As *Egervary* holds, where a decision-maker "is provided with the appropriate facts . . . but fails to properly apply the governing law and procedures, such error must be held to be a superseding cause, breaking the chain of causation." *See* 366 F.3d at 250–51 (invoking *Townes v. City of N.Y.*, 176

9

F.3d 138 (2d Cir. 1999)). As one MMTLP court put it, "[a] claim that FINRA got it wrong" should be litigated first through the Securities and Exchange Commission, if anywhere, not a court. *See Tawil v. FINRA*, Civ. No. 22-440, 2023 U.S. Dist. LEXIS 117247, at *2–3 (N.D. Fla. May 24, 2023).

### B.      Plaintiff's Vermont Securities Act Claim Must Fail

Plaintiff also cannot assert a Section 5501 claim against the GTS Defendants. That is because Section 5501 generally parallels Rule 10b-5 in respects asserted above and thus, should be dismissed for the same reasons. *See Hoehl Family Found. v. Roberts*, Civ. No. 19-229, 2020 U.S. Dist. LEXIS 258005, at *72 (D. Vt. Oct. 15, 2020).

### C.      Plaintiff's Antitrust Claim Must Also Fail

The Court should also reject Plaintiff's jumble of antitrust theories, whether in the form of a supposed price-fixing conspiracy or a conspiracy to monopolize among GTS Securities, Schwab, and FINRA. These theories fall short on multiple independent bases.

The risks of Plantiff's theories proceeding on the merits are acute. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) ("[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." (citation omitted)). Indeed, under the Sherman Act, "[m]istaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *See Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (quotation marks omitted). For example, "every contract excludes, at least to some degree, those who are not parties to it. Indeed, it is the nature of competition that at some point there are winners and losers, and the losers are excluded." *See Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1014–15 (2d Cir. 1984) (citation omitted).

10

And these risks are only compounded here, where Plaintiff attempts to allege a vertical agreement among a market maker that allegedly distributes shares to a downstream brokerage and is regulated by FINRA itself. Indeed, in decision after decision, the Supreme Court has overruled even its prior decisions that treated such vertical conduct as per se illegal. *E.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) (overturning 1911 decision finding that agreements between manufacturer and its distributors setting a minimum resale price, and noting that such agreements "can stimulate Interbrand competition")); *State Oil Co. v. Khan*, 522 U.S. 3 (1997) (overturning decision in favor of rule of reason for agreements as to maximum resale prices). It is thus no accident that Plaintiff tries to attach a "horizontal" label on the alleged conduct here, *see* Mot. Ex. 3 at 7 ¶ 28 (referencing alleged "naked shorting" before Plaintiff ever invested), but "[m]ere labels do not alter the essential nature of the economic [and regulatory] relationship." *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 n.1 (2d Cir. 1997).

### 1. Plaintiff Does Not Adequately Allege an Anticompetitive Agreement

This is why Plaintiff is left to cast about to find something supposedly nefarious about MMTLP trading. Vertical agreements are not inherently suspect and may, indeed, promote downstream competition—just as here, where retail investors seeking a short squeeze are pitted against entities pursuing an opposing strategy supposedly pursuant to a vertical agreement. *Cf. Leegin*, 551 U.S. at 890–91 (noting vertical conduct's promotion of interbrand competition). He leaves it thusly as to the U3 halt, which allegedly caused his injuries, "[t]he U3 halt was orchestrated by two Wall Street back benchers" at FINRA, and the most he can say about others is that they "aided and abetted" FINRA (rather than actually agreed in violation of the Sherman Act) given their "vested financial interest[s]." *See* Mot. Ex. 3 at 14 ¶ 52; *id.* at 24 ¶ 119 ("[S]tone ha[d] the final say" as FINRA's VP of Transparency Services). In short, Plaintiff alleges that "members

11

of the [UPC] were aware of the halt and *acted accordingly in their own institutions*." *Id.* at 22 ¶ 105. But, because they did not have the "final say," those institutions, to say nothing of the GTS Defendants, which were not on the UPC, *id.* at 26 ¶ 127—cannot be said to have agreed for Sherman Act purposes. *See also id.* at 20 ¶ 93 (referencing non-specific, perceived "nod of approval or at least quiet acquiescence"). This is *Twombly*. In short, consciously parallel conduct is insufficient to plead a Sherman Act conspiracy. *See Twombly*, 550 U.S. at 561 n.7; *see also Tawil*, 2023 U.S. Dist. LEXIS 117247, at *3 (rejecting "bald allegation that FINRA acted in concert with hedge funds or others who traded in [MMTLP]"); *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 334 (D. Vt. 2010) (Reiss, J.). Plaintiff's allegations are nothing more than "labels and conclusions" that *Twombly* rejects, *see* 550 U.S. at 555, whether in the form of shopworn references, unidentified "circumstantial evidence" of supposed meetings or social media discussions (at times with nonparties), *e.g.*, Mot. Ex. 3 at 7 n.5, and stereotypes. *See also, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir. 2007).

        **2.**      **Plaintiff Cannot Allege Antitrust Injury**

Just as regulatory conduct of FINRA prevents Plaintiff from alleging causation for securities purposes, he is likewise prevented from alleging antitrust injury. In particular, Plaintiff attempts to blame Defendants for the lost opportunity to sell his shares at a premium that would be effectuated by a short squeeze. He could have sold his shares on December 8, 2022 (but decided not to do so based on price). *See* Mot. Ex. 3 at 18 ¶ 79 (complaining that TDA "refused to accept orders for anything other than a dollar value within approximately 30 to 50 dollars of . . . the lit market trading price"); *see also id.* at 64 ¶ 279 (complaining about the "lost . . . opportunity to sell his 305 shares at prices ranging from $200 to thousands of dollars per share"). What changed? The U3 halt on December 9, implemented by FINRA's UPC, of which the GTS Defendants were

not members.  This cause of Plaintiff's proffered injuries prevents him from alleging antitrust injury.  *E.g.*, *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) ("[T]he federal regulations are the more likely basis for any putative injury, and not any specifically anticompetitive conduct on the part of Equifax.  No cognizable antitrust injury exists where the alleged injury is a byproduct of the regulatory scheme . . . ." (quotation marks omitted)); *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) ("[T]he importation of drugs from Canada is prohibited by federal law.  The absence of competition from Canadian sources . . . , therefore, is caused by the federal statutory and regulatory scheme . . . , not by the conduct of the defendants."); *RSA Media, Inc. v. Media Grp., Inc.*, 260 F.3d 10, 15 (1st Cir. 2001) ("RSA was not excluded from the market for outdoor billboards because of AK's threats; it was excluded because of the Massachusetts regulatory scheme that prevents new billboards from being built.").

Moreover, Plaintiff merely takes issue with conduct that, he alleges, is permitted by FINRA's Rules.  He pleads that the GTS Defendants use "the 'market maker exemption' [to] create shares out of thin air . . . and . . . sell them off," Mot. Ex. 3 at 30 ¶ 149, "without even having to 'locate'" them.  *See id.* ¶ 150; *see id.* (noting that such practice is "allowed" by SEC Rules).  This is hardly a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *See Allen*, 748 F. Supp. 2d at 334 (quotation marks omitted).

### 3.     Plaintiff Fails to Allege a Plausible Market Definition

Plaintiff also fails to adequately allege a plausible market definition, as required.  Plaintiff cannot skirt this requirement through creative pleading.  *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 435 (3d Cir. 2023) ("In this category—which includes purely vertical agreements, as well as hybrid agreements—the 'quick-look' approach is inapt, . . . ."); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 204 (E.D.N.Y. 2023).  Nor does Plaintiff plausibly

allege that the defendants are somehow competitors in any market, where one is a market maker, another a brokerage, and another a regulator. *See Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (Sotomayor, J.) (noting that rule of reason plaintiff must "show that a defendant's conduct exerted an actual adverse effect on competition").

This pleading failure is dispositive. As then-Judge Sotomayor put it, "[c]ases in which dismissal on the pleadings is appropriate frequently involve (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity . . . or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *See id.* at 200 (footnote omitted). Echoing the first comment, a single ticker market is problematic. *E.g.*, *id.* at 191 n.3 (collecting cases); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117–18 (3d Cir. 1980) (rejecting product market limited to Texaco-branded gasoline); *Kalmanovitz v. G. Heileman Brewing Co.*, 576 F. Supp. 922, 928 (D. Del. 1983) (collecting cases, and holding that stock of single issuer "cannot constitute a relevant market for Section 2 purposes"), *aff'd*, 769 F.2d 152 (3d Cir. 1985). Nor does Plaintiff allege why any market definition should be limited to MMTLP. *See Todd*, 275 F.3d at 200. His own allegations undercut the notion. *E.g.*, Mot. Ex. 3 at 19 ¶ 88 ("[M]MTLP shareholders with settled positions as of 12 December 2022 would now receive one share of NBH per share of MMTLP."). In other words, MMTLP is and was a functional substitute for NBH and thus, the two tickers, at the very least, must be included in any plausible market definition. *See Todd*, 275 F.3d at 200–01; *see also Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577–78 (S.D.N.Y. 2011); *Allen*, 748 F. Supp. 2d at 337 (noting relevance of allegations as to substitute products at pleading stage).

### D. Any Claims Against Defendant Rubenstein Should Be Rejected

The Court should also reject Plaintiff's attempts to plead claims against Mr. Rubenstein. Plaintiff was advised four months ago that he "failed to properly serve" Mr. Rubenstein with his pleading, filed in July 2024. *See* Dkt. No. 18 at 14–15; *see also* Dkt. No. 74 at 5. Instead of serving Mr. Rubenstein thereafter, Plaintiff did nothing. The time limit for service has now expired, and no cause exists to extend the deadline. *See* Fed. R. Civ. P. 4(m).

### CONCLUSION

For the foregoing reasons, the GTS Defendants respectfully request the entry of an Order denying Plaintiff leave to file his proposed amended complaint and providing any further relief to the GTS Defendants that the Court deems just and proper.

Dated: December 23, 2024

Respectfully submitted,

/s/ Jonathan R. Voegele
Aaron Morris
Jonathan R. Voegele
MORRIS KANDINOV LLP
4915 Mountain Rd.
Stowe, VT 05672
Tel.: 332-910-5229
aaron@moka.law
jonathan@moka.law

Christopher J. Barber
Stephen A. Fraser
WILLIAMS BARBER & MOREL LTD.
233 S. Wacker, Ste. 6800
Chicago, IL 60606
Tel.: 312-443-3200
cjb@williamsbarbermorel.com
saf@williamsbarbermorel.com

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically today via the Court's CM/ECF Electronic Filing System. A Notice of Electronic Filing will be sent by e-mail to all parties via operation of the Court's CM/ECF Electronic Filing System or by mail to anyone unable to accept electronic filing as indicated on the Notice.

Dated: December 23, 2024                                   /s/ Jonathan R. Voegele