UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 JUN 30 PM 2:40

CLERK

BY_____
DEPUTY CLERK

SCOTT TRAUDT,                                    )
                                                 )
            Plaintiff,                           )
                                                 )
    v.                                           )        Case No. 2:24-cv-782
                                                 )
ARI RUBENSTEIN,                                  )
GTS SECURITIES LLC,                              )
GTS EQUITY PARTNERS LLC,                         )
GTS EXECUTION SERVICES LLC,                      )
CHARLES W. SCHWAB AND CO. INC.,                  )
SCHWAB HOLDINGS, INC.,                           )
FINANCIAL INDUSTRY REGULATORY                    )
AUTHORITY                                        )
            Defendants.                          )

**ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND
AMENDED COMPLAINT**
(Doc. 112)

On December 9, 2024, Plaintiff Scott Traudt filed a motion for leave to file a
Second Amended Complaint ("SAC") adding claims against the Financial Industry
Regulatory Authority ("FINRA") for violations of the Securities and Exchange Act of
1934 (the "Exchange Act"), 15 U.S.C. § 78j, the Sherman Act, 15 U.S.C. §15, and the
Ninth Amendment of the United States Constitution, as well as declaratory judgment and
injunctive relief deeming FINRA's existence unconstitutional; against Ari Rubenstein,
GTS Securities LLC, GTS Equity Partners LLC, and GTS Execution Services LLC
(collectively, Mr. Rubenstein and "the GTS Defendants") for alleged violations of the
Exchange Act, the Sherman Act, and the Vermont Uniform Securities Act, 9 V.S.A.
5501; against Schwab and Co. Inc. and Schwab Holdings, Inc. ("Schwab") for alleged
violations of the Exchange Act and Sherman Act; and against the United States for
declaratory and injunctive relief deeming the Private Securities Litigation Reform Act
("PSLRA") unconstitutional. (Doc. 112.)

Plaintiff is self-represented. The GTS Defendants and Mr. Rubenstein are represented by Christopher J. Barber, Esq., Jonathan D. Miller, Esq., Jonathan R. Voegele, Esq., and Stephen A. Fraser, Esq. FINRA is represented by John P. Mitchell, Esq., Matthew S. Borick, Esq., and Walter E. Judge, Jr., Esq. Schwab is represented by Anne B. Rosenblum, Esq., Jeff Goldman, Esq., Justin B. Barnard, Esq., and Luis Felipe Escobedo, Esq.

## I.      Procedural History.

On July 23, 2024, Plaintiff filed his First Amended Complaint against the GTS Defendants, Mr. Rubenstein, Schwab, and FINRA seeking damages for alleged violations of the Exchange Act, Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and Vermont Uniform Securities Act, 9 V.S.A. § 5605. (Doc. 4.) Schwab moved to stay and compel arbitration, and the court granted its motion on December 16, 2024. (Doc. 113.) On November 19, 2024, the court dismissed Plaintiff's claims against the non-Schwab defendants because Plaintiff abandoned them. (Doc. 103.) The court granted Plaintiff twenty days from the date of the court's order to file a motion for leave to amend that complies with Local Rule 15.

Plaintiff filed the pending motion on December 9, 2024. (Doc. 112.) Mr. Rubenstein and the GTS Defendants opposed the motion on December 23, 2024, (Doc. 116), and FINRA filed its opposition on January 13, 2025, (Doc. 123). Plaintiff filed his reply to Mr. Rubenstein and the GTS Defendants on January 16, 2025, (Doc. 125), and to FINRA on February 14, 2025, (Doc. 132), at which point the court took his motion under advisement.

## II.      Allegations in the Second Amended Complaint.[1]

The GTS Defendants are a market maker in the New York Stock Exchange, and Mr. Rubenstein is their CEO. Schwab is a broker-dealer that merged with TD Ameritrade

---

[1] The SAC is comprised of seventy-six pages and 324 paragraphs. It contains factual allegations, legal arguments, and citations, and appears to include extraneous information inconsistent with Fed. R. Civ. P. 8's requirement of a short and plain statement. The court summarizes only the

2:24-cv-00782-cr    Document 149    Filed 06/30/25    Page 3 of 22

in 2023. FINRA is a self-regulatory organization charged with regulating the U.S.
securities markets.

On December 14, 2020, Torchlight Energy Resources Inc. ("Torchlight"), a
Texas-based oil exploration company, initialized its merger with Meta Materials Inc.
("Meta"), a Canada-based technology company. From January to June 2021, Torchlight
traded 3.6 billion shares in U.S. securities markets. On May 5, 2021, Torchlight issued a
proxy statement indicating that it would declare a dividend of Series A Preferred Stock
that was not expected to be listed on a securities exchange. The SAC alleges that in June
2021, the GTS Defendants, under the direction of Mr. Rubenstein, and a Canadian market
maker "jointly filed paperwork without [Meta] []or [Torchlight] executives' permission"
to enable this Series A Preferred Stock to be traded on NASDAQ's over-the-counter
("OTC") market. (Doc. 112-3 at 4, ¶ 14.) The SAC contends that, in doing so, the GTS
Defendants and the Canadian market maker, who is not a defendant in this case, "used 10
year old dated information in derogation of FINRA rules and submitted falsified" forms
"knowing [that doing so] would harm investors[.]" *Id.* at 5, ¶ 15. This Series A Preferred
Stock became a security called MMTLP.

According to the SAC, Mr. Rubenstein "conspired with" an employee at Schwab
to "allow for certain traders using Schwab to begin naked shorting" MMTLP beginning
in July of 2021 before MMTLP "exist[ed] legally for trading[.]" *Id.* at 7, ¶ 28. MMTLP
began trading on the OTC market on October 6, 2021. The SAC alleges that the GTS
Defendants and Mr. Rubenstein "sold naked shorts" of MMTLP "using the market maker
exception" and that "*there is no evidence available that they ever did a FINRA mandated*

relevant factual allegations in this opinion. *See Lang v. Clinton*, 761 F. Supp. 3d 595, 600
(W.D.N.Y. 2024) ("The statement should be short because [u]necessary prolixity in a pleading
places an unjustified burden on the court and the party who must respond to it because they are
forced to ferret out the relevant material from a mass of verbiage.") (internal quotation marks
omitted) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)); *see also Norton-
Griffiths v. Wells Fargo Home Mortg.*, 2011 WL 884456, at *6 (D. Vt. Mar. 11, 2011) (ordering
plaintiffs "to omit from their proposed Amended Complaint any legal arguments and
questions"); Doc. 142 (order warning "Plaintiff for the second time of the risk of excessive
filings that are duplicative, cumulative, or unauthorized by the applicable rules").

3

'locate' of those shares at any time whatsoever to legally []place them into the stream of securities commerce[.]" *Id.* at 9, ¶ 34 (emphasis in original). The SAC further asserts that the GTS Defendants and Mr. Rubenstein failed to comply with SEC rules requiring market makers to "maintain proper controls to prevent trading practices that could harm market integrity" and "collect and review sufficient information about the securities they create markets for" so that "quotations they publish are not fraudulent or misleading." *Id.* at 11, ¶ 42-43.

Between October 1, 2022 and December 8, 2022, the price of MMTLP fluctuated significantly, "with prices ranging from a low of $2.85 to a high of $12.50[,]" and MMTLP was placed on a list of securities with high levels of fails-to-deliver activity. (Doc. 112-3 at 16, ¶ 62.) According to the SAC, the "algorithmic trading facilitated by [the] GTS [Defendants and Mr. Rubenstein]" had, while MMTLP was still trading, "systematically destroy[ed] MMTLP's share price by supplying naked shorts[,]" with "a nod of approval or at least quiet acquiescence from . . . Schwab," and "utterly eviscerate[d] the possibility of a 'short squeeze' in MMTLP." *Id.* at 20, ¶ 93. The SAC claims that, based on online surveys, "MMTLP was oversold by at least 400 million shares[.]" *Id.* at 13, ¶ 47.

Plaintiff purchased 305 shares of MMTLP at $9.62 per share on November 30, 2022 for a total of $2,934.95. The SAC alleges that, between November 30, 2022 and December 8, 2022, Plaintiff attempted to sell his MMTLP shares on online trading platform TD Ameritrade but the "online trading system refused to accept orders for anything other than a dollar value within approximately 30 to 50 dollars of whatever the lit market trading price was that day" and TD Ameritrade "barred" Plaintiff from selling his shares "at prices that were being accepted as orders from other broker-dealers[.]" *Id.* at 18, ¶ 79-80.

The SAC alleges that, on December 6, 2022, FINRA "issued an intentionally erroneous" corporate action notice regarding MMTLP stating that shares would be "canceled" on December 13, 2022. *Id.* at 19, ¶ 87. On the afternoon of December 8, 2022, FINRA placed a "'caveat emptor' notice on MMTLP stock[.]" *Id.* at 21, ¶ 101. On

December 9, 2022, FINRA issued a U3 trading halt to stop trading of MMTLP. The U3 trading halt left "65,000 shareholders holding long positions [with] no ability to sell[,]" according to the SAC (Doc. 112-3 at 21, ¶ 101.) The SAC contends that Schwab had advance notice of the U3 halt but did not share this information with customers. It further contends that the trade halt occurred "without notice to retail investors" but "with plenty of notice to corporate, hedge, market makers, and 'whale' investors[.]" *Id.* at 22, ¶ 105.

According to the SAC, the GTS Defendants and Mr. Rubenstein "affect[ed] a series of transactions in MMTLP securities that was designed to create oversold conditions in MMTLP securities[,]" and Plaintiff would "never have bought MMTLP shares had these behind the scenes machinations" been known to him. *Id.* at 61, ¶¶ 266-267 (emphasis omitted). The SAC claims that the GTS Defendants "routinely close[] out [their] books for each reporting year by having billion dollars in total securities sold but not yet bought." *Id.* at 9, ¶ 35. The SAC also alleges that Defendants, "acting as a monopoly, manipulated the price of MMTLP shares by artificially inflating the price to $12.26 on [November 22, 2022], then flooding the market with counterfeit shares to depress the price[,]" causing Plaintiff to "los[e] the opportunity to sell his 305 shares at prices ranging from $200 to thousands of dollars per share." *Id.* at 63-64, ¶¶ 274, 279.

The SAC alleges that FINRA "colluded with market makers and brokers to artificially control the price of MMTLP and allowed naked synthetic short shares to enter the market[,]" even though it "knew there were problems with MMTLP shorts from at least October 2021[.]" (Doc. 112-3 at 55, ¶ 238.) It claims that "almost 22% of the float of MMTLP" had been issued to several members of the committee that implemented the U3 halt, creating a conflict of interest. *Id.* at 36, ¶ 170.

Amid concerns from investors and members of Congress in the aftermath of the U3 halt, "FINRA purposely misle[]d the public and Congress about the reasons for the U3 halt . . . by stating it was due to an 'extraordinary event' and 'uncertainty in the settlement process'" even though bluesheets showed that MMTLP had been "horrifically oversold" and "had short positions at a staggering level[,]" according to the SAC. *Id.* at 25, ¶ 120. The SAC points to a letter sent by FINRA's president to Congressman Ralph

Norman which, the SAC contends, falsely represented that FINRA did not provide advance notice of the trading halt to broker-dealers, hedge funds, or other market participants.

The SAC claims that, when Plaintiff called TD Ameritrade's account services number and asked an employee about the MMTLP halt, the employee told him that the halt occurred "because the share price bore no relation to the actual share value" and because "*we had to protect ourselves*[.]" *Id.* at 28-29, ¶ 139-140 (internal quotation marks omitted) (emphasis in original). As a proximate cause of the trading halt, the SAC alleges, Plaintiff was harmed and seeks more than $75,000 in damages.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Under Federal Rule of Civil Procedure 15, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has held a "district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003). "Amendment is futile where the problems with the complaint's claims are substantive and not the result of inartful pleading," *Biswas v. Rouen*, 808 F. App'x 53, 55 (2d Cir. 2020) (internal quotation marks and alterations omitted), such as when the amended complaint "could not withstand a motion to dismiss." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 165 (2d Cir. 2015) (internal quotation marks omitted). Local Rule 15(a) requires that a motion to amend a filing include a red-lined version of the proposed amendment clearly designating additions and deletions. D. Vt. L.R. 15(a)(1).

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

6

relief that is plausible on its face.'"[2] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

Filings by self-represented parties are "to be liberally construed" to raise the strongest arguments they suggest. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation and internal quotation marks omitted); *see also Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (per curiam) (instructing a reviewing court to afford "special solicitude" to self-represented litigants). "Nonetheless, while 'lenity . . . must attend the review of *pro se* pleadings[,]' self-represented litigants must satisfy the plausibility standard set forth in *Iqbal* and *Twombly* and Federal Rule of Civil Procedure 12(b)(6)." *Saltis v. NuVasive, Inc.*, 2020 WL 4689787, at *2 (D. Vt. Mar. 13, 2020) (quoting *Harris v. Mills*, 572 F.3d

---

[2] On March 21, 2025, the court granted Plaintiff's motion to supplement his reply to FINRA with new evidence. (Doc. 142.) Because the new evidence submitted by Plaintiff does not appear in the SAC, it does not affect the court's consideration of the pending motion.

66, 68 (2d Cir. 2009)).

### B.    Whether the SAC was Procedurally Deficient.

In its November 19, 2024 order, the court directed Plaintiff to "file a motion for leave to amend that complies with Local Rule 15." (Doc. 103.) FINRA argues that Plaintiff's motion for leave to amend should be denied because it does not comply with Local Civil Rule 15(a)(1)'s requirement that a motion to amend a filing must include "a redlined version of the proposed amendment clearly designating additions and deletions[.]" According to FINRA, Plaintiff submitted two documents, one purporting to show additions to the First Amended Complaint and the other purporting to show deletions, and a non-redline copy "contain[ing] allegations not identified in either of the purported redlines." (Doc. 123 at 4.)

Because Plaintiff is self-represented and appears to have made a good-faith effort to comply with Local Civil Rule 15, the court excuses his partial non-compliance. For the purposes of deciding this motion, the court relies on the non-redline copy of the SAC. (Doc. 112-3.)

### C.    Whether FINRA is Immune to Claims for Damages.

Counts I through IV of the SAC seek monetary damages against FINRA for its alleged violation of securities laws. FINRA argues that these claims are barred by FINRA's regulatory immunity.

It is well-settled in the Second Circuit that "[a]s an SRO, FINRA and its officers 'are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities.'" *Xu v. Fin. Indus. Regul. Auth. Inc.*, 503 F. App'x 7, 8 (2d Cir. 2012) (summary order) (quoting *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011)); *see Santos-Buch v. Fin. Indus. Regul. Auth. Inc.*, 591 F. App'x 32, 34 (2d Cir. 2015) (summary order) ("Because all of the relevant conduct by FINRA . . . was undertaken in furtherance of its regulatory responsibilities as an SRO, it is immune from [the plaintiff's] claims for damages."). "This immunity extends both to affirmative acts as well as to an SRO's omissions or failure to act." *Standard Inv. Chartered, Inc.*, 637 F.3d at 115. Because it is

8

absolute, "the immunity depends only on whether specific acts and forbearances were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 98 (2d Cir. 2007) (emphasis omitted); *see Xu*, 503 F. App'x at 9 (2d Cir. 2012) (holding that there is no "bad faith" exception to absolute immunity for SROs).

The SAC alleges that FINRA facilitated insider trading by disseminating blue sheet information not available to the general public for the benefit of certain parties on "the UPC Board that halted MMTLP trading"; "colluded with market makers and brokers to artificially control the price of MMTLP" and allow the injection of "synthetic shares" into the market; allowed market makers to "create and conceal naked short positions"; failed to enforce transparency rules; arbitrarily decided to halt trading of MMTLP; and misled the public and Congress about its decision to do so. (Doc. 112-3 at 54, ¶ 234, 55, ¶ 238, 56, ¶ 241.) These actions relate to FINRA's decision to halt MMTLP trading and alleged facilitation of misconduct by market makers and brokers and thus are incident to FINRA's power to regulate the securities market. See *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 454 (S.D.N.Y. 2013) ("The capacity to suspend trading, irrespective of the identity of the decision-maker or the presence of an official SEC rule, is a quintessentially regulatory function."); *Fiero v. Fin. Indus. Regul. Auth., Inc.*, 660 F.3d 569, 571 (2d Cir. 2011) (noting FINRA's responsibility for regulating securities firms that do business with the public).

Plaintiff acknowledges that FINRA is "charged with regulating the . . . markets upon which MMTLP traded" and does not meaningfully dispute that FINRA's actions alleged in the SAC fell within the scope of this regulatory function but argues that FINRA should not have regulatory power in the first instance and thus asks this court to rule that they are unconstitutional. (Doc. 132 at 5.) Courts have held that FINRA was immune from claims based on allegations very similar to those in this case.[3]

---

[3] *See, e.g., Park v. Fin. Indus. Regul. Auth., Inc.*, 2023 WL 11795601, at *1, *6 (N.D. Ga. Sept. 25, 2023) (holding that "FINRA's decision to halt trading of MMTLP securities in advance of the initially announced trading deadline" arose from its performance of regulatory duties); *Tawil*

Because FINRA's alleged misconduct arises from its actions in regulating and overseeing the securities market, FINRA has absolute immunity from Plaintiff's claims for damages. The court therefore DENIES Plaintiff's motion for leave to amend as to Counts I through IV of the SAC because amendment would be futile.

### D.    Whether the SAC States a Claim Against FINRA for Declaratory and Injunctive Relief Based on Alleged Constitutional Violations.

In addition to monetary damages, Plaintiff seeks declaratory and injunctive relief based on his assertion that FINRA's authority to regulate the securities industry is unconstitutional (Count V). Specifically, the SAC contends that FINRA's "wide-ranging exercise of executive or administrative power" violates Articles I and II of the U.S. Constitution because it is an improper exercise of executive power, unconstitutional appointment of a principal officer of the United States, and unconstitutional delegation of legislative power. (Doc. 112-3 at 58.) In Count XV, the SAC also claims that FINRA's decision to implement the U3 halt violated Plaintiff's "[Ninth] Amendment right to economic liberty[.]" (Doc. 112-3 at 73, ¶ 317.)

Requests for declaratory and injunctive relief do not, by themselves, give rise to a cause of action. *See Spectre Air Cap., LLC v. WWTAI AirOpCo II DAC*, 737 F. Supp. 3d 195, 210 (S.D.N.Y. June 17, 2024); *Manrique v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 5745717, at *8 (S.D.N.Y. Dec. 2, 2021) ("Declaratory judgments and injunctions are remedies, not causes of action.") (quoting *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406-07 (S.D.N.Y. 2010)). In this case, the SAC cites no independent cause of action for Count V of the SAC. The "jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution[,]" *Bell v. Hood*, 327 U.S. 678, 684 (1946), is also

---

*v. Fin. Indus. Regul. Auth., Inc.*, 2023 WL 4353179, at *1 (N.D. Fla. May 24, 2023) ("A claim that FINRA got it wrong — that trading should not have been suspended — is precisely the kind of claim from which FINRA should and does have immunity."); *Hofman v. Fid., Brokerage Servs., LLC*, 2023 WL 3872564, at *6 (C.D. Cal. May 8, 2023) (finding, where plaintiff alleged that FINRA "illegally permitted trading of Meta Materials securities" and "conspired to facilitate fraud by nonparties in the securities market," that FINRA was immune from suit because these actions were "appropriately characterized as misconduct . . . in its regulation and oversight of the securities markets").

not an independent claim.

"Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) (internal quotation marks omitted) (quoting *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-96 (2d Cir.1991)). Courts in the Second Circuit have held that FINRA and its predecessor, the National Association of Securities Dealers ("NASD"), are not state actors for purposes of satisfying the requirement for state action. *See, e.g., Santos-Buch v. Fin. Indus. Regul. Auth., Inc.*, 32 F. Supp. 3d 475, 484 (S.D.N.Y. 2014) (finding that FINRA "is not engaged in state action because it receives no federal funding, is a private corporation, and its Board of Governors and Board of Directors are not required to be government officials or appointed by government officials"); *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 138-39 (2d Cir. 2002) (noting "the clear and unambiguous precedent in this Circuit holding that NASD is a private actor").

Plaintiff cites a recent case in which the D.C. Circuit granted a preliminary injunction against FINRA and found the plaintiff was likely to succeed in its argument that FINRA's actions were unconstitutional because they violated the private nondelegation doctrine. *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Circ. 2024). That case is not binding and is distinguishable because the "opinion is limited to expulsion orders issued in expedited proceedings." *Id.* at 1330. The court recognized that, even if "FINRA is ultimately found to be wearing a government hat when it expels members," it "is not a government agency[.]" *Id.* at 1336.

Because FINRA is not a state actor, the SAC fails to state a claim for a violation of the U.S. Constitution. As a result, the court DENIES Plaintiff's motion for leave to amend as to Counts V and XV[4] because amendment would be futile. *See Blackbook Cap.*

---

[4] Plaintiff's proposed Count XV, which claims that FINRA violated his economic liberty rights under the Ninth Amendment, is also futile because "[t]he Ninth Amendment is not an independent source of individual rights; rather, it provides a 'rule of construction' that [courts]

11

*Inc. v. Fin. Indus. Regul. Auth., Inc.*, 2020 WL 4581811, at \*5 (D.N.J. Aug. 10, 2020) (granting motion to dismiss because "FINRA is a private entity" and "[p]laintiffs, therefore, cannot bring their constitutional claims against FINRA"); *see also Mohlman v. Fin. Indus. Regul. Auth., Inc.*, 2020 WL 905269, at \*6 (S.D. Ohio Feb. 25, 2020) (dismissing claim against FINRA under the Ohio state constitution "because FINRA and its employees are not 'state actors'").

## E.    Whether the SAC States a Claim Against the GTS Defendants and Mr. Rubenstein for Market Manipulation.

Count VI of the SAC claims the GTS Defendants and Mr. Rubenstein engaged in market manipulation in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 by placing synthetic shares of MMTLP into the market and engaging in "a predatory trading strategy" that "artificially affected the prices of MMTLP[.]" (Doc. 112-3, 61, ¶ 266.) According to the SAC, Plaintiff "suffered damages in that he held his shares in MMTLP only to have them wiped out" by the U3 halt, and he "would never have bought MMTLP shares" had he known about this alleged market manipulation. *Id.* at 61, ¶ 267.

To state a claim for market manipulation under Section 10(b) of the Exchange Act, *see* 15 U.S.C. § 78j(b), and Rule 10b-5, *see* 17 C.F.R. § 240.10b-5(b), a plaintiff must "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). A claim for market manipulation must be pled with particularity pursuant to Fed. R. Civ. Proc. 9(b). *Id.* This standard is met "when the complaint alleges 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d

---

apply in certain cases." *Jenkins v. Comm'r of IRS*, 483 F.3d 90, 92 (2d Cir. 2007) (quoting *United States v. Bifield*, 702 F.2d 342, 349 (2d Cir.1983)).

100, 116 (S.D.N.Y. 2018) (quoting *ATSI*, 493 F.3d at 102). Additionally, "the complaint must plead with particular[ity] facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities." *ATSI*, 493 F.3d at 102 (citing 15 U.S.C. § 78u-4(b)(2)).

The crux of Plaintiff's allegations is that the GTS Defendants manipulated the price of MMTLP by short selling.[5] In a recent case where the complaint alleged that the defendants manipulated the price of shares by short selling shares without locating or borrowing them, failing to deliver shares on the settlement date, and injecting fictious shares into the market, the court found that the plaintiff failed to state a claim because the complaint made only "conclusory allegations that the [s]hort [s]elling [d]efendants failed to deliver stock . . . [w]ithout any specific factual allegation that any [d]efendant failed to deliver shares following a short sale[.]" *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, 585 F. Supp. 3d 405, 422 (S.D.N.Y. 2022). The court also found that alleging that the relevant shares had a "high turnover rate" and "high percentage of short sales" did not "support any inference that there was fraudulent or reckless intent because short selling, even some naked short selling, is legal." *Id.* at 423.

Similarly, the SAC broadly alleges that the GTS Defendants and Mr. Rubenstein manipulated the market by creating approximately "one billion naked synthetic shares" and "overselling [] 700 million shares of MMTLP to broker-dealers[,]" but fails to identify any specific instance of a defendant selling shares and failing to deliver them to him. (Doc. 112-3 at 61, ¶ 266.) The SAC, instead, merely generally alleges that the GTS Defendants "by and through the direction of [Mr.] Rubenstein distributed naked short

---

[5] The SAC also accuses the GTS Defendants and Mr. Rubenstein of a practice called "spoofing[,]" which it defines as "the illegal practice of placing orders to buy or sell securities with the intent to cancel them before execution, to manipulate the market." Doc. 112-3 at 34, ¶ 166 n.26. Many of these allegations, however, have nothing to do with MMTLP and relate instead to a separate lawsuit in which the GTS Defendants were accused of spoofing a different security. The SAC only alleges that the GTS Defendants and Mr. Rubenstein "*may* have taken part in 'spoofing operations' to drive the MMTLP share price to its peak[.]" *Id.* at 33, ¶ 164 (emphasis added). This conclusory allegation of *potential* misconduct is insufficient to state a market manipulation claim with particularity based on speculation that spoofing may have occurred.

shares that were fictional and never located[,]" that MMTLP had a high fails-to-deliver rate, and that the GTS Defendants "ha[ve] never done locates for any of the shares [they] naked shorted[.]" *Id.* at 39, ¶ 181, 62, ¶ 271. These "broad and conclusory allegations of naked short selling do not state a claim for market manipulation." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424-25 (S.D.N.Y. 2010) (finding plaintiffs' "general allegation that naked short selling resulted in the creation of 'phantom shares' that artificially depressed the price of [security]" insufficient to state claim and noting "the SEC [has] expressly rejected the theory that naked short sales create 'phantom' or 'counterfeit' shares").

For the reasons stated above, the SAC fails to state a claim for market manipulation against the GTS Defendants and Mr. Rubenstein under Fed. R. Civ. P. 12(b)(6), and the court DENIES Plaintiff's motion for leave to amend as to Count VI of the SAC, as amendment would be futile.

### F.    Whether the SAC States a Claim Against the GTS Defendants and Mr. Rubenstein for Fraud Under Vermont Law.

Count VII of the SAC alleges that the GTS Defendants and Mr. Rubenstein committed fraud under Vermont's Uniform Securities Act, which is titled "General Fraud" and provides that "[i]t is unlawful for a person, in connection with the offer to sell, the offer to purchase, the sale, or the purchase of a security, directly or indirectly:"

> (1) to employ a device, scheme, or artifice to defraud;
>
> (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

9 V.S.A. § 5501. A plaintiff alleging fraud "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

> In essence, Rule 9(b) places two further burdens on fraud plaintiffs—the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state. As to the first, we have held that the complaint must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where

14

> and when the statements (or omissions) were made, and (4) explain why the
> statements (or omissions) are fraudulent. As to the second, though mental
> states may be pleaded "generally," Plaintiffs must nonetheless allege facts
> that give rise to a strong inference of fraudulent intent.

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir.
2015) (internal quotation marks and citations omitted). "[W]hile Rule 9(b) permits
scienter to be demonstrated by inference, this must not be mistaken for license to base
claims of fraud on speculation and conclusory allegations. An ample factual basis must
be supplied to support the charges." *Golrick v. Nationstar Mortgage, LLC*, 2025 WL
700265, at *5 (D. Vt. Jan. 31, 2025) (internal quotation marks omitted) (alteration in
original) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir.
1991)). A plaintiff must allege sufficient facts to demonstrate "the time, place, speaker
and sometimes even the content of the alleged misrepresentation." *Aetna Cas. & Sur. Co.
v. Aniero Concrete Co.*, 404 F.3d 566, 579 (2d Cir. 2005) (internal quotation marks
omitted).

In this case, the SAC does not plead any specific statements or omissions by GTS
Defendants or Mr. Rubenstein that Plaintiff contends are fraudulent. It only alleges in a
conclusory manner that they "knowingly or recklessly injected into the market false and
misleading information concerning the origins, supply, and market durability of MMTLP
shares that appeared available for trading." (Doc. 112-3 at 62, ¶ 270.) The SAC further
alleges that the GTS Defendants "submitted falsified Form 211[]s in order to make what
would become MMTLP tradable[,]" but does not identify the false information. *Id.* at 5, ¶
15. The SAC, therefore, does not plead fraud with particularity as required by Rule 9(b),
and the court DENIES Plaintiff's motion for leave to file an SAC that contains a factually
deficient claim. *See Sutton v. Vt. Regional Ctr.*, 2019 VT 71A, ¶ 73, 212 Vt. 612, 238
A.3d 608, 636 (affirming dismissal of plaintiffs' claim under Vermont Uniform
Securities Act because it failed to plead fraud with particularity).

### G.    Whether the SAC States a Claim Against the GTS Defendants and Mr. Rubenstein for Violating the Sherman Act.

Count VIII of the SAC alleges that GTS Defendants and Mr. Rubenstein

15

committed antitrust violations under the Sherman Act. According to the SAC, the GTS
Defendants, Mr. Rubenstein, Schwab, and FINRA, "acting as a monopoly, manipulated
the price of MMTLP shares by artificially inflating the price to $12.26 on [November 22,
2022], then flooding the market with counterfeit shares to depress the price." (Doc. 112-3
at 63, ¶ 274.) As a result, Plaintiff alleges he "lost the opportunity to sell his 305 shares at
prices ranging from $200 to thousands of dollars per share." *Id.* at 64, ¶ 279.

Section One of the Sherman Act provides that "[e]very contract, combination in
the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the
several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "To
survive a motion to dismiss, a Sherman Act claim must '(1) define the relevant
geographic market, (2) allege an antitrust injury, and (3) allege conduct in violation of
antitrust laws.'" *Concord Assocs., L.P. v. Ent. Prop. Trust*, 817 F.3d 46, 52 (2d. Cir.
2016) (quoting *New York Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140,
145 (S.D.N.Y.2006)).

> For antitrust purposes, the concept of a market has two components: a
> product market and a geographic market. A relevant product market
> consists of products that have reasonable interchangeability for the
> purposes for which they are produced—price, use and qualities considered.
> By contrast, the geographic market analysis seeks to identify the precise
> geographic boundaries of effective competition in order to reach a more
> informed conclusion on potential harm to the market. Courts generally
> measure a market's geographic scope, the area of effective competition, by
> determining the areas in which the seller operates and where consumers can
> turn, as a practical matter, for supply of the relevant product.

*Id.* (citations and internal quotation marks omitted). A geographic market "consists
of an area where sellers, 'if unified by a hypothetical cartel or merger, *could profitably
raise prices* significantly above the competitive level.'" *Id.* (emphasis in original)
(quoting *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 228 (2d Cir.1999)).

To determine whether a plaintiff has alleged an antitrust injury, the court
undertakes a three-step process:

> (1) the plaintiff "must 'identify[ ] the practice complained of and the
> reasons such a practice is or might be anticompetitive'"; then (2) the court

16

must "identify the 'actual injury the plaintiff alleges'" by "look[ing] to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of defendant's conduct"; and finally, (3) the court compares the "'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.'"

*Bookends & Beginnings LLC v. Amazon.com, Inc.*, 2022 WL 18144916, at *14 (S.D.N.Y. Aug. 24, 2022) (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013)).

Plaintiff has not identified a geographic or product market for his antitrust claims. Insofar as it can be inferred from the SAC that the relevant market consists of MMTLP stock, other courts have rejected Sherman Act claims where the relevant market consisted of transactions in a single issuer's stock. *Kalmanovitz v. G. Heileman Brewing Co.*, Inc., 769 F.2d 152, 157 (3d Cir. 1985) (holding that § 1 of the Sherman Act did not apply to claim based on "fixing the price of a single issuer's shares in a tender offer"); *Finnegan v. Campeau Corp.*, 722 F. Supp. 1114, 1115-17 (S.D.N.Y. 1989) (holding that allegations of price fixing between rival bidders for stock of a single company did not state Sherman Act Claim).

Even if the SAC sufficiently alleged a product and geographic market, it fails to allege an antitrust injury. The SAC contends that the GTS Defendants' and Schwab's alleged manipulation of "share prices and trading activity," harmed Plaintiff because he "lost the opportunity to sell his 305 shares at prices ranging from $200 to thousands of dollars per share[,]" which Plaintiff claims was the "fair market value" of the shares before the trading halt. (Doc. 112-3 at 63, ¶ 276, 64, ¶¶ 277, 279.) "[T]o survive a motion to dismiss, 'an antitrust plaintiff must allege not only cognizable harm to h[im]self, but an adverse effect on competition market-wide.'" *Giordano v. Saks & Co. LLC*, 2025 WL 799270, at *3 (2d Cir. Mar 13, 2025) (summary order) (alteration adopted) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001)). The SAC does not plausibly allege causation or antitrust injury. Plaintiff's alleged loss of opportunity appears to be unrelated to the GTS Defendants' and Mr. Rubenstein's alleged anticompetitive conduct for an unspecified product in an unspecified geographic market. The SAC alleges these

17

Defendants artificially inflated the price of MMTLP to $12.26 per share and then used counterfeit shares to depress the price of MMTLP. But Plaintiff further claims he was injured because he was unable to sell his shares after the price rose to thousands of dollars per share. To the extent Plaintiff contends he was injured by his inability to sell his MMTLP shares after the trading halt, he alleges that FINRA, not the GTS Defendants or Mr. Rubenstein, caused his harm.

Because Plaintiff's proposed Sherman Act claim does not sufficiently allege a product market, geographic market, causation, or antitrust injury, leave to amend would be futile. *See Concord Assoc.*, 817 F.3d at 55 ("Because plaintiffs failed to plead a relevant geographic market in the Amended Complaint, the district court correctly concluded that each of the Sherman Act claims was subject to dismissal."); *Oklahoma Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, 2024 WL 4202680, at *11-12 (S.D.N.Y. Sept. 13, 2024) (finding failure to plead antitrust injury where complaint "does not point to any transaction in which the plaintiff paid too much or received too little when it bought or sold a [government bond] with any of the defendants" and "failed to allege plausibly any episodic price-fixing that affected the plaintiff's own trades"). The court therefore DENIES Plaintiff's motion for leave to amend as to Count VIII.

## H.    Whether to Grant Plaintiff Leave to Amend to Add New Claims Against Schwab.

The SAC proposes several new claims against Schwab (Counts IX, X, and XIII) even though the court has already stayed this action and referred the matter to arbitration regarding claims against Schwab. The court thus DENIES Plaintiff's motion for leave to amend as to counts IX, X, and XIII of the SAC. Plaintiff may present his new claims to the arbitrator.

## I.    Whether the SAC States Constitutional Claims Against the United States.

The SAC attempts to add the United States as a defendant, arguing that the PSLRA is unconstitutional (Count XIV). Although Plaintiff styles this as a single action for declaratory judgment and injunctive relief, the court treats the SAC as pleading four

18

constitutional claims based on the First Amendment, the separation of powers doctrine, and the Fourteenth Amendment rights to equal protection and due process.[6]

### 1.    Whether the SAC States a Separation of Powers Claim.

The PSLRA applies to private securities fraud actions brought under the Exchange Act and requires them to meet certain pleading requirements:

> In pleading scienter in an action for money damages requiring proof of a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

> . . .

> If the plaintiff alleges a false statement or omission, the PSLRA also requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

*ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1), (b)(2)).

The SAC contends that, because the PSLRA "impos[es] judicially enforceable pleading standards that substantially restrict the judiciary's ability to adjudicate securities fraud cases[,]" it violates the separation of powers doctrine. (Doc. 112-3 at 69, ¶ 303.) The Supreme Court, however, has recognized that Congress "has ultimate authority over the Federal Rules of Civil Procedure" and "can create exceptions to an individual rule as it sees fit—either by directly amending the rule or by enacting a separate statute overriding it in certain instances." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010). The SAC's claim that the PSLRA is unconstitutional because it creates an exception to the default rules of pleading in federal courts fails to state a claim. No court has recognized a cause of action on this basis. Fed. R. Civ. P. 12(b)(6).

---

[6] The SAC also references a Fifteenth Amendment violation, which the court assumes is a typographical error.

## 2.    Whether the SAC States a First Amendment Claim.

The SAC alleges that the "PLSRA's stringent pleading requirements" violate the First Amendment "by chilling access to the courts." (Doc. 112-3 at 69, ¶ 305.) "As a threshold matter, a plaintiff must establish standing to state an access to courts claim under the First Amendment by alleging actual injury." *Kelsey v. Rutledge*, 2022 WL 2110436, at *4 (S.D.N.Y. June 10, 2022).

In this case, the SAC does not allege that Plaintiff has been prevented from bringing a meritorious lawsuit or that his access to courts has been chilled in any other way. *Id.* ("Without an allegation that he was prevented from filing a meritorious lawsuit, Plaintiff specifically fails to plausibly allege an actual injury sufficient to state a claim of denial of access to courts."). Nor could it, as Plaintiff is presently litigating his securities fraud claims in federal court and the court has not dismissed any of his claims for failure to satisfy the PSLRA's pleading requirements. *See Gunn v. Doe*, 2020 WL 1140746, at *2 (S.D.N.Y. Mar. 6, 2020) (explaining that "[t]o state a claim for denial of access to the courts, a plaintiff must allege facts showing that the defendant's conduct . . . 'resulted in actual injury to the plaintiff, such as the dismissal of an otherwise meritorious legal claim'") (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)). Plaintiff has therefore failed to allege a First Amendment injury and lacks standing to bring a First Amendment claim based on the alleged unconstitutionality of the PSLRA. *See Keepers, Inc. v. City of Milford*, 807 F.3d 24, 43 (2d Cir. 2015) (finding no First Amendment injury when plaintiff offered no "objective evidence to substantiate [its] claim that the challenged regulation has deterred [it] from engaging in protected activity") (alterations in original) (internal quotation marks and citation omitted).

## 3.    Whether the SAC States an Equal Protection Claim.

The SAC asserts that the PSLRA violates the Equal Protection Clause "[b]y raising the barriers to bringing securities fraud claims," and thus "disproportionately burdening small investors while shielding institutional actors from accountability" and because it "effectively preempt[s] state-law remedies and impos[es] federal standards that favor corporate defendants[,]" and "denies state plaintiffs equal protection under the

law." (Doc. 112-3 at 69-70, ¶¶ 306, 308.) These allegations are unsupported by any facts showing that the PSLRA disadvantages small investors relative to institutional actors or prevents securities plaintiffs from pursuing state law remedies. Even assuming that were the case, "if a law neither burdens a fundamental right nor targets a suspect class, [the court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

In this case, neither small investors nor state court plaintiffs are suspect classes, and there is no fundamental right for plaintiffs to be subject to the least restrictive pleading standard or to bring state law claims that are preempted by federal law. Insofar as the PSLRA's pleading requirements impact plaintiffs differently than defendants, this is a rational distinction because only the plaintiff, by definition, has the initial burden of stating a claim. The SAC thus fails to state an equal protection claim. *See Clementine Co., LLC v. Adams*, 74 F.4th 77, 89-90 (2d Cir. 2023) (affirming dismissal of equal protection claim where the challenged law did not impair fundamental right or target a suspect class and had a rational basis).

### 4.    Whether the SAC States a Procedural Due Process Claim.

According to the SAC, the PSLRA violates Plaintiff's procedural due process rights because the provision of the law that allows for discovery to be stayed while a motion to dismiss is pending, combined with the heightened pleading requirements for securities fraud claims, "effectively den[ies] plaintiffs the opportunity to prove their claims" and thus "deprives plaintiffs of their right to a meaningful opportunity to be heard[.]" (Doc. 112-3 at 70, ¶ 307.) Plaintiff's assertion that he has been denied the opportunity to prove his claims is bereft of factual allegations plausibly supporting that claim and is, in any event, insufficient to plead a procedural due process claim. *See Iqbal*, 556 U.S. at 678 (explaining that "naked assertions devoid of further factual enhancement" are insufficient to state a claim) (internal quotation marks and citation omitted) (alteration adopted); *see also Leise v. Vermont Hum. Comm'n*, 2023 WL 4247768, at *4 (D. Vt. June 29, 2023) ("A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2)

deprivation of that interest without due process.") (internal quotation marks omitted) (quoting *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012)).

Because the SAC fails to state any constitutional claim against the United States, the court DENIES Plaintiff's motion for leave to amend as to Count XIV of the SAC.

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion for leave to file an SAC (Doc. 112).[7] Because Plaintiff has already sought leave to amend, the court does not grant further leave to amend *sua sponte*, especially as amendment may be futile. Plaintiff may nonetheless petition the court for further leave to amend and is directed to follow the court's Local Rules in doing so.[8]

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 30th day of June, 2025.

Christina Reiss, Chief Judge
United States District Court

---

[7] Because Plaintiff's motion for leave to file the SAC is denied in full, the court need not reach FINRA's argument that this court lacks personal jurisdiction over FINRA or the GTS Defendants' and Mr. Rubenstein's argument that Mr. Rubenstein was never properly served.

[8] Plaintiff is advised that "[s]elf-represented status does not relieve parties of the expectation that they will comport themselves civilly when addressing opposing counsel and the court." *Kirk v. Citigroup Glob. Markets Holdings Inc.*, 2025 WL 751381, at *2 (2d Cir. Mar. 10, 2025); *see, e.g.*, Doc. 125 at 7 ("Hogwash. . . . GTS is a beastly, predatory, abusive player in the market. Traudt responds as follows to GTS's quote that Traudt wants "*to turn every MMTLP investor*[] *into a financial insurgent*[]': HELL YEAH! (Really, what options do Americans have?)") (emphasis in original) (footnote omitted).

22